**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD LEWIS,<br><br>                                         Plaintiff,<br><br>          vs.<br><br>THE ROOSEVELT ISLAND OPERATING CORPORATION, THE ROOSEVELT ISLAND OPERATING CORPORATION BOARD OF DIRECTORS, CHARLENE M. INDELICATO, CLAUDIA MCDADE, FRANCES A. WALTON, MARGARET SMITH, HOWARD POLIVY, KATHERINE GRIMM, MICHAEL SHINOZAKI, FAY FREYER CHRISTIAN, DARRYL TOWNS, DAVID KRAUT and MARY BETH LABATE in their official and individual capacities,<br><br>                                         Defendants. | 16-cv-03071(ALC)(SN) |

## DECLARATION OF ANTHONY J. ROTONDI IN SUPPORT OF ATTORNEY'S FEE PETITION *(corrected)*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION...................................................................1

II.  FEES AND COSTS INCURRED IN THIS MATTER................................5

III.  ATTORNEY BACKGROUND AND EXPERIENCE..................................5

    A.  PERSONAL BACKGROUND ...............................................5

    B.  BACKGROUND OF MELANIE L. OXHORN ...............................8

IV.  EVENTS GIVING RISE TO PLAINTIFF'S
CLAIMS...........................................................10

V.  PLAINTIFF'S EFFORTS TO RESOLVE HIS CLAIMS BEFORE FILING THE NOTICE OF CLAIM, THE
EEOC CHARGE, THE EEOC SUPPLEMENTAL CHARGE AND THIS ACTION.............................10

VI.  REPORTS TO THE NEW YORK STATE OFFICE OF THE INSPECTOR GENERAL.....................11

VII. PLAINTIFF'S EFFORTS TO OBTAIN DOCUMENTS THROUGH FOIL...................................11

    A.  PLAINTIFF'S FOIL REQUESTS TO RIOC AND RIOC'S OBSTRUCTIONIST RESPONSES ...11

    B.  PLAINTIFF'S REQUEST FOR AN OPINION FROM THE NEW YORK STATE COMMITTEE
ON OPEN GOVERNMENT AND PURSUANT TO REQUEST FOR OPINION FILED BY PLAINTIFF
11

VIII. PLAINTIFF'S FOIL REQUESTS TO SEVERAL NEW YORK STATE AGENCIES AND
OBSTRUCTIONIST RESPONSES TO SAME......................................................14

    A.  TWO FOIL REQUESTS TO NEW YORK STATE DEPARTMENT OF INVESTIGATIONS .......14

    B.  FOIL REQUESTS TO NEW YORK STATE OFFICE OF GENERAL SERVICES .....................15

    C.  FOIL REQUESTS TO ADDITIONAL NEW YORK STATE HIRING AGENCIES .....................15

IX.  THE FIRST MEDIATION FOLLOWING THE NOTICE OF CLAIM......................................15

X.  THE EEOC PRE-FILING PROCESS...............................................................17

XI.  DEFENDANTS' NOTICE OF 50-H HEARING.......................................................18

XII. THE INITIAL FILINGS IN THE LITIGATION...................................................18

    A.  THE COMPLAINT ...............................................................18

    B.    DEFENDANTS' DUPLICITOUS CONDUCT IN REQUESTING EXTENSIONS OF TIME TO RESPOND TO THE COMPLAINT ................................................................................................19

    C.    DEFENDANTS' MOTION TO STAY DISCOVERY ............................................................20

    D.    DEFENDANTS' MOTION TO DISMISS........................................................................20

XIII. DEFENDANTS' OBSTRUCTIONIST TACTICS DURING DISCOVERY................................21

    A.    DEFENDANTS' FAILURE TO TIMELY SERVE THEIR INITIAL DISCLOSURES.................21

    B.    DISCOVERY SERVED BY PLAINTIFF AND DEFENDANTS' IMPROPER RESPONSES.......22

    C.    DEFENDANTS' GAMESMANSHIP REGARDING THE RFAS ............................................26

XIV. TIME AND LABOR SPENT SCHEDULING AND RESCHEDULING DEPOSITIONS....................26

XV. SECOND ATTEMPT AT MEDIATION AND RIOC'S SUBSTITUTIONS OF COUNSEL....................29

XVI. THE MAGISTRATE JUDGE'S REFUSAL TO HOLD DEFENDANTS ACCOUNTABLE FOR DISCOVERY VIOLATIONS AND THE IMPACT ON TIME AND COSTS..................................................................31

XVII.ADDITIONAL CONSIDERATIONS FOR FEE APPLICATION............................................34

ANTHONY J. ROTONDI, an attorney admitted to practice in the State of New York, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

1.      I am a member of the firm of Rotondi, LLC, attorneys for Plaintiff Donald Lewis ("Plaintiff"). As such, I am fully familiar with the facts and circumstances of this matter, having represented Plaintiff regarding his claims since his unlawful termination on April 24, 2015.

2.      I submit this declaration in support of Plaintiff's FRCP 54 Motion for Attorneys' Fees, Costs, and Expenses and Notice of Taxation of Costs pursuant to (i) the judgment dated May 17, 2017 (Dkt. 171), entered against all Defendants on all claims, which provides that "Defendants shall pay all Plaintiff's reasonable attorneys' fees, costs, and expenses in an amount to be determined by the Court;" (ii) the statutory provisions providing for a prevailing party's recovery of attorney's fees, costs, and expenses as set forth in the Complaint and the Memorandum of Law accompanying this Declaration; and (iii) Plaintiff's separate Bill of Costs pursuant to 28 U.S.C. § 1920. (For the Court's ease of reference, a copy of the Complaint dated April 25, 2016, is annexed hereto as Exhibit A.)

## I.    INTRODUCTION

3.      I am a solo practitioner and was the only attorney representing Plaintiff during the two years that Plaintiff prosecuted his employment discrimination case against Defendants, who consisted of a quasi-government entity and its individual board members and high-ranking executives. I was able to utilize the cost-effective assistance of six law students and two paralegals, whose time I have written off for Plaintiff's fee application.

4.      By contrast, at various stages of this hard-fought litigation—which also included a pre-suit EEOC proceeding—there were upwards of 18 attorneys for Defendants and other parties with aligned interests, with multiple attorneys involved even at the most routine depositions. Those attorneys used the vastly superior resources available to them to delay Plaintiff's prosecution of his claims, avoid producing evidence that he needed to prove his case, and try to pound our side into submission by wearing me down. Defendants were able to employ so many attorneys for this purpose because Defendants' attorneys' fees were covered by, among other things, a $5 million insurance policy and the taxpayer's deep pockets because Defendant

Roosevelt Island Operating Corporation ("RIOC") collects rental lease payments from Roosevelt Island.

5.     Defendants' repeated pattern of delay and obstruction was evident at every phase of the case. This included resistance to even the most fundamental discovery obligations and concealment of evidence regarding the false nature of their purported justification for Plaintiff's unlawful termination.

6.     With respect to the evidence, Defendants proffered various pretextual bases for their conduct that changed repeatedly beginning with the day of Plaintiff's termination and continuing through the day on which the offer of judgment was accepted. For example, in the termination letter Defendant Indelicato claimed that Plaintiff was being terminated "because the Board decided to go in a different direction." (Ex. A at 11-12, ¶ 41.) Plaintiff thereafter confirmed with each Resident Director that he or she did not participate in any termination decision and was not informed of the decision until after it was reached or in some cases even after Plaintiff's termination occurred. This was despite the fact that RIOC's enabling legislation and bylaws stated that only the Board has authority to terminate an executive like Plaintiff. Moreover, the Resident Directors offered and gave Plaintiff a glowing letter of recommendation after his termination praising him for his honesty among other things. (See Declaration of Plaintiff Donald Lewis ("Lewis Decl."), ¶ 8 (referring to letter annexed thereto as Exhibit B.))

7.     In the face of this evidence, RIOC shifted its basis and asserted that Plaintiff was terminated for cause, asserting false claims regarding performance and even maligning his professional competence. When Magistrate Judge Netburn inquired as to the documentary evidence supporting this during a January 23, 2017 conference call, Defendants had to admit that there was none, advising the Court that there were no documents in Plaintiff's personnel file to support their purported "good cause" for termination. When the Court followed up, asking if Defendants intended to prove the existence of good cause for termination "through emails as well as testimony, or just through testimony," Defense Counsel conceded "[m]ore through testimony."

8.     Indeed, as discussed herein, not only did such evidence not exist but Defendants destroyed or at least failed to produce any evidence contrary to their position, including Plaintiff's positive performance evaluations that formed the basis of salary increases shortly

2

before he was terminated. (Excerpts from Dep. Tr. of Defendant McDade, annexed hereto as Exhibit B, at 14:10-19:25; Lewis Decl., ¶ 8.) Having no evidence to support their pretextual assertions regarding Plaintiff's performance, Defendants then attempted at the last minute to claim that he was terminated by Alphonso David, an African-American member of the New York State Governor's Executive Chamber even though that individual lacked authority to do so and had never met Plaintiff or had a one-on-one discussion with him. (Ex. B at 301:21-302:5.)

9.      Defendants also sought to delay the course of the litigation through repeated refusals to comply with their discovery obligations and obligations related to Plaintiff's pre-Complaint requests for information under New York's Freedom of Information Law ("FOIL"), and they engaged in other conduct calculated to increase Plaintiff's time and labor expenditures on this matter. As detailed herein, with respect to the scheduling of depositions, Defendants informed Plaintiff that they would not produce documents only days before depositions, which resulted in the last-minute re-scheduling and cancellation of depositions (including Court-ordered depositions). The scheduling of depositions was further complicated by the fact that RIOC's then-General Counsel insisted on attending each deposition and would not permit depositions to proceed in her absence on dates that she was unavailable. Defendants also refused to respond to any document requests (including requests made through FOIL prior to the commencement of the action as well as those made through post-filing discovery), refused to respond to interrogatories, refused to respond to requests for admission and refused to even serve their initial disclosures. Other tactics included producing only correspondence from Plaintiff's counsel to Defense Counsel or between Plaintiff and Defendants in response to document requests when any production or response finally was made after extensive efforts. In addition, Defense Counsel proposed two sham mediations in their efforts to delay Plaintiff from prosecuting his claims—cancelling the first mediation at the last minute after refusing to allow their clients to participate, and failing to make even a single offer in the second mediation.

10.      In addition, the case had an extremely tight Court-ordered discovery and deposition schedule as a result of both Defendants' failure to provide discovery responses in a timely manner and a series of rulings by the Magistrate Judge against Plaintiff in which she, among other things, refused to compel Defendants' compliance and allowed them to produce documents only days before she ordered depositions to begin. This left Plaintiff approximately

3

three weeks to take 30 depositions between New York City and Albany. Meanwhile, Defendants needed only to take Plaintiff's deposition and were in possession of all of the documents except for those documents evidencing his mitigating damages. Furthermore, RIOC's last-minute changes in counsel caused additional delays and confusion in the proceedings because those changes required me to re-schedule depositions on which I was already prepared to proceed and I once again needed to clear my calendar to accommodate Defendants' cancellation of the entire schedule for the 30 deposition witnesses.

11.     Defendants also took specious and frivolous positions on various issues, including: (a) asserting that any Defendants who were dismissed from the action on the pending motion to dismiss would not be witnesses and thus would be unavailable to be deposed by Plaintiff; and (b) making negative hearsay accusations against Plaintiff about how he handled a certain matter but then refusing to provide any documentary information about it or the manner by which he allegedly mishandled it and asserting that such information was privileged even though their purported selective disclosure had effected a waiver of any such privilege. Additionally, counsel for Defendants and the Executive Chamber witnesses continually shifted the asserted basis for their claim of privilege, initially asserting that certain attorneys were acting in their capacity as attorneys and then, after waiving the privilege because of RIOC's prior disclosure, claiming that those attorneys were instead acting only as clients. (4/20/2017 Hr'g Tr., annexed hereto as Ex. C, at 27-30 (Dkt. 163).)

12.     Because of the obvious impact of Defendants' tactics on my fees and costs in this litigation, I believe that it is necessary to describe in some detail herein the specific ways in which Defendants obstructed the prosecution of Plaintiff's claims and the resulting increases in my time and labor at each stage. For example, the amount of time and labor that was involved in simply scheduling depositions and conducting discovery in this matter was unprecedented in my more than two decades of practice, with haphazard schedules of depositions being conducted without the benefit of documents and therefore left open, all to Plaintiff's detriment. In addition, at various points I relied upon what should have been cost-effective strategies to obtain information, and had Defendants complied, the costs would have been substantially reduced. However, Defendants instead repeatedly decided to make me go through every hurdle, and

4

complied only when absolutely forced to do so and only after a lengthy period of engaging in delay, obstruction and misrepresentations of fact.

## II. FEES AND COSTS INCURRED IN THIS MATTER

13. Attached as Exhibit QQ is a printout of the hours I spent on this case from my billing software program. I recorded my time contemporaneously with the tasks performed. Plaintiff's fees incurred at the requested rate of $650 through May 2017 (with the exception of certain fees Plaintiff was unable to attach with this submission) come to a total of $2,099,129.[1] The costs incurred during that period are set forth in the separate Bill of Costs and come to a total of $29,827.14, which includes expenses paid for: (i) filing the complaint; (ii) service of process; (iii) court reporter, videographer, transcript and conference room fees for depositions; (iv) half of mediation fees; (v) transcripts of court proceedings; (vi) photocopying and scanning costs; and (vii) costs of obtaining court files in related cases; and (viii) other costs necessarily incurred in this matter. As further described herein, in my judgment, the requested amounts reflect work reasonably and necessarily performed and expenses reasonably and necessarily incurred in connection with the litigation of this matter.

## III. ATTORNEY BACKGROUND AND EXPERIENCE

### A. Personal background

14. I began practicing law in New York in 1994. Before entering private practice, I served as an Assistant Corporation Counsel in the New York City Law Department, where I represented New York City and its agencies and employees in matters involving labor and policy issues, civil rights violations and constitutional law issues. The department in which I worked has since been split into two departments, currently known as "Labor and Employment" and "Special Federal Litigation." In my position in the Corporation Counsel's Office, I defended New York City and its agencies in both individual and class action litigations primarily in the

---

[1] Plaintiff respectfully reserves the right to amend / supplement this request to include, among other things, fees and costs that could not be submitted herewith because of technical and other issues and / or fees and costs incurred in connection with the instant application and any further proceedings.

Southern and Eastern Districts of New York. These matters included employment discrimination cases and other civil rights and constitutional cases. In this position, I handled cases from inception through trial. In addition to the more typical employment discrimination and civil rights cases and other matters, I defended the NYPD in a matter challenging the constitutionality of the NYPD's policy regarding the sanctioning of fraternal organizations as discriminatory against certain racial and ethnic groups and a class action challenging the constitutionality of New York City's administration and allocation of resources relating to home health care aides. Many of my matters involved the representation of high-ranking agency heads/commissioners whom I would prepare for deposition and trial testimony.

15.     To a lesser degree I handled cases in the New York County Supreme Court. In one such case, I successfully defended the City of New York in an action challenging the constitutionality of drug testing government employees through the collection of hair samples as discriminatory against African-American employees.

16.     During my tenure with the Corporation Counsel's Office, I handled approximately 35–45 active cases at a time, most of which were in federal court. All of these cases involved employment discrimination or other civil rights matters. My remaining cases were in the New York Supreme Court and involved labor and employment issues. Additionally, I was one of only two lawyers who was assigned to try or assist other lawyers in trying cases despite not having handled such cases from inception.

17.     I earned a Juris Doctorate degree, summa cum laude, from St. John's University School of Law while I was employed full-time as a government employee. Although I graduated in 1995 and was admitted in 1996, between 1994 and 1996 I worked as an attorney under a New York State practice order that permits a government employee attending law school or awaiting admission to practice as an attorney in New York State courts. The judges in the Southern and Eastern Districts of New York before whom I appeared prior to my admission honored that practice order in the federal courts as well.

18.     Before and during law school, I worked for the New York City Police Department ("NYPD"), primarily working in an investigatory and undercover capacity, including in the Organized Crime Control Bureau, and I left the NYPD as a Lieutenant. As a police officer, I helped prepare hundreds of cases for criminal prosecution and civil forfeiture proceedings and

6

testified before judges and juries on more occasions than I can hazard a guess. While, in the Organized Control Bureau, in addition to appearing before judges in applying for search warrants that I had drafted, I also prepared cases for civil forfeiture of property, which constituted the proceeds of criminal activities.

19.    I also investigated corruption/potential corruption and misconduct of government employees as part of my duties and was honored by a former Police Commissioner for my actions towards combating corruption. While assigned to the Organized Crime Control Bureau, I also worked on joint cases with the FBI, DEA and New York State police. During my last year of law school, the Deputy Commissioner of Legal Matters insisted that I be transferred to the Legal Bureau, where I worked on civil matters including employment and labor matters and civil forfeiture proceedings. Under the practice order, I routinely filed papers and appeared in Court as counsel of record in civil forfeiture proceedings, involving the forfeiture of proceeds of criminal activity as well as real property designated to be a public nuisance.

20.    My experience in government is relevant to my representation in this case because RIOC is a quasi-governmental agency and this action involves allegations of corruption and misconduct by government employees and RIOC's attempt to cover up the misconduct (including by falsifying, backdating and destroying documents). Additionally, this case implicated many issues regarding inter-agency conduct between RIOC and other New York State government agencies where my experience at the NYPD proved relevant.

21.    As an attorney I have directly handled, supervised or otherwise participated in the representation of clients in likely near a thousand matters including class action securities litigations, complex commercial litigations, ERISA Class actions, "Key Executive" compensation, joint ventures, merger transactions, recovery of priceless art stolen by Nazis during WWII and anti-terrorism protocols. These have frequently been high-stakes matters involving sophisticated parties and legal issues.

22.    My experience representing foreign governments and foreign government-owned businesses in litigations and arbitrations was brought to bear on this case because RIOC essentially is a government-owned business (as it runs the business of apartment rentals etc. on Roosevelt Island).

7

23.     While affiliated with a large Wall Street firm, I also first chaired two pro bono federal civil rights trials by supervising junior and mid-level associates who conducted the trials as a training opportunity.

24.     After leaving government practice, I was a litigator with Cleary Gottlieb Stein & Hamilton and Milbank, Tweed, Hadley & McCloy LLP before joining Howrey LLP as a partner. Although I was the most junior partner in Howrey's New York office both in terms of years out of law school and years in the partnership, because of client demand for my time, my billing rate was approximately double the rate regularly paid by clients of some other partners in that office and the highest rate in the entire New York office, including its management partners.

25.     My experience dealing with governmental agencies was particularly trenchant when, while at Milbank, I was staffed on a sensitive litigation defending a non-governmental entity's establishment of a private security force in the public streets as a result of the 9/11 attacks. In addition to the litigation, this involved negotiating a memorandum of understanding with the NYPD and New York City regarding the scope of permissible security measures at an extremely significant New York City landmark. The MOU that I helped to negotiate involved an unusual delegation of authority from the NYPD/New York City to the New York City landmark, allowing it to establish its own special patrolman force to patrol New York City streets for several blocks around its building.

26.     I decided to open my own practice because of increasing demand by clients for me to personally attend to their matters and in light of certain inefficiencies inherent in any large firm practice.

27.     I was valedictorian of my law school class, graduating in 1995 first in my class of 375 with the highest GPA ever awarded in the law school. I concurrently was awarded two different merit-based full scholarships for all years. I was also a member and Editor of the Law Review and received more than 20 additional awards and honors for excellence.

28.     Since 2009, my hourly billing rate in all types of cases has been at least $1,100 per hour. However, I am not requesting that rate but a rate of $650 per hour, which is less than my time has been billed since well over a decade but in line with the prevailing rate awarded by courts in the Southern District of New York in employment discrimination and civil rights cases.

B.   Background of Melanie L. Oxhorn

8

29.     Although I was the only attorney who litigated this matter from inception Melanie L. Oxhorn, appearing on this submission as "Of Counsel," assisted me with preparing and drafting the Memorandum of Law and supporting declarations for this fee application because of limitations while I was receiving medical treatment and recuperating from surgery.

30.     Ms. Oxhorn focuses her practice on, and has particular expertise in, analyzing and briefing complex issues in litigation matters in federal and state courts throughout the country. Although she maintains her own practice (Melanie L. Oxhorn, P.C.), she primarily serves as Of Counsel to the boutique litigation firm Kobre & Kim LLP.

31.     Prior to working with Kobre & Kim, Ms. Oxhorn spent over six years in the New York State Attorney General's Office's Appeals & Opinions Division, where she was awarded a commendation by then-Attorney General Eliot Spitzer for winning some of the most challenging cases confronted by that Division during her tenure there.

32.     Prior to joining the New York State Office of the Attorney General, Ms. Oxhorn practiced for two years in the Appellate & Supreme Court Practice Group established at Mayer Brown in New York, which was one of the first large firms in the U.S. to have such a specialized practice predominantly aimed at Second Circuit and New York state appeals.

33.     Prior to working for Mayer Brown, Ms. Oxhorn was a litigator with Wachtell, Lipton, Rosen & Katz.

34.     Ms. Oxhorn also practiced before then in the boutique Supreme Court litigation practice of Harvard Law Professor and constitutional scholar Laurence H. Tribe, which gives her an insightful perspective regarding certain issues in this fee application.

35.     After law school, and before joining Wachtell, Lipton, Rosen & Katz, Ms. Oxhorn completed a clerkship with then-Chief Judge Jon O. Newman of the U.S. Court of Appeals for the Second Circuit.

36.     Ms. Oxhorn earned her J.D., magna cum laude, from Harvard Law School in 1994 and was an Editor of the Harvard Law Review. She has been practicing in New York's federal and state courts since 1995 and is also a member of the Massachusetts and D.C. bars and admitted in a number of federal courts, including the Southern District of New York.

37.     Ms. Oxhorn also earned her B.A., summa cum laude, from Yale College in 1991.

38.    Ms. Oxhorn's regular billing rate is $850 per hour. However, as with the rate of Mr. Rotondi, Plaintiff is requesting a rate of $650 for Ms. Oxhorn, which is well below the market rate for someone of her skill, expertise and qualifications.

## IV.    EVENTS GIVING RISE TO PLAINTIFF'S CLAIMS

39.    By way of background (and as set forth in the Complaint), on April 24, 2015, Plaintiff was unlawfully terminated on 15 minutes notice by email from his position as General Counsel and VP of Defendant RIOC. The termination was the culmination of Plaintiff being subjected to a hostile work environment, discrimination and retaliation based upon his race, gender and reporting of concerns about discrimination and misconduct, including an unauthorized raise given to RIOC's CFO, Defendant Frances Walton (the "Walton Raise"). Plaintiff was the only male and only minority (black) member of the executive team. After he was terminated, Defendants replaced him with a white woman, leaving RIOC's executive team comprised of all white woman of similar age. As discussed below, in their EEOC Position Statement Defendants admitted that Plaintiff's termination was related to his reporting misconduct.

## V.    PLAINTIFF'S EFFORTS TO RESOLVE HIS CLAIMS BEFORE FILING THE NOTICE OF CLAIM, THE EEOC CHARGE, THE EEOC SUPPLEMENTAL CHARGE AND THIS ACTION

40.    Immediately upon being retained by Plaintiff, I sought to explore a very early consensual resolution of his claims. In that vein, I wrote to the contact person in the Executive Chamber relating to RIOC matters. (See May 13, 2015 letter annexed hereto as Exhibit D.) After failing to respond, that person informed me in a phone call that, regarding Plaintiff's termination and the occurrences at RIOC:

> "The Executive Chamber had nothing to do with it. Whatever happened is between Don, Charlene Indelicato and RIOC."

41.    After these early attempts at resolution were rebuffed, Plaintiff chose to continue prosecuting his claims as he was unemployed (and remained so for more than one year) and therefore justifiably anxious to pursue available legal remedies.

## VI. REPORTS TO THE NEW YORK STATE OFFICE OF THE INSPECTOR GENERAL

42.    In following through with his report of misconduct regarding the Walton Raise (which, as noted, Defendants later admitted was a basis for his termination), Plaintiff met with representatives of the New York State Office of the Inspector General ("OIG") and understandably asked me as his counsel to accompany him to that meeting. I arranged and prepared for the meeting, prepared Plaintiff for the meeting, and participated in the meeting with two OIG representatives on June 5, 2015.[2] At its request, I provided the OIG with among other things, a memorandum dated June 18, 2015, containing factual background and documents relating to the misconduct.

## VII. PLAINTIFF'S EFFORTS TO OBTAIN DOCUMENTS THROUGH FOIL

43.    With no resolution in sight, I began prosecuting Plaintiff's claims by seeking documents through FOIL.

### A. Plaintiff's FOIL requests to RIOC and RIOC's obstructionist responses

44.    Because FOIL can provide a simple and cost-effective means of obtaining necessary information I served three FOIL requests to RIOC on: May 21, 2015, June 8, 2015, and September 3, 2015. (The FOIL requests are annexed hereto as Exhibit E at 6-8, 21-22 and Exhibit F at 4-5.) However, RIOC did not produce any of the requested FOIL information or documents within the statutory deadline. Instead, RIOC responded to all the FOIL requests by: (a) stating that it was "conducting diligent searches" for the information and would "notify [Plaintiff] of our progress" by some arbitrarily selected future date; and (b) instead of producing the documents by those dates, sending another letter informing Plaintiff that it would "notify [him] of our progress" by another arbitrarily selected date. (Ex. G at 13, 16, 27, 30.)

### B. Plaintiff's request for an opinion from the New York State Committee on Open Government and pursuant to request for opinion filed by Plaintiff

---

[2] The factual knowledge regarding the events and documents at issue that Plaintiff's counsel acquired during this time were essential in the prosecution of Plaintiff's claims and would have been spent regardless.

45.     Because of RIOC's non-compliance with FOIL, Plaintiff appealed RIOC's determinations of those requests. However, RIOC, through Defendant Indelicato—who was RIOC's FOIL Appeals Officer at the time—denied Plaintiff's appeals. (Ex. G at 29-30.) I therefore considered other ways to seek RIOC's compliance, including an Article 78 proceeding to compel the production of FOIL responses and a CPLR § 3102(c) pre-action discovery complaint. I decided against those avenues, however, because in my view the amount of work required would be too time consuming and expensive. I instead chose to pursue the cost-effective option of seeking the assistance of the New York State Committee on Open Government ("COOG"), which "oversee[s] and advis[es] with regard to the Freedom of Information Law." Although the COOG does not have authority to compel an entity to produce documents or information, it can issue advisory opinions regarding whether the entity's conduct violates FOIL.

46.     Knowing that Plaintiff's appeal of the FOIL requests triggered RIOC's obligation to notice the COOG of the appeal, on August 19, 2015, I informed Robert J. Freeman ("Mr. Freeman") (COOG's Executive Director and the individual primarily responsible for handling COOG's advisory opinions) of RIOC's misconduct and forwarded the relevant communications. This should have sufficed to persuade RIOC to comply with its FOIL obligations simply to avoid the COOG's scrutiny for its non-compliance or the issuance of an adverse Advisory Opinion to that effect. Plaintiff therefore initially did not seek an advisory opinion from the COOG. (A copy of the letter dated August 19, 2015 (with exhibits) from Anthony Rotondi to Mr. Freeman is annexed hereto Exhibit E.)

47.     Instead, consistent with its past and future behavior, RIOC attempted to mislead the COOG through misrepresentations and attempted to create a false record of the events by: (a) making a sham electronic production of organizational charts and final budgets that were publicly available and literally required a few mouse clicks to produce; and (b) falsely informing the COOG that the parties had agreed to a 70% reduction in the scope of requests and that RIOC was "diligently responding" to the FOIL Requests by producing documents on a "rolling basis." (Ex. G at 42.)

48.     Accordingly, on August 26, 2015, I submitted to the COOG a detailed Request for an Advisory Opinion (the "COOG Opinion Request"). (The COOG Opinion Request (with

12

exhibits) is annexed as Exhibit G.)[3]  On October 14, 2015, I filed a supplement to this COOG Opinion Request (attached as Exhibit F) to include RIOC's conduct related to a FOIL Request served by Plaintiff on September 3, 2015.

49.     From August through October 2015, I repeatedly attempted to contact Mr. Freeman to discuss Plaintiff's COOG Opinion Request and left numerous messages with his assistants, but he failed to return any of my telephone calls or emails. This was out of character for him based upon his reputation. (See Sean Lahman, "Freeman: Freedom of Information based on common sense"[4] ( stating "Freeman is undoubtedly the most accessible figure in state government.")). Accordingly, by letter dated October 29, 2015 to Mr. Freeman, I expressed my concern in that regard, detailing some of Mr. Freeman's failures to respond. (A copy of the October 29, 2015 letter from Plaintiff's counsel to Mr. Freeman is annexed as Exhibit H.)  I believe that Mr. Freeman's unusual conduct can be clearly linked to the position of Mary Beth LaBate—a Defendant in this action—as a Committee Member of the New York State COOG. (See letterhead from CCOG Advisory Opinion (Ex. I) listing Defendant Labate as a COOG committee member.)

50.     On December 15, 2015, the COOG issued its "Advisory Opinion" (the "COOG Opinion"), which confirmed Plaintiff's position that RIOC was violating FOIL provisions by failing to timely and completely respond to Plaintiff's request. (A copy of the COOG Opinion dated December 15, 2015 is annexed hereto as Exhibit I.) Although dated December 15, the Opinion was not sent to or made available to Plaintiff until December 23, 2015. The COOG Opinion confirmed that RIOC violated FOIL by, inter alia: (i) giving itself repeated extensions to merely advise Plaintiff of its progress; (ii) not providing the reasons for requiring additional time; and (iii) failing to provide a date certain for production.

51.     As soon as COOG made its Advisory Opinion available to me, RIOC started emailing me substantial productions of documents. (A copy of a screenshot from my email inbox showing RIOC's instant production of documents after COOG determined violated FOIL

---

[3] Plaintiff is annexing to this declaration just a small portion of correspondence regarding issues related to Plaintiff's FOIL requests and Plaintiff's efforts towards obtaining RIOC's compliance with its FOIL obligations.
[4] http://www.democratandchronicle.com/story/news/local/blogs/watchdog/2016/03/17/freeman-foil-laws-based-common-sense/81834106/ (last accessed on Dec. 22, 2017).

is attached as Exhibit J.) As this reflects, the FOIL requests and efforts connected with the advisory opinion benefitted Plaintiff's case by resulting in the production of relevant information. It also demonstrates that RIOC had documents ready for production but was simply unwilling to produce until forced to do so. However, RIOC's production was never completed, and RIOC's then-General Counsel Susan Rosenthal and, later during the litigation, RIOC's President subsequently misinformed the Court that production was near final and would be finalized within a few weeks of the Case Management Conference.

## VIII. PLAINTIFF'S FOIL REQUESTS TO SEVERAL NEW YORK STATE AGENCIES AND OBSTRUCTIONIST RESPONSES TO SAME

### A. Two FOIL requests to New York State Office of the Inspector General

52. On December 15, 2015, I sent Plaintiff's first FOIL request to the New York State OIG seeking documents relevant to his claims against RIOC and the Individual Defendants, including documents related to the OIG's investigation of Plaintiff's claims and/or its refusal to investigate. In response, the OIG simply produced prior correspondence with me, implausibly stating that this was the entirety of the responsive documents. (A copy of the cover letter to the OIG's response is annexed hereto as Exhibit K.) Defendants in this action later adopted and liberally employed this tactic of simply producing my own correspondence in response to document requests.

53. On March 6, 2016, I emailed a FOIL request to the OIG seeking "all materials related to complaints made to [the OIG] concerning [RIOC]." In response, the OIG sent a letter dated August 29, 2016—six (6) months after Plaintiff's request and well outside the five-day response period required by FOIL—denying the request on the purported ground that "[i]t would require a herculean effort to respond to [the] request." (A copy of the OIG's August 29 letter denying Plaintiff's FOIL request is annexed hereto as Exhibit L.) Moreover, although the letter was dated August 29, 2016, it was not sent until after Plaintiff's opposition to Defendants' Motion to Dismiss was due to be filed. Additionally, the author of the letter claimed that she attempted to contact me to discuss the request in May—also outside the five-day time period—and that she left a message but I had not called her back. This was false because each message into my office is meticulously logged in, even if the caller does not want to leave a message or name or telephone number. Moreover, I have since confirmed with a member of the OIG that the

14

excuse that searching for the requested complaints would require "herculean efforts" was simply nonsense. The OIG's conduct—particularly its delay in sending its response until after the deadline for opposing Defendants' Motion to Dismiss—shows that it was coordinating efforts with RIOC in connection with this dispute.

### B. FOIL requests to New York State Office of General Services

54. On March 9, 2016, I served FOIL requests to the New York State Office of General Services ("OGS"). This time, I did not identify myself as Plaintiff's counsel, did not use my office address but instead used a residential address, and did not use my work email address but instead submitted the request through my personal Gmail address. In sharp contrast to the responses from the other New York State agencies, within a reasonable time I received documents responding to the FOIL requests.

### C. FOIL requests to additional New York State Hiring Agencies

55. During this period, I also sent FOIL requests for information to certain New York State hiring agencies, including the Office of General Services and received documents response to those requests. The documents received in response included an employment application of Defendant Indelicato in which she falsely stated that she had never "been named as a defendant or respondent in any agency proceeding or civil litigation" even though that at the time she had been named as a Defendant in at least two federal employment discrimination lawsuits filed in the Southern District of New York and an unknown number of administrative complaints. (Ex. M at 2 (Dkt. 154.))

## IX. THE FIRST MEDIATION FOLLOWING THE NOTICE OF CLAIM

56. On July 23, 2015, I served Plaintiff's Notice of Claim (Ex. A at 3, ¶ 10), which was required under RIOC's enabling legislation as a condition precedent to the commencement of an action. See NY Unconsolidated Laws § 6392(a)(2).

57. On September 21, 2015, Mr. Michael Mazurczak of Melick & Porter ("Melick" or "Defense Counsel") informed me that his firm was representing Defendant RIOC and stated that he and Mr. Jeremy Stein of Melick wanted to discuss Plaintiff's claims. After several telephone conferences with Melick, I agreed to explore consensual resolution of Plaintiff's claims through mediation with a neutral mediator. Much of the relevant correspondence is annexed to the

Complaint (Ex. A) as exhibit B (Dkt. 4-2). In that correspondence, Melick denied agreeing to the mediation terms and called off the mediation as set forth below.

58.     By emails dated October 2, 2015 and October 7, 2015 from me to Mr. Stein, I confirmed Plaintiff's willingness to mediate provided that "the parties listed in the notice of claim be present at the mediation," which included the six Resident Directors, all of whom had confirmed, inter alia, that the representations in Defendant Indelicato's termination to Plaintiff were false and agreed that Plaintiff had been wronged. (Ex. A at 49.)[5]  By email dated October 7, 2015, Mr. Stein confirmed both his agreement with Plaintiff's mediation terms and the fact that Melick represented "all parties on the Notice of Claim." (Ex. A at 49.)

59.     In reliance on Melick's representations, I expended significant efforts towards mediation, including negotiations with Melick attempting to agree on an appropriate mediator, vetting and researching mediator options, and engaging in telephone conferences and correspondence with numerous potential mediators to discuss potential conflicts, availability and scheduling.

60.     However, in late February 2016, as the parties neared agreement on the potential mediator, Melick asserted for the first time that it had no intention of having RIOC's Resident Directors present at mediation or for that matter anyone listed on the Notice of Claim, and refused to even inform Plaintiff who would attend the mediation as a party. (Ex. A at 48.) Melick then called off the mediation. (Ex. A at 44-45.)

61.     Melick's conduct unquestionably evidences that Defense Counsel never intended to mediate in good faith, but rather over the course of five months sought to exploit Plaintiff's willingness to explore early resolution through mediation to increase demands on his counsel's time and resources and/or delay Plaintiff from seeking resolution of his claims (some of which had to be prosecuted within one year under the RIOC enabling provision). (Ex. A at 44.)

_____

[5] Additionally, during one of the initial telephone conferences with Mr. Stein, he stated that he was hired by Melick to build up its Connecticut office and he boasted that his fees were being paid by Defendants' insurance policy and telling me that I had to be nice to him because he controlled whether or not Mr. Lewis received an offer from the insurance company. Considering those statements and the other factors previously mentioned, Plaintiff sought participation of the Resident Directors as the only way towards a potential consensual resolution. Mr. Stein was removed from the representation of Defendants during the pendency of this action and recently is no longer listed as a partner at Melick.

Moreover, Melick clearly attempted to keep the Resident Directors away from the mediation because they had informed Plaintiff, among other things, that they wanted to give him a severance package that he never received, that he should not take his termination lying down and that Indelicato had "lied to" them about what happened. (See excerpts from Shinozaki Dep. Tr., annexed as Exhibit N, at 192:9-197:25; Ex. A at 13-14, ¶¶ 48-49.) In fact, unlike Defendant Indelicato, the Resident Directors had been sued by Plaintiff not because of any affirmative misconduct on their part but rather because they knew that what happened to him was wrong and had the power to correct it but chose to do nothing out of concern for losing their seats on the Board during the upcoming re-election.

## X.    THE EEOC PRE-FILING PROCESS

62.    As a prerequisite to this action, on August 12, 2015, I filed on Plaintiff's behalf a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") outlining his claims and on October 21, 2015 I filed a more detailed supplemental charge. (The Charge dated August 12, 2015 and the Supplemental Charge of Discrimination dated on October 21, 2015 are together annexed hereto as Exhibit O and referred to hereinafter collectively as the "EEOC Charge.")

63.    Confronted by the statements of the RIOC Board Chairman and individual Resident Directors establishing the falsity of the statement in Defendant Indelicato's email that Plaintiff was terminated because "the Board decided to go in a different direction," RIOC for the first time now claimed that Plaintiff was terminated "for cause" and raised various claimed performance deficiencies in its December 22, 2015, Position Statement (annexed hereto as Exhibit P). RIOC's dramatic change in position by Defendants required me to investigate Defendants' new allegations, and seek evidence demonstrating their falsity. I then drafted and filed a rebuttal to RIOC's Position Statement (annexed hereto as Exhibit Q).

64.    Plaintiff ultimately decided to forego the EEOC investigation which was slowly proceeding in order to prosecute his claims in federal court. Accordingly, I had the EEOC expedite referral of Plaintiff's Charge to the U.S. Department of Justice, Civil Rights Division and then had the DOJ expedite issuance of a Notice of Right to Sue Letter Upon Request ensuring that Plaintiff could file his claim within one year precluding any potential statute of limitations arguments related to certain claims.

65.     During the EEOC process, I maintained communications with the EEOC to ensure that Plaintiff's Charge did not languish and that the EEOC was aware that Plaintiff was ready and able to provide additional information. More importantly, during these communications, I assisted the EEOC's investigation of Plaintiff's Charge and the EEOC's investigation of Charges filed by other RIOC employees by providing guidance regarding documents and information that the EEOC should seek from RIOC in its investigation of Plaintiff's Charge as well as the Charges of other RIOC employees. And, as indicated above, these communications also effected the prompt referral of Plaintiff's Charge to the DOJ and the issuance of a right to sue letter within days of Plaintiff's decision to withdraw from the EEOC process, which absent counsel's diligence and persistence, would have taken many months from the date requested, as is usually the case.

## XI.    DEFENDANTS' NOTICE OF 50-H HEARING

66.     Defendants caused further expenditure of my time and labor by acting without doing preliminary research. On October 22, 2015, Defense Counsel served a notice of 50-H hearing on Plaintiff, citing § 50-h of the General Municipal Law ("GML") as authority for compelling Plaintiff's attendance at the hearing. (A copy of the October 22 letter, notice, and following correspondence, is attached hereto as Exhibit R.) On November 10, 2015, I emailed Defense Counsel, advising that the § 50-h GML notice was invalid because there is no provision for such a hearing in RIOC's enabling statute. Accordingly, I requested Defense Counsel to provide the legal authority, if any, supporting the notice. (Ex. R, tab 2.) Having received no response, I advised that I would operate on the assumption that no authority existed and that I would deem the notice to be withdrawn. Defendants failed to rebut my assumptions, and the issue was dropped. (Ex. R, tab 3.)

## XII.   THE INITIAL FILINGS IN THE LITIGATION

### A.  The Complaint

67.     Plaintiff filed a detailed Complaint asserting statutory claims for violation of 42 U.S.C. § 1981 et seq. ("Section 1981"), 42 U.S.C. § 1983 et seq. ("Section 1983"), Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e et seq. ("Title VII"), the New York City Human Rights Law, Administrative Code § 8-107 et seq. ("NYCHRL") and the New

18

York State Human Rights Law, N.Y. Executive Law § 290 et seq. ("NYSHRL") and common-law claims for negligent hiring, supervision, retention and training and against the Board of Directors and Individual Directors for failure to properly exercise their duties. (Ex. A.)

B. Defendants' duplicitous conduct in requesting extensions of time to respond to the Complaint

68.    Defendants' obstruction and delay of the proceedings in this Court began from the very inception of this action. After having initially delayed the proceedings by refusing to accept service of the Complaint and summonses on behalf of all Defendants (despite having already been representing Defendants for seven months), Melick contacted me to request an extension to respond to the Complaint. Because it is my practice to provide courtesies to adversaries, I advised that although Plaintiff would not consent to the 60 days requested by Defense Counsel, Plaintiff was willing to consent to a more reasonable extension but that I first would have to approve the Court filing seeking the extension. Melick sent me a proposed letter request, which I reviewed and approved. (Ex. S at 10-12 (Dkt. 49-1, tab 2.)) After I approved the contents of the Court submission, Melick changed the request prior to submitting it to the Court, adding the false claim that the extension was needed because I had refused to provide copies of affidavits of service, which Plaintiff in fact filed via the ECF upon receiving such affidavits from the process server and which thereby were simultaneously served on Defense Counsel. (Ex. S at 14-15 (Dkt. 49-1, tab 3.)) The revised letter also added the provision that "Defendants reserve the right to seek additional time to respond to the complaint" in light of Plaintiff's refusal to agree to a longer extension. (See Ex. S at 17-18 (Dkt. 49-1, tab 4) (comparing the proposed letter to the Court submission in redline.)) When I emailed Defense Counsel the reason for Plaintiff withholding consent for Defendants' second request as based on Melick's duplicitous conduct in altering the prior court filing, Melick omitted Plaintiff's reasons for withholding consent, in violation of this Court's Individual Rules. I was obliged to inform the Court about how Melick had previously changed the letter request before its submission. Undaunted, Melick continued to repeat specious claims regarding affidavits of service in connection with several more extension requests.

69.    Furthermore, after seeking repeated extensions, Defendants did not answer but instead on the deadline of the last extension but instead simply submitted a three-page letter

requesting permission to file a motion to dismiss ("MTD Letter Request"), which had the effect of simply setting a briefing schedule thereby granting themselves another extension to respond to the Complaint, resulting in further delay. (Dkt. 52.)

C. Defendants' motion to stay discovery

70. Defendants neglected to request a stay of discovery in their MTD Letter Request as well as numerous requests seeking extensions to respond to the Complaint. Anticipating that Defendants would request a discovery stay after Plaintiff requested a Case Management Conference ("CMC"), I drafted a nine-page single-spaced Letter Brief in Opposition to Defendants' Request for Stay of Discovery. (A copy of my opposition Letter Brief is annexed hereto as Exhibit T (Dkt. 59.)) And in fact, in response to Plaintiff's request for a CMC, Defendants filed a separate page and a half long letter Motion to Stay Discovery contemporaneously with their Motion to Dismiss. (Dkt. 58.) I then finalized and filed the previously drafted Letter Brief opposing Defendants' requested discovery stay. (Ex. T (Dkt. 59.))

71. By order dated August 12, 2016, the Court denied Defendants' request to stay discovery and referred the case to Magistrate Netburn for a CMC as Plaintiff requested. (Dkt. 63.) Magistrate Netburn then set a CMC for September 8, 2016. (Dkt. 64.)

D. Defendants' Motion to Dismiss

72. Defendants did not respond to Plaintiff's Complaint until July 29, 2016, filing an FRCP 12(b)(6) motion to dismiss. (Dkt. 56, 57.) I then prepared a 28-page opposing memorandum of law of law addressing the numerous issues raised in support of Defendants' motion. (A copy of Plaintiff's response to Defendants' Motion to Dismiss is annexed hereto as Exhibit U (Dkt. 73, 73-1).) Litigating Defendants' Motion to Dismiss consumed my time and resources, despite doing little to advance Defendants' substantive interests. (Dkt. 72, 73.) Defendants' effort to obtain dismissal at the pleadings stage on qualified immunity grounds was baseless because this involves a fact-specific inquiry and each of the cases upon which Defendants relied was decided on a summary judgment motion. In addition, Defendants also later asserted the frivolous position that any Defendants who were dismissed on sovereign immunity grounds would not be subject to discovery, even after the Court denied Defendants' motion to stay discovery. (Dkt. 68, 60, 63.)

20

73.     Moreover, the dismissal of certain Defendants on sovereign immunity grounds actually benefitted Plaintiff because this came at a time when the Magistrate Judge was permitting Defendants to escape the consequences of missing deadlines on all discovery responses and had issued orders severely hamstringing plaintiff's ability to prosecute his case. The dismissal of RIOC and the Individual Defendants in their official capacities on sovereign immunity grounds then created the opportunity for Plaintiff to split his claims — an otherwise impermissible practice — by bringing a separate action simultaneously in state court, where Plaintiff could prosecute his claims with the hopes of obtaining discovery that he was entitled to but defendants were being permitted to withhold on. (Ex. T (Dkt. 59, 59-1.))

## XIII.  DEFENDANTS' OBSTRUCTIONIST TACTICS DURING DISCOVERY

### A.  Defendants' failure to timely serve their initial disclosures

74.     Defendants' long and well-documented pattern of engaging in obstructionist tactics to delay Plaintiff's resolution of his claims is evidenced by Defendants' refusal to comply with the most basic of discovery obligations to serve initial disclosures in a timely manner, until immediately after I served the motion to preclude their witnesses and documents.

75.     In accordance with Rule 26(a)(1)(C), the initial disclosures were to be served by September 6, 2016, 14 days after the September 20, 2016 Initial Pretrial Conference. After the due date came and went, I repeatedly contacted Defense Counsel seeking to coordinate a time and manner for Defendants to comply with their obligations to serve initial disclosures. Defense Counsel at first repeatedly agreed to exchange disclosures simultaneously, but then—without explanation—failed to actually serve them as agreed and eventually stopped responding to my communications altogether. (A true and correct copy of email correspondence between Plaintiff's counsel and Defendants' counsel reflecting those communications is attached hereto as Exhibit V.)

76.     Defendants' delays, and later, complete lack of response left me with no option but to seek this Court's intervention. This was based on my more than year-long experience dealing with other delays and resistance to basic requests for information—including in response to the FOIL requests, where, as discussed above, Defendants waited until after being admonished by the COOG Advisory Opinion and then started sending documents that they undoubtedly had

ready for production all along. On October 19, 2016, I filed Plaintiff's Motion to Preclude Defendants' Introduction of Documents or Witness Testimony and related exhibits (attached hereto as Exhibit W (Dkt. 82)). After becoming aware of Plaintiff's motion later that same day, Defendants finally served their initial disclosures on October 19, 2016, 43 days after they were due. (A true and correct copy of the undersigned's email inbox containing the ECF emails showing Defendants' filed their initial disclosures only an hour and a half after receiving Plaintiff's motion to compel in order to make the motion moot is attached hereto as Exhibit X.)

77.     Although this Court ultimately denied Plaintiff's motion (Dkt. 85, 86), it accomplished the goal of having Defendants serve their initial disclosures and, based upon my experience with Defendants and their counsel, was the best viable and cost-effective option to compel Defendants to comply with one of the most basic discovery obligations after exhausting other options.

B.     Discovery served by Plaintiff and Defendants' improper responses

78.     Following the Case Management Conference, I served Plaintiff's Interrogatories, Request for the Production of Documents, Requests for Admission, and Notices of Deposition on RIOC and each of the Individual Defendants—39 separate documents in total—between October 11 and November 1, 2016. Additionally, on October 14, 2016, I served a notice to depose seven RIOC employees. (Ex. Y at 2 (Dkt. 94.)) I also subsequently served various subpoenas to current and former members of the Executive Chamber and other New York State government agency employees listed on Defendants' initial disclosures who were non-party witnesses.

79.     Defendants delayed serving responses/objections and producing documents for months until after significant efforts on my part, including: (a) numerous conferences with Defense Counsel in which they would agree to produce documents and then renege; (b) conferences with Defense Counsel to schedule depositions after which they would inform me that they would no longer produce documents before the depositions; and (c) conferences in which Defendants repeatedly asked for extensions, Plaintiff in exchange sought a commitment from Defendants to produce documents on a date certain, and Defendants failed to respond. The efforts also included numerous Court conferences, Court conference calls and letter submissions to the Court. Tellingly, after months of peppering the Court and Plaintiff with tales of multiple discovery being served and multiple Defendants being represented, Defendants failed to even

22

serve a single objection and response to a discovery request, interrogatory request or RFA within the requisite thirty-day period. Rather, Defendants' responses to each of these was sent out by their counsel many months after the due date had passed  Then, after such efforts, when Defendants finally would respond, the response would be wholly deficient and take baseless unsupportable positions. For example:

a.  Defendants identified only one specific matter—the Anthony Jones case— that they claimed Plaintiff mishandled as the basis of his termination. Defendants produced selective documents and testified freely regarding that matter but then later claimed that they would not produce any documents that Plaintiff requested relating to that matter, asserting that those documents were protected by the attorney-client privilege.

b.  Defendants claimed privilege from disclosure under the attorney work product doctrine of anticipation of litigation regarding documents that, by her own testimony, Defendant Smith asked the personnel director to prepare without the involvement or knowledge of any counsel, without any specific litigation in mind, and essentially just for her own edification. (See excerpt from Smith Dep. Tr., annexed hereto as Exhibit Z, at 21-25.)

c.  Employees who were terminated for cause from RIOC would be provided with letters explicitly stating that they were terminated for cause and stating the basis that formed the cause, i.e. not via email at 4:45 PM on a Friday stating that the "Board decided to go in a different direction". Plaintiff received no such letter. I repeatedly asked RIOC to provide copies of termination and resignation letters for former RIOC employees, as further discussed below, Defendants refused to do so and made a variety of excuses. Aside from creating a gap in the evidence that Plaintiff needed to prove his case, this resulted in time being wasted at depositions when Defendants who were questioned about the termination of other employees for cause would have to speculate and then state that they needed to see these documents.

d.  Defendants would not produce severance agreements with former RIOC employees. As a result, Defendants gave deceptive testimony seeking to hide the fact that other executives (potentially even one who had been arrested) received severance. In fact, the evidence showed that Plaintiff's white predecessor did receive severance and was given months to find a new position after being voted out by the Board under the proper procedure.

e.  For months Defendants' counsel regaled the Court and Plaintiff with tales of the extraordinary efforts being undertaken to respond to Plaintiff's document requests (which had been served on October 10, 2016). During depositions and meet and confers, it became clear that Defendants essentially had done nothing to produce documents until January 2017—

23

immediately before their productions in mid-to-late January 2017—and then only produced a few documents.

f. Defendants kept referring me to the RIOC website for documents, claiming that the documents that Plaintiff requested were publicly available on the website,. despite the fact that RIOC had changed its website to a new hosting platform and had neither preserved the prior platform nor the documents that they claimed to be on the website.

g. As further discussed below, Defendants used the excuse of RIOC's change of counsel to stall resolving discovery issues. New counsel claimed that his firm could not get its own client's document production from the client's former counsel (Melick) or from the client, so I had to provide them with copies. New counsel also admitted that many of the asserted claims of privilege did not apply and that certain other documents should have been produced, but then claimed that he could not get the documents despite repeated requests to his client and Melick.

80.    Defendants even went so far as to engage in destruction and spoliation of case documents. For example, Defendants were unable to produce Plaintiff's employee evaluations and his self-evaluations (both of which reflected his excellent performance), denied that executives were even evaluated and misrepresented to Magistrate Judge Netburn that none existed. Although Defense Counsel sought to prevent me from asking Arthur Eliav, RIOC's Associate General Counsel, about the existence of the evaluations and self-evaluations (Ex. AA at 163:17-21), he went on to confirm that RIOC executives, including Plaintiff, receive annual performance evaluations and that he had seen Plaintiff submit his final evaluation to Defendant Indelicato prior to Plaintiff's termination (Ex. AA at 162-65).

81.    In addition, during depositions, Defendants with near universality admitted that they exerted little to no effort to comply with Plaintiff's discovery requests. As a consequence, the Individual Defendants failed to produce various documents responsive to Plaintiff's discovery requests and destroyed others despite being aware of the litigation. (See, e.g., Ex. B at 52-54, 59, 80-84, 159, 212, 218, 221, 222, 250, 258, 264, 281, 332-334 (Defendant McDade admitting that 21 responsive documents known to her were not produced); Ex. BB at 71:2-18, 72:19-73:23, 81:13-82:4, 82:16-83:9 (Defendant Grimm acknowledging that she did not recall being told to preserve potentially relevant documents and that Defendants created a false custodial record by allocating documents to different Defendants irrespective of whether the producing individual was the actual custodian); Ex. CC at 13:7-10, 16, 24, 30 (Defendant Christian acknowledging that she "[m]ostly" deleted documents related to Plaintiff's case and

24

only found two letters from Plaintiff's counsel and only looked for documents "physically in [her] possession"); Ex. DD at 45:10-47:6, 49:3-16 (Defendant Polivy describing a haphazard process of going through his files that yielded only six pages of documents consisting of correspondence between Plaintiff and Defendants). The one exception was Defendant Shinozaki, who testified that despite not seeking Plaintiff's request for production, he sent all of his files to Melick in a box, even though Melick's production purportedly coming from him consisted of only approximately 31 pages. (Ex. N at 13:6-25, 23:20-24:22.)

82.     On April 21, 2017, Melick sent a letter to Plaintiff's counsel, in response to direction from the Court, asserting that "Flug [RIOC's GC], did an initial extremely thorough, manual, email-by-email search of each of the [referenced custodians'] mailboxes" in the course of responding to Plaintiff's discovery requests. (A copy of the letter is annexed hereto as Exhibit JJ.) However, RIOC produced only a few insignificant emails and Melick's production for each of the Individual Defendants was woefully and obviously deficient.

83.     Defendants' complete failure to make any effort to respond to Plaintiff's discovery requests necessitated expenditure of additional time and labor in response. Due to that failure, which was apparently with the support or at least indifference of Melick, I was required to:

   a.  leave all depositions open for further questioning upon production of responsive documents;

   b.  focus much of his time and labor identifying the existence and possible location of responsive documents, rather than receiving the requested documents in discovery and then being able to focus solely on the facts of the case; and

   c.  continuously correspond with Melick and Bond Shoeneck and make submissions to the Court regarding Defendants' failures to comply with basic discovery requirements.

84.     The few documents that Defendants actually produced were inherently deficient because Plaintiff requested that all documents be produced in their native format yet received only hard copy documents. Defendants' failure to comply with Plaintiff's request for native documents was particularly troublesome with respect to the documents pertaining to the Walton Raise, an issue of great significance in this case because Plaintiff was terminated by Indelicato shortly after reporting her involvement in unilaterally giving Walton the unauthorized raise. (Ex. A at 22-23, ¶¶ 88-89.) (A copy of the Walton Raise documents are attached as Exhibit EE.)

Defendant Shinozaki testified, drawing on his technological background, that important information with respect to the creation of the Walton Raise document could have been gleaned from metadata contained in the native version, such as dates of document creation and modification, which would have revealed whether Indelicato backdated the document. (Ex. N at 132-144.)

85.     Ultimately, as noted, Defendants did not respond within the deadline to a single one of the 39 discovery requests that I prepared and served, nor did they even bother to serve objections before serving documents. Instead, Defendants simply ignored all of the requests. Unfortunately, as later discussed herein, they were able to flout their discovery obligations because the Magistrate Judge permitted them to miss this and other deadlines.

   C.   Defendants' gamesmanship regarding the RFAs

86.     Plaintiff served Requests for Admission ("RFAs") on seven Defendants, which Defendants ignored and failed to serve any responses or objections or obtain an extension. As such,  under FRCP Rule 36(a)(3), any RFA not responded to is automatically deemed admitted without any further requirement for a motion to compel or other action. At Defendants' request—and consistent with the Magistrate Judge's other rulings relieving Defendants of discovery obligations—the Court relieved Defendants' from their "deemed admissions" and ordered that they respond to the RFAs by "one week before the corresponding defendants deposition, or March 3, 2017, whichever is earlier." (Dkt. 124.) Although Plaintiff appealed Judge Netburn's order to this Court, via an FRCP 72(a) objection to findings, the standard of review is particularly difficult to overcome and this Court denied Plaintiff's objection.

87.     Nevertheless, after being given another chance to respond to the RFAs, Defendants once again missed the new deadline set in Judge Netburn's order by sending the RFA responses to Plaintiff by email, which did not constitute valid service in this case because Plaintiff never consented to such service. Thus, after all the efforts that I was forced to expend in relation to the RFAs (including drafting letter submissions and a Rule 72(a) objection), the result was the same as if Defendants had never asked for special treatment because the RFAs ultimately were deemed admitted.

## XIV.  TIME AND LABOR SPENT SCHEDULING AND RESCHEDULING DEPOSITIONS

88.     An illustrative collection of email and letter correspondence revealing the considerable time and labor required to simply schedule depositions in the face of Defense Counsel's intransigence is annexed hereto as Exhibit FF. Moreover, because the Magistrate Judge repeatedly advised me to go back and try to resolve any discovery scheduling issues in response to my requests for assistance (see discussion at Point XVI, infra), I had little choice but to rely upon Defendants' statements of an intent to agree to a specific schedule only to have Defendants renege at the last minute, which of course increased the time and labor expended just on this one task.

89.     On October 14, 2016, Plaintiff noticed the deposition of Defendants and seven RIOC employees requesting that Defense Counsel advise "whether the selected dates work . . . so that we can agree on other dates should there be a conflict." I followed up the following week to ensure documents would be timely produced in advance of the depositions, to which Defense Counsel responded that they were in the process of "determining [their] availability and that of [their] clients." (Ex. FF, tab 18.)

90.     Between October 27, 2016 and December 8, 2017, a pattern of conduct emerged in which: (i) Defense Counsel would request extensions for discovery responses and depositions; (ii) I would indicate Plaintiff's willingness to consider consenting but only if they would agree to a confirmed deposition and document production schedule; and (iii) Defense Counsel would refuse to provide a definite date for depositions and document production and would instead further delay (including in one instance unilaterally announce a postponement in production). (Ex. FF, tabs 1-6.)

91.     Nearly two months after Plaintiff served his notices of deposition, a deposition schedule was yet to be set, notwithstanding having been negotiated several times over and defendants had not provided a single discovery responses. This is reflected in Defense Counsel's correspondence on December 8, 2016 unilaterally announcing that they were pushing their production for an additional weeks. (Ex. FF, tab 8.)

92.     With few options available to move the case along, I agreed to Defendants' requests to extend discovery deadlines for document production followed by depositions. On December 19, 2016, Defense Counsel filed a joint status letter with the Court (Dkt. 91), advising that the parties had agreed to an extension of the fact discovery deadline and setting forth

27

available dates for the depositions of the Individual Defendants. The Court denied the request. (Dkt. 92.)

93. Defendants' bad faith participation in discovery only escalated from there. On December 27, I sent Defendants a deposition schedule (Ex. Y at 7-8 (Dkt. 94-1)), selecting available deposition dates from Defense Counsel's December 19, 2016, joint status letter. In conferring with me regarding the joint status letter and final deposition schedule, Defense Counsel made clear that it had no intention of providing complete discovery responses in advance of the depositions as scheduled, thus requiring me to depose each of the individual Defendants twice even though Defendants' deadlines for responding to discovery had long since passed.

94. Having been advised of these issues, the Court set a status conference, instructing the parties to "come to Court with their calendars and all dates of all deponents' availability." (Dkt. 95.) After Defendants first sought and received an adjournment of the Court's scheduled status conference (Dkt. 97), a status conference was held on January 4, 2017, at which time the Court ordered that the parties provide a deposition schedule by January 20, 2017, and that depositions commence by February 21, 2017. (Dkt. 100.)

95. Because of Magistrate Judge's unwillingness to require Defendants to comply with discovery deadlines, I was ultimately forced to create and recreate deposition schedules, clear my schedule and confirm schedules for nonparty deponents repeatedly throughout January and February, 2017. (See Ex. FF, tabs 9-16.) On February 23, 2017, I informed Melick: "By now I likely have spent well over 50 hours over the past four months creating and recreating deposition schedules to address Defendants' various delays." (Ex. FF, tab 17.) Not until March 7, 2017, weeks after depositions were supposed to begin and approximately 46 days after a final deposition schedule was supposed to be provided to the Court, did the parties finally reach a confirmed deposition schedule as part of their stipulation to mediate. (Dkt. 140.)

96. The time and labor spent scheduling depositions in this matter was unprecedented in my more than 20 years of practice. As a result of Melick's bad faith, delay and obstruction, I was required to:

> a. draft and submit deposition-related letter motions and status letters to the Court;
>
> b. engage in endless email and telephone correspondence with Melick;

28

c.  constantly reschedule depositions and adjust his own schedule accordingly; and

d.  have to prepare for depositions without knowing whether or when they would take place (not to mention doing so without the benefit of good-faith discovery responses).

## XV.  Second Attempt at Mediation and RIOC's Substitutions of Counsel

97.    Despite the bad faith displayed by Defendants and Defense Counsel in negotiating terms of mediation at the outset of the dispute, Plaintiff and I again engaged in mediation negotiations during the pendency of proceedings in this Court. As with the first attempt to negotiate mediating terms, Melick did everything in its power to make the process as difficult and time consuming as possible. The second round of mediation negotiations also occurred contemporaneously with a series of events involving RIOC's substitutions of counsel, which needlessly complicated the proceedings.

98.    On February 23, 2017—nearly seven months after Melick first appeared on behalf of all Defendants in this matter, and right on the eve of depositions that were scheduled only after great difficulty due to obstinance on the part of Defendants and Melick—Monte Chandler ("Chandler") and Richard Washington ("Washington") entered notices of appearance on behalf of RIOC (Dkts. 127, 128), substituting for Melick. Washington also filed a Letter Motion for Extension of Time (Dkt. 126)), which sought to stay discovery including vacating the depositions scheduled for the following week.

99.    The next day, I advised the Court of Plaintiff's intent to oppose RIOC's motion to stay on the grounds that Chandler was ethically prohibited from representing RIOC in this case because Plaintiff previously engaged in privileged conversations with Chandler's firm regarding his claims against RIOC, and because Chandler was also a witness as to some issues in the case. (Dkt. 129.) The Court granted Plaintiff's request to submit an opposition to the motion to stay discovery. (Dkt. 130.)

100.    On February 26, 2017, Melick contacted me and asserted that, because of the pending motion to stay, and also due to ongoing negotiations regarding possible mediation, Defendants "cannot go forward with depositions this week or until the aforementioned issues are resolved by the parties or the Court." In other words, Melick effectively granted themselves a stay before the Court had an opportunity to weigh in on the matter. In response, I stated

Plaintiff's desire to proceed with the depositions as scheduled. (This email exchange is annexed as Exhibit GG.)

101. In light of the seeming impunity with which Defendants were able to continually flout discovery deadlines, I continued to negotiate terms of mediation, which appeared to be the most promising (or only) avenue for reaching an efficient resolution to the dispute under the circumstances. Ultimately, the parties were able to reach a stipulation to mediate, pursuant to which mediation was to be held on March 12, 2017. (Dkt. 134-1.) This stipulation was made possible by virtue of Plaintiff's consent to Defendants' requests for yet further discovery extensions. In reaching this stipulation, the Court had to be involved throughout the process in light of the pending motion to stay, requiring me to draft multiple submissions to the Court. The Court accepted the parties' joint request for extension (Dkt. 139), and the stipulation was entered. (Dkt. 140.)

102. Mere days before the scheduled mediation, on March 8, 2017, in response to Plaintiff's conflict of interest challenge, RIOC replaced Chandler and Washington with attorneys Mark Reinharz ("Reinharz") and Howard Miller ("Miller") of Bond Shoeneck & King (Dkts. 137-138, 141, 143-44).

103. Defendants ultimately failed to make even one offer during the mediation, much less a good-faith offer. Defendants used mediation like everything else solely as a tool for further delay and obstruction.

104. Following the unsuccessful mediation, in recognition of Defendants' bad faith, Melick's managing partner represented that he would pay mediation fees of both sides. He repeated that representation during subsequent telephone calls with me. After making these representations, Melick did not pay Plaintiff's side of the invoice and failed to notify me of this fact. Only upon receiving correspondence from the mediator threatening to sue Plaintiff for non-payment of fees did I realize that Melick's managing partner failed to follow through on his promise. He then denied ever having agreed to pay Plaintiff's side of the mediator fees.

105. I was required to expend substantial time and labor negotiating the terms of, preparing for and participating in the second mediation. I believed that if committed to by both sides, mediation had a high likelihood of success because of the strong merits of Plaintiff's case and the benefits to RIOC of resolving the matter. Ultimately, the effort was to no avail because it

became clear that Defendants at no point intended to engage in a good faith mediation. Instead, they again exploited Plaintiff's desire to reach an expeditious resolution of the dispute to achieve their contrary objective of making litigation as unnecessarily time-consuming as possible, using mediation as an inducement to get Plaintiff to agree to further extensions and then failing to even make an offer.

106. The aforementioned substitutions of counsel likewise required me to perform additional work because: (a) as indicated above, I had to ensure that Chandler and Washington were removed from the case due to conflicts issues; and (b) second, when Bond Shoeneck & King was substituted in, I had to start meet and confers from scratch because that firm refused to confer with Melick regarding agreements and representations prior counsel made during prior meet and confers or even what was discussed as issues during those meet and confers.

## XVI. THE MAGISTRATE JUDGE'S REFUSAL TO HOLD DEFENDANTS ACCOUNTABLE FOR DISCOVERY VIOLATIONS AND THE IMPACT ON TIME AND COSTS.

107. Melick's trial strategy of delay and obstruction was unfortunately rewarded by Magistrate Judge Netburn, who was assigned to handle pretrial issues in the case. The pattern that played out throughout the proceedings was that: (1) Melick would delay and obstruct; (2) I would communicate with Melick in an effort to move discovery along; (3) these efforts would fail due to Melick's intransigence; (4) I would raise the issue with the Magistrate Judge; and (5) she would accept Melick's blatant misrepresentations and excuses, decline to impose sanctions even when Melick's conduct directly flagrantly violated Court orders, and tell the parties to work out the issues amongst each other, assigning equal blame to Plaintiff and Defendants in the process. Each successive time this pattern occurred, Melick became more emboldened and its obstruction became more egregious.

108. When Magistrate Judge Netburn initially was assigned this case, the matter proceeded in accord with the normal schedule in this judicial district. On September 21, 2016, Judge Netburn ordered a case schedule, rejecting Defendants' request for eight months of discovery and instead allowing for the four months that is standard in this district.

109. However, Magistrate Judge Netburn's approach to handling the case changed after Defendants finally filed their initial disclosures (Dkt. 83). Having just filed their initial

disclosures 43 days late in response to Plaintiff's Motion to Preclude Defendants' Introduction of Documents or Witness Testimony (Ex. W (Dkt. 82)), Defendants argued that the motion was now moot, and accused Plaintiff of proceeding in an "unnecessarily litigious and adversarial manner." (Dkt. 84.)

110. Despite the obvious fact that Plaintiff needed to file a motion to get Defendants to comply with its most basic discovery obligations, the Magistrate Judge accepted Defendants' argument and chastised Plaintiff for seeking compulsion of initial disclosures 43 days after they were due. (Dkt. 86.) This order set the stage for Defendants to flout every deadline and obligation going forward, assuring them that their strategy of delay and obstruction would go unpunished.

111. The problem became particularly acute when, in the face of Defendants' continuing unwillingness to agree to a discovery schedule and a joint status letter indicating many areas of disagreement (Dkt. 91), the Magistrate Judge denied the joint request for an extension and threatened to cut off discovery. (Dkt. 92.) This order rewarded Defendants tremendously for their misconduct. The Defendants did not need much in the way of discovery from Plaintiff, as they were in possession of all the relevant documents. Also, Plaintiff needed to take depositions of the many Defendants, whereas Defendants needed only to take Plaintiff's deposition.

112. Similarly, after I once again explained Melick's many discovery abuses to the Court (Ex. Y (Dkt. 94)), the Magistrate Judge's solution was to make Plaintiff respond first to discovery, even though Plaintiff served Defendants with discovery requests long before, and to deny Plaintiff the opportunity to control the order in which he deposes Defendants. (Dkt. 100.) Also, despite months of delays already by the time of the January 4, 2017, conference, the Magistrate Judge required only that Defendants produce documents the Friday before depositions were to begin the following Tuesday (Monday being a holiday). (Dkt. 100.) This schedule was particularly extraordinary given the fact that Defendants only had to depose one witness (Plaintiff himself), they were not seeking documents from Plaintiff and they were in exclusive possession of most of the documents needed to establish Plaintiff's claims.

113. The only instance in which the Magistrate Judge showed any inclination to hold Defendants accountable was on January 17, 2017, when the Court granted Plaintiff's request for

an extension for good cause shown, while denying Defendants' baseless request for an extension just because Plaintiff received one (Dkt. 105.) but then on January 20, 2017, the Magistrate Judge reversed course, essentially giving Defendants a blanket extension to produce documents, thus granting a blanket extension until Defendants agreed to the terms of a protective order. (Order dated January 20, 2017 giving Defendants until three days after an order of protection is entered to make its production (Dkt. 108.)) Then, on January 23, 2017, after the order of protection was entered (Dkt. 112.), the Magistrate Judge extended Defendants yet another extension for production of documents during a conference call. (See 1/23/2017 entry in case Docket Report between Dkt. 111 and 112.)

114.    Shortly thereafter, on January 30, 2017, Plaintiff highlighted for the Court the fact that its rulings were aiding and abetting Defendants' bad-faith conduct, advising that "the Court has excused nearly each default all to Plaintiff's prejudice and Defendants' benefit." (The referenced letter is annexed hereto as Exhibit KK (Dkt. 123.)) Unfortunately, this letter was to no avail as the Court again allowed Defendants to escape the consequences of their default by relieving them of their deemed admissions to Plaintiff's RFAs. (Dkt. 124.)

115.    After months of dealing with Defendants' bad-faith conduct following the face of prior extensions, the Magistrate Judge denied the parties' request for an extension on April 2, 2017. At this point, I wrote to the Magistrate Judge (in letters that were cc'd to the Honorable Judge Carter) informing her, among other things, that: (a) Plaintiff was requesting a conference "establishing an unbiased discovery schedule that does not unfairly prejudice Plaintiff and preclude Plaintiff from obtaining the discovery necessary to prove his claims"; and (b) the denial of the extension request "unduly prejudice[d] Plaintiff to the benefit of Defendants because . . . Plaintiff [wa]s taking all but one of the many necessary depositions and all of the documents [we]re in the Defendants' possession." (The April 13 and 19 letters attached as Exhibit M (Dkt. 154) and Exhibit HH (Dkt. 157.)) In response, on April 20, 2017, the Magistrate Judge finally set a new schedule giving the parties until June 30, 2017 to complete discovery. (Dkt. 158.)

116.    On May 3, 2017, in the midst of ongoing attempts to induce Defendants to comply with their discovery obligations in advance of Plaintiff's motion to compel deadline, Plaintiff accepted Defendants' offer of judgment, ending the discovery phase of the dispute with

Defendants never having even come close to full compliance. (Dkt. 162.)[6]

117.     In addition to the increased time and labor necessitated by Defendants' obstruction and delay described herein, the decisions of the Magistrate Judge were highly prejudicial to Plaintiff and further increased the time spent litigating this matter by emboldening Defendants on nearly every occasion.

## XVII.  ADDITIONAL CONSIDERATIONS FOR FEE APPLICATION

118.     As further discussed in the Memorandum of Law accompanying this fee application, various aspects of this litigation and my representation support the reasonableness of the requested fees.

119.     With respect to the amount of time and labor involved, as detailed above, Defendants' obstructionist tactics greatly increased the costs of the litigation for Plaintiff. Defendants' use of their vastly superior resources to delay and thwart the prosecution of a meritorious employment discrimination claim is the very circumstance that the fee-shifting statutes were designed to address through an award at the prevailing market rate. An award that does not take these costs and burdens into account would allow Defendants to avoid the full consequences of their own misconduct.

120.     The requested hourly rate of $650 is also supported by various other facts specific to this case. My previously discussed experience as a Federal litigator—particularly in the areas of governmental relations, labor and employment law—was definitely brought to bear in this employment discrimination case against a government employer. The requested rate is markedly below the $1,100 rate that I customarily charge my high-profile corporate clients in connection with commercial litigation, and which rate I have previously charged in employment matters. (A true and correct copy of a retainer agreement charging the $1,100 rate in another employment matter is annexed hereto as Exhibit OO.) My requested hourly rate is also lower than the hourly rate under my retainer agreement with Plaintiff that he was required to pay in the event that he

_____

[6] In addition to the Magistrate Judge's rulings on the discovery schedule, as previously discussed (*see supra* at ¶¶ 107-117), Plaintiff was similarly prejudiced by her failure to hold Defendants accountable for their failure to respond timely to requests for admission.

discharged me without cause. (A true and correct copy of my retainer agreement with Plaintiff is annexed hereto as Exhibit NN.)

121. In this case, I was able to obtain a judgment in Plaintiff's favor against all Defendants "on all claims . . . asserted in the Complaint" (Dkt. 171), which included civil rights claims under federal, state and city law. Moreover, the outcome had considerable non-monetary benefits for Plaintiff. As he explains in his own declaration in support of this fee application, in addition to obtaining damages of $180,000, it was extremely important to him that the litigation be resolved by a public judgment and that he would not have traded this for a private and confidential settlement for many multiples of the damages award. (See Lewis Decl., ¶¶ 3-8.)

122. Furthermore, the litigation prompted beneficial institutional changes by exposing a discriminatory supervisor as well as the politics at RIOC (including the Board's failure to act as required) and financial misconduct regarding taxpayer funds. Among other things, after the Complaint was filed, the RIOC executive team once again became diverse as it had been before Defendant Indelicato's reign as President. (See Lewis Decl., ¶¶ 9-11 (describing the composition of the executive team both before and after this litigation)). In fact, Plaintiff is not the only individual affected by the discriminatory behavior of RIOC, and particularly its Executive Chamber. On September 26, 2016, another individual, Othniel Maragh, who was pursuing similar civil rights claims against RIOC and individuals working for RIOC (including Defendants in this matter) and who apparently was unable to obtain representation at the time, was able to essentially copy Plaintiff's Complaint so that he could meet his filing deadline; he was later able to obtain representation with a well-known firm. (See complaint filed in Maragh v. The Roosevelt Island Operating Corporation et al., annexed hereto as Exhibit II.)

123. In addition, this type of case presented significant and unique challenges at every stage even apart from the substantive legal issues raised. Prior to this case, the "RIOC Board" as an entity never had a judgment against it and its individual members never had a judgment entered against them in their individual or representative capacities, and I am unaware of any other case in which a judgment had ever been entered against the board members of any New York State public benefit corporation in their individual capacity. Moreover, because of all of the attorneys involved (including Plaintiff, RIOC's General Counsel, the Executive Chamber attorneys and the outside counsel representing RIOC in the matters at issue forming the

35

pretextual basis for Plaintiff's termination), there were complicated issues regarding privilege, which Defendants sought to use to their advantage.

124. The representation also imposed considerable risks, expenses and burdens on me. I worked on a contingency basis. The litigation was especially risky in light of the substantial amount of the expenses that I had agreed to advance. Thirty depositions were noticed and eight of these were taken (most by video) before Plaintiff accepted Defendants' offer of judgment. I was also required to pay approximately $9000 in fees for a mediation that did not yield any offer from Defendants (even though Melick previously represented that they would pay those fees). Moreover, Plaintiff was unable to find counsel willing to advance those costs and willing to not publicize the matter—which Plaintiff very much sought to avoid considering his position in the legal profession and the uncertainty inherent in any litigation. I likewise was unable to find suitable counsel for Plaintiff who was willing to take the representation on those same terms. Nevertheless, even after Defendants paid Plaintiff the judgment amount, I did not retain anything from that amount for the fees in this action pending resolution of this fee application, as is customary in these types of cases. Instead, I retained only an amount to cover a portion of the expenses that my firm had advanced.

125. In addition to the costs, the case imposed substantial time limits on my other work. Plaintiff was unemployed for a year after his termination and therefore justifiably anxious to prosecute his claims. Toward that end, I took various actions, including seeking information through FOIL requests and attempting to preserve evidence prior to commencing the action as well as fighting hard to oppose Defendants' request for a stay of discovery. In addition, I found himself unable to accept other matters for several months because of the time limitations created both by Defendants' misconduct and by the other restrictions imposed on him by the Magistrate Judge in this case—including the order scheduling depositions, which put me on a double full-time schedule for the first quarter of 2017. As a result, I was unable to take on representation of other RIOC employees who reached out to me even though I might otherwise have taken them on simply for economies of scale.

126. Nor did representing Plaintiff provide me with any offsetting business advantages. In fact, the representation restricted my professional business opportunities. As a result of the representation and litigating against Defendants, I am unlikely to be able to obtain any RFPs with

36

New York State entities in the future despite having substantial experience representing government entities. In addition, Plaintiff is not a repeat client and could no longer be a source of business for me despite having been a professional acquaintance who served as an in-house attorney in a large international corporation. On the other hand, Defense Counsel: (a) was working on behalf of Chubb Insurance under a policy that covered the cost of Defendants' representation and the judgment award; (b) works for Chubb on other matters; (c) desired to obtain additional matters from Chubb; and (d) is in fact representing these Defendants in Maragh v. R.I.O.C., which as previously discussed involves similar claims.

127. With respect to the reasonableness of the charges, although I am a solo practitioner, I was assisted by numerous law students and paralegals in connection with such areas as legal research, preparation of certain document, document management (including deposition exhibits) and file maintenance. However, in the exercise of my billing discretion, I did not charge Plaintiff's account with any of those costs. Instead, I wrote these off even though it is my practice to bill those costs and expenses through to clients. The amount written off is approximately $35,000 (attributable to 6 law students) and two legal Assistant. I also wrote off or otherwise did not charge certain administrative costs and Westlaw/Lexis research costs, which would have exceeded $100,000.

128. Also supporting Plaintiff's request for fees are two declarations from experienced attorneys who are able to attest both to my skills and knowledge as an attorney and the reasonableness of my requested hourly rate of $650 per hour for work performed in this matter. Annexed hereto as Exhibit LL is a true and correct copy of a signed Declaration of Seth A. Harris in Support of Plaintiff's Attorney's Fees Petition. Annexed hereto as Exhibit MM is a true and correct copy of a signed Declaration of Andrew Multer in Support of Plaintiff's Attorney's Fees Petition.

129. Finally, in further support of Plaintiff's request for fees is a declaration from Plaintiff Donald Lewis attesting to the quality of the work I put in to this matter and the importance of achieving the favorable result that was achieved. Annexed hereto as Exhibit PP is a true and correct copy of a signed Declaration of Plaintiff Donald Lewis in Support of Plaintiff's Attorney's Fees Petition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
December 22, 2017 By:_____/s/_____
Anthony J. Rotondi, Esq.

*Attorney for Plaintiff*
Rotondi, LLC
30 Wall Street, 8th Floor
New York, NY 10005