# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DONALD LEWIS,

    Plaintiff,

        vs.

THE ROOSEVELT ISLAND OPERATING CORPORATION, THE
ROOSEVELT ISLAND OPERATING CORPORATION BOARD OF
DIRECTORS, CHARLENE M. INDELICATO, CLAUDIA MCDADE,
FRANCES A. WALTON, MARGARET SMITH, HOWARD POLIVY,
KATHERINE GRIMM, MICHAEL SHINOZAKI, FAY FREYER
CHRISTIAN, DARRYL TOWNS, DAVID KRAUT and MARY BETH
LABATE  in their official and individual capacities,

    Defendants.

Civil Action No. 16-CV-

**COMPLAINT**

**JURY TRIAL DEMAND**

---

       Plaintiff Donald Lewis, by and through his attorney, Anthony Rotondi, alleges upon

personal knowledge and upon information and belief to all other matters, as follows:

### NATURE OF ACTION

1.      Plaintiff Donald Lewis ("Plaintiff" or "Mr. Lewis"), brings this action against

Defendants the Roosevelt Island Operating Corporation ("RIOC" or the "Corporation"),

Charlene M. Indelicato, Frances A. Walton, Claudia McDade, the Roosevelt Island Board of

Directors (during the events at issue) including resident Directors Howard Polivy, David Kraut,

Michael Shinozaki, Margaret "Margie" Smith, Fay Freyer Christian and Dr. Katherine Grimm

and former Commissioner of the New York State Division of Homes and Community Renewal,

Darryl Towns, and former New York State Director of Budget, Mary Beth Labate, in their

official and individual capacities during the relevant events at issue.[1]

2.      This action seeks monetary relief and damages for injuries that Plaintiff, has sustained as

---

[1] Unless otherwise noted, any reference to the Individual Defendants as defined under the "Parties" Section of this
Complaint or the Board of Directors shall include those Defendants in both their official and individual capacities.

a result of the Defendants' unlawful acts and omissions, including race (Black) and gender (male) discrimination, retaliation, exposure to a hostile work environment and wrongful termination. Defendants' conduct was willful, malicious, done in bad faith, with a depraved indifference to Plaintiff's rights, reckless and / or negligent.

3.      The events giving rise to the claims in this Complaint are particularly egregious. Plaintiff served as General Counsel ("GC") to the Corporation in an exemplary fashion for nearly four years. During nine-months of that time, he simultaneously solely performed the job duties of three of the four executive positions without increased compensation. He received the highest of praise from the Board of Directors. Notwithstanding Plaintiff's recognized contributions to the Corporation, or that he had received a performance-based raise just a few weeks earlier, he was terminated immediately by an e-mail sent on a Friday afternoon by RIOC President Charlene Indelicato. The termination was the culmination of Plaintiff being subjected to a hostile work environment, discrimination and retaliation bases upon Plaintiff's race, gender and that he had reporting concerns about wrongdoing at the corporation, including with regard to financial and discrimination issues, *i.e.* "whistleblowing." Plaintiff was the only male and only minority (black) member of the executive team. After he was terminated, Defendants replaced him with a white women of similar age to President Indelicato, leaving RIOC with an executive team of all white woman of similar age. Strikingly, Defendants even have admitted that Plaintiff's termination was an act of retaliation.

4.      Plaintiff also asserts claims against Defendants RIOC, the Board of Directors and the Individual Directors for negligent hiring, supervision, retention and training and against the Board of Directors and Individual Directors for failure to properly exercise their duties.

5.      Defendants' actions and conduct, *inter alia*, violated 42 U.S.C. § 1981 *et seq.* ("Section 1981"), 42 U.S.C. § 1983 *et seq.* ("Section 1983"), Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York City Human Rights Law, Administrative Code § 8-107 *et seq.* ("NYCHRL"), the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"). Defendants' acts and omissions constituted a "continuing violation" of these Federal and State civil rights laws (concerning, among other items, anti-discrimination protections, due process rights, and protection against violation of First Amendment rights and against retaliation).

6.     Defendants' actions have caused, and will continue to cause, Plaintiff to suffer substantial economic and non-economic damages, including without limitation, loss of income (back and front pay), loss of future earning potential, loss of future employment prospects, harm to his professional and personal reputation, mental anguish and emotional distress.  Plaintiff seeks to recover compensatory damages, costs, attorney's fees and other items to make him whole for the damages he has suffered.  Defendants have acted intentionally, deliberately and with malice to discriminate and retaliate against Plaintiff and/or acted in reckless disregard for Plaintiff's protected right to be free from discrimination and retaliation, as well as well-established corporate policy, entitling Plaintiff to punitive damages and to deter Defendants from repeating the same or similar unlawful discriminatory conduct.  Plaintiff seeks damages in an amount to be determined by a jury at trial.

**JURISDICTION AND VENUE**

7.     This action arises under Title VII, 42 U.S.C. Sections 1981 and 1983, New York State and New York City anti-discrimination and anti-retaliation laws, and common-law protections.

8.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1332, 1343, 1367(a) and the aforementioned statutory provisions.

9.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's New York City and New York State statutory claims brought under the NYCHRL and NYSHRL and common-law claims.

10.    Plaintiff has complied with all the conditions precedent to initiating suit.  Plaintiff timely served a Notice of Claim on Defendants on July 23, 2015.  More than 30 days have elapsed since the Notice of Claim was served upon Defendants and adjustment or payment has been neglected or refused.

11.    Plaintiff has satisfied all statutory prerequisites for filing this action.  Plaintiff timely filed a charge of discrimination and retaliation (the "Charge") with the United States Equal Employment Opportunity Commission ("EEOC").  The EEOC referred Plaintiff's Charge to the United States Department of Justice, Civil Rights Division and on April 13, 2016, the Department of Justice issued a Notice of Right to Sue Letter Upon Request (the "Notice"). This action was timely brought within ninety (90) days of the Notice.  A copy of the Notice is

annexed to this Complaint as Exhibit A.

12.     Within ten (10) days after having commenced this action, pursuant to 8 NYCRR 502(a) and (c) Plaintiff will serve a copy of this Complaint upon such authorized representatives of the City Commission on Human Rights and the Corporation Counsel.

13.     Venue is proper within this district pursuant to 28 U.S.C. §§ 1391 and 42 U.S.C. § 2000e-5(f)(3) because RIOC's Main Office is located at 591 Main Street, New York, New York and substantial part, if not all, of the unlawful conduct which gives rise to Ms. Lewis' claims occurred within the Southern District of New York.

14.     Defendants are subject to personal jurisdiction in New York.

**PARTIES**

I.      <u>PLAINTIFF</u>

15.     <u>Plaintiff Donald Lewis</u> was employed by RIOC from October 31, 2011 through April 24, 2015 and was an "employee" of RIOC within the meaning of all applicable federal, state and city statutes.  Plaintiff is a resident of the State of New York.

II.     <u>RIOC AND EMPLOYEE DEFENDANTS</u>

16.     <u>Defendant the Roosevelt Island Operating Corporation ("RIOC")</u> is a public benefit corporation, located in New York City, and empowered under Chapter 196 of the New York State Unconsolidated Laws to carry out the operation, maintenance, and development of Roosevelt Island.  RIOC employs more than 20 employees.  RIOC is an "employer" as well as a public employer and state actor within the meaning of applicable federal, state and city statutes including but not limited to Title VII, Sections 1981 and 1983, the New York Executive Law, the New York Civil Service Law, and the New York City Administrative Code.  During the relevant time, RIOC accepted Federal funds, including funding for the Franklin Delano Roosevelt Four Freedoms Park on Roosevelt Island.

17.     <u>Defendant Charlene M. Indelicato ("Indelicato")</u> is being sued in her individual and official capacity.  From in or around May 2013 through March 2016, Defendant Indelicato was (i) the President & CEO of RIOC and as such was acting in the capacity of officer, servant, employee and/or agent of RIOC; (ii) acting under the color of the laws, statutes, ordinances,

regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her employment (unless otherwise noted); and (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff. Defendant Indelicato had substantial policy making authority at RIOC. During all relevant times Indelicato was a resident of the State of New York.

18.     Defendant Frances A. Walton ("Walton") is being sued in her individual and official capacity. From around January 2014 through December 2015, Defendant Walton was the Chief Financial Officer ("CFO") of RIOC and as such was (i) acting in the capacity of officer, servant, employee and/or agent of RIOC; (ii) acting under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her employment; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff. In her CFO capacity, Defendant Walton had substantial policy making authority at RIOC. Defendant Walton is being sued as aider and abettor. During all relevant times Walton was a resident of the State of New York.

19.     Defendant Claudia McDade ("McDade") is being sued in her individual and official capacity. From around 2007 through present (unless otherwise noted), Defendant Claudia McDade was the Director of Human Resources at RIOC and as such was (i) acting in the capacity of officer, servant, employee and/or agent of RIOC; (ii) acting under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her employment; and (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff. In her Director of Human Resources capacity, McDade had substantial policy making authority at RIOC. Defendant McDade is also being sued as aider and abettor. During all relevant times McDade was a resident of the State of New York.

III.     RIOC BOARD OF DIRECTORS AND DIRECTOR DEFENDANTS

20.     Defendant RIOC Board of Directors (the "Board") governs the Corporation and pursuant to RIOC's enabling legislation, the Board is to be composed of nine members, including the Commissioner of the New York State Division of Housing and Community Renewal (or his or her designee), who serves as the Chair; the New York State Budget Director (or his or her designee); and seven public members appointed by the Governor with the advice and consent of

the Senate. Of the seven public members, five members must be Roosevelt Island residents ("Resident Directors"). At all times relevant to this action, the Board was comprised of eight members with one seat remaining vacant. Six of the eight members were residents of Roosevelt Island. The Board sets RIOC policy and is responsible for the business affairs of the corporation. The Board is also responsible for the hiring and firing of executives and, among other things, supervising and monitoring the conduct of executives while in office.

IV. RESIDENT DIRECTOR DEFENDANTS

21. Defendant Michael Shinozaki ("Shinozaki"), a resident of Roosevelt Island, is being sued in his individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Shinozaki was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of his duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Shinozaki is also being sued as aider and abettor. During all relevant times Shinozaki was a resident of the State of New York.

22. Defendant Howard Polivy ("Polivy"), a resident of Roosevelt Island, is being sued in his individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Polivy was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Polivy is also being sued as aider and abettor. During all relevant times Polivy was a resident of the State of New York.

23. Defendant Margaret "Margie" Smith ("Smith"), a resident of Roosevelt Island, is being sued in her individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Smith was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her duties; (iii)

actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Smith is also being sued as aider and abettor. During all relevant times Smith was a resident of the State of New York.

24. <u>Defendant David Kraut ("Kraut")</u>, a resident of Roosevelt Island, is being sued in his individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Kraut was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of his duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Kraut is also being sued as aider and abettor. During all relevant times Kraut was a resident of the State of New York.

25. <u>Defendant Dr. Katherine Teets Grimm ("Grimm")</u>, a resident of Roosevelt Island, is being sued in her individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Grimm was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Grimm is also being sued as aider and abettor. During all relevant times Grimm was a resident of the State of New York.

26. <u>Defendant Fay Freyer Christian ("Christian")</u>, a resident of Roosevelt Island, is being sued in her individual and official capacity as a member of the RIOC Board. At all times relevant to this action, Christian was (i) acting as an agent of RIOC, a public benefit corporation of the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein. Smith is also being sued as aider and abettor.

During all relevant times Christian was a resident of the State of New York.

27.     These six individuals collectively are referred to in this Complaint as the "<u>Resident Directors</u>".

V.     <u>Ex-Officio Director Defendants</u>

28.     <u>Defendant Darryl Towns ("Towns")</u> is being sued in his individual and official capacity as a member of the RIOC Board.  At all times relevant to this action, Towns served as Chairman of the Board through his position as Commissioner of the New York State Division of Housing and Community Renewal and was (i) acting as an agent of RIOC, a municipal agency of for the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of his duties; (iii)  actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein.  Towns is also being sued as aider and abettor. During all relevant times Towns was a resident of the State of New York.

29.     <u>Defendant Mary Beth Labate ("Labate")</u> is being sued in her individual and official capacity as a member of the RIOC Board.  From around February 2015 through at least Plaintiff's termination, Labate served on the Board through her position as New York State Director of Budget and was (i) acting as an agent of RIOC, a municipal agency of for the State of New York; (ii) under the color of the laws, statutes, ordinances, regulations, policies, customs, and/or usages of RIOC and the State of New York and within the scope of her duties; (iii) actively and directly participated in the unlawful discriminatory and retaliatory conduct directed against Plaintiff, and (iv) failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein.  Labate is also being sued as aider and abettor.  During all relevant times Labate was a resident of the State of New York.

30.     These ex-officio Defendant Directors, collectively with the Resident Directors, are referred to in this Complaint as the "<u>Director Defendants</u>."

31.     The Director Defendants, collectively with Defendants Indelicato, Walton and McDade are referred to in this Complaint as the "<u>Individual Defendants</u>."

32.     At all relevant times, Defendants' conduct violated clearly established statutory and

constitutional rights of which a reasonable person would have known.

<h1 style="text-align:center">FACTUAL ALLEGATIONS</h1>

33.    Plaintiff is a 42-year old Black male and was employed at RIOC from October 31, 2011 through April 24, 2015 as Vice President and General Counsel.  From September 2012 through May 2013, Plaintiff continued in his role as General Counsel while simultaneously serving as Acting President and CEO, as well as essentially filling the vacant Vice President of Operations position.  Plaintiff was unanimously voted in by the Board to serve as Acting President & CEO. Plaintiff occupied all of three executive positions by himself – *i.e.,* he performed the duties assigned to three full-time paid executives – but was not compensated for this increased workload.

34.    Throughout his tenure at RIOC, Plaintiff never received a negative performance evaluation. Indeed, just two weeks prior to his unlawful termination, Plaintiff received a performance-based salary increase.  Plaintiff also consistently received accolades from colleagues, co-workers, as well as primary Roosevelt Island stakeholders whom Plaintiff interacted with regarding significant issues and many of whom were shocked upon learning that Plaintiff was dismissed.

35.    The RIOC Directors consistently made glowing comments about Plaintiff's work and work ethic and continued to do so following his unlawful termination.  Indeed, a letter executed by Resident Directors Smith, Grimm, Shinozaki, Polivy, Christian and Kraut (provided to Plaintiff one week following his dismissal) is illustrative of the Directors views concerning Plaintiff during his tenure at RIOC.  This letter reads:

*April 30, 2015*

*Dear Sir or Madam*

*We serve on the Board of Directors for the Roosevelt Island Operating Corporation (RIOC). This letter of recommendation is written in support of Don Lewis, who dutifully served as Vice President and General Counsel of RIOC from October 31, 2011 through April 24, 2015. Further, from September 2012 through May 2013, during an extremely tumultuous time for RIOC, Mr. Lewis served as Acting President and Chief Executive Officer of the Corporation, in addition to fulfilling his demanding duties as General Counsel.  Mr. Lewis has always served RIOC in an exemplary fashion.*

*Mr. Lewis has consistently displayed a high level of professionalism, intellect, perseverance, and commitment. His ability to handle sensitive and complex matters, balancing competing interests, as well as his honesty and integrity and ability to be a team player make him stand out among the executives who have served the Corporation during each of our tenures. On a personal level, Mr. Lewis always comported himself in a refreshing manner. His wit, sense of humor and general good nature made it a true pleasure to work with him.*

*We are fully confident that Mr. Lewis will make an outstanding addition to the organization where he chooses to next bring his talents. We fully recommend and endorse Mr. Lewis as a fine attorney and regret seeing him leave.*

*Yours truly,*

*RIOC Resident Directors (with signatures)*

36.     Notwithstanding his commendable record and performance, Plaintiff unfortunately was not a member of the favored demographic at RIOC under Defendant Indelicato. Lewis is Black and a male, the precise type of characteristics Defendant Indelicato disfavored and tried to excise from the RIOC Main Office where she was located.

37.     Indeed, under Defendant Indelicato's reign, with Indelicato as President and CEO clearly leading the way, with the assistance of Human Resources Director McDade, and the support and/or sign off of the Board of Directors, repeated steps were taken to surround Indelicato with White women. Illustratively, during this time period:

(i)     Defendants hired only women to work in the RIOC Main Office;[2]

(ii)    Nearly the entirety of those hires were White;

(iii)   Defendants terminated all of the Black males who were employed in the RIOC Main Office at the inception of Defendant Indelicato's tenure;

(iv)    Defendants replaced Plaintiff with a White female of similar age to Defendant Indelicato;

(v)     Defendants filled the CFO executive position with another White female of similar age to Defendant Indelicato;

(vi)    Defendants replaced Plaintiff with another White female of similar age to Defendant Indelicato; and

---

[2] The Main Office at RIOC is located at 591 Main Street and is where RIOC executive offices are located (the "Main Office"). The executives do substantially all of their work in the Main Office. Although RIOC employs far greater than 20 employees, the Main Office hosts approximately 20 of those employees primarily in the legal, fiscal, information technology and human resources departments. Because of the relatively small size of the Main Office, there is a great deal of daily interaction between those employees. The other departments at RIOC such as engineering, public safety, grounds, and maintenance have offices or work stations at different locations spread out through Roosevelt Island and those employees' daily interactions with the executives in the Main Office is *de minimus*.

(vii)    Defendants systematically converted the RIOC Executive positions that prior to Defendant Indelicato's tenure was comprised of a diverse and representative mix of individuals -- a Hispanic female, a Black male, a White male and a Hispanic male of varying ages to all White females substantially close in age to Defendant Indelicato.

38.    Notwithstanding Plaintiff's dutiful service to RIOC, on Friday, April 24, 2015 at 4:20 p.m., while Plaintiff was out of the office, he was fired effective immediately *via* an e-mail from Defendant Indelicato containing typographical errors that any two-second proofread should have corrected.  To be clear – after almost four years of dedicated service  and suffering under a hostile work environment under Defendant Indelicato – shortly after Defendant Indelicato learned that Plaintiff had reported (i) Defendant Indelicato's discriminatory conduct towards him; (ii) concerns about pervasive discrimination at RIOC and (iii) concerns regarding potentially improper salary activity, Plaintiff was terminated in an *ultra-vires* action by Defendant Indelicato with zero notice in a blatant act of retaliation and discrimination.

39.    Critically, pursuant to RIOC's By-laws, executives like Plaintiff may only be removed by Board action.  And for a Board action to be effectuated, a majority of the Directors then in office (five at the time) must vote in favor of the action.  Moreover, the powers of the RIOC President are expressly set forth in RIOC's By-laws and do *not* include the power to remove executives.

40.    Defendant Indelicato flaunted the laws governing removal of an executive and terminated Plaintiff without following those requirements.  Moreover, in a deceitful attempt to somehow justify her illegal and *ultra-vires* conduct, Defendant Indelicato attempted to poison the well against Plaintiff by disseminating false information to certain individuals, withholding critical information from other individuals, and acting as if there an urgent need to terminate Plaintiff, when in fact there was no need whatsoever.

41.    Defendant Indelicato's email provided only one reason for Plaintiff's termination, which has proved to be demonstrably and unequivocally by false.  Indelicato claimed the decision was made by the Board, stating:

   "The Chairman and the Board have decided to take the counsel's office in a different direction." Defendant Indelicato's e-mail continued:

   "Therefore, after conferring with the Chairman and the Board, we are asking for your immediate resignation."

(Emphasis added.)  This has proven to be a complete fiction created by Defendant Indelicato to

cover-up her *ultra-vires* and illegal actions. By falsely relaying to Plaintiff that the termination decision was made by the Board, Defendant Indelicato attempted to create the misimpression that the decision was made by the authorized persons and that the appropriate procedural steps had been taken to terminate Plaintiff.

42. To advance the deception, Defendant Indelicato withheld information and relayed misinformation to the Board. Almost immediately following receipt of Defendant Indelicato's email and throughout the following weeks, Plaintiff discussed his unlawful termination with all of the Resident Directors each of whom informed Plaintiff that (i) they had absolutely nothing to do with the decision to terminate Plaintiff, (ii) they did not "decide" to terminate Plaintiff, and (iii) they were not "conferred" with concerning Plaintiff's termination. Moreover, the Resident Directors that Defendant Indelicato simply informed them of the termination as a *fait accompli*, i.e., merely for informational purposes and not as an issue for the Board's deliberation.

43. In furtherance of the ploy, Defendant Indelicato did not copy the Resident Directors on the termination email in order to hide the fact that she was falsely was attributing the decision to terminate Plaintiff to the Board.

44. Notably, prior to his immediate termination by e-mail, none of the Defendants had expressed any concerns regarding Plaintiff's work. Likewise, Defendants had not relayed to Plaintiff (i) any rationale for his dismissal; (ii) any policy or practice that he was alleged to violate; or (iii) any verbal or written warnings. This continued to be the case in the weeks following his termination when Plaintiff was in regular contact with the Resident Directors certain of whom expressed extreme resentment towards Indelicato for lying about their alleged involvement.

45. The false sense of urgency that Indelicato manufactured, appears to have been an attempt at avoiding review of her ultra-vires actions and the possibility that her self-serving plan would be defeated (as was alleged to have occurred in another instance when Defendant Indelicato improperly attempted to coerce a resignation behind the backs of her then supervisors in a different government position). Defendant Indelicato's email stated that Lewis' employment would end in 45 minutes and if he did not submit his resignation within the next three (3) business hours, he would be considered "terminated." The duplicitous urgency Defendant Indelicato created regarding Lewis' removal – sending a hurried typo-ridden e-mail on a Friday

at 4:20 p.m. terminating his employment in less than an hour – served no legitimate purpose.

46.     Simply put, Defendant Indelicato wanted to eliminate the Black male Plaintiff – who at this point of Defendant Indelicato's reign was the only RIOC Executive remaining who was not both White and female – and she culminated her discriminatory and abusive treatment Plaintiff, with the support of the other Defendants, by unlawfully retaliating against Plaintiff for reporting concerns about pervasive discrimination and potential wrongdoing.

47.     The RIOC Board has plainly rejected the fabrications in Defendant Indelicato's termination e-mail.  Although the Board was not involved in the termination decision, they also (i) failed to supervise properly Defendant Indelicato, (ii) take any corrective action, and (iii) admitted during a public Board meeting following the termination of Plaintiff that they have failed to exercise properly their duties.  Moreover, notwithstanding their knowledge of Defendant Indelicato's wrongful conduct and their agreement that there was no legitimate basis for Plaintiff's termination, the Board and the Directors failed to take corrective action.

48.     The Friday evening of his termination and over that weekend, Plaintiff spoke with the all of the Directors who expressed shock, dismay and confusion that Plaintiff had been terminated. Among the quotes from the Directors during these conversations:

- "I had no idea.  I tried to get a hold of Charlene in her car and I couldn't.  What was the reason? I hope the termination letter didn't say anything about the Board.  We had nothing to do with this.  If you need a letter from us, consider it done.  If you need a reference, you got it.  We will push to get you a package, because you definitely deserve a package.  I'll be in touch." – RIOC Director Margie Smith, April 26, 2015.

  Ms. Smith did not know whether the termination letter said anything about the Board, or even what the letter said at all, because Defendant Indelicato did not to copy the Resident Directors on the termination e-mail.

- "I was not informed.  I was not given a reason.  You should not take this lying down.  The only way you should go is if they gave you a super great package.  We should have been informed. You should be given a great recommendation.  I don't like not knowing what happened." – RIOC Director Fay Christian, April 24, 2015.

- "I'm very troubled by the way this happened.  I really enjoyed working with you and I was shocked to hear.  I wish you the very best." – RIOC Director Dr. Kathy Grimm, April 24, 2015.

- "I don't know what happened.  I was not involved in the decision.  These things happen and we don't know why.  I'll try to work up some support.  I can be a reference."  – RIOC Director

Howard Polivy, April 24, 2015.

- "I was totally surprised.  With [a former RIOC Executive] we wanted him gone.  With you, we didn't and I was surprised to hear.  No one wanted you gone.  It really bothers me that we weren't even asked, that we are not given control over executives that we were just informed, not asked." – RIOC Director Michael Shinozaki, April 26, 2015.

- "What news?  I had no idea." – RIOC Director of Budget Board Designee Mike Kendall's response to Plaintiff informing him on Monday April 27, 2015 that Plaintiff had been fired on Friday.  Kendall did not even know, three days later, that Plaintiff had been terminated.

49.     Directors have repeated similar views in subsequent conversations with Plaintiff.  Indeed,

over one month later, the following statements were made to Plaintiff.

- "Everyone agreed [you should get a package], I remember there was an e-mail going around and no one was against that…  [Indelicato] said it was us [as reason for your dismissal]?!?!?  I can't believe that.  That's what everyone is upset about." – RIOC Director Fay Christian, June 1, 2015.

- Agreeing that Plaintiff was "getting overwhelmingly screwed here," Smith stated, "You gotta to do what you gotta do here, and we'll all tell the truth, and that will only help." – Director Margie Smith, June 1, 2015.

- "She [Indelicato] said it was the Board?!?!?  The Board had nothing to do with this . . .We asked her about a severance package and she said we couldn't do it. . .  I said it wasn't fair that he didn't get a severance package." – Director Dr. Kathy Grimm, June 1, 2015.

- "I asked specifically: am I being asked about this decision or am I being informed and after a lot of hemming and hawing I was told I was being informed. . . we are suddenly informed that you were gone and we were not notified earlier that there were any issues or problems with you even when we specifically asked, I was pissed off." – RIOC Director Michael Shinozaki, June 1, 2015.

- In addition, Defendant Chairman Towns has communicated to Plaintiff on multiple occasions that he did not agree with Defendant Indelicato's decision to terminate Lewis' employment.

50.     Certain Directors also have publicly expressed concern with the termination of Plaintiff

and reaffirmed that they had no involvement with the decision.  For example, during a RIOC

Board meeting on May 21, 2015, approximately one month after Plaintiff's dismissal, the

following statements were made by Directors, in the presence of the entire Board and met with

no objection:

- "I'm not even sure why we bother with the vote [concerning a new General Counsel] . . .

because <u>we had no choice in either decision</u>." – RIOC Director Mr. Shinozaki May 21, 2015 referring to the decision to terminate Plaintiff and to hire a replacement.

- "<u>I'm not happy with Mr. Lewis' absence here,</u> there's a lot of questions I have that have not been answered…. why dismiss him…. <u>I would not have dismissed him</u>…. <u>whatever the case we're in the dark</u>…" – RIOC Director Fay Christian May 21,2015.

51.     This public Board Meeting yet again unequivocally evidences Defendant Indelicato's fabrications.

52.     Notwithstanding their clear disagreement with Defendant Indelicato's *ultra-vires*, discriminatory and retaliatory action, RIOC and the Directors took no corrective action and instead failed to exercise their duties properly and failed to follow RIOC's relevant established policies and practices.

53.     The Board's failure to properly exercise their duties (and instead proceed in willful ignorance) is further evidenced by their steadfast failure to accept Lewis' offer to conduct an exit interview, as required by RIOC policy. During several discussions with Resident Directors, Plaintiff unsuccessfully attempted to schedule an exit interview. None of the Resident Directors scheduled an exit meeting despite Lewis' efforts and Director Polivy representations to Plaintiff on multiple occasions that he would set up such meeting.

54.     That Plaintiff was immediately "thrown out the door," via e-mail, after almost four years of service, with absolutely no notice, without a single discussion, based on a complete fabrication, with no severance and without an opportunity to seek new employment is punitive and indicative of the malicious nature of Defendants' conduct. This is particularly true given the Board's failure to act notwithstanding their positive views concerning Plaintiff's tenure at RIOC and their willingness, more than six-months after his termination, to disseminate false information concerning Plaintiff, his competency and work ethic as a pretextual reason for his termination.

55.     In March and April of 2015, Plaintiff reported numerous concerns regarding RIOC under the reign of the self-described "dictator" Defendant Indelicato. Plaintiff reported items of public concern related to the following issues:

     (1) concerns related questionable and concealed salary activity;

     (2) abusive treatment and discriminatory race-based directives given to Plaintiff by Defendant

Indelicato; and

(3) concerns about pervasive discrimination.

56.     In or around mid-April, Defendant Indelicato was heard complaining about, among other things, that Plaintiff had reported concerns regarding these issues, all of which involved Defendant Indelicato, Walton and McDade.  Just a few days later, Plaintiff was fired by Defendant Indelicato through ultra-vires, discriminatory, and blatant act of retaliation.

57.     Astoundingly, <u>Defendants subsequently admitted that Plaintiff was terminated for reporting potential wrongdoing</u>, commonly referred to as "Whistleblowing."  That is, in an almost surreal fashion, through their counsel, Melick and Porter, and otherwise Defendants admitted that Plaintiff's dismissal was a retaliatory act done in response to his reporting concerns about potential misconduct and wrongdoing.  Defendants thereby expressly admitted that their conduct violated and was in direct contradiction to, *inter alia*, the protections afforded to Mr. Lewis under: 42 U.S.C. 1983; 42 U.S.C. 1981; Federal and State Constitutional provisions including the First Amendment; Title VII; the New York City Human Rights Law; and the NYS Human Rights Law**.**  Defendants' conduct also violated RIOC's own claimed policy of affording "whistleblowers" protection against adverse employment action as well as the NYS Public Officers Law Section that mandates the same protections be afforded employees who report potential misconduct. Defendants' apparent comfort with admitting that they violated a slew of Constitutional and statutory civil rights protections exemplifies the manner in which certain Defendants conducted themselves with an air of impunity during Defendant Indelicato's self-described reign as dictator.

58.     In addition, following his dismissal, certain Defendants disseminated malicious pre-textual fabrications concerning Plaintiff and his tenure at RIOC, including false statements concerning Plaintiff's performance and work habits.  For example, upon information and belief, Defendant McDade, RIOC's Human Resources Director, has on multiple occasions spread outright false statements of facts on Roosevelt Island concerning the circumstances surrounding Plaintiff's dismissal.  These false statements portrayed Plaintiff in a negative light.

59.     Based on discussions with Defendants and their representatives, Plaintiff believes that Defendants disseminated these false defamatory statements to dissuade Plaintiff from initiating litigation in order to avoid his being subjected to a public smear campaign by certain Defendants.

60.     Further, the Friday of Plaintiff's unlawful immediate dismissal, the lock on Plaintiff's office door visibly changed.  Upon information and belief, Indelicato, Walton and McDade collectively made that decision.  That the lock was visibly changed resulted in a good deal of discussion on Roosevelt Island leaving people with the impression that Plaintiff had engaged in some type of illicit activity.  Plaintiff is unaware of a single additional instance at RIOC when office locks of dismissed employees were visibly changed to lock the employee out of his/her office.  This was undoubtedly done to paint Plaintiff in a negative light and was the beginning of a defamatory smear campaign Defendants undertook.

61.     In or around May 2013, the RIOC Board of Directors appointed Defendant Indelicato to her position as RIOC CEO and President.  Defendant Indelicato took over the full-time Presidency at RIOC, a position which Plaintiff had filled for nine months in an interim capacity.  Defendant Indelicato is a White female over 60 years old, who has described herself as "unemployable," presumably because of two prior employment discrimination lawsuits against her.

62.     The two prior employment discrimination lawsuits against Defendant Indelicato were, and should have been, a sign of things to come.  A news article concerning one of the lawsuits against Defendant Indelicato is entitled *"Ex-Marine Sues' Man-Hating' W'Chester Lady Lawyers"*.  Indeed, Ms. Defendant Indelicato, with the support of the other Defendants, has continued her discriminatory and "man-hating" behavior at RIOC.

63.     Defendant Indelicato is a high-ranking Government executive who had policy-making authority and set RIOC policies.  For much of Defendant Indelicato's tenure – and through Lewis' termination and continuing thereafter – Defendant Indelicato, acted in concert with Walton and McDade (who are also high-ranking Government executives who had policy-making authority and set certain RIOC policies) to undermine and discriminate against Plaintiff.

64.     The unlawful termination of Plaintiff was the final step in Defendant Indelicato's attempts to remove Plaintiff from the position of General Counsel and replace him with a White woman, which began at the very inception of her tenure.  Almost immediately upon her appointment, Defendant Indelicato requested that Plaintiff voluntarily vacate his VP/General Counsel ("GC") position and take the open position of VP of Operations, thereby enabling Indelicato to fill the GC position with a White female she desired to become GC.  Plaintiff

refused to do so but Defendant Indelicato continued pressuring him to vacant the GC position in favor of the Operations position. Defendant Indelicato later eliminated the Operations position, which presumably would have meant the elimination of Plaintiff's employment had he been in that position. After Defendant Indelicato's failed attempts to cajole Plaintiff into voluntarily vacating the GC position in exchange for a soon-to-be obsolete position that would have resulted in his elimination, Defendant Indelicato stepped up her coercive methods to eliminate Plaintiff by making his workplace intolerable through discrimination and creating an abusive and hostile work environment and then ultimately to unlawfully terminating Plaintiff.

65.     By terminating Plaintiff and replacing him with another White female around the same age as Indelicato, Defendants concluded the transition of RIOC's entire Executive positions from a racially and gender diverse group of executives to exclusively all female and all White executives around the same age.   Defendants had already filled the CFO position in or around January 2014, with Walton, an older White female like Defendant Indelicato; thus with Plaintiff's replacement, RIOC was left with a perfectly homogenous executive team comprised of individuals who were all White, all female, and all around the same age.

66.     As noted, the Main Office at RIOC is located at 591 Main Street and is where RIOC executive offices are located (the "Main Office").  The executives do substantially all of their work in the Main Office.   Although RIOC employs far greater than 20 employees, the Main Office hosts approximately 20 of those employees primarily in the legal, fiscal, information technology and human resources departments.  Because of the relatively small size of the Main Office, there is a great deal of interaction between those employees.  The other departments at RIOC such as engineering, public safety, grounds, and maintenance have offices or work stations at different locations throughout Roosevelt Island and those employees' daily interactions with the executives in the Main Office is *de minimus*.

67.     Of the four Blacks employed in the Main Office when Defendant Indelicato arrived – two Black males and two Black females – all have complained about their treatment under Defendant Indelicato's reign.  Moreover, the only two Black male employees have been fired.  That is, 100% of the Black male employees (who were located in the Main Office when Defendant Indelicato arrived) have been terminated.  And 100% of the Black employees (who were located in the Main Office when Defendant Indelicato arrived) have complained about their treatment.

68.     Additionally, the last full executive RIOC team, prior to Defendant Indelicato's appointment, was comprised of a Hispanic female (President & CEO), a White male (VP & CFO), a Hispanic male (VP of Operations), and a Black male (VP & General Counsel).  The racial and gender makeup of the executives was 50% Hispanic, 25% Black (for a total of 75% Minority), 25% White, 75% male and 25% female.  Subsequent to the appointment of Indelicato, Defendants RIOC, RIOC Board, Individual Directors, McDade, and Indelicato changed the profile of the executive positions at RIOC to 0% Hispanic, 0% Black, 0% Minority, 100% White, and 100% female.[3]

69.     Tellingly, upon information and belied, every full-time employee hired in RIOC's Main Office (of approximately 20 employees) during Defendant Indelicato's tenure (and while Plaintiff was still employed at RIOC) was a woman.  There were five or more hires in the Main Office during this period – all of women – including: (i) VP & Chief Financial Officer; (ii) Internal Controls & Compliance Officer; (iii) Director of Information Technology; (iv) Another Director of Information Technology; and (v) Human Resources Assistant.

70.     Additionally, three full-time positions were filled in the Main Office shortly after Plaintiff was terminated and Defendants filled each of these positions with a female.  Furthermore, as previously alleged, Plaintiff was replaced by a White woman.  From May 2013 through shortly after Plaintiff's termination, upon information and belief, in the Main Office which hosts approximately 20 employees, Defendant Indelicato, along with McDade, spearheaded the consecutive hiring of at least eight (8) women, seven (7) of whom were White.

71.     Under Defendant Indelicato's administration, Plaintiff suffered abusive, hostile and discriminatory treatment where race, ethnicity and gender formed the basis for Defendant Indelicato's high-handed decisions who even referred to herself as a "dictator."  Defendant Walton –  the other RIOC executive who reported to Defendant Indelicato and most similarly situated to Plaintiff –  was never subjected to this type of treatment.  Neither was the white female McDade who was essentially treated as an executive by Indelicato.

72.     Defendant Walton was the RIOC employee most similarly situated to Plaintiff, as they were the only two executives other than Defendant Indelicato and both reported to, and were

---

[3]  As previously indicated, Indelicato eliminated the VP of Operations executive position.

supervised, by Defendant Indelicato. Plaintiff, as a Black male, was treated far worse than the White female Defendant Indelicato, and this gross difference in treatment was recognized by several employees at RIOC.

73.     For example, it was not uncommon for Defendant Indelicato to yell, scream and curse in response to legitimate questions from Plaintiff to which she had no adequate response. Defendant Indelicato's hostility towards Plaintiff but restraint towards Defendant Walton and Defendant McDade is consistent with her alleged misbehavior towards male subordinates. A prior federal discrimination suit by a male U.S. Marine against Defendant Indelicato – regarding her employment in a prior government position – alleges that "Male staff . . . are publicly degraded due to their gender by Defendant Indelicato, who has screamed so loudly at them in the presence of subordinate staff that she could be heard through the walls of several offices." Likewise, Defendant Indelicato frequently screamed at Plaintiff in a manner that clearly could be heard through office walls by virtually all RIOC employees located on the first floor of the Main Office.

74.     Defendant Indelicato would also frequently subject Plaintiff to the "silent treatment" for entire days. The silent treatment by superiors is widely recognized as a highly abusive form of treatment by superiors in the workplace.

75.     The abusive, hostile and discriminatory treatment of Plaintiff by Defendant Indelicato was commonplace and included, but were not limited to, comments about: (i) Plaintiff's skin color/complexion; (ii) Blacks and Caribbeans; and (iii) behaviors of "ethnic people." Defendant Indelicato frequently screamed at Plaintiff, used expletives and more than once directed Plaintiff to "GET THE F*CK OUT OF MY OFFICE!" For example, when Plaintiff attempted to discuss a major reduction to the Legal budget, for which he was not consulted, Defendant Indelicato screamed at Plaintiff "I DON'T NEED TO DEAL WITH THIS SH*T!." Defendant Indelicato later continued, "I DON'T WANT TO DEAL WITH THIS SH*T!" Defendant Indelicato was yelling so loudly that foam literally formed on the sides of her mouth.

76.     Defendant Indelicato's frequent open hostility towards Plaintiff was recognized by several RIOC employees who at times became visibly disturbed and uncomfortable. Additionally, in one instance Director Polivy sought Plaintiff out after witnessing such an incident to apologize for Defendant Indelicato's behavior and claimed, "I'll talk with her later."

Polivy either never spoke with Defendant Indelicato or, if he did, his discussion had no effect because Defendant Indelicato's abusive, hostile and discriminatory conduct towards Plaintiff continued.

77. In another instance, during a meeting with a representative from the Department of Labor ("DOL"), Defendant Indelicato aggressively snatched a document from Plaintiff and refused to give him a copy, which he required for his work. Plaintiff had to contact a DOL representative to obtain the document. Indelicato never undertook such aggressive, inappropriate and hostile behavior towards Walton or McDade.

78. In addition, Defendant Indelicato would make offensive remarks to Plaintiff about other Black persons. For example, Defendant Indelicato suggested that a prominent Black executive had received his position not on merit, but rather because he "checked off" certain "affirmative action" boxes, including being Black. Defendant Indelicato stated:

> [He] checks off a lot of boxes, that's why he has his position. But he's just a figurehead . . . he doesn't [handle] real issues … he's an empty suit meddling . . . because he has nothing better to do.

79. Defendant Indelicato made additional racially charged disparaging remarks about Black employees, their appearances and willingness to work with other Blacks. Defendant Walton and McDade have echoed certain of these statements and have independently made racially charged comments concerning Black employees at RIOC.

80. Defendant McDade's conduct is particularly inexcusable considering that as Director of Human Resources she should have been available to employees for an objective review of employment concerns. Rather than displaying objectivity, Defendant McDade apparently made blatantly racist comments, took sides by aligning herself with the misconduct of Defendants Indelicato and Walton, and discriminated against Black employees.

81. For example, subsequent to his termination, Plaintiff was informed by another employee that Defendant McDade instructed her assistant not to speak with certain RIOC employees, stating: "[B]ecause they are Black and they think they are treated unfairly just because of their skin so don't ever talk to them and stay away from them." Plaintiff was also informed that in response to certain Black employees voicing concerns about their treatment, Defendant McDade stated to her assistant:

"Look at what they do, because they are Black.  Black people are always looking to make some money, some easy money."

82.     Certain Defendants have continued to disseminate disparaging, false and defamatory statements concerning Plaintiff following his unlawful termination.  Indeed, Defendants' conduct following Plaintiff's termination has been highly questionable and suggests further wrongdoing. For example, on July 23, 2015, Plaintiff requested a copy of his personnel file from McDade. Despite representing to Plaintiff that his file would be promptly provided, Defendants withheld the file from Plaintiff for almost six months.  There is no legitimate reason for this information to have been withheld for such a long period of time.

83.     Plaintiff was subjected to disparate treatment and treated less favorably than similarly situated White executives with regards to compensation and salary increases.

84.     Further, at the time he was terminated, Plaintiff:

    (i)      had been employed at RIOC for nearly four years;
    (ii)     had for nine months simultaneously served in three executive positions, including the role of Acting President for nine-months;
    (iii)    had been denied payment for the salary differential for his time as Acting President and CEO, and was told that he would be provided a raise instead; and
    (iv)     had received glowing praise from the Board of Directors concerning his tenure at RIOC.

85.     In contrast to Lewis' employment history Defendant Walton:

    (i)       had only been employed by RIOC for one year; and
    (ii)      was widely known to do far less work than the prior CFO.

86.     In further contrast to Lewis' employment history, Defendant McDade had resigned from her position at RIOC to accept other employment and just recently returned to RIOC's employ when the other employment did not work out.  McDade's return to RIOC itself was in direct contradiction to the policy and practice under Defendant Indelicato.  Defendant Indelicato stated on more than one occasion "once you leave RIOC, it is a sign of disloyalty, and you do not return; we wouldn't even consider that."

87.     Nonetheless both Defendant Walton and McDade received raises that were not given to Plaintiff.

88.     Upon information and belief, in or around January 2015, Defendant Walton with Defendant Indelicato's and McDade's undertook certain concealed salary activity that according

to her former assistant, Defendant McDade had referred to as "total[] fraud."

89.     Although Plaintiff was not responsible for payrolls or salary, when Plaintiff learned of this concealed raise which was a matter of public concern, he reported it. In a blatant act or retaliation, Plaintiff was terminated shortly following his report of the wrongdoing.

90.     In another example of Defendants' adverse treatment of Plaintiff, Defendants denied Plaintiff's request to be compensated for at least the salary differential during his nine months as Acting President and CEO, while continuing in his role as General Counsel and Vice President, and essentially filling the Vice President of Operations position. This differential had been paid to a former RIOC employee who requested the compensation. Nonetheless, Plaintiff's request was denied and Defendant Indelicato assured him that he would receive a raise in the future (other than standard across the Board or performance based raises) to compensate for the denial. Plaintiff was never given that promised raise.

91.     Plaintiff was also treated less favorably than certain former White RIOC executives and senior employees with respect to his post-termination accrued time, benefits and severance payments (which Plaintiff did not receive).

92.     In addition, Plaintiff contributed to the NYS pension system throughout his RIOC employment but Defendants unlawfully terminated him just 18 months short of the vesting of his pension benefits. Accordingly, Defendants' unlawful actions have disqualified Plaintiff from collecting those benefits at his retirement.

93.     Defendant Indelicato also gave Plaintiff directives based solely on his race.

94.     In one instance in March 2015, Defendant Indelicato directed Plaintiff to participate in the termination of a Black employee with whom Plaintiff had no involvement. Defendant Walton, who is White, had direct involvement with this employee's work, yet Indelicato did not ask Defendant Walton to participate in the termination meeting. When Plaintiff rightfully objected, Indelicato became incensed and then directed another Black employee -- who also had no involvement with the employee being terminated -- to attend the termination.

95.     Indelicato also frequently directed Plaintiff to handle communications with Director Christian because Plaintiff and Christian are both Black. Indeed, Indelicato rarely communicated with Christian, although she communicated practically daily with Directors Polivy and Smith

who are White.

96.     In another example of Indelicato's blatantly transparent race-based task assignment system, when a Black male employee was out of the office for personal issues, Defendant Indelicato directed Plaintiff to call the employee "to check up on him." This was plainly a responsibility more suited to Human Resources (Defendant McDade) or the employee's supervisor (Defendant Walton), but Indelicato directed Plaintiff to do so simply because he and the employee were both Black.

97.     Defendants consistently tried to undermine Plaintiff and make it increasingly difficult for him to fulfill his duties as head of the Legal Department. For example, every request for additional staffing for the Legal Department was summarily rejected by Indelicato. To the contrary, the Fiscal department headed by Defendant Walton was provided with raises and additional staff. Moreover, after Lewis' termination and replacement by a White female, the Legal Department was almost immediately provided with additional staffing.

98.      As another example, Defendant Walton and Indelicato inexplicably reduced the legal budget dramatically without even a discussion with Plaintiff. The reduction was made notwithstanding a budget narrative drafted primarily by Indelicato and Defendant Walton, which stated that essentially every department at RIOC was under stress and needed additional personnel and/or increased payroll.

99.     On October 14, 2014, Plaintiff attempted to address this issue and Indelicato launched into a screaming tirade: "I DON'T NEED TO DEAL WITH THIS SH*T! . . . I DON'T WANT TO DEAL WITH THIS SH*T!" Defendant Walton later acknowledged the mistreatment, stating to Plaintiff "I should have spoken with you first. It was wrong."

100.    Indelicato regularly would hold private meetings with Defendants McDade and Walton to the exclusion of Plaintiff, concerning issues on which Plaintiff should have participated. This conduct made it more difficult for Plaintiff to perform his duties and was designed to undermine his authority. RIOC staff noted that this was occurring.

101.    Defendants Indelicato, Walton and McDade also would withhold and conceal relevant information from Plaintiff which should have been shared with him in order to undermine his position and hamstring his ability to perform his duties. RIOC staff noted these occurrences.

102.     Defendants RIOC, Board, and Individual Directors have ultimate authority and responsibility for the hiring, supervision and firing of employees as well as related practices and policies.  Likewise, these Defendants have ultimate authority and responsibility to ensure compliance with anti-discrimination and anti-retaliation rules and laws, as well as related policies and practices.

103.     Defendants Board and Individual Directors, among other duties, have the responsibility to:

     a. Directly oversee the CEO's performance (in this case Defendant Indelicato);

     b. Establish written policies and procedures for: Personnel & whistleblowers;

     c. Ensure that RIOC's practices are consistent with the adopted rules and by-laws;

     d. Comply with all applicable laws; and

     e. Keep the interests of the authority above personal interests.

104.     Defendants RIOC, Board, and Individual Directors failed to discharge properly their obligations with regard to preventing gender and race discrimination against Plaintiff, preventing unlawful retaliation, and preventing a hostile work environment.  In addition, the Board and Director Defendants failed to act in good faith and with that degree of diligence, care, and skill which an ordinarily prudent person in like position would use in similar circumstances.

105.     Defendants RIOC, Board, and Individual Directors were responsible by their own acts and/or omissions, as well as through the unlawful actions and omissions of Defendants Indelicato, Walton and McDade.  Additionally, Defendant RIOC was responsible by its own acts and/or omissions, as well as through the unlawful actions and omissions of Defendants Board, and Individual Directors.

106.     The Board and Director Defendants' unlawful actions detailed herein were in each instance undertaken in bad faith, with malice, and in violation of clearly established law of which they were all aware, as well as clearly established RIOC policy.

107.     The Board and Director Defendants failed to fulfill their duties concerning Indelicato, as well as Walton and McDade.  Among other things, the Director Defendants were negligent and/or reckless and/or willfully ignorant in hiring Indelicato by failing to properly vet Indelicato including, but not limited to, Indelicato's role as a Defendant in at least two prior Federal

employment discrimination lawsuits.

108.     Indeed, the Board and Director Defendants publically admitted the failure in that regard. While the Board "deliberated" whether to hire Indelicato, Defendant Director Grimm expressed displeasure that:

> "[R]eferences haven't been adequately checked," and continued, "I heard some things on the subway here today coming to this meeting that disturbed me and I feel obliged to abstain."

109.     Notwithstanding Grimm's concerns about hearing "disturbing" information concerning Indelicato, and with the Board admittedly not doing proper diligence, the Board voted to approve Indelicato's hire.

110.     On multiple occasions, Plaintiff reported to certain Directors his concerns regarding (i) the troubling treatment of Black employee, (ii) the abusive and discriminatory treatment he was being subjected to, and (iii) the mistreatment of his staff designed to undermine his authority. The Directors indicated they would discuss the issue with their fellow Directors, and Indelicato, yet apparently, nothing was done to correct the issues of which Plaintiff complained because there was no improvement regarding those issues. The Board's inaction amounted to a ratification of the conduct of which Lewis complained.

111.     Instead, the Board and Director Defendants upon information and belief simply informed Indelicato of Lewis' complaints which led to her discriminatory, unlawful and ultra-vires retaliation against Plaintiff.

112.     Moreover, following Lewis' termination, the Director Defendants publicly admitted that they failed to fulfilled certain of their duties and had no involvement with Plaintiff's dismissal. In the presence of all Directors, during a discussion about the dismissal of Plaintiff and his replacement, Director Grimm stated that the Board had generally failed to fulfill its duties and was not operating pursuant to training the Directors had received. During that same discussion, Defendant Director Smith admitted that Board and Director Defendants consistently have not fulfilled its fiduciary duties and obligations under the law. The remainder of the Board and Directors Defendants were in apparent agreement as not a single Director disagreed with Defendant Grimm and Smith's admissions.

113.     Indeed, Director Defendants failed to supervise appropriately Defendants Indelicato and

Walton, and failed to prevent or correct misconduct, disparate treatment, discrimination and unlawful conduct at RIOC. The Director Defendants conduct thereby breached their duties, including fiduciary duties, duties to act in accordance with RIOC's By-laws, duty to supervise RIOC executives; duty to exercise independent judgment, and duty to exercise reasonable care, skill and diligence.

114. Defendant Board's conduct was equally if not more disturbing than that of the other Defendants including Indelicato. Over the course of months, the Board openly acknowledged their disagreement with Lewis's termination and that it was failing to fulfil its duties. Nonetheless, it not only failed to take corrective action, but it ratified the unlawful and improper actions, such as Lewis' termination.

115. Astoundingly, Defendants Board and Directors took no action even when they were faced with the knowledge that Defendants RIOC and Indelicato falsely placed the decision to terminate Lewis on them and that Defendant Indelicato engaged in an illicit ploy to conceal that misrepresentation by omitting them from the email that she used to memorialize falsely that the decision was reached by the Board. Equally astounding, is that while the Board freely admitted not only their disagreement with Lewis' termination but that they were enjoyed working with him both professionally and personally, the Board failed to take corrective action. The Board's failure in that regard constituted a ratification of the wrongful conduct of the other Defendants and evidences the Board's bad faith and malice.

116. Defendants Board and Directors bad faith and malice even continued during the almost one year subsequent to Lewis' termination. First, by directly interacting with Lewis and misleadingly suggesting on multiple occasions that he should and would receive a severance package. Second, by having multiple conversations with Plaintiff and promising to set up an exit interview, but failing to do so. And, among other items, third, condoning the dissemination of patently false and defamatory statements about Plaintiff's work and his work effort proffered as a pre-textual basis in an effort to somehow support his unlawful termination.

117. Defendants continued this ploy through their attorneys, Melick and Porter. After Plaintiff filed his Notice of Claim, Melick and Porter contacted Plaintiff's attorney to propose settling Plaintiff's claims before a neutral mediator. Through their respective counsel, Plaintiff and Defendants agreed to mediate Plaintiff's claims. In reliance on that agreement, Plaintiff

expended resources over the course of months working toward that goal.  Defendants' counsel then reneged on the agreement resulting in Plaintiff having needlessly expended time and resources.  All the while Plaintiff was unemployed and continuing to accrue damages while Defendants continued their bad-faith and malicious behavior in trying to delay Plaintiff from prosecuting his claims with a proposal they apparently never intended to honor.  Email correspondence documenting the mediation agreement and blatant breach of that agreement by Defendants is attached to this Complaint as Exhibit B. The attached email correspondence is between Plaintiff's attorney, Anthony Rotondi, and Defendants' attorneys, Melick and Porter (Jeremy Stein and Holly Rogers).

118.    Notably, <u>each of the six Resident Directors are sitting in *expired seats*</u>, which leaves them in a tenuous position subject to removal from the Board at any time.  Additionally, the Resident Directors have financial interests on Roosevelt Island, the extent of which may be greatly influenced by the result of negotiations involving New York State.  Accordingly, these Directors were beholden to Indelicato – who repeatedly stated that she has connections in the Albany power structure – as she they believed she had influence over whether these Directors' could remain on the Board in their expired seats.

119.    Defendants, intentionally, reckless, negligently or with deliberate indifference failed to protect Plaintiff regarding well-known federally and state protected rights concerning hostile, discriminatory and retaliatory treatment.

120.    Defendants failed to supervise, failed to monitor, failed to investigate, failed to discipline and failed to take corrective action, which all resulted in substantial damage to Plaintiff in violation of well-established corporate policy and federally protected rights.  Indeed, through their absolute indifference to the discrimination, abusive environment and retaliatory termination of Plaintiff, Defendants acted in bad faith, failed to ensure nondiscriminatory working conditions and/or ratified or condoned the conduct alleged herein.

121.    Defendants wrongfully created a policy or practice, failed to follow a policy or practice, wrongfully followed a policy or practice and/or failed to create an appropriate policy or practice resulting in the claims discussed herein.  The policies and practices implicated include, without limitation, policies and practices with regard to RIOC's:

(i)      By-Laws;

| | |
|---|---|
| (ii) | Enabling Legislation; |
| (iii) | Policies Regarding Payment of Salary, Compensation and Reimbursements to Chief Executive Officer and Senior Management; |
| (iv) | Equal Employment Opportunity Policy Statement; |
| (v) | Harassment Policy Statement; |
| (vi) | Corrective Action Policy Statement; |
| (vii) | Reporting of Misconduct and Protection against Any Adverse Personnel Action Policy Statement; |
| (viii) | Exit Interviews; |
| (ix) | Fiduciary Responsibilities, as set forth in relevant ABO Guidance; and |
| (x) | Separate Oversight and Executive Management Functions, as set forth in ABO Guidance. |

122.    In addition to other damages, Plaintiff has suffered severe emotional distress (including mental and physical anguish and pain) and severe reputational harm because of the Defendants discriminatory and retaliatory termination of his employment.  Defendants' termination of Plaintiff has embarrassed him and tarnished his well-earned reputation, including among the numerous colleagues in the legal community who have expressed shock and disbelief about his separation from RIOC.

## <u>COUNT I</u>

**RACE AND GENDER DISCRIMINATION IN VIOLATION OF CIVIL RIGHTS ACT OF 1866, 42 U.S.C.A § 1981 (ALL DEFENDANTS)**

123.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

124.    Defendants have intentionally discriminated against Plaintiff on the basis of his race (Black) and Gender (male) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

125.    Defendants more favorable treatment of a similarly situated White employee, the pattern and practice of discrimination at RIOC, and Defendants acquiescence to the discriminatory conduct described herein, among other things, give rise to an inference of intentional discrimination based on Plaintiff's race and gender.

126.    Upon information and belief, the individual Defendants directed and/or participated in and/or were aware of and failed to take immediate and appropriate corrective action to prevent the discriminatory conduct alleged herein.

127.    Additionally, upon information and belief, other individuals who exercised managerial/supervisory control over Plaintiff participated in the conduct alleged herein and/or were

aware of the conduct and failed to take immediate and appropriate corrective action.

128. Defendants' discriminatory actions, as alleged herein, constituted a continuing violation, since specific ongoing discriminatory policies or practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

129. As a result of Defendants' actions, Plaintiff has suffered damages.

130. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## <u>COUNT II</u>
### DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE, 42 U.S.C § 1983 (ALL DEFENDANTS)

131. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

132. Defendants' actions as described herein were under the color of state law.

133. Defendants have discriminated against Plaintiff on the basis of his race (Black) in violation of the Equal Protection Clause of the United States Constitution by denying Plaintiff equal terms and conditions of employment.

134. Defendants have discriminated against Plaintiff on the basis of his gender (male) in violation of the Equal Protection Clause of the United States Constitution by denying Plaintiff equal terms and conditions of employment.

135. Upon information and belief, the Individual Defendants directed and/or participated in and/or were aware of the discriminatory acts alleged herein, which discriminatory acts resulted from municipal policy or custom.

136. Additionally, the discriminatory conduct was so apparent as to create constructive acquiescence of the senior policy making officials Defendants, including the Director Defendants.

137. Defendants' discriminatory actions, as alleged herein, constituted a continuing violation, since specific ongoing discriminatory policies or practices, and/or specific and related instances

of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

138.    As a result of Defendants' actions, Plaintiff has suffered damages.

139.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 1983 for which Plaintiff is entitled to an award of punitive damages.

## COUNT III
### DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT, 42 U.S.C § 1983 (ALL DEFENDANTS)

140.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

141.    Under Section 1983 of Title 42 of the United States Code,

> every person who, under color of any statute, ordinance regulation, custom, or usage, or any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

142.    Defendants, who were exercising state governmental authority, violated Plaintiff's First Amendment Rights.  Defendants were aware of Plaintiff's actions in exercising his First Amendment rights, and as a result of his actions in that regard, Defendants, among other things, unlawfully subjected him to adverse employment actions including: discrimination, retaliation, exposure to a hostile work environment and termination.  Defendants' unlawful actions continued past Plaintiff's termination.

143.    The Individual Defendants directed and/or participated in and/or were aware of the wrongful acts alleged herein, which resulted from a government policy or custom, failure to implement an established policy or custom and/or failure to establish an appropriate policy or custom.

144.    Additionally, the wrongful conduct was so apparent as to create constructive acquiescence of the Defendant senior policy making officials, including the Director Defendants.

145.    Defendants' discriminatory actions, as alleged herein, constituted a continuing violation,

since specific ongoing discriminatory policies or practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

146.   As a result of Defendants' actions, Plaintiff has suffered damages.

147.   Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 1983 for which Plaintiff is entitled to an award of punitive damages.

### COUNT IV [4]

**RACE AND GENDER– DISPARATE TREATMENT IN VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A §2000E ET SEQ. (AGAINST DEFENDANT RIOC)**

148.   Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

149.   Plaintiff is a Black male, so he is within such protected classes of individuals.

150.   Defendants' actions as alleged herein constitute unlawful employment practices and discriminatory treatment on the basis of Plaintiff's race and gender in violation of Title VII, as amended, 42 U.S.C. §§ 2000e *et seq.*

151.   Defendants' discriminatory actions, as alleged herein, constituted a continuing violation, since specific ongoing discriminatory policies or practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

152.   As a result of Defendants' actions, has suffered damages.

153.   Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 2000e *et seq.* for which Plaintiff is entitled to an award of punitive damages.

---

[4]   The U.S. Court of Appeals for the Second Circuit recently clarified, in *Littlejohn v. City of New York*, that a plaintiff at the pleading stage of a workplace discrimination and/or retaliation suit, before the employer comes forward with the claimed reason for its action, is not required to present substantial evidence of discriminatory intent; rather, "need only give plausible support to a minimal inference of discriminatory motivation." *See Littlejohn v. City of New York*, No. 14-1395-CV, 2015 WL 4604250, at *4-8 (2d Cir. Aug. 3, 2015)

## COUNT V
**RACE AND GENDER– HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A §2000E ET SEQ. (AGAINST DEFENDANT RIOC)**

154.     Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

155.     Plaintiff is a Black male, so he is within such protected classes of individuals.

156.     Defendants' actions as alleged herein constitute unlawful employment practices and constituted a hostile work environment on the basis of Plaintiff's race and gender in violation of Title VII, as amended, 42 U.S.C. §§ 2000e *et seq.*

157.     The hostile work-environment, as alleged herein, constituted a continuing violation, since specific ongoing policies or practices, and/or specific and related instances of the hostile work-environment were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

158.     The hostile work environment was of such severity and pervasiveness as to alter the conditions of the Plaintiff's employment and created an abusive working environment.

159.     The conduct that created the hostile work environment is imputed to Defendant RIOC and Defendant RIOC is vicariously liable for such conduct based on, *inter alia*, Individual Defendants' supervisory positions and because Defendant RIOC took no corrective action notwithstanding knowledge of the situation.

160.     As a result of Defendants' actions, has suffered damages.

161.     Defendants' unlawful actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 2000e *et seq.* for which Plaintiff is entitled to an award of punitive damages.

## COUNT VI
**RACE AND GENDER DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW, ADMINISTRATIVE CODE § 8-107 ET SEQ. (ALL DEFENDANTS)**

162.     Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

163.     Defendants' actions as alleged herein constitute unlawful employment practices and

discriminatory treatment on the basis of Plaintiff's race and gender in violation of the New York City Human Rights Law, Administrative Code § 8-107 *et seq.*

164.    Defendants' discriminatory actions, as alleged herein, constituted a continuing violation, since specific ongoing discriminatory policies or practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

165.    Defendants' unlawful actions were willful, wanton, reckless, and malicious, and further show a compete and deliberate indifference to, and conscious disregard for, Plaintiff's right under the New York City Human Rights Law.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages under the liberal and expansive provisions in the New York City Human Rights Law in an amount sufficient to punish Defendants and/or deter them and others from like conduct in the future.

166.    As a result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial.

<u>COUNT VII</u>
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW, ADMINISTRATIVE CODE § 8-107 ET SEQ.  (ALL DEFENDANTS)**

167.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

168.    Section 8-107(1)(a) of NYCHRL makes it unlawful "for an employer or an employee or agent thereof" to create a hostile work environment. N.Y.C. Admin. Code § 8–107(1)(a). Defendants' actions as alleged herein constitute unlawful employment practices and a hostile work environment on the basis of Plaintiff's race and gender in violation of the New York City Human Rights Law, Administrative Code § 8-107 *et seq*.

169.    Defendants' creation of a hostile work environment, as alleged herein, constituted a continuing violation, since specific ongoing hostile work environment policies or practices, and/or specific and related instances of a hostile work environment were permitted by Defendants' to continue unremedied for so long as to amount to a policy or practice permitting a hostile work environment.

170.    Defendants' unlawful actions were willful, wanton, reckless, and malicious, and further

show a compete and deliberate indifference to, and conscious disregard for, Plaintiff's right under the New York City Human Rights Law.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages under the liberal and expansive provisions in the New York City Human Rights Law in an amount sufficient to punish Defendants and/or deter them and others from like conduct in the future.

171.     As a result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT VIII**

**RETALIATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW, ADMINISTRATIVE CODE § 8-107 ET SEQ.  (ALL DEFENDANTS)**

172.     Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

173.     Defendants' actions as alleged herein constitute unlawful employment practices and retaliation on the basis of Plaintiff participating in a protected activity, in among other things, reporting discrimination and potential misconduct in violation of the New York City Human Rights Law, Administrative Code § 8-107 *et seq.*  Defendants' conduct is reasonably likely to deter a person from engaging in protected activity.

174.     Defendants' retaliatory actions, as alleged herein, constituted a continuing violation, since specific ongoing retaliatory policies or practices, and/or specific and related instances of retaliation were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

175.     Defendants' unlawful actions were willful, wanton, reckless, and malicious, and further show a compete and deliberate indifference to, and conscious disregard for, Plaintiff's right under the New York City Human Rights Law.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages under the liberal and expansive provisions in the New York City Human Rights Law in an amount sufficient to punish Defendants and/or deter them and others from like conduct in the future.

176.     As a result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IX
### AIDING AND ABETTING RACE AND GENDER DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW, ADMINISTRATIVE CODE § 8-107 ET SEQ. (ALL DEFENDANTS EXCEPT DEFENDANT RIOC)

177.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

178.    Title 8 of NYCHRL imposes liability on a defendant for aiding and abetting, discrimination, aiding and abetting creation of a hostile work environment and aiding and abetting retaliation.  Defendants' actions as alleged herein constitute unlawful employment practices and aiding and abetting discriminatory treatment on the basis of Plaintiff's race and gender, creation of a hostile work environment and retaliation in violation of the New York City Human Rights Law, Administrative Code § 8-107 *et seq.*

179.    Defendants' actions in aiding and abetting discrimination, aiding and abetting creation of a hostile work environment, and aiding and abetting retaliation, as alleged herein, constituted a continuing violation, since specific ongoing policies or practices, and/or specific and related instances were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

180.    Defendants' unlawful actions were willful, wanton, reckless, and malicious, and further show a compete and deliberate indifference to, and conscious disregard for, Plaintiff's right under the New York City Human Rights Law.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages under the liberal and expansive provisions in the New York City Human Rights Law in an amount sufficient to punish Defendants and/or deter them and others from like conduct in the future.

181.    As a result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial.

182.    The Individual Defendants aided and abetted the discriminatory practices and acts alleged herein.

## COUNT X
### RACE AND GENDER DISPARATE TREATMENT IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 290 ET SEQ. (ALL DEFENDANTS)

183.    Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth

herein.

184. Defendants' actions as alleged herein constitute unlawful employment practices and discriminatory treatment on the basis of Plaintiff's race in violation of the New York State Human Rights Law, Executive Law § 296 *et seq*.

185. Defendants' actions as alleged herein constitute unlawful employment practices and discriminatory treatment on the basis of Plaintiff's gender in violation of the New York State Human Rights Law, Executive Law § 296 *et seq*.

186. Defendants' discriminatory actions, as alleged herein, constituted a continuing violation, since specific ongoing discriminatory policies or practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice.

187. Upon information and belief, the Individual Defendants aided and abetted the discriminatory practices and acts alleged herein.

188. As a result of Defendants' actions, Plaintiff has suffered damages.

## COUNT XI
### RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 (ALL DEFENDANTS)

189. Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

190. Defendants retaliated against Plaintiff for reporting Defendants' discriminatory employment practices and wrongful conduct, including potentially unauthorized salary increases in violation of 42 U.S.C. § 1983. Plaintiff speech was not within his duties and the conduct complained of was a matter of public concern. Plaintiff's aforementioned reporting was a protected activity.

191. Defendants' conduct set forth above were the types of acts, which were reasonably likely to deter Plaintiff and other employees from engaging protected activity.

192. Defendants' unlawful retaliatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 1983 for which Plaintiff is entitled to an award of punitive damages.

193.     AS a direct result of Plaintiff speech, Defendants' subjected Plaintiff to adverse employment action, including further discrimination, termination and post-termination adverse actions.

194.     As a result of Defendants' actions, Plaintiff has suffered damages.

## COUNTS XII
### RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, EXECUTIVE LAW § 296 AND § 8-101 OF THE NEW YORK CITY ADMINISTRATIVE CODE (ALL DEFENDANTS)

195.     Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

196.     Defendants have retaliated against Plaintiff for opposing Defendants' discriminatory employment practices and wrongful conduct in violation of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, Executive Law § 296 and § 8-101 of the New York City Administrative Code.

197.     Defendants' conduct set forth above were the types of acts, which were reasonably likely to deter Plaintiff and other employees from engaging protected activity.

198.     Defendants unlawful retaliatory actions were willful, wanton, reckless, and malicious, and further show a compete and deliberate indifference to, and conscious disregard for, Plaintiff's right under the New York City Human Rights Law.  Therefore, Plaintiff is entitled to an award of punitive or exemplary damages under the liberal and expansive provisions in the New York City Human Rights Law in an amount sufficient to punish Defendants and/or deter them and others from like conduct in the future.

199.     Defendants' unlawful retaliatory actions constitute malicious, willful and wanton conduct, undertaken in reckless indifference to Plaintiff's federally protected rights under Section 1983 for which Plaintiff is entitled to an award of punitive damages.

200.     As a result of Defendants' actions, Plaintiff has suffered damages.

## COUNT XIII
### NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION AND TRAINING (RIOC AND DIRECTOR DEFENDANTS)

201.     Plaintiff hereby repeats and re-alleges each and every allegation above as if fully set forth herein.

202.    RIOC and the Director Defendants violated their duty as Plaintiff's employer to provide a workplace free of unlawful discrimination and retaliation, to take reasonable steps to determine the fitness of Plaintiff's co-workers and supervisors and to reasonably supervise Plaintiff's co-workers and supervisors by, inter alia, failing and refusing to investigate and/or take appropriate disciplinary or other action in response to Plaintiff's repeated complaints of discriminatory and harassing conduct by his co-workers and/or supervisors on the basis of his race/color.  Defendant had actual knowledge of the undue risk of harm to which it was thereby exposing Plaintiff based on Plaintiff's repeated complaints to his supervisors.

203.    The Director Defendants have publicly admitted that they failed to properly exercise their duties in violation of the law.

204.    As a direct and proximate result of Defendant's breach of duty to supervise, Plaintiff has been injured and has incurred damages thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Lewis respectfully requests that this Court enter a judgment and issue:

(a)    A judgment declaring the acts and practices of Defendants to be in violation of Title VII, 42 U.S.C. §2000e-5(g);

(b)    A judgment declaring the acts and practices of Defendants to be in violation of Section 1981, 42 U.S.C. §1981 *et seq*.;

(c)    A judgment declaring the acts and practices of Defendants to be in violation of Section 1983, 42 U.S.C. §1983 *et seq*.;

(d)    A judgment declaring the acts and practices of Defendants to be in violation of New York State Human Rights Law, N.Y. Exec. Law §297(9);

(e)    A judgment declaring the acts and practices of Defendants to be in violation of New York City Human Rights Law, Administrative Code § 8-107 *et seq*.;

(f)    A finding that discriminatory and retaliatory conduct was part of the Defendants ongoing policies and practices, and/or specific and related instances of discrimination were permitted by Defendants' to continue unremedied for so long as to amount to a discriminatory policy or practice;

(g)    An award in favor of Mr. Lewis and against Defendants for her actual damages in an amount to be determined at trial for lost wages and benefits, including but not limited to, an award of back pay, front pay, overtime pay, benefits, pension benefits, earnings, privileges and interest lost as a result of said unlawful discrimination and unlawful retaliation in accordance with Section 1981, 42 U.S.C. §1981 *et seq*.; Section 1983, 42 U.S.C. §1983 *et seq*.; Title VII, 42 U.S.C. §2000e-5(g); New York

State Human Rights Law, N.Y. Exec. Law §297(9); and New York City Human Rights Law, Administrative Code § 8-107 *et seq*.;

(h) An award in favor of Mr. Lewis and against Defendants for consequential damages, compensatory damages, including pain and suffering and emotional and physical distress, and punitive damages, all to the fullest extent possible permitted by applicable laws and statutes;

(i) An award to Mr. Lewis of the costs of this action, including reasonable attorneys' fees and expert fees, to the fullest extent permitted by applicable laws and statutes;

(j) An award of pre- and post-judgment interest on all of Mr. Lewis's statutory claims; and

(k) Such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

DATED: April 25, 2016

New York, New York

By: _____

Anthony J. Rotondi (AR 1111)
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
ajr@ajrotondi.com
*Attorney for Plaintiff*

EXHIBIT A



U.S. Depai _went of Justice
Civil Rights Division

950 Pennsylvania Avenue, N.W.
Karen Ferguson , EMP, PHB, Room
4239 Washington, DC 20530

CERTIFIED MAIL
7010 0290 0000 2017 1206

April 13, 2016

Mr. Donald Lewis
c/o Anthony J. Rotondi, Esquire
Rotondi Law
5 Columbus Circle
Suite 800
New York, NY 10019

Re: EEOC Charge Against Roosevelt Island Operating Corp.
   No. 520201503449

Dear Mr. Lewis:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney
General i it Rights Division

by         C
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
  Roosevelt Island Operating Corp.

EXHIBIT B

# Anthony J. Rotondi

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Wednesday, March 16, 2016 5:09 PM |
| **To:** | 'Jeremy I. Stein' |
| **Cc:** | 'Holly G. Rogers' |
| **Subject:** | RE: RIOC |

Jeremy:

The lack of veracity in your e-mail is astounding, including the statement that I have somehow "taken [your] e-mail out of context." The documented terms of our mediation agreement are clear and unambiguous to anyone who can read. You plainly agreed to certain mediation terms in writing and are now breaching that agreement and desperately attempting to obfuscate the record by misrepresenting telephone discussions between us, as well as with the proposed mediator. In light of the clear written record, your desperate attempt to go on the offensive by incredulously claiming that I somehow "mean only to obstruct any meaningful chance of resolving this case with a neutral" is absurd.

To the contrary, Melick has played games and obstructed the process while Mr. Lewis remains unemployed and continues to incur damages based on your clients' and your conduct. It appears that Melick's strategy regarding mediation has been to cause delay and waste my time and Mr. Lewis' time with false representations. While this strategy is consistent with Respondents' penchant for fabrication, it does not serve their interest and instead appears to be designed to advance the interests of the Executive Chamber.

Rest assured that your strategy of delay and relying on false representations will serve no purpose other than to increase the damages that a jury ultimately will award Mr. Lewis. Indeed, I look forward to questioning your clients under oath regarding the slew of varying positions and blatant misrepresentations they have disseminated concerning Mr. Lewis' termination, as well as our efforts at mediation. A sophisticated jury in the Southern District of New York will clearly see through the plethora of nonsensical and irreconcilable fabrications.

/AJR

**From:** Jeremy I. Stein [mailto:jstein@melicklaw.com]
**Sent:** Tuesday, March 15, 2016 3:52 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Holly G. Rogers <hrogers@melicklaw.com>
**Subject:** RE: RIOC

Anthony:

I had made it very clear over the telephone, numerous times, that we were not going to bring all of the board of directors to the mediation, and that we would only be bringing those people who were absolutely necessary to facilitate settlement. This was repeated when we spoke to the proposed mediator. You have taken my e-mail out of context. Since you are unwilling to compromise on the most basic issue related to this mediation, it is clear that you mean only to obstruct any meaningful chance at resolving this case with a neutral. My clients are no longer interested in mediation at this time.

Please feel free to call me to discuss this matter further if your position changes or you wish to present us with a more reasonable demand or proposed resolution.

Jeremy I. Stein
Partner
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
jstein@melicklaw.com
www.melicklaw.com

MA — RI CT — NH NY CA

**From:** Anthony J. Rotondi [mailto:AJRPAJROTONDI.COM]
**Sent:** Tuesday, March 15, 2016 11:01 AM
**To:** Holly G. Rogers
**Cc:** Jeremy **I.** Stein
**Subject:** RE: RIOC

Holly,

I have forwarded Melick & Porter's recently revised proposed mediation terms to Mr. Lewis. Nonetheless, I am certain you are aware of the wholly disingenuous nature of the positions advanced in your correspondence regarding the previously agreed mediation terms. Melick's effort to obfuscate its reneging on an agreement reached five months ago — as outlined below — and the concomitant lack of good faith in advancing those positions seriously jeopardizes the possibility of any pre-suit settlement.

*First,* two partners from Melick (Jeremy Stein and Mark Mazurczak) contacted me in September 2015 to propose mediation. My October 7, 2015 e-mail below clearly stated that Mr. Lewis was agreeable to mediation contingent upon the three simple provisions set forth therein, ***including that all Respondents be present.*** Because Melick had already proposed mediation, there was no need for Melick to confirm that Melick and its clients were generally agreeable to mediation. Jeremy's October 8 email response unequivocally indicated that Melick and its clients agreed to mediation on Mr. Lewis' proposed terms. To claim in your email below that "[t]here was never an agreement reached that all parties on the notice of claim would be present at the mediation" — and instead now state that RIOC intends to have Susan Rosenthal and a mysterious "representative of the Board to be determined by RIOC" attend a mediation —is unbelievable.

That Melick and its clients had already proposed mediation in September is plainly evident from my October e-mails with Jeremy. Indeed, there would be no reason for Jeremy in his October 8 response to state "our client is agreeable to mediation," — which had already been established — unless it was to accept the straightforward terms in my October 7 e-mail. Tellingly, my e-mail unambiguously stated:

> Please let me know whether RIOC agrees to proceed **in this manner.** I cannot imagine that any of our requests prevent mediation, but **if this is unacceptable, please advise in what regard.** (Emphasis added.)

Jeremy's response likewise was plain and clear: "We are agreeable to mediation."

*Second,* the claim in your March 7, 2016 e-mail below that Jeremy's October 8, 2015 email somehow meant to convey that "since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7" defies credulity. In an October 2 e-mail I requested that Jeremy "confirm whether [it] remains the case" that Melick "was not representing RIOC in regards to Mr. Lewis' FOIL requests." Jeremy's response on this FOIL issue could not have been clearer:

> **I do not have any further information on the FOIL issues. I am waiting to hear back from my client contact who is currently in China,** so I appreciate your patience. As soon as I can get an answer I will relay that to you. (Emphasis added.)

To now claim that this "out of the country" reference somehow relates to the already agreed upon mediation, and not FOIL, is absurd.

Melick's current attempts at creating a wholly manufactured, revisionist, and unsupportable history are unfortunate. In reliance on Melick's agreement to our proposed mediation turns, for five months Mr. Lewis and myself have invested our time (as well as the time of multiple mediators and their assistants) in furtherance of mediation. Because Melick and its clients are now breaching that agreement it is likely that our efforts were a needless expenditure of resources.

Considering that RIOC President Indelicato has told blatant untruths about, among other things, Mr. Lewis termination and the other Respondents' actions related thereto, it is inappropriate to have a veiled mediation that excludes the Respondent Directors. This is particularly the case given the apparent conflict of interest between Ms. Indelicato and the individual Director Respondents given Ms. Indelicato's publicly confirmed misrepresentations.

Further, should the case continue through trial, there is a very real risk of personal judgments being entered against the individual Respondents for punitive damages under myriad statutory provisions. As you know, current law, public policy and contractual terms prohibit coverage or indemnification for punitive damages awards under insurance policies and

indemnity agreements. Under such circumstances, it is improper to shield the Respondent Directors from a mediation process thereby depriving those individuals as well as the insurer(s) of a potential settlement that could resolve Mr. Lewis's claims thereby avoiding any risk of personal exposure to the individual Respondents. It is unclear who is making these decisions that affect the exposure of the individual Respondents (as well as Respondents' insurer(s), which you have oddly refused to identify). This conduct, however, seems consistent with the manner in which the Executive Chamber and the resident Respondent Directors interact.

I additionally note that excluding the individual Respondents makes little sense from Melick's perspective. Respondents covered by insurance and indemnity provisions who are excluded from a mediation (that could resolve the matter and prevent litigation) would surely look to their counsel to justify their exclusion from the process if suit is later filed against those respondents. This conflict would be magnified in the event that a judgment, which imposes personal, uninsurable and unindemnifiable liability is entered against those individual Respondents (as is very likely with respect to Mr. Lewis's claims).

It appears that the only entity that would benefit from holding a mediation on Melick's materially revised terms is the Executive Chamber. In such case, the Executive Chamber — neither an intended beneficiary under the insurance policy(s) nor a potential beneficiary of indemnity provisions — would control benefits that are meant to inure to the individual Director Respondents.

Finally, requesting us to "confirm . . . if [Mr. Lewis] intends on providing a reduced and more reasonable demand in advance of the mediation" in the very same communication in which Melick advances outlandish positions to justify its breach of the previously agreement quite frankly is offensive. Additionally, from your communication and our prior discussions, it appears that Melick and the Executive Chamber do not appreciate adequately the seriousness of the Respondents' misconduct and the overwhelming incontrovertible evidence in Mr. Lewis' favor.

Again I have forwarded your email to Mr. Lewis and will confer with him regarding your recently revised mediation terms and revert. Nonetheless, to avoid jeopardizing the possibility of pre-suit settlement, I again request that Melick and its clients honor the previously agreed terms.

/AJR

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Monday, February 29, 2016 5:51 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Jeremy I. Stein <isteinPmelicklaw.com>
**Subject:** RE: RIOC

Anthony:

As discussed, the email from Jeremy to you on October 8, 2015 (that you have provided below) states only that our client is agreeable to mediation, and that since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7, 2015.

There was never an agreement reached that all parties on the notice of claim would be present at the mediation.

In our last discussion, I informed you of who my client intends to have present at the mediation. That has not changed.

Please confirm whether or not your client intends on participating in mediation, and, if so, if he intends on providing a reduced and more reasonable demand in advance of the mediation, as discussed last week.

Best regards,

Holly G. Rogers
Attorney
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702 Main:
(203) 596-0500 Fax: (203)
721-8532
hrogers@melicklaw.com
www.melicklaw.com

M A  RI  C T -  N H  - -  N Y  C A

**From:** Anthony J. Rotondi [mailto:AJRPAJROTONDI.COM]
**Sent:** Monday, February 29, 2016 5:32 PM
**To:** Holly G. Rogers
**Subject:** FW: RIOC

Holly,

Below is the email I mentioned during our prior conversations in which Jeremy indicated that Melick & Porter represents all parties on the Notice of Claim and agreed on their behalf, among other things, that as a condition of the mediation "all parties listed in the notice of claim be present at the mediation." In that same email, I offered "to hold the mediation after hours or on a weekend should scheduling be an issue" to accommodate the respondents -- as I indicated might be necessary during the recent conversation you and I had with Ms. Jansenson.

As you can imagine, I do not see how Jeremy can now "deny" that an agreement was reached regarding the presence of all parties in the mediation (as you indicated he has during our discussion last week). Such a "denial" would be a complete 180 change in position from having all the individual respondents present at the mediation to having none of the individual respondents present. Please circle back with Jeremy and advise regarding whether the prior agreement will be honored and your clients will be present at the mediation. Thank you.

Anthony

**From:** Jeremy I. Stein [mailto:Istein@melicklaw.com]
**Sent:** Thursday, October 08, 2015 5:59 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** RE: RIOC

Anthony:

We are agreeable to mediation. Please be advised that Melick & Porter represents all parties on the Notice of Claim. I do not have any further information on the FOIL issues. I am waiting to hear back from my client contact who is currently in China, so I appreciate your patience. As soon as I can get an answer I will relay that to you.

As discussed, we would suggest using Ruth Raisfeld as a mediator, who is a little more reasonable given your prior concerns with the cost of JAMS. If that is agreeable to you, we will obtain her availability. Please feel to call me with any concerns you might have.

Jeremy I. Stein
Partner
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
istein@melicklaw.com
www.melicklaw.com

MA — -- CT -- NH NY CA

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Wednesday, October 07, 2015 12:34 PM
**To:** Jeremy I. Stein
**Subject:** RE: RIOC

Jeremy,

Further to our discussion regarding your inquiry of whether Mr. Lewis would consider submitting a demand or participating in a mediation to explore early resolution of his claims, he is willing to participate in a mediation with the very simple provisos set forth below:

(i)     the parties agree on an acceptable mediator and forum;
(ii)    all parties listed in the notice of claim be present at the mediation (We are willing to hold the mediation after hours or on a weekend should scheduling be an issue); and
(iii)   the parties and counsel use their best efforts so that any mediation occurs without undue delay.

Please let me know whether RIOC agrees to proceed in this manner. I cannot imagine that any of our requests prevent mediation, but if this is unacceptable, please advise in what regard. Feel free to contact me should you care to discuss prior to circulating to your client(s).

Additionally, I have not received a response to my email of October 2 seeking clarification of the parties that Melick & Porter represents and the specific matters. Kindly confirm whether Melick & Porter represents any parties listed in the notice of claim other than RIOC so that I may contact any remaining parties or their counsel, as necessary.

Please advise regarding the mediation and Melick & Porter's representation by noon on Friday, October 9. Otherwise, I will assume that RIOC does not desire to participate in a mediation and that Melick & Porter represents RIOC and no other parties and only with regards to the notice of claim. Thank you.

/AJR

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 02, 2015 5:06 PM
**To:** 'Jeremy I. Stein' <istein@melicklaw.com>
**Subject:** RIOC

Jeremy,

I will be following up with Mr. Lewis over the weekend regarding our call yesterday after which I will forward to you the email that we discussed concerning a potential mediation. In the interim, I would appreciate it if you could clear up the two issues below for me.

I recently read an email relating to FOIL requests from Mr. Kraut (one of RIOC's directors) to Mr. Lewis in which Mr. Kraut seemed to indicate that RIOC had retained counsel for the FOIL issues. I understood from our first discussion that Melick & Porter was not representing RIOC in regards to Mr. Lewis' FOIL requests. Could you please confirm whether that remains the case. Additionally, if you know of another firm representing RIOC on the FOIL issues, I would appreciated it if you let me know who that is so that I communicate with the appropriate persons/firm.

I understand that Melick & Porter represents the RIOC corporate entity with respect to Mr. Lewis's notice of claim, but I am not certain whether Melick represents the RIOC Executives, RIOC's Board of Directors, or the Individual Directors. Could you please let me know either way, again, so that I communicate with the appropriate persons/firm. Thanks.

- Anthony

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.airotondi.com

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

DONALD LEWIS,

               Plaintiff,


        -against-            Civil Action No.

                       16-CV-03071 (ALC)


THE ROOSEVELT ISLAND OPERATING

CORPORATION, et al.,

               Defendants.

-------------------------------------x

                  30 Wall Street, 8th Floor
                  New York, New York

                  April 6, 2017
                  10:17 a.m.


        DEPOSITION of CLAUDIA MCDADE, taken by the

attorney for Plaintiff pursuant to Notice, held at the

above place and time before Aline Akelis, a

Stenographic Reporter and Notary Public within and for

the State of New York.

1                    Claudia McDade

2    myself.  You would be evaluating yourself.

3            An evaluation, if you reported to me, I

4    would be evaluating you.

5        Q    Right.  Self evaluation gets submitted

6    where in RIOC?

7        A    To HR.

8        Q    To you?

9        A    Yeah.

10       Q    And you testified, I believe, that

11   Ms. Indelicato did not do evaluations on the

12   executive team, correct?

13       A    To my knowledge, she chose not to do the

14   evaluations.

15       Q    But she did -- but self evaluations were

16   done by the executive team, correct?

17       A    I believe so.

18       Q    What do you base your knowledge that

19   evaluations were not done on the executive team

20   upon?

21       A    My recollection and the fact that they

22   are not in their files.

23       Q    Do you think anyone could have removed

24   the evaluations from anyone's files?

25       A    No.

1              Claudia McDade

2      Q    Who's in control of the files?

3      A    Myself and my coworker.

4      Q    Who is your coworker?

5      A    Lisa.

6      Q    Lisa who?

7      A    Cody.

8      Q    How long has she been there?

9      A    Year and a half.

10     Q    How would a file that the person -- I'm

11   sorry, did you -- when we were speaking about

12   files, were you speaking about personnel files?

13     A    Yes.

14     Q    How are they secured at RIOC?

15     A    They're in a locked file cabinet.

16     Q    Who has the key?

17     A    I have one and Lisa has one.

18     Q    When were they, when was the lock put on

19   the cabinet?

20     A    There's always been a lock on the

21   cabinet.  It was changed maybe two, two and a half

22   years ago because the lock would no longer lock.

23     Q    When was it changed?

24     A    I'm sorry?

25     Q    Can you be more specific about when the

1                     Claudia McDade

2    lock was changed?

3         A    I can't, no.

4         Q    Was it before or after the issue arose

5    regarding Frances Walton's raise?

6         A    I'm sorry?

7         Q    Was it before or after the issues arose

8    regarding Frances Walton's raise?

9              MS. ROGERS:  Objection.

10             MR. REINHARZ:  Objection.

11        A    I'm not aware of any issues --

12        Q    You're not aware of any issues

13   concerning an improper raise to Frances Walton, or

14   an alleged improper raise to Frances Walton?

15        A    I've heard the allegation, yeah.

16        Q    But this is not the first that you're

17   hearing about it?

18        A    No.

19        Q    Okay.  So was the lock changed before or

20   after you learned about those issues regarding

21   Frances Walton's raise?

22        A    A year before, at least.

23        Q    When did you, how did you hear about the

24   issues regarding Frances Walton's raise?

25        A    When Mr. Lewis filed his claim.

1                    Claudia McDade

2          Q    You heard nothing at all about a

3     questionable raise to Frances Walton before you

4     were served with the complaint in this matter?

5          A    Not that there was a complaint about it,

6     but that there was a question to it.

7               One of the legal team had e-mailed me

8     for a list of salary information, which I sent to

9     him.  And he at that point questioned somebody in

10    the accounting department as to the accuracy of

11    her --

12         Q    When you say "one of the legal team,"

13    are you referring to Mr. Lewis?

14         A    No.

15         Q    Who are you referring to?

16         A    Arthur Eliav.

17         Q    When was that?

18         A    February or March of 2015.

19         Q    And you produced that e-mail in response

20    to Mr. Lewis' request for documents?

21         A    I didn't produce any documents.

22         Q    Somehow that doesn't surprise me.

23              Didn't you send e-mails to the members

24    of the executive staff, specifically Mr. Lewis

25    requesting that they fill out evaluations for

1                    Claudia McDade

2  Ms. Indelicato?

3       A    If I did, I don't recall it.

4       Q    So you may have?

5       A    I don't recall.

6       Q    You don't recall either way?

7       A    Correct.

8       Q    How about in May or June of 2014, did

9  you send an e-mail of that nature to the executive

10  team requesting they fill out evaluations or self

11  evaluations?

12       A    Self evaluations, yes.

13       Q    And no self evaluations were prepared --

14  well, Mr. Lewis prepared and submitted that self

15  evaluation, correct?

16       A    I'm not 100 percent certain if he did or

17  he didn't.

18       Q    Is it more likely or not that he did or

19  did not?

20       A    I couldn't say.

21       Q    How could you tell -- what would refresh

22  your recollection as to whether he submitted that

23  evaluation?

24       A    I would have to physically look through

25  his file.

1              Claudia McDade

2      Q    Did you look through the files?

3      A    I had no reason to.

4      Q    You had no reason to look through the

5  files in response to Mr. Lewis' document request?

6      A    The document requests were not performed

7  by me or the --

8      Q    You didn't know to search for documents?

9      A    Unless I was specifically requested to

10  look for something, no.

11      Q    Do you know that documents were

12  destroyed in this case, relating to the

13  allegations in this case?

14      A    I did not know that to be true, no.

15      Q    Didn't you specifically discuss

16  Mr. Lewis' self evaluation with him?

17      A    I may have.  I don't remember.

18      Q    Tell me the document destruction.

19           MS. ROGERS:  Objection.

20           MR. REINHARZ:  Objection.

21      Q    You can answer.  When they object, you

22  still have to answer unless they direct you not to

23  answer.

24      A    That is absolute nonsense.  That's my

25  answer.

1                          Claudia McDade

2        A     Because he called her.

3        Q     I'm sorry?

4        A     He called her.

5        Q     He called her?

6        A     Yes.

7        Q     And he called you at the same time?

8        A     No.  He e-mailed me and asked for

9    information.  I sent it to him.  He then called

10   the accountant to ask about the salary, if it was

11   correct.

12       Q     Okay.  Do you know what she told him, if

13   the salary was correct or not?

14       A     Yeah, she did.

15       Q     I'm sorry?

16       A     She did tell him that it was correct.

17       Q     What was the amount of the salary?

18       A     In the 140s.  I don't remember the exact

19   number.

20             MR. ROTONDI:  I would ask for production

21        of that e-mail, again, between Mr. Eliav and

22        Ms. McDade.

23       Q     Anyone else on that e-mail?

24       A     No.

25       Q     This request from Mr. Eliav, again, what

1                    Claudia McDade

2    prompted that?

3         A     Every year the Corporation has to file a

4    list of what's called FDS filers.  It's an annual

5    process.  We report various personnel and their

6    salary and positions to an agency called JCOPE.

7    And then the legal team sends an e-mail out to

8    those individuals reminding them that they have to

9    file this report to the State.

10        Q     What else did Ms. Lee say to you?

11        A     Sorry?

12        Q     What else did Ms. Lee say to you

13   regarding the request from --

14        A     It's "Zee."  Zee.  Z-E-E.

15        Q     I'm sorry?

16        A     It's Zee, not Lee.  Z-E-E.

17        Q     Z-E-E?

18        A     She just wanted to know why Arthur was

19   calling her to ask about Frances' salary.

20        Q     What did you say?

21        A     I said I don't know, really, didn't

22   know, wasn't familiar with it.

23        Q     This request, this e-mail was prior to

24   Mr. Lewis' termination, correct?

25        A     Yes.

1                      Claudia McDade

2          Q     Just shortly before his termination?

3          A     Probably two months.

4          Q     How about the call that you had with

5     Ms. Zee?

6          A     It was the same day.

7          Q     Same day as the e-mail from Mr. Eliav?

8     Same day?

9          A     Yes, same day.

10         Q     And you responded to Mr. Eliav on the

11    same day.

12         A     I believe so, yeah.

13               MR. ROTONDI:  Again, we would call for

14         production of that document.  If you please,

15         mark the record.

16               (Plaintiff's Exhibit 49, Plaintiff's First

17         Request for the Production of Documents, marked

18         for identification as of this date.)

19         Q     The court reporter has handed you what's

20    been marked Plaintiff's Exhibit 49, which is

21    Plaintiff's First Request for the Production of

22    Documents to you; have you seen this document

23    before?

24         A     Yes.

25         Q     When was first time you saw it?

                        Claudia McDade

 1                      Claudia McDade

 2    Claudia McDade's Privilege Log?

 3         A    No.

 4         Q    Item 4 references correspondence between

 5    Claudia McDade and Fay Christian, re employee

 6    demographics, correct?

 7              MS. ROGERS:  Which one are you referring

 8         to?

 9              MR. ROTONDI:  Item 4.

10         Q    Was anyone else on that correspondence?

11         A    I don't recall.  Ms. Smith may have

12    been, but I don't recall off the top of my head.

13         Q    Other than Ms. Smith, that's it, though?

14         A    I believe so.

15              MR. ROTONDI:  I would call for

16         production of the documents withheld in

17         item 4 in the privilege control log.

18         Q    Item 3, correspondence between Claudia

19    McDade and Margie Smith, re salary promotions;

20    what did that correspondence relate to?

21         A    Exactly what it says, salary and

22    promotions.

23         Q    Which salaries and which promotions?

24         A    Any salaries, any promotions or salary

25    increases outside of the ordinary.

1                    Claudia McDade

2        Q    Questions posed by either Serena White

3    or Mr. Chin?

4        A    Yes.

5             MR. ROTONDI:  I call for the production

6        of that document.

7             MS. ROGERS:  Which document?

8             MR. ROTONDI:  Number 20.

9        Q    Number 21, are you familiar with that

10   document?

11       A    It doesn't say who its from, or --

12       Q    You don't know who drafted it?

13       A    -- I'm not sure.

14       Q    Number 22, are you familiar with that

15   document.

16       A    No.

17       Q    Number 23, are you familiar with that

18   document?

19       A    I believe I've seen it, yes.

20       Q    Who is Adam Shulman?

21       A    He, I believe, worked for, at HCR?  He's

22   an attorney for the State at one of the agencies;

23   I'm not sure.

24       Q    What's HCR?

25       A    Housing and Community Renewal.

1                    Claudia McDade

2        Q    Why would he have received the document

3    from RIOC?

4        A    Because they, we kind of sort of

5    reported to them.

6        Q    How so?

7        A    HCR commissioner sits as the Chair of

8    our Board.

9        Q    Who is the HCR Chair on September 8 of

10   2015?  Was that Jamie Ruben?

11       A    I believe so.  It may have been

12   Mr. Townes.  I'm not 100 percent sure when one

13   left and the other came in.

14       Q    What litigation was this document

15   related to?

16       A    I assume it was Mr. Lewis, but I don't

17   know that.

18       Q    You don't know either way?

19       A    No.

20       Q    You did say you saw this document or I'm

21   mistaken?

22       A    It sounds familiar.  I'm not sure.

23       Q    How about number 24 -- actually, let me

24   back up for a second.

25            Do you know if anyone else who has been

1                    Claudia McDade

2    on, as far as you recall, anyone else listed on

3    document 23, or you just don't recall --

4         A    I don't recall either way.

5         Q    Did you ever see the document listed in

6    Privilege Control 24?

7         A    No.

8              MR. ROTONDI:  I would call for the

9         production of documents 23 and 24.

10             In fact, I don't think there's any

11        documents on this Privilege Log that I would

12        not call for the production of.  So I'll just

13        note this in the record and we can discuss it

14        off the record.

15        Q    Number 25, e-mails between Donald Lewis

16   and Julia Kupiec.  Who's Julia Kupiec?

17        A    I don't know her.  I believe she worked

18   in the Chamber.

19        Q    Kisha Santiago?

20        A    She was our Deputy Secretary in Albany,

21   or the Deputy Secretary assigned to RIOC.

22        Q    All right.  In the Executive Chamber?

23        A    Yes.

24        Q    Deputy Secretary of what, the Governor's

25   Office?

1                    Claudia McDade

2        A    I think so.

3        Q    Is she an attorney?

4        A    I'm not sure.

5        Q    Do you know -- did you see his e-mails

6   that are referenced, these three e-mails in

7   number 25?

8        A    No.

9             MR. ROTONDI:  I would call for the

10            production of those.

11       Q    Number 26, are you familiar with those

12  documents, four documents referenced, e-mails from

13  Donald Lewis?

14       A    No.

15            MR. ROTONDI:  I would call for the

16            production of those.

17       Q    Number 27?  Are you familiar with those

18  documents?

19       A    No.

20            MR. ROTONDI:  I would call for

21            production of those.

22       Q    Number 28, are you familiar with those?

23       A    No.

24            MR. ROTONDI:  I would call for

25            production of those.

1                    Claudia McDade

2       Q    Number 29, are you familiar with those

3  documents?

4       A    No.

5       Q    Number 30?

6       A    No.

7       Q    Number 31?

8            Just to be clear, numbers 29, 30, when

9  you say no, you're not familiar with those

10  documents?

11      A    Yes, that's correct.

12      Q    Number 31, same question?

13      A    No.

14      Q    Number 32?

15      A    No.

16      Q    Number 33?

17      A    No.

18      Q    A.

19           MR. ROTONDI:  We call for the production

20      of all those documents, but we can take it up

21      off the record.

22           Mark the record for me, please.

23           Can we go off the record while I

24      organize these exhibits.

25           THE VIDEOGRAPHER:  At 11:59 a.m., off

1                         Claudia McDade

2            MR. ROTONDI:  I'm going to ask that we

3        leave a blank in the record; if you could

4        produce those documents.

5        Q    Which postings are you referring to, the

6   one that Ms. Cobill interviewed for or the one

7   that Ms. Robinson was hired for?

8        A    It's the same position.

9        Q    But there was a year that transpired or

10  so between the two, no?

11       A    No, I don't think there was a year.

12       Q    How much time transpired between the

13  time Ms. Cobill was interviewed and Ms. Robinson

14  was hired?

15       A    I have no recollection nor would I guess

16  as to when this Ketley, whatever her name was,

17  interviewed and when Gretchen was hired.

18       Q    Do you have any documents showing what

19  the salary was being considered for Ms. Ketley

20  Cobill?

21       A    I do not.

22       Q    Do you know whether any exist?

23       A    I don't know.

24       Q    Were there any e-mails that you remember

25  seeing?

1                    Claudia McDade

2  typical involvement?

3        A    Typically, executives are suggested to

4  us by somebody in Albany.  They did not have a

5  candidate for us for CFO so we did actually

6  recruit for this one.  I put out an ad and

7  Ms. Quinones was one of the applicants.

8        Q    Where did you put the ad?

9        A    I believe it was on Indeed.

10       Q    I'm sorry?

11       A    I believe it was on Indeed, but I'm not

12  100 percent sure.

13       Q    "On Indeed," is that what you said?

14       A    I believe so.  But I'm not --

15       Q    We'll leave a blank in the record.  Can

16  you provide a copy of whatever advertisement you

17  posted.

18       A    Mm-hmm.

19       Q    Getting back to your typical

20  involvement, say there's a candidate that's

21  referred from somewhere else, you know, somewhere

22  in the State, you know, Executive Chamber or your

23  office of whatever; what's your involvement in

24  that hiring process?

25       A    Just processing them once they've come

1                    Claudia McDade

2        Q    That wasn't produced.  You weren't

3   involved with the production, but I'm representing

4   that that wasn't produced.

5             I'm leaving a blank in the record.  If

6   you could produce those documents to your counsel,

7   I'm calling for the production of those documents.

8             MS. ROGERS:  Which documents?

9             MR. ROTONDI:  The other people who were

10        considered for the CFO position in addition

11        to Ms. Quinones.

12        Q    Was she hired because she was Hispanic?

13        A    I'm sorry?

14        Q    Is Ms. Quinones Hispanic?

15        A    I believe she is, yes.

16        Q    Did that have any bearing on hiring her

17   for the position?

18        A    Absolutely not.

19        Q    Even after Mr. Lewis complained of the

20   RIOC executive members being all white females?

21        A    No.

22        Q    Were you involved in the hiring -- well,

23   the COO position was phased out, am I right?  At

24   some point.

25        A    It was while Charlene was there.

1                    Claudia McDade

2           MR. ROTONDI:  Again, I would call for

3      production of both of those ads.

4      Q    How many people interviewed for the COO

5 position?

6      A    Around the same number, three to five.

7      Q    Were you personally involved?

8      A    Yes.

9      Q    Were you involved in the current COO --

10 what's his name?

11      A    He's the Vice President of Operations.

12 His name is Shelton Haynes.

13      Q    Hayes?

14      A    Haynes.

15      Q    Shelton Hayne.  Who else was interviewed

16 beside Mr. Hayne?

17      A    I don't know.

18      Q    But you sat in on those interviews?

19      A    I did, yes, for most of them.  I may

20 have been absent for one or two --

21      Q    They would be documented -- I'm sorry.

22      A    Yes.

23      Q    I didn't mean to interrupt you.

24      A    There would be resumes, yes.

25      Q    In RIOC's files somewhere?

                     Claudia McDade

1

2      A     Mm-hmm.

3      Q     In your files?

4      A     Mm-hmm.

5            MR. ROTONDI:  Again, I would call for

6      production of those documents regarding the

7      interviews, the selection of the COO

8      replacement, the COO position.

9      Q     With respect to Mr. Hayne and

10   Ms. Quinones, the Executive Chamber had nothing to

11   do with those positions?

12     A     Well, yeah, they have to vet them and

13   approve them.

14     Q     But the position, did they suggest

15   either one of those individuals?

16     A     They did -- definitely didn't suggest

17   Mr. Haynes, because he came up from Atlanta.

18   Ms. Quinones, I believe may have known somebody in

19   State service, but I don't know that it was a

20   recommendation.

21     Q     Do you know how Mr. Hayne came, well,

22   you believe that Mr. Hayne learned of the position

23   through Indeed?

24     A     Yeah.

25     Q     Were you a proponent of hiring

1                    Claudia McDade

2        A    A copy of the --

3        Q    Severance agreement?  The termination

4   letter?

5        A    Yes.

6        Q    Which Mr. Lewis has requested, which has

7   not been produced.

8             MR. ROTONDI:  I would call for the

9        production of all the severance agreements

10        and termination, resignation letters once

11        again.

12        Q    Did you sever your employment with RIOC

13   at any point?

14        A    Yes.

15        Q    When?

16        A    The very end of December of 2014.

17        Q    Why did that happen?

18        A    Got another job.

19        Q    I'm sorry?

20        A    I got another job.

21        Q    That was during the presidency

22   Ms. Indelicato?

23        A    Yes.

24        Q    How did you effectuate -- did you

25   resign?

1                   Claudia McDade

2       A    Rie called a lot.

3       Q    Rie?

4       A    Yes.

5       Q    Did anyone ever call you about any

6   issues concerning the raise of Frances Walton?

7       A    No.

8       Q    No one ever called you in all these

9   calls?

10      A    No.

11      Q    How many calls a day were you getting

12  from them?

13      A    Between calls and texts or e-mails,

14  several.

15      Q    Do you have those texts and e-mails?

16      A    I may.

17           MR. ROTONDI:  I would ask for production

18      of those texts and e-mails.

19           MR. REINHARZ:  What possible

20      relevance --

21      Q    What e-mail address were they sent to?

22           MR. REINHARZ:  Let me state for the

23      record:  What possible relevance would those

24      e-mails --

25           MR. ROTONDI:  That's fine.

1                    Claudia McDade

2  they were not satisfied with his performance?

3       A    I would be, yes.

4       Q    Would you be surprised to learn that he

5  resigned?

6       A    Mr. Lightner?

7       Q    Yeah.

8       A    If he did, it was at the request of

9  someone.

10      Q    But he was not terminated?

11      A    It was a severance agreement.

12      Q    Have you seen that severance agreement

13  in the documents we've looked at today?

14      A    No.

15           MR. ROTONDI:  Again, I would call for

16      the production of the severance agreements,

17      which have not been produced yet.

18      Q    Have you ever had any conversations with

19  Andrew Kennedy?

20      A    Other than niceties at a Board meeting,

21  saying hello, no.

22      Q    There was a meeting with the Board

23  members and Mr. Kennedy by videoconference; are

24  you aware of that?

25      A    Yes, but I would not have been invited

1                    Claudia McDade

2   that received an increase?

3        A    No.

4        Q    That was Erica Spencer?

5        A    Mm-hmm.

6        Q    Did she receive any increase in relation

7   to this?

8        A    She did not.

9        Q    Page 516, which is the second page,

10  references interrogations and interviews.

11       A    Mm-hmm.

12       Q    Where were the notes maintained for

13  those interrogations and interviews?

14       A    You'd have to ask Mr. Chin.

15       Q    Mr. Chin is a designee of RIOC, correct?

16       A    He's a designee of the State.

17       Q    And when he produces his final report,

18  does he turn anything else over to RIOC?

19       A    His notes, no.

20       Q    What happens to his notes, do you know?

21       A    I don't know.

22            MR. ROTONDI:  Mark in the record a call

23       for production of those documents.

24            MS. ROGERS:  Production of what

25       documents?

1                           Claudia McDade

2      these is when you saw this complaint?

3          A    Was when this piece of paper came.

4          Q    When did you first see this piece of

5      paper?

6          A    Whenever it was filed.  I don't -- was

7      it dated?

8          Q    The page with the paragraph that we read

9      from is dated 9/9/15.

10         A    September, sometime in 2015.

11         Q    Mr. Reinharz has requested he be given

12     some time to ask questions before we conclude for

13     today.

14             I haven't concluded my questioning yet,

15     Ms. McDade.  But in the interest of cooperation

16     from Counsel I'm going to stop questioning now and

17     allow Mr. Reinharz to proceed and maybe Ms. Rogers

18     if she so desires.

19             MR. REINHARZ:  How much time do we have

20         so far?

21             THE VIDEOGRAPHER:  Just over 5 hours.

22             MR. ROTONDI:  Let me just finish really

23         quick.

24         Q    And you'll have to appear to conclude

25     your deposition; are you willing to do that?

1                    Claudia McDade

2        A     If I have to, I have to.

3              MR. ROTONDI:  One final thing -- because

4        one of the reasons is Mr. Reinharz has asked

5        to ask some questions, and another reason is

6        that I have more questions, and another

7        reason is that the documents responsive to

8        plaintiff's request have not been produced in

9        this case.

10   EXAMINATION BY MR. REINHARZ:

11       Q     Good evening, Ms. McDade.  I'm Mark

12   Reinharz.  I represent RIOC in this case.

13             I just have a few questions that I want

14   to ask you to follow up on what Mr. Rotondi asked

15   you earlier.

16             He had asked toward the beginning of

17   this deposition about the circumstances

18   surrounding the termination of the plaintiff in

19   this case, Mr. Lewis.

20       A     Yes.

21       Q     Can you tell me what the circumstances

22   were; specifically who made the decision to

23   terminate Mr. Lewis?

24       A     To my knowledge, it was Alphonso David.

25       Q     How do you know that?

1                    Claudia McDade

2       A    That's what I was told by

3  Ms. Indelicato, and that was the gist of what any

4  communication that I had with anybody on the

5  subject said.

6       Q    You mentioned before that you didn't

7  speak to anyone personally in Albany about this,

8  correct?

9       A    Before he was terminated, no.

10      Q    What about after?

11      A    I spoke to Mr. Volforte in GOER on a

12  couple of occasions.  Asking him --

13      Q    Mr. Volforte, what's his title?

14      A    Acting Counsel for GOER.

15      Q    And GOER is employee relations, right?

16      A    Yes.

17      Q    So tell me about your conversations with

18  Mr. GOER.  When was the first time you spoke with

19  Mr. GOER?

20      A    Mr. Volforte?

21      Q    At GOER.

22      A    I would say the week after Mr. Lewis was

23  terminated.  I contacted to ask him about the

24  possibly of severance.

25      Q    Was that something you did on your own?

1

2                    I N D E X

3    WITNESS           EXAMINATION BY          PAGE
     --------------------------------------------------------
4    Ms. McDade         Mr. Rotondi                 5

5                       Mr. Reinharz              301

6

7                MARKED FOR DISCUSSION
                                    PAGE   LINE
8    --------------------------------------------------------

9    assertion of privilege              60     22

10   C. McDade privilege log             62      2

11   RIOC privilege log                  82     10

12

13              DIRECTIONS NOT TO ANSWER
                                    PAGE   LINE
14   --------------------------------------------------------

15                                      109     24

16                                      121      8

17                                      128     14

18                                      262     19

19

20              REQUESTS FOR DOCUMENTS
                                           PAGE
21   --------------------------------------------------------

22   Mr. Rothman's catalog of Mr. Lewis' office      43

23   Chart prepared by Ms. McDade, provided to Board of     50

24   Directors, of race and gender composition of RIOC

25   employees

1

2                     REQUESTS FOR DOCUMENTS
                                                          PAGE
3        ---------------------------------------------------------

4        E-mail between Mr. Eliav and Ms. McDade regarding    52

5        Ms. Walton's salary

6        See production request of page 52                    54

7        McDade privilege log item 4                          59

8        RIOC privilege log item 20                           80

9        RIOC privilege log items 23 and 24                   82

10       RIOC privilege log item 25                           83

11       RIOC privilege log item 26                           83

12       RIOC privilege log item 27                           83

13       RIOC privilege log item 28                           83

14       RIOC privilege log items 29, 30, 31, 32, 33          84

15       Job posting for compliance and internal controls    159

16       position

17       CFO job posting which appeared on Indeed             212

18       Resumes of other candidates considered for the CFO  218

19       position, in addition to Ms. Quinones

20       COO job posting which appeared on Indeed             221

21       Resumes of other candidates considered for the COO  222

22       position

23       All severance agreements, termination letters and   250

24       resignation letters

25

1

2                    REQUESTS FOR DOCUMENTS

3       ----------------------------------------------------      PAGE

4       Text messages and e-mails between Ms. McDade and      258

5       RIOC during Ms. McDade's employment at NYC

6       Department of Consumer Affairs

7       Restating a call for severance agreements      264

8       Notes of Mr. Chin relating to interrogations and      281

9       interviews in the matter of Karline Jean

10

11                       EXHIBITS MARKED
                   (Exhibits retained by Mr. Rotondi.)
12       Plaintiff's                                            PAGE
        ----------------------------------------------------
13          49   Plaintiff's First Request for the            54

14               Production of Documents

15          50   Claudia McDade privilege log                 57

16          51   E-mails                                      66

17          52   Defendant Roosevelt Island Operating         71

18               Corporation's privilege log

19          53   Job description for the position of         165

20               Director of Human Resources and

21               Administration

22          54   Chart of requested staff promotions        166

23          55   Roosevelt Island Operating Corporation   171 --

24               proposed budget for the fiscal year 2015 -

25               2016

# EXHIBIT C

H4K8LEWC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DONALD LEWIS,

                Plaintiff,

          v.                          16 Cv. 3071 (SN)

ROOSEVELT ISLAND OPERATING
CORPORATION, et al.,

                Defendants.

------------------------------x

                                      April 20, 2017
                                      11:30 a.m.

Before:

                    HON. SARAH NETBURN,

                                        Magistrate Judge

                    APPEARANCES

ANTHONY J. ROTONDI
     Attorney for Plaintiff

BOND SCHOENECK & KING
     Attorneys for Defendant Roosevelt Island Operating Corp.
MARK N. REINHARZ

MELICK & PORTER
     Attorneys for Individual Defendants
HOLLY ROGERS
```

H4K8LEWC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MR. ROTONDI:  Anthony Rotondi for plaintiff.

5          MR. REINHARZ:  Mark Reinharz for defendant Roosevelt

6     Island Operating Corp.

7          MS. ROGERS:  Holly Rogers for the individual

8     defendants.

9          THE COURT:  Thank you.

10         We are here to discuss discovery.  I have the letters

11    that have been filed in the last week.  Mr. Rotondi's letter

12    filed on the 13th of April, the joint defendants' letter filed

13    on April 18th, and then I have reviewed Mr. Rotondi's letter

14    that was filed either late last night or early this morning.

15         What I want to do is find out where things stand with

16    respect to discovery.  When I granted the parties' request to

17    stay discovery on March 7th, and I endorsed the deposition

18    schedule that the parties had presented to me, which set forth

19    specific dates on which all of the depositions were going to

20    take place, and had those depositions completed by May 19th, I

21    did that at the request of the parties who believe that there

22    might be a window of opportunity for settlement, but otherwise

23    had worked together to come up with a deposition schedule,

24    which I approved.

25         I am now being led to believe that that deposition

1   schedule has either been wholly or in part ignored and that the

2   depositions that were intending to go forward, as agreed upon

3   by the parties, are not going forward.  I would like to find

4   out why that is.  Typically when parties present to the Court a

5   schedule that the parties have jointly agreed upon with actual

6   dates for depositions, I assume that you all are representing

7   the truth to me and those are dates that everybody has agreed

8   upon and that the parties have confirmed and are going to go

9   forward.  So I am not sure why only six or seven depositions

10  have happened as of now.

11          In Mr. Rotondi's letter he also complains about

12  inadequate responses to discovery.  The defendants have

13  responded that they believe they have produced everything.  I

14  am also informed that the depositions are being held open

15  because of this issue.

16          The parties have an obligation to raise discovery

17  disputes among one another, to have a cooperative and effective

18  meet-and-confer effort, and if you're unable to resolve those

19  discovery disputes, you need to bring them to the Court in a

20  timely matter.  I am not going to perpetually extend discovery

21  because parties are not timely bringing disputes to me after

22  you have made an effort to resolve them on your own.

23          So I would like to hear exactly what are the discovery

24  disputes that are outstanding, what documents Mr. Rotondi

25  believes have not been produced and should be produced, and

H4K8LEWC

```
1    relatedly there is an insinuation that there are privileged

2    documents that are not -- or that the defendants have asserted

3    attorney-client privilege as to certain documents and it's not

4    clear exactly what that dispute is all about.

5          So, Mr. Rotondi, why don't I begin by asking you what

6    you believe the state of discovery is at this point.

7          MR. ROTONDI:  Thank you, your Honor.

8          As your Honor stated, the state of discovery is not

9    proceeding as it should and mostly because of the document

10   discovery issue and because defendants have postponed a bunch

11   of the depositions that were scheduled.  Even after I --

12         THE COURT:  You have to speak more slowly, sir.

13         MR. ROTONDI:  After I sent that last letter requesting

14   a court conference, I was informed that Ms. Labate who was

15   scheduled to be deposed would only be appearing for two hours

16   instead of the whole day.  And Ms. Walton who was supposed to

17   be deposed the other day, I was informed at 4 p.m. she was not

18   showing up for her deposition.

19         It's been impossible to take depositions, to be

20   leaving depositions open pending resolution of the document

21   discovery issue.

22         THE COURT:  Mr. Rotondi, I am having a hard time

23   hearing you and I can't imagine that the court reporter is able

24   to take you down.

25         MR. ROTONDI:  Am I speaking too fast or am I mumbling?
```

H4K8LEWC

1          THE COURT:  You are speaking too fast.

2          We have set aside plenty of time.  There is no

3    urgency.  If you can speak more calmly, otherwise you won't

4    have a clean record.

5          MR. ROTONDI:  It's been a problem my entire life.  I

6    apologize.

7          I will address the issue that the Court raised

8    initially, raising these issues promptly with the Court.

9          When plaintiff received defendants' discovery

10   responses, they were wholly inadequate.  I reached out to Ms.

11   Rogers to negotiate, as we are required to do.  I had extensive

12   discussions with her, going through all of the requests.  She

13   agreed to do a number of things in order to resolve the issues.

14         Then a few days later new counsel appeared on behalf

15   of RIOC.  So Ms. Rogers was not authorized to speak on those

16   issues.  Then a week later new counsel appeared on behalf of

17   RIOC.  It's been -- I don't know how long they have been on it.

18   I don't have the docket in front of me.  It's probably been at

19   least six weeks.

20         But they haven't been able to get their client's own

21   documents during that time.  I had to produce RIOC's production

22   to their own counsel because RIOC's new counsel was unable to

23   get their documents from their clients or from their prior

24   counsel, and there's a bunch of documents that have wrongfully

25   been withheld based on privilege.

1          RIOC's new counsel has indicated he agrees with

2     plaintiff that many of those should be turned over, but he has

3     been unable to get those documents from his prior counsel or

4     from RIOC until I sent a letter to the Court requesting a

5     conference, and then that day he received the documents.

6          For me to have to produce his own client's documents

7     to him is absurd.  Plaintiff did everything he could in order

8     to resolve these issues and it has just been stymied.

9          Ms. Rogers and Mr. Reinharz in their letter saying

10    that I just forwarded this list of issues to them a few days

11    ago, we have been discussing these issues for six weeks now and

12    no progress has been made.  I have been told I am getting

13    documents that are not going to be privileged.  I still haven't

14    received them.  There are many, many deficiencies.

15         In common sense, I mean, you're talking about an

16    entity, they haven't searched for any e-mails.  They produced

17    one e-mail, I believe, which was redacted so you can't see who

18    received it.  1500 pages, the equivalent of three reams of

19    paper, for all of the individual defendants and the entity.  It

20    appears that they didn't even really do a search.

21         One of the individuals testified that all she did to

22    find documents was type Lewis in her e-mails and that was it,

23    nothing else.  She never received a document request, never

24    received instructions.  Just typed Lewis in her e-mails and

25    that was it.  I showed her about 17 pages of documents that

H4K8LEWC

1   were produced and she said they aren't even my documents.

2           Another individual testified that he burned all these

3   documents to a Blu-ray CD, and in response I have seven pieces

4   of paper from him.  It's hard to imagine that there are no

5   responsive documents in there.

6           In terms of the privilege log, the privilege log is

7   completely inadequate.  It doesn't list the subject matter in

8   many instances.  It doesn't list who the sender is, who the

9   author is, who the recipients are.  It's impossible for

10  plaintiff to make an evaluation on whether the document is

11  privileged unless the privilege log indicates who received the

12  document, right, because a document that otherwise would be

13  privileged is no longer privileged if it's sent outside of the

14  permitted number of people.  Not number, but appropriate

15  people.  That would breach the privilege.

16          Those are just a few issues.  I don't know if you want

17  me to keep going or want to take them one at a time.

18          THE COURT:  To summarize, you believe that they have

19  not conducted a search for electronic discovery at a minimum

20  because you don't have any e-mails and the privilege log that

21  has been produced does not comply with the rules.

22          MR. ROTONDI:  That's true, and it's much more than

23  that.  I don't believe they have conducted a search at all for

24  documents.  I think what they have done, they have a shifting

25  theory of the case that changes every few months.  Now they

H4K8LEWC

 1    have this new theory that it was Chambers decision, so they

 2    produce one e-mail to support that and nothing else.  Nothing

 3    that predated that or -- they produced a few documents that

 4    supports whatever theory that they have of the day, and the

 5    rest of the documents they produce are all publicly available

 6    documents or documents that -- most of the individual

 7    defendants, all they produced are letters that I wrote and sent

 8    them to defendants' counsel, which has been a prevalent issue

 9    in this case.

10         When I sent FOIA requests to outside agencies, what

11    they sent me back is my correspondence to them.  The pattern

12    that they do is a big the hell with you, we don't care, we will

13    do what we want.

14         THE COURT:  Let me hear from the defendants with

15    respect to their efforts to search for documents.

16         MR. REINHARZ:  Good morning, your Honor.  I represent

17    Roosevelt Island.  I am new to this.  I didn't come into this

18    case until March last year -- of this year.  So I believe I

19    appeared March 7.

20         The day after I appeared, I got an e-mail from Mr.

21    Rotondi telling me, as you know, defendants' production has

22    been wholly deficient.  I didn't know that.  I don't know that

23    today.  But I saw the e-mail and I immediately spoke to him and

24    I said, Listen, at this point I am just appearing in the case,

25    I haven't had a chance to review any documents.  I don't even

H4K8LEWC

1    have the documents now.  I just got into the case.  Give me a

2    little time.

3          I spoke with him at some point over next few days.  He

4    was in such a rush he said, You know what, I will send you the

5    documents that were produced.  I said, OK, send me the

6    documents you produced.

7          So I went through the documents.  I had actually

8    gotten the documents from my client and from co-counsel.  I

9    went through them and then I spoke with Mr. Rotondi numerous

10   times and I said, Let's go through the document response,

11   because there were about 26, 27, 28 document demands.

12         Several times we tried to arrange it and each time he

13   was busy, he couldn't do it.  Finally he said to me, I went

14   through it with Ms. Rogers.  I am not going to do it all over

15   again with you.  I said, OK, fine.  But if you have a problem,

16   send it to me.

17         So on April 5 -- this is about a month after I am

18   taking over the case -- he finally did send me this list of 41

19   some odd items, a month after.  And immediately, on Friday,

20   last Friday and on Monday I spoke with him about this and I

21   said, I will produce this.  This is too broad.  He is asking

22   for things under the sun.  He is asking things about deals of

23   co-ops on Roosevelt Island.  He wants every e-mail under the

24   sun.  I want the Anthony Jones matter.  I said, You have got to

25   narrow this down.

H4K8LEWC

1          I said, By the way, Mr. Rotondi, Anthony, you told me

2     we did an inadequate search.  We did do a document search.  Ms.

3     Rogers can talk about that in more detail because she was

4     counsel at the time.  We did do an electronic search.  We have

5     somewhat of an antiquated e-mail, but there was a search done

6     and more than one e-mail produced.  There were a number of

7     e-mails produced.  But we did do a document search and

8     everything that we have was produced.  So for him to come in

9     and say we didn't do a search is inadequate.

10          But I said to him, Anthony, give me search terms.  You

11     don't think we used the right search terms, give me the search

12     terms.  I will send you the search terms.  I got the search

13     terms yesterday.  So for him to say we have been delaying is by

14     far not the case.

15          I also want to point out some other inaccuracies.  He

16     is claiming that we canceled depositions.  The first deposition

17     that got canceled was by Mr. Rotondi.  We had a deposition

18     scheduled for David Kraut on March 23.  We got a notice, I

19     can't do it.  No explanation, nothing.  He canceled.

20          He also canceled the Walton deposition.  Again, that

21     was something that he said that in light of the fact that I

22     don't have the documents I can't move forward.

23          So we have been diligently producing the people that

24     are required.  Again, this Exhibit B -- in all due respect,

25     your Honor, I wasn't here.  RIOC wasn't represented at the time

1    of this list of 27 witnesses.  This is a single-plaintiff case

2    where 27 depositions are being taken and every deposition is

3    being taken in excruciating detail, and I pointed out a couple

4    of things in our letter.  The witnesses are being asked

5    numerous irrelevant questions.  Your husband is being

6    discussed.  Benches are being discussed.  A myriad of things

7    that have nothing to do with the case.

8              Counsel is running out the clock.  By 7:00 at night

9    the witness is exhausted, understandably.  We haven't had a

10   chance to ask them any questions because he moves around the

11   issue.  The key issue is who terminated Mr. Lewis and why was

12   he terminated.  That he doesn't get to.

13             We spend hours and hours grilling them on what their

14   e-mail server is and on other things that have nothing to do

15   with the case.  So we are spending thousands and thousands of

16   attorney hours on issues that have nothing to do with the case.

17             Then he is coming into court and has the chutzpah to

18   say we have been delaying and we haven't been doing anything.

19   If anything, it's been Mr. Rotondi and the plaintiffs who have

20   been coming in and scheduling these depositions, taking hour

21   and a half lunch breaks.  There was one deposition, I don't

22   think we left until after 7:00 at night.

23             So I think everything has to be put in context.

24             I have worked with Mr. Rotondi tirelessly.  I said to

25   him, Send me that list.  It took him a month to send me the

1    list.  I went through it on Friday and didn't finish until

2    Monday.  I said, Send me search terms.  It took him six weeks

3    for him to send me search terms.

4           So I think the shoe is on the other foot here when it

5    comes to discovery disputes.

6           THE COURT:  With respect to the search terms, you say

7    you have an antiquated e-mail system.  I don't know exactly

8    what that means.  I assume people communicated by e-mail in the

9    organization.

10          MR. REINHARZ:  Yes.  It's my understanding, and I only

11   know this because I'm dealing with a dinosaur here, your Honor,

12   is that until recently RIOC had an e-mail system by a company

13   called GroupWise.  The only reason I know GroupWise is because

14   I had it in the 1980s and 1990s.  So searching on GroupWise for

15   all the e-mails from that time period is very, very difficult.

16          Mr. Rotondi did give me some search terms.  We are

17   going to look at them.  Some of them I don't understand.  We

18   haven't had a chance to talk about the search terms because he

19   is asking for things that are unclear.  But we will search the

20   e-mails.

21          We have done a diligent search.  I don't think we are

22   going to be coming up with millions of documents here.  We have

23   done a good faith search, and Ms. Rogers can talk more

24   diligently about that because I wasn't counsel at the time.

25   But as far as we know, we have turned over the documents.

H4K8LEWC

1      He has asked for another 41 list of documents.  Again,

2      I don't even think some of these were covered by the original

3      document request.  I have spoken to Mr. Rotondi.  I said I

4      would produce some documents or certainly look for documents,

5      and that's where we stand now.

6           All of the sudden when he wrote to the Court asking

7      for more time and we brought up all these issues about how he

8      is conducting these depositions, where he is arguing with the

9      witness, grilling the witness, asking inappropriate questions,

10     then he responded with his missive last night describing us as

11     being horrible people.

12          THE COURT:  With respect to GroupWise, would you be

13     searching the entirety of the system or would you be gathering

14     custodians?

15          MR. REINHARZ:  Would I be personally, are you asking,

16     or my client?

17          THE COURT:  Whoever is going to be doing the

18     electronic search.

19          MR. REINHARZ:  My client will be doing the electronic

20     search.  Probably the general counsel of the client will be

21     doing the electronic search.  I think there are about a dozen

22     names that Mr. Rotondi had asked us to look in for the e-mails

23     for these people.

24          THE COURT:  So the electronic search is just for names

25     of individuals?

1          MR. REINHARZ:  No.  I don't have the list here, but

2     there's about -- he has given us a list of about 20 search

3     terms for e-mails of about 15 people.  Then he has some other

4     thing about metadata, which is beyond me, which he also has

5     listed.  I can show you the list that he provided.

6          THE COURT:  Sure.

7          So, Mr. Rotondi, you are seeking -- I want to make

8     sure we are all on the same page here.  You want the defendants

9     to collect the e-mail from the list of custodians in the middle

10    column, to run searches using the terms on the first column,

11    and to produce to you the documents in native format that

12    includes the metadata in the third right column, is that

13    correct?

14         MR. ROTONDI:  That's essentially it, Judge.  As I

15    indicated in my correspondence to the defendants, those were

16    open for discussion.  I am prepared to have an electronic

17    discovery outfit come and do the searches for them.

18         Additionally, I don't want to get --

19         THE COURT:  You're offering to hire your own vendor to

20    come in and conduct the searches?

21         MR. ROTONDI:  Yes.

22         THE COURT:  OK.  I don't know how the defendants feel

23    about that.

24         MR. REINHARZ:  I don't think that's necessary, your

25    Honor.

H4K8LEWC

1          THE COURT:  OK.

2          MR. ROTONDI:  If I might, I don't want to get off

3    track, but Mr. Reinharz indicated to your Honor that I canceled

4    Ms. Walton's deposition.  I only have one copy, but I will read

5    it into the record, and I will hand it up to your Honor.

6          This is on 4/17.  At 4:28 p.m., after I got off the

7    telephone with Mr. Reinharz, I sent Ms. Rogers an e-mail:

8    "Holly, I was under the impression that we were deposing Walton

9    tomorrow, but I was just on the phone with Mark who is under

10   the impression that you are not going forward pending the court

11   conference.  Can you please confirm so I can let the court

12   reporter know.  Thanks."

13         I only have the one copy.

14         THE COURT:  I don't need you to hand it up.

15         MR. REINHARZ:  There is a prior e-mail where Mr.

16   Rotondi talks about how the documents haven't been produced and

17   he doesn't feel it's necessary to go forward with a number of

18   depositions.  I don't have the e-mail here, but I will be happy

19   to show the Court.

20         THE COURT:  Let me just give you guys a little tip.

21   No one is looking good in this case.  You are all looking like

22   you're unable to respond professionally as lawyers.  These

23   types of letters, I have to say, they are aberrant.  These are

24   not the letters I normally get from lawyers.  So I am actually

25   not that interested in who is the worst player in this debacle.

But it seems to me that nobody is engaging in discovery in an appropriate way, and I don't really feel like having to resolve the schoolyard fights about who is worse than whom.  I would like to move forward here.  So I don't need an endless list of why everybody is so mean.

So I assume that everybody here is basically not cooperating in good faith.  That's the impression that I am getting, and neither of you is going to convince you that one of you is an angel and the other of you is not.  So I would rather move forward and try to figure out a way to resolve this litigation so that the parties can make their best efforts in gathering discovery and moving the case towards trial.

Mr. Rotondi, you will likely take depositions without all of the information that you would like and you will likely try this case without all the information you would like.  Discovery is an imprecise tool.  There are ways in which we can try and identify and cull the most relevant documents, but you need to be able to move forward with the case.

I understand that the defendants have produced, in addition to the FOIL discovery that you received, the 200 pages of documents.  I assume there is information there that is helpful.

I am prepared to work with the parties right now in a way to identify gaps in discovery and set a schedule that is reasonable.  I want to talk about depositions and what is going

1    on during these depositions and put some limitations on them.

2    But I am not really interested in who is canceling depositions

3    first.  I don't have time.

4              MS. ROGERS:  Your Honor, can I speak to the issue of

5    the document search that was done by RIOC when I was

6    representing them?  Because I think that goes to what has been

7    done so far.

8              THE COURT:  Sure.

9              Mr. Rotondi, you can be seated.

10             MS. ROGERS:  Thank you.

11             Mr. Rotondi's representation that RIOC did not do any

12   document searches or electronic searches is not true.  Both

13   RIOC's IT department and their legal department did a thorough

14   electronic search based upon the document requests of all of

15   the custodians that could have possible documents.

16             I believe that it's true that we have agreed to work

17   with Mr. Rotondi through their new counsel and myself as

18   counsel to the individuals to see what additional documents may

19   be out there.

20             THE COURT:  Does Mr. Rotondi know which custodians you

21   searched in that first batch?

22             MS. ROGERS:  I can certainly provide him a list.  He

23   hasn't asked for that.  But we'd be happy to do that.

24             THE COURT:  I think it's worth it to disclose as much

25   information here so that there is not a sense that one side is

1    cheating the other.  So if you have done an electronic search

2    already, I think it behooves you to let Mr. Rotondi know which

3    custodians were searched or, if they are shared files, which

4    shared files were searched and what search terms were used.

5    That may assist Mr. Rotondi in being satisfied, or not, that

6    the efforts that were previously made were adequate.

7         MS. ROGERS:  We can do that.

8         With regard to the individual defendants specifically,

9    your Honor, these are not people who have a ton of documents.

10   They are resident board members.  This is an ancillary thing

11   they do in their life.  They have other jobs.  They have other

12   occupations.  They have done a search of the documents that are

13   in their custody, and I believe that they have found everything

14   that they have.

15        Mr. Rotondi referred to the fact that some of these

16   people sent to me as their counsel any document that they ever

17   had under the sun as a board member of RIOC because they felt

18   that we would be better suited to search through them, and they

19   did.  Mr. Rotondi leaves out the fact that when he asked the

20   deponent about their document production, he doesn't ask what

21   was responsive.  He asks them, what number of documents did you

22   give your counsel?  Then hears the number that were produced.

23   Not taking into consideration the fact that a lot of these

24   documents are completely nonresponsive, despite the fact that

25   his document requests are very broad.

H4K8LEWC

1          I think at a certain point, your Honor, with all due
2    respect, this continuous fishing expedition has to come to some
3    sort of end.  And rather than the onerous consistently being on
4    the defendants to defend what we have already done, maybe Mr.
5    Rotondi should be required at some point to start making a
6    showing as to why he needs these certain documents.  He already
7    has 17,000 documents.  He has marked 66 exhibits in the
8    depositions that have gone forward.  He doesn't appear to be
9    without documents.  Quite frankly, at some of the depositions
10   he hasn't taken the opportunity to even ask the deponent about
11   certain documents that appear to be relevant and that he has
12   asked other deponents about.  He doesn't take the opportunity
13   to examine them.
14         THE COURT:  How Mr. Rotondi chooses to gather the
15   information is his litigation strategy.
16         Certainly, absolutely, it is not unusual for a
17   layperson to produce a volume of documents and then the lawyer
18   to cull through that and produce only those documents that are
19   responsive.  So I think on that front, absent some evidence
20   that you have, Mr. Rotondi, that with respect to the individual
21   defendants there are specific documents that you know are
22   available or believe should be available, I am not going to
23   require the individual defendants to go back through their
24   search efforts.
25         With respect to the search efforts that were done for

1    RIOC, I do think it is important that Mr. Rotondi understand

2    which custodians, as I said earlier, were searched and what

3    search terms were used.  Because it's possible, for instance,

4    that everyone that is on this custodian list has been searched

5    and Mr. Rotondi's search terms were the ones that you all used.

6    And it's worth it for, I think, both sides to explore that.  It

7    will also help in determining whether or not the search terms

8    that Mr. Rotondi is proposing are likely to produce relevant

9    documents.

10            I don't know a lot of the search terms that are here,

11    but, for instance, the word "fellow," I don't know that that

12    would necessarily capture just issues related to this case.  I

13    can see a situation where RIOC has a number of fellows that

14    they are dealing with.  Or the Center for Recruitment and

15    Public Service.  I could imagine there is a large volume of

16    documents that have to do with that center, whatever that

17    center is, and have nothing to do with the plaintiff here.

18            So I would never order a search of these search terms

19    generally.  I think they need to be tethered to the claims.

20    Otherwise what is going to end up happening, and I see it time

21    and again, is that the one party insists on very broad search

22    terms or that are untethered to the claims in the case and what

23    ends up happening is that there are three million hits and

24    either the producing party has the burden of going through

25    those three million hits and producing the minority of

H4K8LEWC

documents that are relevant or the producing party decides just
to dump those three million documents on the requesting party
and the requesting party is frustrated that they have 95
percent of documents that are totally irrelevant.  So neither
solution works for anyone.

So any search terms that you want to conduct, Mr.
Rotondi, need to be better tied to the claims in this case.
But I think the starting point should be to understand which
custodians were searched and what search terms were used.

Ms. Rogers, I will ask that you provide that
information.  I don't see a reason why you can't get it to him
by the end of the week so he understands what has been
provided.

Then I think, Mr. Rotondi, you should have a
conversation with Mr. Reinharz about what documents you believe
have not been produced that you think should be produced and
whether or not you believe there are either additional
custodians that should be searched or the same custodians that
were previously searched should be searched using different
terms.

But this particular document here, again, knowing as
little as I do, I think is going to result in a lot of
information that's not tied to this case and therefore not
terribly helpful.

MR. ROTONDI:  May I address a few points?

H4K8LEWC

```
1              THE COURT:  Sure.

2              MR. ROTONDI:  For one, the document that you're

3    looking at was sent as a starter for discussions and it was

4    clear in my e-mail to Mr. Reinharz and in my discussions that I

5    was putting that out there as an initial discussion.

6              THE COURT:  OK.

7              MR. ROTONDI:  Some of those terms yield a large number

8    of documents, and I am not interested in receiving documents

9    not related to this case.

10             In terms of this allegation that I am on a fishing

11   expedition, I am more than happy to bring the entire production

12   to your Honor and you will see that all the documents they

13   produced are publicly filed or documents I sent to them.  They

14   essentially did no search.  So to claim that I am on some sort

15   of fishing expedition is outrageous.

16             To claim that the individuals did this exhaustive

17   search is also completely contrary to their testimony.  In the

18   letter I filed last night, Exhibit B, Dr. Grimm stated that all

19   she did to search for documents is type Lewis in her e-mails

20   and nothing else other than that, and never even saw the

21   document request.  I don't know how she did an exhaustive

22   search for documents.  I think a lot of the other individuals

23   did the same type of search.

24             In terms of what is missing, I don't know if the Court

25   had an opportunity to look at the respondent's position
```

1    statement in response to the EEOC complaint.  It's rife with

2    all of these harsh, insulting statements about Mr. Lewis.  So

3    much so that the managing partner from Melick & Porter had to

4    come on board and replace Mr. Stein because of his conduct, and

5    at the mediation he apologized to my client for the EEOC

6    position statement.  He said it was unprofessional, it was

7    uncalled for, and it was not the way the firm wants to be, that

8    Ms. Rogers was just hired and I think he was going to have to

9    sit down and speak with her.

10          Just to address another point about statements they

11   made about Mr. Lewis in a letter the Court --

12          THE COURT:  I am going to stop you.  I am not going to

13   try this case right now.  So what I want to focus on is what

14   discovery you believe you need.

15          So tell me what area of documents you believe you have

16   not received that you are still seeking.

17          MR. ROTONDI:  I would say, as a general description,

18   if you look at the EEOC position statement, there was a lot of

19   bases that they claim, that respondents claim that they

20   terminated Mr. Lewis for, yet they refused to produce any of

21   those documents.

22          One issue is this Anthony Jones matter, which

23   respondents testified to being a basis for his termination.

24   They said he completely mishandled it and all these other

25   allegations about him, but they refuse to turn over any

1    documents concerning that matter, claiming that it's privilege,

2    after they questioned their own witnesses about it and after

3    they use it as a basis for the termination.  If there was a

4    privilege, it's waived.

5          Just to go back on electronic searches, it seems like

6    they have not done the searches electronically.  I am more than

7    willing to pay for an electronic search firm to come in and do

8    the discovery with some confidentiality agreement.  Whatever

9    works for the Court.  I am not looking to obtain documents that

10   I am not entitled to.  If I can assist them to get the

11   documents, I will pay for them.

12         THE COURT:  Absent some greater concern about the

13   competency of defendants' counsel, I am not inclined to allow

14   you to hire a vendor to go into their documents.

15         So you identified one area of documents that you

16   believe you have not received, and so I am going to order the

17   defendants to produce all documents that form the basis for the

18   decision to terminate the plaintiff.  They seem like highly

19   relevant documents and to the extent you have not produced

20   those documents, you should.  To the extent the EEOC report

21   identifies a basis for the termination, any documents that

22   underlie that decision should be produced.

23         MR. REINHARZ:  Your Honor, one of the things, he

24   mentioned the Anthony Jones matter.  I don't want to get into

25   satellite litigation, but Anthony Jones was a litigation that

1    was in this court, I believe, where a resident was beaten by,

2    allegedly beaten by some public safety over officer at

3    Roosevelt Island.  The file in and of itself, there is a lot of

4    sensitive information in there about personal issues about

5    Mr. Jones.  Asking for every document relating to Anthony Jones

6    seems to be under the sun.

7            In terms of how the decision was made, the decision

8    was made by people in Albany saying they didn't like the way he

9    handled the matter.  That doesn't necessarily mean he is

10   entitled to every piece of paper related to Anthony Jones.

11   Because if he was, that would probably take up the entire room.

12           He has to narrow the search terms.  What is it about

13   Anthony Jones that he thinks he is entitled to.  To say I want

14   everything on the Anthony Jones matter, officers were

15   disciplined after that.  It has nothing to do with this case.

16   He has too make it a little more narrow in terms of what he is

17   looking for with Anthony Jones.  Otherwise, we will be back

18   here week after week.

19           THE COURT:  Certainly any documents that relate to Mr.

20   Lewis's conduct in connection with the Anthony Jones matter

21   should be produced.  So to the extent there are e-mails or

22   communications from Albany indicating that the way the

23   plaintiff handled this matter were somehow not acceptable or

24   inadequate in certain ways, those underlying documents should

25   be produced.

1          Mr. Rotondi, I don't know what you are looking for.

2   We are not going to try the case on the merits of whatever

3   happened to Mr. Jones.  Can you be more discriminating in what

4   you're seeking with respect to the Jones file?

5          MR. ROTONDI:  Sure, Judge.  To back up, I never said I

6   wanted every, plaintiff never said he wanted every document on

7   Anthony Jones.  The discussion ended there.  I said obviously

8   you don't have to produce publicly-available documents.  The

9   complaint that I got, the docket is large.  I said, of course

10  you don't need to produce documents on the docket.

11         Then I was told they are not producing anything on

12  Anthony Jones because they are claiming privilege.

13         Mr. Lewis was the acting president at the time.  He

14  was being advised by an outside lawyer.

15         THE COURT:  You have to speak more slowly, sir.

16         MR. ROTONDI:  Mr. Lewis was the acting president at

17  the time, by the way, and he was terminated from general

18  counsel for something he did as acting president allegedly.

19  But he was being advised not only by outside counsel, but the

20  Governor's office was involved in making decisions on it.

21         So obviously any documents relating to the

22  decision-making or background facts is relevant to what his

23  state of mind was and how he conducted himself in this matter.

24         THE COURT:  You want documents regarding what Albany

25  thought of how Mr. Lewis handled the situation?

H4K8LEWC

1          MR. ROTONDI:  Not only what they thought about it, but

2     they were directing it.  So they were intimately involved.  Any

3     documents reflecting what occurred in the decision-making

4     process in that case that are now being attributed to Mr.

5     Lewis, who was following the advice of his outside counsel and

6     following the instructions of Chambers.

7          Now defendants are claiming that Chambers fired him

8     for something he did three years before that on this matter

9     where Chambers was directing what to do.  It's just bizarre.

10          MR. REINHARZ:  First of all, he was general counsel at

11     the time of the Anthony Jones matter.  So there is going to be

12     e-mails between him and outside counsel which are obviously

13     going to be covered by the attorney-client privilege.

14          The decision that was made in Albany, if he wants to

15     get documents from Albany to say why did we fire Anthony Jones,

16     then he should issue a subpoena to the people in Albany and say

17     turn it over.  And if they are privileged, they are privileged.

18     If they are not, they are not.

19          In terms of the decision-making process, we didn't

20     make the decision to fire Mr. Lewis.  Albany did.  One of the

21     reasons, they were unhappy about the way they handled Anthony

22     Jones.  What we have here is not necessarily going to help him.

23     What Albany has is going to help him.

24          For him to say I want all the e-mails between Mr.

25     Lewis and Jackson Lewis concerning the Anthony Jones matter is

H4K8LEWC

1    a privileged matter and we shouldn't have to turn those

2    documents over.  What Albany did in terms of making a business

3    decision is not privileged and if they have those documents, he

4    is entitled to that.  Just to say I want everything on Anthony

5    Jones, it's not going to be a relevance issue, it's going to be

6    a privilege issue.

7             THE COURT:  What I want you to do is search your

8    documents and make sure you have produced any communications.

9    Obviously any communications regarding the decision to

10   terminate Mr. Lewis need to be produced, and that would include

11   documents that reflect anyone's evaluation of Mr. Lewis's

12   conduct or professionalism or whatever it would be in

13   connection with the Anthony Jones matter.

14            So I am not going to order that the Anthony Jones file

15   be produced.  I think if there are targeted documents, maybe we

16   can have a conversation about that.  But in the first instance

17   we are looking for any documents that RIOC has, or if the

18   individual defendants, but I assume they don't, but any

19   documents RIOC has that reflect Mr. Lewis's performance, and

20   that would include his performance vis-a-vis the Anthony Jones

21   matter.

22            So I want to go back to just cleaning up the discovery

23   here.

24            MR. ROTONDI:  I am sorry.  The Anthony Jones matter I

25   think defendants have sort of succeeded in conflating two

H4K8LEWC

1    issues.  There are no documents that are going to be

2    criticizing Mr. Lewis's performance on Anthony Jones because

3    there was nothing wrong with his performance, because there was

4    a complete pretextual basis for his termination.

5          What we need are documents that reflect that Chambers

6    was on board with the decision that was made in that case and

7    that Mr. Lewis was following his counsel's advice.  We are not

8    going to find any documents that say, hey, you screwed this up,

9    because he didn't.  It's a pretextual basis.

10          The privilege has been completely waived by RIOC and

11    the individual defendant.  For Mr. Reinharz to now say I am

12    supposed to go to Chambers to get those documents is absurd.

13    First of all, I spoke at length with the Chambers'

14    representatives' attorneys and they are taking the position

15    that maybe some issues that are privileged are not.

16          But their position is essentially this.  They act as

17    counsel sometimes in some agencies.  So the privilege belongs

18    to the client, not the attorney.  Even if Chambers wanted to

19    produce it, it wasn't up to them.  It's up to RIOC, who holds

20    the privilege, and they have waived it.

21          I can cite to the Court a bunch of cases where it's

22    clear that you cannot put something at issue and then hide

23    behind the privilege.  You can't do a partial waiver of

24    privilege by standing behind something and say I am not going

25    to tell you what happened, it's privileged.  We fired him on

H4K8LEWC

1  performance, but I am not going to let you know what his

2  performance is.  It's absurd and completely contrary to law.

3          I am willing to brief that if the Court wants that

4  briefed.  But this is a crucial issue because the entire EEOC

5  position statement has a fabricated basis for his termination.

6  There is not one scintilla of evidence, not one word that

7  substantiates any of the allegations in that EEOC position

8  statement.

9          THE COURT:  OK.  I need to move on.

10         So what I want to do, Ms. Rogers, you are to provide

11 by tomorrow the search terms and custodians for the RIOC

12 search.

13         Mr. Rotondi, you are to review that search information

14 and then you are to have a conversation with Mr. Reinharz next

15 week regarding what types of electronic searches you believe

16 are still required in order to locate responsive documents.

17         I have already ordered that all the documents that

18 form the basis for Mr. Lewis's termination need to be produced.

19 I would assume those have been produced already.  They are

20 highly relevant.  So you need to produce those if you haven't

21 already.

22         With respect to the Anthony Jones file, what I am

23 going to do is direct that the parties have a meet and confer

24 and if you cannot reach agreement on what documents from that

25 file would be an appropriate subset -- I think everybody agrees

1    the entire file doesn't need to be produced -- then, Mr.

2    Rotondi, I will allow you to file a letter brief.  You can file

3    it next Friday, which is April 28, and I will get a responsive

4    letter from the defendants on May 4.  That's on the Jones

5    matter.

6         I think what I will do is also ask in that April 28th

7    letter if there is disagreement about either search terms or

8    any other categories of documents that you believe have not

9    been produced, and you should have a meet and confer with Mr.

10   Reinharz next week and you can include in your April 28 letter

11   any other areas of document discovery that you believe have not

12   been produced that should be produced.

13        MR. ROTONDI:  I would just like mention two issues so

14   it doesn't come as a surprise if it's not resolved by next week

15   or by the date of that letter.

16        One thing that we have requested is, as your Honor

17   said, documents that are relevant to the performance

18   evaluation, self-performance evaluation.  Mr. Lewis knows there

19   were e-mails that were sent around regarding those issues

20   relating to executives, evaluations and/or self-evaluations

21   done on RIOC executives and e-mails on the topic that were not

22   produced.

23        The other issue is termination and severance

24   agreements and resignation letters.  There is an issue about

25   how termination is effectuated on an executive and who received

1    severance and who didn't.  There has been a ton of testimony

2    that is conflicting about whether the other executives received

3    severance or whether the board terminated them or they

4    resigned.  I have asked for severance and termination letters.

5    I have yet to receive them.  I have been told they are

6    forthcoming for a month now and have yet to receive them.

7             We are wasting untold time with these witnesses who

8    have no recollection and who have conflicting testimony on

9    these issues.

10            THE COURT:  You're never going to get a transcript in

11   this case.  You have to slow down.

12            MR. ROTONDI:  A lot of these issues can be resolved

13   with just a production of a few documents which the defendants

14   refuse to produce.  Again, with the privilege documents, they

15   read off some of them shouldn't be privileged but they haven't

16   produced them.

17            One final thing before I forget is the data on the

18   privilege logs, according to federal rules, we are entitled to

19   sufficient data to identify whether the document is privileged

20   or not, which cannot be done without the privilege log

21   indicating the author and recipients, including the CCs.

22            THE COURT:  I understand.

23            Mr. Reinharz.

24            MR. REINHARZ:  We have looked for documents and

25   evaluations.  We haven't been able to find any documents.

1          THE COURT:  Do you know if you have done an electronic

2   search?

3          MR. REINHARZ:  Yes.

4          Second, I spoke to Mr. Rotondi on Monday.  I said I

5   would produce the three severance agreements.  As a matter of

6   fact, one of the severance agreements is from many, many years

7   ago, outside the scope of the time period.  I said I would give

8   it to him anyway.  We are being cooperative.

9          I said I would give him termination letters.  We had

10  discussed that issue.  I would give him the termination letters

11  of the people who were terminated or resigned.  It just

12  happened on Monday, your Honor.  It's not like we are not being

13  cooperative.  Even though I don't think the fact that a bus

14  driver was terminated five years ago, I don't know what that

15  has to do with anything in this case.  I said I would give it

16  to him.  So we have been more than cooperative.  For him to

17  suggest we haven't been is simply not the case.

18         THE COURT:  The severance agreements and termination

19  letters should be produced by next Friday.  That's the 28th.

20         If you want to make my life better, you can produce

21  them by the 27th so Mr. Rotondi does not include in the letter

22  in the 28th that he hasn't yet received them from you.

23         With respect to the performance reviews, Mr. Rotondi

24  will be able to evaluate what type of search you have conducted

25  in order to assess whether or not the search was adequate to

H4K8LEWC

1    locate those performance reviews.

2            Let me ask you about the privilege log.  I don't have

3    a copy of it.

4            MR. REINHARZ:  It's attached to Mr. Rotondi's letter,

5    Exhibit C to his April 19 letter.

6            THE COURT:  My computer is not on.

7            MR. ROTONDI:  One of the privilege logs that -- most

8    of the individuals also had privilege logs.

9            THE COURT:  Let me make this easy.  Do you believe

10    that the privilege log that you have produced complies with the

11    local rules?

12            MS. ROGERS:  Yes, your Honor.  That's what I wanted to

13    address.  I do believe it complies.  We did a

14    document-by-document description.  There was no categories or

15    anything like that.  It discloses the document's author and

16    recipients and the CCs on any of those communications.  We

17    provided a general description of the document, including the

18    subject matter.  We provided the document date, if there was

19    one.  And the privilege asserted.  I do believe that is what is

20    required.

21            THE COURT:  Mr. Rotondi, then you all should continue

22    the conversation next week about whether or not you think the

23    privilege has been asserted inappropriately.  If you continue

24    to believe the privilege has been wrongly asserted, you can

25    file a motion to compel and I will do an in camera, ex parte

1    review of certain privileged documents to evaluate whether or

2    not the privilege was appropriately asserted.

3         MR. ROTONDI:  If you like, I can get some of the

4    privilege logs together and you will see that the CCs are not

5    included.  The documents are all lumped together.  Some of them

6    just say six documents with barely any description.  It doesn't

7    indicate who is receiving them.  I don't know how Ms. Rogers

8    can say that it indicates who the CCs are.  Sometimes it does,

9    but not always.  It doesn't even indicate who the author are.

10        Additionally, there are other documents on there that

11   aren't privileged.

12        THE COURT:  So I will get the motion to compel.  That

13   should also be filed on 4/28.

14        What I will do, Mr. Rotondi, because I am asking you

15   to put a lot in that letter, I will give you ten pages.

16        MR. ROTONDI:  Would it be possible to give me until

17   Monday instead of Friday?

18        THE COURT:  Mr. Rotondi, you keep complaining that I

19   am not pushing this case fast enough.  So I am happy to give

20   you more time, but you're running out of time on the calendar.

21        MR. ROTONDI:  I understand.  It's just a weekend.

22        THE COURT:  You can give it to me on May 1.

23        MR. ROTONDI:  Thank you, Judge.

24        MR. REINHARZ:  Is that for both?

25        THE COURT:  And you can give me your response on May

5.

          MR. ROTONDI:  One other thing, Judge.  In terms of the

electronic searches, just so I don't want to have revisit this

later on and claim there was some misrepresentation, it's not

just the e-mails I am looking at.  From what I understand, I am

not sure how RIOC controls their documents, but I think part of

it is they have a shared drive.

          THE COURT:  I assume all of that is going to be

provided to you so you will understand what Ms. Rogers

searched.

          MR. ROTONDI:  I don't want it to come up later on and

say I was just limited to e-mails.

          THE COURT:  Let's talk about depositions.  Are there

any depositions going forward in the next week?

          MR. ROTONDI:  There is Ms. Indelicato scheduled for

tomorrow.

          THE COURT:  Is that going forward?

          MR. ROTONDI:  As far as I know.

          MS. ROGERS:  We inquired about this and we were told

that Mr. Rotondi was going to let us know based upon what was

decided here by the Court.

          THE COURT:  Mr. Rotondi, is it going forward?

          MR. ROTONDI:  What I said is we would have to wait for

the judge's ruling and see if we get more time and it makes

sense to wait and proceed with Ms. Indelicato after we get the

H4K8LEWC

1    documents.  But if the judge is leaving the same discovery

2    schedule, then we need to go forward.

3              THE COURT:  Who else remains to be deposed?

4              MR. ROTONDI:  I would say -- there has only been six

5    witnesses so far.  So everybody besides those six witnesses.

6              THE COURT:  So 21 witnesses that you need to depose.

7              MR. ROTONDI:  Correct.  And those witnesses aren't

8    done because notwithstanding -- I don't want to get into the

9    back and forth, but almost every witness had to leave early.

10   No depositions went until 7.  One went kind of late because the

11   defendants insisted on going late.  All the rest of them ended

12   very early because most of the witnesses had other plans.

13             THE COURT:  Of the 21 witnesses remaining, how many

14   are nonparties?

15             MR. ROTONDI:  There are, I think, five Chambers

16   witnesses and four or five employee witnesses.  One way maybe

17   to have --

18             THE COURT:  So nine is the answer to my question?

19             MR. ROTONDI:  I'm sorry?

20             THE COURT:  Of the 21, nine are nonparties?

21             MR. ROTONDI:  I am not a hundred percent sure.

22             MR. REINHARZ:  14.

23             THE COURT:  14 are nonparties.

24             Ms. Indelicato is a party?

25             MR. REINHARZ:  Yes.

1          MR. ROTONDI:  What I was going to suggest, Judge, is

2     that maybe the way to let the case proceed in the absence of

3     the documents is maybe do the RIOC employee deposition before

4     we resume with the other depositions.  I would like to have all

5     the documents obviously, but just going through the EEOC

6     position statement should accomplish a lot.

7          THE COURT:  Let's first talk about what is going to

8     happen with these depositions.  For one thing, we are going to

9     have them all start at 9:00 in the morning.  So to the extent

10    that inconveniences witnesses, you will have to let them know

11    it's by court order.

12         Mr. Rotondi's depositions for those that are going to

13    last seven hours need to be completed by 5:00.  So that gives

14    you eight hours for a seven-hour deposition.  And you should

15    take a half hour lunch, two 15-minute breaks.  But generally

16    speaking, those depositions need to start by 9 and conclude by

17    5.  That should give enough time if defendants wish to ask any

18    followup questions.

19         MR. ROTONDI:  That is when depositions were noticed

20    for, 9 a.m.  I moved it to 10 at the request of defense counsel

21    because they were traveling from out of state or Long Island.

22         THE COURT:  In light of the issues that are coming up,

23    I am going to require them to start at 9.  Mr. Rotondi will

24    have eight hours from the moment it starts to complete seven

25    hours, which means that if eight hours comes and goes and you

H4K8LEWC

1    have only done six and a half hours of deposition, the

2    deposition is over.

3            I think with respect to the nonparty witnesses, there

4    is no reason why they need to be seven hours long.  So I am

5    going to order that those depositions be four hours long for

6    the nonparty witnesses.

7            MS. ROGERS:  Does that four hours include time for

8    defense counsel to ask any questions?

9            THE COURT:  No.  For the noticing party.

10           If you think you're going to take a full deposition of

11   somebody, then you should notice that person too, I suppose.

12   If you think you're going to need an hour or so to follow up, I

13   think that's reasonable.

14           Let me also tell you that if there are issues going on

15   at the deposition regarding questions that one party thinks is

16   inappropriate or questions that are being asked to harass a

17   witness, the solution is to call Chambers and I will listen to

18   the question that is asked and the answer or the objection that

19   is made and I will give you a ruling at the time.  I may not be

20   immediately available when you call, but you should call my

21   chambers and as soon as I am available, I will call your

22   conference room and I will give you a ruling.  That's a good

23   way if depositions are getting out of hand to get everybody

24   back on track.  So you are invited to call me.

25           With respect to the allegations that the plaintiff is

1    being disruptive in the deposition, I don't want to hear

2    whether it's true or not.  Parties are welcome in depositions.

3    They have a right to sit in the deposition, but they don't have

4    a right to interfere in the process.

5           Mr. Lewis is welcome to pass notes to his lawyer or

6    otherwise confer with his lawyer.  Oftentimes the party knows

7    more than the lawyer knows about the case.  So I am not going

8    to prohibit him from doing that.  But to the extent he is

9    making any sort of commentary or body language or laughing or

10   whatever it is in a way to try and communicate one way or the

11   other his view on the question or the answer, that is

12   inappropriate.

13          So he is invited to be in the deposition.  He is

14   certainly invited to assist his lawyer in preparing questions.

15   But to the extent his conduct is unprofessional, it should be

16   stopped.  He is a lawyer.  I assume he knows how to behave.

17          MR. ROTONDI:  I know you don't want to hear whether

18   it's true or not, but he was doing nothing different than what

19   I have done at depositions and at trial.

20          THE COURT:  OK.  All right.  It looks like we have

21   seven seven-hour depositions that remain and 14 four-hour

22   depositions that remain, and those depositions I have

23   authorized to go forward until June 30.

24          The seven depositions are supposed to be completed by

25   May 19, which is roughly four weeks from today.  It seems to me

H4K8LEWC

1    that we should be able to get through seven depositions in four

2    weeks.

3            Is that not something that the parties think is

4    possible?

5            MR. ROTONDI:  The other issue, Judge, is the

6    depositions that were started and not completed have to be

7    scheduled as well.

8            THE COURT:  How many of those?

9            MR. ROTONDI:  All of them.

10           THE COURT:  Why did you take these depositions without

11   coming to the Court and saying that you had discovery document

12   problems?

13           MR. ROTONDI:  Because, as I have indicated in my

14   letter, the initial schedule was that discovery was closing on

15   X date.  Depositions had to start five days after we receive

16   documents.  So I prepared to go forward on that basis.  The

17   last order from the Court said no further extensions.  So we

18   set a schedule.

19           THE COURT:  I stayed discovery at your request and

20   stayed depositions for 30 days.  So I don't quite understand

21   why the parties have been moving in the way that they have.

22           In any event, what I will do is the following.

23           MS. ROGERS:  May I be quickly heard on this issue?

24           THE COURT:  Sure.

25           MS. ROGERS:  As their counsel, I submit that Mr.

H4K8LEWC

1   Rotondi has had adequate time at this point with them.  These

2   are resident board members who have testified over and over

3   that they had nothing to do with Mr. Lewis's termination.  I

4   don't think that's disputed.  They have been questioned at

5   length about other things that are not relevant.

6           They have had to come from their jobs to appear, and I

7   submit that he has had adequate time with them.  Defense

8   counsel has not had any time to address these witnesses, and in

9   that regard we don't oppose them coming back because defense

10  counsel hasn't had any time.  But I am asserting that Mr.

11  Rotondi has had ample time with these witnesses.

12          THE COURT:  OK.  Mr. Rotondi, your reservation is

13  based on the assumption that you're going to get documents that

14  are relevant and we don't know that that's true.

15          MR. ROTONDI:  Not exactly, Judge.  That's part of it.

16  I need to address a few things.

17          First of all, to say I had adequate time is insane.

18  The allegation that was in the correspondence to your Honor

19  saying that I refused to let them ask questions and they had to

20  insist, Mr. Reinharz said I would like to ask some questions.

21  I said, Go ahead, OK.  I will continue.  With another deponent

22  Ms. Rogers said I would like to ask questions.  Mr. Reinharz

23  wouldn't let me ask any questions.

24          What they are trying to do is, they bring their own

25  witnesses, their own clients at the deposition, ask them all

leading questions where the counsel is testifying, and then

they don't want the witness to be re-questioned.  Not all the

depositions were completed up until the point of the documents

because many of the witnesses said -- one witness had to pick

up her granddaughter, another one was tired, another one Ms.

Rogers wanted to ask questions so I stopped so she could ask

questions.  Mr. Reinharz wanted to ask questions.  So I stopped

for that.  Every single one of these depositions has counsel's

agreement on the record to continue.

          MR. REINHARZ:  Of all the depositions taken, we have

only asked questions in one.  All the other depositions Mr.

Rotondi ran out the clock and prohibited us from asking any

questions until the witness was exhausted.  So for him to

suggest that I had the opportunity to question any of these

people except one is simply not the case.

          THE COURT:  OK.  Going forward, party depositions can

last seven hours.  Nonparty depositions can last four hours.

          Depositions are to commence at 9:00.  They are to end

at 5:00.  They end with respect to Mr. Rotondi's questioning.

Even if Mr. Rotondi, for whatever reason, has been unable to

complete his seven hours, they are concluding at 5 p.m., and

that will give the defendants some time.  Many of these people

are your people so I don't imagine you need huge amount of

time.  But to the extent you need to clean up the record, you

are able to ask the witness questions after 5 p.m.

1          You should advise the witnesses that the Court has

2     ordered that the depositions will start at 9 and they may well

3     go until 6 or 7.  People should plan their schedule

4     accordingly.  They should come prepared to sit for eight or

5     nine grueling hours, they should bring energy bars, and be

6     ready to go for the whole day.

7          Mr. Rotondi, I am just looking over my schedule.  It

8     looks like RIOC should have produced those documents to you on

9     January 26th and I stayed depositions until March 13th.  So I

10    don't understand the argument that you're taking depositions

11    five days later.

12         In any event, what I am going to do is give you until

13    June 30 to complete all of the depositions.  I will move the

14    May 19 deadline.  So I will allow all of the depositions to be

15    completed by June 30.  That includes nonparty depositions.

16         With respect to depositions that have happened and

17    that Mr. Rotondi has indicated that he wishes to call them

18    back, the parties are directed to have a meet and confer on

19    that.  If the parties do not agree that it is appropriate for

20    Mr. Rotondi to call these witnesses back, you can submit a

21    short letter to me with your position as to why renewing the

22    deposition either is necessary for Mr. Rotondi's position or

23    unnecessary from the defendants' position, and I will give

24    individual rulings with respect to those six depositions that

25    have already taken place.

1          MS. ROGERS:  Your Honor, may I suggest that, with

2    regard to those depositions, I am perfectly willing to meet and

3    confer, but if we could even agree today on a limited amount of

4    time for Mr. Rotondi to continue his questioning and then give

5    defense counsel a short amount of time after that, that's

6    probably --

7          THE COURT:  I am perfectly happy to have you all try

8    and reach an agreement.  I am not going to spend any more of my

9    time.  I have got lawyers here for a 12:00 conference who are

10   listening patiently to this conference.

11         I think it would be great if you could agree that Mr.

12   Rotondi could have a certain amount of time for a witness and

13   defendants have certain amount of time.  If you cannot reach a

14   agreement, you need to come to me with a short letter and each

15   side needs to explain why their position is reasonable.

16         MR. ROTONDI:  Judge, to avoid the need to bother you

17   in the future, with respect to your ruling previously regarding

18   the seven hours and four hours for me to take testimony and for

19   the defendants to cross-examine the witness, in two instances

20   where the defendants examined their own employees and clients,

21   what happened is during the direct testimony the witness said I

22   have no memory of anything, they testified I didn't have any

23   conversation --

24         THE COURT:  Mr. Rotondi, if you think that is counsel

25   is behaving inappropriately, you can call me.  I understand you

1   think they have asked questions to muddy the record.  That's

2   what lawyers do.

3         MR. ROTONDI:  My question was, I should be permitted

4   some time, particularly when a witness completely changes his

5   or her testimony, I should be permitted some time after the

6   cross-examination for redirect.  I am not asking for a ton of

7   time.  Like the other day I asked for three minutes and they

8   wouldn't even allow that.

9         THE COURT:  If you all can't figure out in order to

10  give somebody three minutes of time, then I don't know that I

11  can help you.  It really is remarkable and I am not going to

12  send my law clerk to sit in your depositions and watch over

13  you.  It's surprising to me that you all can't get along any

14  better than you do.

15        So if Mr. Rotondi needs five minutes to take some

16  redirect questions, he is authorized to do so.  But, Mr.

17  Rotondi, I will remind you that the primary purpose of a

18  deposition is fact gathering.  So you should be asking relevant

19  questions in order to gather information that you will use at

20  trial.  It is not the opportunity to have the I gotcha moment.

21  You should save that for trial.

22        MR. ROTONDI:  Judge, I am happy to hand in all the

23  transcripts.  They have complained, made this big deal.  It's a

24  red herring to distract from document production.  They didn't

25  object to any questions in the deposition.  There was one

H4K8LEWC

1    objection based on form.  It was based on, claiming that I was

2    asking a leading question of an adverse witness, which was

3    befuddling to me, and then some speaking objections.  Besides

4    that, there were no objections except for maybe one or two

5    based on a motion and not based on any rationale.

6         I have said from the beginning that everyone involved

7    in this case -- I have never seen a case in this matter.  You

8    can call any of my adversaries, most of whom would say they

9    would hire me.  I have never had situation occur like this.  I

10   am as shocked as you are.

11        THE COURT:  I will receive a letter from Mr. Rotondi

12   on May 1.  It can be ten pages long.  It's going to address

13   what documents, if any, he believes he is entitled to related

14   to the Anthony Jones matter.  It should address the privilege

15   log issues, both whether or not you believe that the log itself

16   is inadequate and whether or not there are documents you

17   believe that are inappropriately being withheld on privilege

18   grounds.  And it is also to address electronic discovery, to

19   the extent you believe there is additional electronic discovery

20   that needs to be done that the parties have not agreed on.

21        As I said you're given ten pages for that letter.  And

22   the defendants can respond.  I appreciated the joint letter.

23   If you can do it jointly, I would appreciate it.  Your response

24   is due Friday, May 5.

25        MR. REINHARZ:  Your Honor, since he got the weekend --

1          THE COURT:  Sure.  You can have until May 8.  I am not

2    moving the June 30 deadline.  I want to be very clear about

3    that.  So everybody take all the time you need at your peril.

4          MS. ROGERS:  Your Honor, just to clarify, with regard

5    to the continued depositions, were they attributable to any of

6    the time frames that you gave with regard to May 19 and

7    parties?

8          THE COURT:  Again, I want you all to discuss this.  I

9    assume if there is a party whose deposition was taken for seven

10   hours and Mr. Rotondi held it open and believes he needs more

11   time, he is not seeking to take another seven-hour deposition.

12   If you want to agree to that, so be it.  If you think that's

13   crazy and you all can't agree, then you can send me a letter on

14   an individual basis on what you think is an appropriate amount

15   of time to reopen a witness.  But I am not going to predict for

16   these six witnesses.  It may be that zero minutes is

17   appropriate and it may be that three hours is appropriate.  It

18   all depends on the foundation.

19          If there is a real reason to hold open the deposition,

20   so be it.  If Mr. Rotondi spent seven hours asking questions

21   about birds, then I am probably not going to be inclined to

22   allow him to take an additional number of hours for

23   depositions.  But if the deposition was in some other way

24   inadequate for reasons beyond his fault, I will be more open to

25   ordering those witnesses to reappear.

1          I will get my letters from you all I guess starting

2     May 1.

3          MR. ROTONDI:  May I address one quick point because it

4     was put in a letter and it sort of impugned me.

5          I had raised the issue of your Honor's husband

6     representing potential witnesses in Chambers.  It wasn't some

7     kind of a gossip thing or a conspiracy theory.  I was concerned

8     and my client was concerned whether there is a potential

9     conflict considering that there are witnesses from Chambers

10    that are going to be deposed.

11         Now, I don't know if your Honor's spouse is

12    representing people from Chambers, but I know that he has

13    represented people regarding the Moreland Commission

14    investigation.  I just wanted to pose that.  A, I wanted to

15    clarify that it wasn't some sort of gossip, and B, whether your

16    Honor thinks it might be a potential conflict given the six

17    witnesses that are currently or formerly with the Executive

18    Chambers that may have been involved with the Moreland

19    Commission, and also Mr. Larry Schwartz was the main defendant,

20    sort of like promoted to the position of president of RIOC.  So

21    I just wanted to raise that.

22         THE COURT:  Who my husband represents, as I am sure

23    you can appreciate, is privileged and I am not going to discuss

24    that.  I don't think there is any conflict issue whatsoever.

25    If you want to make a request to recuse me, you may do so, but

H4K8LEWC

 1   there is no conflict at all.

 2           MR. ROTONDI:  I just wanted to leave it up to you.  I

 3   raise it for your attention.

 4           THE COURT:  I don't think there is an issue.

 5           Thank you.

 6           (Adjourned)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(646) 510-2929

May 13, 2015

**VIA ELECTRONIC MAIL**

Andrew S. Kennedy
Deputy Director of State
 Operations for Policy
Washington Avenue and State Street
Albany, New York 14222

Re:  Former RIOC General Counsel Donald Lewis

Dear Mr. Kennedy:

I represent Mr. Donald Lewis ("Lewis") who was unlawfully terminated from his position as Vice President and General Counsel of the Roosevelt Island Operating Corporation ("RIOC").  In order to explore a potential early resolution of Lewis' claims, I am providing this communication for the Executive Chamber's review *only*, but to be treated as a privileged and confidential settlement communication and as such inadmissible for any purpose and in any forum.[1]  If this communication should be addressed to a different individual in the Chamber, please forward it accordingly and ask that person to provide me with contact information.

By way of background, Lewis, who is African American, served RIOC dutifully for nearly four years, and for a nine-month period Lewis filled three of the four RIOC executive positions, including Acting President and Chief Executive Officer.[2]  Throughout his tenure, Lewis never received a negative evaluation.  Rather, without exception, the RIOC Board of Directors has praised Lewis for his work and work ethic.  Indeed, just *two weeks prior* to being terminated, Lewis received a merit-based performance raise.  Nonetheless, on Friday, April 24 at 4:20 p.m., while Lewis was out of the office due to illness, RIOC President Charlene M. Indelicato ("Indelicato") fired him effective immediately via e-mail containing typographical errors that any two-second proofread should have corrected.  To be clear -- after almost four years of dedicated service -- Lewis was terminated by an e-mail that appears to have been hastily compiled by Indelicato, that she apparently did not even bother to review before sending.  The sole purported reason for the dismissal of Lewis -- confirmed to be a fabrication -- was that "[t]he Chairman and the Board have decided to take the counsel's office in a different direction."  (Indelicato's e-mail and Lewis' response are annexed.)

I understand that during his tenure, Lewis suffered in a hostile work environment where race, ethnicity and gender formed the basis for the high-handed decisions of Indelicato.  I am informed that it was not uncommon for Indelicato to comport herself in an incredibly disturbing manner, yelling, screaming, cursing and literally frothing at the mouth in response to legitimate questions from Lewis to which she had no adequate

---

[1] We do not consent to this letter or its contents being shared outside the Executive Chamber without our express written authorization.  Moreover, Lewis does not waive, limit, or otherwise restrict any potential claims he may have and Lewis expressly preserves any potential claims against any entities or individuals.  Furthermore, this letter shall not be construed as any limitation on the amount of damages Lewis may seek.  Finally, Lewis' election to raise or not raise any specific issue or concern in this letter shall not be construed as a waiver of that or any other issue or concern.

[2] Lewis occupied all of these positions by himself -- *i.e.*, he performed the duties that had been assigned to three full-time paid executives -- but was not compensated in any manner for the increased responsibilities.  Moreover, Lewis was not considered for the permanent position of President.  Instead, the position was awarded to Indelicato -- a Caucasian female, self-described as "unemployable" presumably due to at least two federal employment discrimination cases filed against her in prior government positions.

response. Indelicato's discriminatory ways are reflected in the disparate treatment of RIOC employees during her tenure and in the hiring, firing, and discipline of staff during this period.[3] Apparently, Indelicato is likewise largely incapable of maintaining cordial professional relationships with outside parties and frequently would make troubling remarks such as repeatedly asserting, "Sally [Minard] is a bitch."[4] Indelicato made similarly offensive comments about members of the Executive Chamber, including stating on March 19, 2015, that: "Alphonso [David] checks off a lot of boxes, that's why he has his position" and that "he's an empty suit meddling in a bunch of agencies business because he has nothing better to do."[5]

Virtually all efforts by Lewis to discuss sensitive issues with Indelicato were met with screaming, yelling, dishonesty and ultimately unlawful retaliation. Indeed, since Indelicato's appointment, Lewis suffered a pervasive stream of discrimination and abuse, which his Caucasian counterparts have not been subjected to, and which continued even after his termination. For example, the lock on Lewis' office door was immediately changed upon his dismissal and this matter has reportedly been widely discussed on the Island. The negative connotations of an employee being terminated and having the lock to his office door visibly changed need not be spelled out. Lewis is unaware of any other terminated RIOC employee whose door lock was changed, including employees involved in RIOC related behavior that resulted in prison time.[6]

Moreover, under the reign of Indelicato and her predecessor, certain individuals engaged in criminal activity with impunity. When Lewis reported, attempted to stop or to redress these wrongs, he became the victim of retaliation. For example, Lewis provided information to the Office of the Inspector General ("OIG") after exposing corruption among RIOC's former top executives. At one point, Lewis was told to stop providing information because the State was "not looking to hurt anyone" and was subsequently penalized by having his name included negatively in the resulting OIG report.[7]

On another such occasion, on or around June 30, 2014, Lewis raised with Indelicato her inaction against Santo Verta ("Verta"), a RIOC employee of Italian descent, who received gross preferential treatment from Indelicato. Verta stole and "totaled" a RIOC vehicle in New Jersey allegedly while using the vehicle to steal scrap metal from support structures on an Island bridge. Nonetheless, Indelicato took no disciplinary action against Verta referring to him as "a good Italian boy who lives with his mother." It was not until Verta stole a second RIOC vehicle months later that he was suspended. In response to Lewis expressing his concern about the inaction, Indelicato screamed at him to "get the f*ck out of my office." This exact directive was communicated to Lewis by Indelicato on multiple occasions.

On another occasion, RIOC CFO Frances Walton ("Walton"), a Caucasian female executive, manipulated her salary to award herself an approximately $10,000 raise (characterized as a "salary adjustment") and Indelicato endorsed, was complicit in and intentionally concealed this from Lewis as well as the public. Upon learning of this issue, on March 6, 2015, Lewis immediately reported the matter to the Chamber and

---

[3] Of the four African-Americans employed in the main RIOC office when Indelicato arrived, three have since filed internal and EEOC complaints of discrimination and Lewis was abruptly fired. In addition, an African-American engineering employee was recently fired by Indelicato. There are disturbing gender trends under her reign as well.

[4] Minard is heavily involved with the Four Freedoms State Park project on Roosevelt Island and is Chair Emeritus of the Democratic National Committee Women's Leadership Forum in N.Y. State. I understand that Indelicato has made similar derisive comments about Lisa Lim (former counsel to ESD), Lewis "Skip" Hartman (proprietor of the Island tennis and racquet club) and Cathy Dove (former Cornell University executive).

[5] Indelicato has also remarked: "Everyone says Alphonso is impossible to work with and no one likes dealing with him" and that Chamber counsel Julia Kupiec is "a kid who has no idea what she's doing…she won't last very long."

[6] Additionally, Lewis was treated less favorably than certain former Caucasian RIOC executives with respect to his accrued time and benefits.

[7] According to Indelicato, other former RIOC employees received favorable treatment in the OIG report for political reasons. Indelicato has said that the (i) OIG did not seek prison time for the former President because her father is a New York State Supreme Court Justice and (ii) OIG did not include the former PSD Director because of his influence in the Latin-American political community and potential damaging effects on the second term campaign.

communicated his fear that Indelicato would retaliate if she were made aware of his report. Eventually, Indelicato was informed and in a blatant act of retaliation, Lewis was fired shortly thereafter.

Indelicato also apparently told blatant falsehoods about the events related to this issue, including falsely asserting that Walton's "salary adjustment" was specifically set forth in the budget. It also appears that Indelicato and Walton took additional measures to conceal this manipulation by giving "salary adjustments" to all RIOC employees whose cooperation was needed to effectuate the Walton increase and keep it a secret.[8]

This was not the only reporting from Lewis that resulted in retaliation. At approximately the same time, Lewis reported to the Chamber his concerns about Indelicato's giving him directives based purely on racial grounds and his concern about the pervasive problems in the office concerning African-American employees. Lewis expressed his fear that if these concerns were communicated to Indelicato, there would be retaliation. Lewis' concerns were eventually communicated to Indelicato, and consistent with the retaliatory pattern, Lewis was fired shortly thereafter.

Instances of the divisive, dishonest, discriminatory and hostile manner in which Indelicato conducted State business abound. Additional examples include:

- Indelicato's surreptitious collusion with Walton unreasonably slashing the budget of the Legal Department (led by Lewis) by over 50%. When Lewis raised his concern, on October 14, 2014, Indelicato screamed at him that "I don't need to deal with this sh*t!" Lewis reported this to the Chamber.

- Indelicato's frequent clandestine meetings with the other two most senior and high-ranking RIOC employees – Walton and HR Director Claudia McDade, both Caucasian females, while excluding Lewis. Walton and McDade also received certain "salary adjustments" that were not awarded to Lewis.

- Indelicato's inappropriate remarks about Lewis' physical appearance, including his skin tone, and at times saying "but this is not sexual harassment" in a flippant attempt to justify her comments.

- Indelicato stated to Lewis on multiple occasions, "Sicilians are also black."

- Indelicato directed Lewis, on October 25, 2014, to sit in on a termination meeting of another African-American employee with whom Lewis had no involvement simply because Lewis is African-American. Lewis reported this to the Chamber, which agreed that he should not attend the interview. Indelicato then directed another African-American employee to attend instead of Lewis.

- Indelicato's hostility towards Lewis when he advised that certain sensitive issues should be brought to the attention of the Chamber and warning him against doing so.

- Indelicato -- who is an attorney and frequently refers to herself as "an attorney by trade" stated, on December 17, 2014, that she "does not need to respond to litigation holds," that she is not "staff," and that receiving such holds "is insulting." Lewis informed Indelicato that she is legally required to respond to the holds and, after much yelling at Lewis, Indelicato agreed to comply. Lewis reported this to the Chamber.

- During a meeting with the OIG, on October 8, 2014, Indelicato referred to photos of another African American employee as "gang" pictures.

- Indelicato's statement that a Caribbean male employee could never work for a Caribbean female employee, and other racial and ethnic offensive remarks directed at "Phillipinos," "Russians," "Eastern Europeans" and "WASPs."

---

[8]  Also troubling is the fact that while all of the other publicly disclosed raises were implemented at the beginning of RIOC's fiscal year, April 15, 2015, Walton's raise apparently was made effective January 2015, just weeks after the December Board meeting where other raises were disclosed and hers was not.

- Complaint, termination, disciplinary, hiring and salary history for RIOC, including race, gender, ethnicity during Indelicato's tenure.

- Indelicato manipulated and altered the long-standing RIOC organizational structure to create a position with an enhanced salary for her Caucasian female friend. Indelicato's friend ultimately did not take the position and an African-American female was hired at a lower salary.

- Meetings between Indelicato and various influential individuals certain of which Walton has referred to as "secret meetings."

As a former Assistant Corporation Counsel with the New York City Law Department, I represented NYC, and its agencies and employees in civil rights actions, including employment discrimination. I personally have never seen an action with allegations as troubling and egregious as I understand them to be in this instance, especially considering that the allegations primarily concern the misconduct of a high-ranking appointed Government executive. In light of these circumstances, the fact that Lewis was immediately "thrown out the door," via e-mail with absolutely no notice, without a single discussion, with no severance and without an opportunity to seek new employment is egregious, punitive and quite frankly reprehensible.

If this matter is litigated, we will aggressively pursue discovery that will include the use of witnesses who will corroborate Lewis' claims as well as our own electronic discovery experts to analyze relevant computer and document management systems for additional evidence. Accordingly, we request that Chambers take all necessary steps to preserve and avoid destruction of any documents or information, in whatever form retained, including correspondence, emails, notes, etc. that relate to any of the issues raised in this communication, including any documents or information relating to Lewis and Indelicato.

As a prevailing plaintiff with claims based on the facts noted above, Lewis would be entitled to an award for compensatory damages for among other things, lost wages, emotional distress, and reputational harm, as well as an award for punitive damages and attorney fees. Moreover, because public policy prohibits indemnification for punitive damages and because many of the intentional acts complained of may preclude indemnification, certain individuals would face significant personal financial exposure.

Further, when Indelicato was being considered for her position, the Appointments Office and the Executive Chamber knew or should have known that in connection with her prior government employment, Indelicato was twice sued in federal court for discrimination. (The dockets for both cases are annexed.) In addition, since her appointment, Indelicato has been named as a respondent in EEOC and internal discrimination complaints filed by RIOC employees. These facts support claims for negligent hiring, negligent retention and negligent supervision.

Although Lewis has grounds to pursue his claims immediately, he is willing to first explore the possibility of settlement, so that the potential parties may avoid a time-consuming public airing of the issues. Given the immediacy with which Lewis was terminated, and the resultant hardship and reputational harm he has been forced to endure, we request to be advised by close of business on Thursday, May 14 if the Chamber wishes to schedule a meeting to explore a resolution. If we do not hear from the Chamber by then, we will pursue Lewis' claims in the appropriate forum.

Very truly yours,

/s/

Anthony Rotondi

**From:** "Donald.lewis87@gmail.com" <donald.lewis87@gmail.com>
**Date:** April 27, 2015 at 11:37:52 AM EDT
**To:** Charlene Indelicato <Charlene.Indelicato@rioc.ny.gov>
**Cc:** "Darryl C (NYSHCR) Towns" <Darryl.Towns@nyshcr.org>
**Subject: Re: Counsel's office**

Charlene:

It has taken me some time to process your e-mail below. Needless to say, your message has made for a miserable few days and I'm not doing well.

It is outrageous that I am being directed to resign or be terminated after almost four years of dutiful service to the Corporation, particularly given that the only reason provided is "the Chairman and the Board have decided to take the counsel's office on a different direction."


I find that statement incredulous given that during my entire tenure at RIOC I have not had a single communication with the Chairman or any Director where concern about my work or position within the Corporation has been expressed. As you are well aware, I also received a merit-based annual performance raise just a few weeks ago. I am certain that any reasonable person would agree that, in light of these circumstances, being fired effective immediately via mail at 4:20 pm when I was out sick on a Friday is egregious and appalling.

Be that as it may, regardless of the stigma attached to termination, I do not intend to resign because there is no legitimate basis for that ultimatum.

Considering, among other things, the manner in which this has been handled, I intend to retain counsel.

Very truly yours,

Don Lewis


**From:** "Charlene Indelicato" <Charlene.Indelicato@rioc.ny.gov>
**Date:** April 24, 2015 at 4:20:47 PM EDT
**To:** <donald.lewis87@gmail.com>
**Cc:** "Darryl C (NYSHCR) Towns" <Darryl.Towns@nyshcr.org>
**Subject: Counsel's office**

Don,

I was not aware that you would be out today and only found out through Karline Jean. Since we could speak in person, the Chairman tried to reach you telephone and have left several messages.

The Chairman and the Board have decided to take the counsel's office in a different direction. Therefore, after conferring with the Chairman and the Board, we are asking for your immediate resignation. If you do not resign, you must consider yourself terminated. You can inform us by Monday by 12 PM of your choice, however, severance of your employment is as of April 24th, 2015.

Information regarding your health insurance, unused vacation time, personal time and COBRA benefits will be sent to you in a letter. Appropriate accruals will be paid once all company property is returned to RIOC.

We can arrange to have your personal items sent to you.

Thank you for your service to the Corporation.

Charlene M. Indelicato

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:97-cv-02728-CLB-MDF

Hurlie-Smith, et al v. Strome, et al

Assigned to: Judge Charles L. Brieant

Referred to: Magistrate Judge Mark D. Fox

Demand: $0

Case in other court:

Cause: 42:1983 Civil Rights Act

Date Filed: 04/17/1997

Date Terminated: 10/09/1998

Jury Demand: Defendant

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Pat Hurlie-Smith**                    represented by **Jonathan Lovett**
                                        Law Office of Jonathan Lovett
                                        305 Old Tarry Road, 2nd Floor
                                        White Plains, NY 10603
                                        (914) 686-4500
                                        Fax: (914) 686-4545
                                        Email: jlovett@lovett-law.com
                                        *LEAD ATTORNEY*

V.

**Defendant**

**Sara Furlong**                        represented by **Janice Berkowitz**
*individually*                          Ahmuty, Demers & McManus
                                        200 I.U. Willets Road
                                        Albertson, NY 11507
                                        (516) 535-1887
                                        Fax: (516) 294-5387
                                        Email: janice.berkowitz@admlaw.com
                                        *LEAD ATTORNEY*

                                        **Vincent Toomey**
                                        Law Office of Vincent Toomey
                                        3000 Marcus Avenue
                                        Suite 3W2A
                                        Lake Success, NY 11042
                                        (516) 358-5690
                                        Email: vtoomey@vtlawoffice.com
                                        *LEAD ATTORNEY*

**Defendant**

**Charles B. Strome**
*individually*

represented by **Janice Berkowitz**
(See above for address)
*LEAD ATTORNEY*

**Vincent Toomey**
(See above for address)
*LEAD ATTORNEY*

**Defendant**

**Matthew Iarocci**
*individually*

represented by **Janice Berkowitz**
(See above for address)
*LEAD ATTORNEY*

**Vincent Toomey**
(See above for address)
*LEAD ATTORNEY*

**Defendant**

**Charlene Indelicato**
*individually*

represented by **Janice Berkowitz**
(See above for address)
*LEAD ATTORNEY*

**Vincent Toomey**
(See above for address)
*LEAD ATTORNEY*

**Defendant**

**The City of New Rochelle**
*New York*

represented by **Janice Berkowitz**
(See above for address)
*LEAD ATTORNEY*

**Vincent Toomey**
(See above for address)
*LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/17/1997 | 1 | COMPLAINT filed; Summons issued and Notice pursuant to 28 U.S.C. 636(c); FILING FEE $ 150.00 RECEIPT # 278754 (cj) (Entered: 04/18/1997) |
| 04/18/1997 | | Magistrate Judge Fox is so Designated. (cj) (Entered: 04/18/1997) |
| 05/19/1997 | 2 | STIPULATION and ORDER EXTENDING DFT'S TIME TO ANSWER; It is hereby stipulated and agreed as follows; 1) All dfts shall be deemed to have been served with the |

| | | |
|---|---|---|
| | | complaint as of 5/9/97. 2) the time in which dfts may move against, answer or otherwise respond to the complaint is hereby extended to and including 6/9/97. SO ORDERE:D ( signed by Judge Charles L. Brieant ). (ds) (Entered: 05/20/1997) |
| 05/23/1997 | 3 | RETURN OF SERVICE executed as to Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch by Robert R. Gray and Peter Enea on 04/21/97 and 5/21/97 Answer due on 6/10/97 for Sara Furlong, for Charles B. Strome, for Matthew Iarocci, for Charlene Indelicato, for The City of New Roch. Served summonds and complaint at Hugh Doyle Center, Davis Ave., New Rochelle, NY; North Broadway, New Rochelle, NY and 1 Baker Avenue, White Plains, NY. (ec) (Entered: 05/27/1997) |
| 06/11/1997 | 4 | ANSWER to Complaint by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch (Attorney Janice - Berkowitz),; jury demand; Firm of: Ahmuty,Demers & McManus, Esq by attorney Janice - Berkowitz for defendant The City of New Roch (ds) (Entered: 06/11/1997) |
| 06/25/1997 | 5 | Case Management Plan in a Standard or Complex Case: Case management conference set for 9:00 12/19/97 Joinder of parties and amended pleadings, N/A, Rule 46 interrogatories 8-1-97, first requests 8-1-97, depositions completed 11-1-97, further interrogatories 11-15-97, requests to admit 11-15-97, discovery completed 12-15-97. ( signed by Judge Charles L. Brieant ); Copies mailed. (dh) (Entered: 06/25/1997) |
| 10/24/1997 | 6 | Confidentiality Agreement and ORDER... (see document for details) ( signed by Judge Charles L. Brieant ); Copies mailed (ec) (Entered: 10/27/1997) |
| 02/20/1998 | 7 | NOTICE OF MOTION by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch for summary judgment purs. to Rule 56 FRCP , Return date 3/20/98 at 10:30 (ds) (Entered: 02/20/1998) |
| 02/20/1998 | 8 | MEMORANDUM by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch in support of [7-1] motion for summary judgment purs. to Rule 56 FRCP (ds) (Entered: 02/20/1998) |
| 02/20/1998 | 9 | Rule 3(g) statement filed by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch (ds) (Entered: 02/20/1998) |
| 03/10/1998 | 10 | Rule 56.1 statement filed by Pat Hurlie-Smith (ec) (Entered: 03/10/1998) |
| 03/10/1998 | 11 | Pltf's first amended proposed Jury instructions (ec) (Entered: 03/10/1998) |
| 03/10/1998 | 12 | MEMORANDUM by Pat Hurlie-Smith in opposition to [7-1] motion for summary judgment purs. to Rule 56 FRCP (ec) (Entered: 03/10/1998) |
| 03/10/1998 | 13 | AFFIDAVIT in opposition of Kim Berg by Pat Hurlie-Smith Re: [7-1] motion for summary judgment purs. to Rule 56 FRCP (ec) (Entered: 03/10/1998) |
| 04/06/1998 | 14 | REPLY MEMORANDUM by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch re: [7-1] motion for summary judgment purs. to Rule 56 FRCP (dh) (Entered: 04/07/1998) |
| | | |

| 04/17/1998 | 15 | SUPPLEMENTAL AFFIDAVIT in opposition of Kim Berg by Pat Hurlie-Smith Re: [7-1] motion for summary judgment purs. to Rule 56 FRCP (ds) (Entered: 04/17/1998) |
|---|---|---|
| 04/17/1998 | | Memorandum to Docket Clerk:Hearing begun and concluded on April 17, 1998 of defts' motion for summary judgment. (court rpt. Adrienne Mignano). Judge's decision - decision reserved. (ec) (Entered: 04/17/1998) |
| 04/22/1998 | 16 | Order referring action to the Clerk to assign the above-entitled action to mediation. All issues are eligible. So Ordered: ( signed by Judge Charles L. Brieant ) (ds) (Entered: 04/23/1998) |
| 04/27/1998 | 17 | Notice of selection of mediator. (sc) (Entered: 04/27/1998) |
| 06/19/1998 | 18 | Letter to USDJ Brieant filed by Pat Hurlie-Smith, Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch dated June 18, 1998 re status of settlement negotiations (ds) (Entered: 06/19/1998) |
| 07/07/1998 | 19 | Letter filed by Pat Hurlie-Smith dated July 7, 1998 re request court defer deciding the pending motion for summary judgment to allow the parties time to engage in further discussions attempting to resolve this matter. (ll) (Entered: 07/07/1998) |
| 08/25/1998 | 20 | Letter filed dated August 18, 1998 to Judge Brieant from atty Kim Berg re we are writing to the Court on behalf of all parties to advise the Court of the status of settlement negotiations (ec) (Entered: 08/25/1998) |
| 08/31/1998 | 21 | Letter filed dated 8/22/98 to Judge Brieant from Kim Bers. re: request that the Court take these circumstances into consideration when considering this application. (fb) (Entered: 08/31/1998) |
| 09/16/1998 | | Settlement conference held before Judge Brieant (transcript taken by Adrienne Mignano) (ec) (Entered: 09/16/1998) |
| 09/21/1998 | 22 | Letter filed dated Sept. 18, 1998 to Judge Brieant from atty janice Berkowitz re This letter will serve to advise you that the City Council decided not to authorize settlement at this time....the defts respectfully request that your Honor render a decision with respect to the defts' motion for summary judgment. (ec) (Entered: 09/21/1998) |
| 09/21/1998 | 23 | Letter filed dated April 27, 1998 to Judge Brieant from atty Kim Berg re we are writing to the Court on behalf of all parties to advise the Court of the date scheduled for mediation of the matter. (ec) (Entered: 09/22/1998) |
| 09/21/1998 | 24 | Letter filed dated August 18, 1998 to Judge Brieant from atty Kim Berg re we are writing to the court on behalf of all parties to advised the Court of the status of settlement negotiations in the matter. (ec) (Entered: 09/22/1998) |
| 09/22/1998 | 25 | MEMORANDUM & ORDER .... Accordingly, summary judgment is granted on Ms. Hurlie-Smith's due process claim and right to petition claim. In all other respects deft's motion for summary judgment is denied. The case is marked ready for jury selection and trial September 28, 1998 at 9:30am., subject to prior cases. Counsel should check the schedule with the deputy clerk prior to that date. denying [7-1] motion for summary |

| | | judgment purs. to Rule 56 FRCP ( Signed by Judge Charles L. Brieant ); Copies mailed. (ec) (Entered: 09/22/1998) |
|---|---|---|
| 10/01/1998 | 26 | Proposed Voir Dire Questions by Pat Hurlie-Smith (ds) (Entered: 10/02/1998) |
| 10/01/1998 | 27 | Witness list by Pat Hurlie-Smith (ds) (Entered: 10/02/1998) |
| 10/02/1998 | 28 | Proposed Voir Dire Questions by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch (pf) (Entered: 10/02/1998) |
| 10/02/1998 | 29 | Witness list by Sara Furlong, Charles B. Strome, Matthew Iarocci, Charlene Indelicato, The City of New Roch (pf) (Entered: 10/02/1998) |
| 10/05/1998 | 30 | Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for jury Selection at 9:30am. So Ordered: ( signed by Judge Charles L. Brieant ) Referred to Magistrate Judge Mark D. Fox (ds) (Entered: 10/06/1998) |
| 10/09/1998 | 31 | STIPULATION AND ORDER of discontinuing action with prejudice ....it is hereby stip. and agreed that the action hereby is discontinued with prejudice, without costs and without fees to either party as against the other. ( signed by Judge Charles L. Brieant ) (ec) (Entered: 10/13/1998) |
| 10/09/1998 | | Case closed (ec) (Entered: 10/13/1998) |
| 11/02/1998 | 32 | SETTLEMENT AGREEMENT AND GENERAL RELEASE ...(see document for details).... So Ordered: ( signed by Judge Charles L. Brieant ). (ds) (Entered: 11/03/1998) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/12/2014 11:45:56 | | | |
| **PACER Login:** | ps0111 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:97-cv-02728-CLB-MDF |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |



| E-Mail | Password |

Need Password Help?

 **Did you know?** RCN has a PlainSite profile. Take a look!

# Deem v. Idelicato et al

New York Southern District Court, Case No. 7:09-cv-01842
District Judge Stephen C. Robinson, presiding
docket://gov.uscourts.nysd.7-09-cv-01842 (What is this?)

 No tags have been applied so far. Sign in to add some.

## This docket can only tell you so much. Get the rest.
Access comprehensive profiles on judges, firms, lawyers, and more with PlainSite Pro and Pro Se.

 **Michael A Deem**, Plaintiff

▾ Represented by Law Office of Jonathan Lovett

| Name | Phone | Fax | E-Mail |
| --- | --- | --- | --- |
| Jonathan Lovett | +1 914 686 4500 | +1 914 686 4545 | jlovett@lovett-law.com |

# v.



 **Carol Arcuri**, Defendant

 **Charlene Idelicato**, Defendant

▾ Represented by Jackson Lewis LLP

| Name | Phone | Fax | E-Mail |
| --- | --- | --- | --- |
| Susanne Kantor | +1 914 328 0404 | +1 914 328 1882 | kantors@jacksonlewis.com |
| Joseph Anthony Saccomano, Jr | +1 914 514 6124 | +1 914 328 0541 | saccomaj@jacksonlewis.com |

 **County of Westchester, New York**, Defendant



**Hillary Raimondi**, Defendant



**Lori Alesio**, Defendant

---

| | |
|---|---|
| **Citation** |  42 U.S.C. § 1983 |
| **Nature of Suit** | 440 Civil Rights: Other |

Entries (25)   Calendar Events   Related (0)   Tools

**Need legal research help? Let us know!**

 25   **Filed:** 7/19/2010, **Entered:** None         

MEMO ENDORSEMENT on re: 24 Stipulation of Voluntary Dismissal filed by Lori Alesio, Charlene Idelicato, Michael A Deem, Carol Arcuri, County of Westchester, New York, Hillary Raimondi... Case closed. SO ORDERED. (Signed by Judge Stephen C. Robinson on 7/19/2010) (mml) (Entered: 07/19/2010)

 Request

 24   **Filed:** 5/17/2010, **Entered:** None

STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, with prejudice against the defendant(s) Carol Arcuri, Charlene Idelicato, Lori Alesio, Hillary Raimondi, County of Westchester, New York and without costs to either party pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by Michael A Deem, Carol Arcuri, Charlene Idelicato, Lori Alesio, Hillary Raimondi, County of Westchester, New York.(Saccomano, Joseph) (Entered: 05/17/2010)

 23   **Filed:** 2/17/2010, **Entered:** None         

AMENDED SCHEDULING NOTICE:The matter of Michael A. Deem v. CHarlen Indelicato, et al. has been scheduled for a case management conference before the Hon. Stephen C. Robinson, United States District Judge, for February 25th, 2010,at 3:30pm in Courtroom 621, 6th Floor. Case Management Conference set for 2/25/2010 at 03:30 PM before Judge Stephen C. Robinson. (rj) (Entered: 02/17/2010)

 Request

 22   **Filed:** 2/16/2010, **Entered:** None         

RESCHEDULING NOTICE: Thc matter of Michael A. Deem v. Charlene Indelicato has been re-scheduled for a case management conference before thc Hon. Stephen C. Robinson, United States District Judge, from February 24, 2010 at 1O:00 am to February 24, 2010 at 3:30 pm in Courtroom 621, 6th Floor. Case Management Conference set for 2/24/2010 at 03:30 PM before Judge Stephen C. Robinson. (mml) (Entered: 02/16/2010)

 Request

 21   **Filed:** 8/5/2009, **Entered:** None

NOTICE OF CHANGE OF ADDRESS by Jonathan Lovett on behalf of Michael A Deem. New Address: Lovett & Bellantoni, LLP, 37A Saw Mill River Road, Hawthorne, New York, USA 10532, 914-347-4500. (Lovett, Jonathan) (Entered: 08/05/2009)

 Request

 20   **Filed:** 7/22/2009, **Entered:** None         

SCHEDULING NOTICE: The matter of Michael A. Deem v. Charlene Indelicato, et al. has been scheduled for a case management conference before the Hon. Stephen C. Robinson, United States District Judge, for September 24, 2009, at 10:00 am in Courtroom 621, 6th floor. Case Management Conference set for 9/24/2009 at 10:00 AM before Judge Stephen C. Robinson. (mml) (Entered: 07/22/2009)

 Request

 19   **Filed:** 7/22/2009, **Entered:** None         

CIVIL CASE DISCOVERY PLAN AND ORDER: Amended Pleadings due by 7/22/2009, Deposition due by 12/30/2009, Discovery due by 2/17/2010, Interrogatories due by 7/29/2009, Joinder of Parties due by 7/22/2009, Request for Production of Documents due

by 7/29/2009. SO ORDERED. (Signed by Judge Stephen C. Robinson on 7/22/2009) (mml) (Entered: 07/22/2009)

📄 Request

---

🌐 **18** **Filed:** 7/8/2009, **Entered:** None                                                                              

ENDORSED LETTER addressed to Judge Stephen C. Robinson from Jonathan Lovett dated 7/2/09 re: Request for an adjournment of conference currently set for 7/8/09. ENDORSEMENT: Application Granted. New conference date is July 22, 2009 at 10:00 am. (Signed by Judge Stephen C. Robinson on 7/8/09) (fk) (Entered: 07/08/2009)

📄 Request

---

🌐 **17** **Filed:** 5/14/2009, **Entered:** None

AFFIDAVIT OF SERVICE. Charlene Idelicato served on 3/3/2009, answer due 3/23/2009. Service was accepted by Donna Dixon, Clerk/Legal Dept.. Service was made by Mail 3/4/09. Document filed by Michael A Deem. (Lovett, Jonathan) (Entered: 05/14/2009)

📄 Request

---

🌐 **16** **Filed:** 5/14/2009, **Entered:** None

AFFIDAVIT OF SERVICE. Lori Alesio served on 3/3/2009, answer due 3/23/2009. Service was accepted by Donna Dixon, Clerk/Legal Dept.. Service was made by Mail 3/4/09. Document filed by Michael A Deem. (Lovett, Jonathan) (Entered: 05/14/2009)

📄 Request

---

🌐 **15** **Filed:** 5/14/2009, **Entered:** None

AFFIDAVIT OF SERVICE. Hillary Raimondi served on 3/3/2009, answer due 3/23/2009. Service was accepted by Donna Dixon, Clerk/Legal Dept.. Service was made by Mail 3/4/09. Document filed by Michael A Deem. (Lovett, Jonathan) (Entered: 05/14/2009)

📄 Request

---

🌐 **14** **Filed:** 5/14/2009, **Entered:** None

AFFIDAVIT OF SERVICE. Carol Arcuri served on 3/3/2009, answer due 3/23/2009. Service was accepted by Donna Dixon, Clerk/Legal Dept.. Service was made by Mail 3/4/09. Document filed by Michael A Deem. (Lovett, Jonathan) (Entered: 05/14/2009)

📄 Request

---

🌐 **13** **Filed:** 5/14/2009, **Entered:** None

AFFIDAVIT OF SERVICE. County of Westchester, New York served on 3/3/2009, answer due 3/23/2009. Service was accepted by Donna Dixon, Clerk/Legal Department. Document filed by Michael A Deem. (Lovett, Jonathan) (Entered: 05/14/2009)

📄 Request

---

🌐 **12** **Filed:** 4/15/2009, **Entered:** None                                                                            

STIPULATION EXTENDING TIME TO ANSWER:IT IS HEREBY STIPULATED AND AGREED,by and between the undersigned, that Defendants time to answer, move, or otherwise respond to the Complaint herein shall be extended to and including April 2,2009. SO ORDERED (Signed by Judge Stephen C. Robinson on 4/14/2009) (rj) (Entered: 04/15/2009)

📄 Request

---

🌐 **11** **Filed:** 3/31/2009, **Entered:** None

NOTICE OF APPEARANCE by Susanne Kantor on behalf of Carol Arcuri (Kantor, Susanne) (Entered: 03/31/2009)

📄 Request

---

🌐 **10** **Filed:** 3/31/2009, **Entered:** None

ANSWER to Complaint. Document filed by Carol Arcuri.(Saccomano, Joseph) (Entered: 03/31/2009)

📄 Request

---

🌐 **9** **Filed:** 3/31/2009, **Entered:** None

NOTICE OF APPEARANCE by Joseph Anthony Saccomano, Jr on behalf of Carol Arcuri (Saccomano, Joseph) (Entered: 03/31/2009)

📄 Request

---

🌐 **8** **Filed:** 3/30/2009, **Entered:** None

ANSWER to Complaint. Document filed by Hillary Raimondi.(Saccomano, Joseph) (Entered: 03/30/2009)

📄 Request

---

🌐 **7** **Filed:** 3/30/2009, **Entered:** None

ANSWER to Complaint. Document filed by Lori Alesio.(Saccomano, Joseph) (Entered: 03/30/2009)

Request

---

**6** Filed: 3/30/2009, **Entered:** None

ANSWER to Complaint. Document filed by Charlene Idelicato.(Saccomano, Joseph) (Entered: 03/30/2009)

---

**5** Filed: 3/30/2009, **Entered:** None

ANSWER to Complaint. Document filed by County of Westchester, New York.(Saccomano, Joseph) (Entered: 03/30/2009)

Request

---

**4** Filed: 3/30/2009, **Entered:** None

NOTICE OF APPEARANCE by Joseph Anthony Saccomano, Jr on behalf of Charlene Idelicato, Lori Alesio, Hillary Raimondi, County of Westchester, New York (Saccomano, Joseph) (Entered: 03/30/2009)

Request

---

**3** Filed: 3/30/2009, **Entered:** None

NOTICE OF APPEARANCE by Susanne Kantor on behalf of Charlene Idelicato, Lori Alesio, Hillary Raimondi, County of Westchester, New York (Kantor, Susanne) (Entered: 03/30/2009)

Request

---

**2** Filed: 3/6/2009, **Entered:** None 

NOTICE of Requirement to Submit a Scheduling Order: Case Management Conference set for 7/8/2009 at 10:00 AM before Judge Stephen C. Robinson. (Melendez, Melissa) (Entered: 03/06/2009)

Request

---

**1** Filed: 2/27/2009, **Entered:** None

COMPLAINT against Charlene Idelicato, Lori Alesio, Hillary Raimondi, County of Westchester, New York. (Filing Fee $ 350.00, Receipt Number 677757)Document filed by Michael A Deem.(ll) (Entered: 02/27/2009)

---

## Statistics

This case has been viewed **233** times.

---

No comments have been added yet. Sign in to post a comment.

       

Issues    Laws    Cases    Pro    Pro Se    Articles    Firms    Entities

A joint venture of Think Computer Corporation and Think Computer Foundation, a 501(c)(3) non-profit organization.
Non-Government Works Copyright © 2001-2015 Think Computer Corporation. All Rights Reserved. PlainSite is a registered trademark of Think Computer Corporation. Patents pending.
Please do not bulk download information from this web site without prior permission.

About    Help Us    Media    Privacy    Security    Contact Us

**EXHIBIT E**

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

August 19, 2015

**VIA ELECTRONIC MAIL**

Executive Director Robert J. Freeman
NYS Committee on Open Government
   Department of State
One Commerce Plaza
99 Washington Avenue, Suite 650
Albany, NY 12231

Re:  Roosevelt Island Operating Corporation FOIL Appeal Denial

Dear Director Freeman:

I am the attorney for Donald Lewis on whose behalf I submitted to the Roosevelt Island Operating Corporation ("RIOC") the Freedom of Information Law ("FOIL") requests dated May 21, 2015 (the "May 21 Requests") referenced in the attached appeal denial letter from Charlene M. Indelicato dated June 15, 2015 (the "June 15 Appeal Denial") on which your office was copied. Mr. Lewis also submitted a second FOIL request dated June 8, 2015 (the "June 8 Requests" collectively, with the May 21 Requests, the "Requests"). Because it appears that prior correspondence related to the May 21 Requests was not included with the June 15 Appeal Denial, I write to provide you with those materials (as well subsequent correspondence and correspondence regarding the June 8 Requests), which illustrate the dilatory manner in which RIOC has handled the Requests.

Although RIOC's June 15 Appeal Denial standing alone may mislead the reader to conclude that RIOC's position is reasonable, the full record illustrates that position is in fact unreasonable as well as arbitrary and capricious. Strikingly, to date, RIOC has yet to produce one single piece of paper or even committed to a production date notwithstanding that: (i) many of the requested items are available with a simple mouse click; (ii) we requested the materials be produced on a rolling basis; (iii) three months have passed since the requests; and (iv) we offered to narrow certain Requests to exclude 70% of the employees, contingent on RIOC providing a reasonable production date. RIOC's response has simply been to state that it will *"advise you of our progress"* on arbitrarily selected dates that are *three months* after the FOIL Requests dates.

Exemplary of the misleading nature of the Appeal Denial is Ms. Indelicato's citation in paragraph two of *In re Data Tree, LLC v Romaine*, 9 N.Y.3d 454 (2007), for the proposition that "'there is no specific time period in which the agency must *grant access to the records*'" and that "RIOC is required *to provide records* 'in a time … which is reasonable in view of the attendant circumstances.'" (emphasis added) Ms. Indelicato then states, "Given the volume of your request as well as limited staff time, 60 business days is not unreasonable." As set forth below, RIOC's position is untenable for myriad reasons:

- *First*, to set a date three months out from the request – *i.e.* 90 days from the Requests – and then attempt to ameliorate the appearance of the three months by characterizing it as "60 business days" is inconsistent with common business practice, inaccurate and disingenuous.

- *Second*, and most significantly, the entire discussion regarding "*granting access to the records*" in paragraph two of the Appeal Denial is inapposite to RIOC's concept of "*advise you of our progress.*" Whether characterized as "60 business days" or, more accurately, as "90 days," RIOC has made no commitment to provide access to the documents. Rather, RIOC has simply committed to "advise you of our progress."

- *Third*, during a telephone conversation on June 19, 2015 -- over one month after the requests had been issued -- RIOC's General Counsel, who is leading the response to our FOIL Request, informed Mr. Lewis and myself that she had yet even to discuss the same with RIOC's information technology team; not a confidence inspiring circumstance for the "advise you of our progress" report.

- *Fourth*, after the Appeal Denial, in an effort to reach resolution, *we offered to narrow certain requests to exclude 70% of the employees*, but RIOC still would not agree to provide any production date, let alone a reasonable production date.

Considering the apparent lack of diligence by RIOC, we are also concerned that RIOC has not taken any steps to preserve and secure responsive documents from its Board of Directors. RIOC's dilatory conduct is further illustrated by its refusal to respond to our repeated request simply to identify RIOC's Appeal Officer. Instead, after ignoring multiple inquiries, RIOC waited until the last day to respond to our appeal, revealing Ms. Indelicato's role as the Appeals Officer for the first time in that response.

We are aware that we will need to seek redress in another forum to receive a binding resolution. In the interests of not consuming the resources of your office, we are not requesting an Advisory Opinion at this time, although we may do so in the future. In the interim, we believe the NYS Committee on Open Government is entitled to the entire record to form a full understanding of the issues and not be misled by RIOC's one-sided and misleading Appeal Denial. Accordingly, below is a summary of the relevant written communications that Ms. Indelicato did not include with her Appeal Denial communication:

**Tab 1**: Mr. Lewis' May 21, 2015 FOIL requests. I understand that the majority of the requested items literally are available with a simple click of a mouse and could be made available within minutes.

**Tab 2**: RIOC'S May 29, 2015 email response to the May Request. RIOC waits until the last date for it to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC takes the vague position that it is "performing a diligent search for the record you requested, and will *notify you of our progress* on or before August 21, 2015" – *three months* after the May Request.

**Tab 3**: A. Rotondi's June 1, 2015 response to RIOC's May 29 correspondence in which we (i) object to RIOC's *"notify you of our progress"* date; (ii) appeal RIOC's denial and (iii) request that RIOC provide us with the identity of its appeals officer.

**Tab 4**: A. Rotondi June 5, 2015 email again requesting that RIOC provide us with the identity of the appeals officer, which it had yet to do.

**Tab 5**: RIOC's June 5, 2015 response to our request to identify RIOC's Appeals Officer in which RIOC continues its refusal to identify its appeals officer simply states, "RIOC will respond to your inquiry within 10 business days."

**Tab 6**: A Rotondi June 8, 2015 email (i) objecting to RIOC's continued concealment of and refusal to provide the identity of RIOC's appeals officer (ii) requesting for a third time that RIOC inform us of the identity of its Appeal Officer and (iii) submitting a formal FOIL request for "[t]he identity of the RIOC appeal officer."

**Tab 7**: Mr. Lewis' June 8, 2015 FOIL Requests seeking additional information. As with the May 21 Requests, many of those items literally are available with a simple click of a mouse and were requested on a rolling basis.

**Tab 8**: RIOC'S June 15, 2015 email response to the June 8 Requests. As with its response to the May 21 Requests, RIOC waits until the last day for it to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC again takes the vague position that it is "performing a diligent search for the record you requested, and will *notify you of our progress* on or before September 9, 2015."

**Tab 9**: RIOC's June 15, 2015 Appeal Denial, copied to the NYS Committee on Open Government.

**Tab 10**: RIOC General Counsel Susan Rosenthal's June 17, 2015 email suggesting a call "to help narrow or clarify the requests."

A call regarding the requests took place on June 19, 2015 (the "June 19 Call") between RIOC's General Counsel, Mr. Lewis and myself. During that call, among other things, RIOC's counsel indicated that RIOC's technology team had not yet even been consulted regarding retrieval of the requested information.

**Tab 11**: June 19, 2015 email from RIOC's counsel confirming the answers to issues raised during the June 19 and RIOC's inquiry regarding whether we would agree to narrow our requests (in a manner that would *reduce most of the information sought by approximately 70%*).

**Tab 12**: Correspondence to RIOC's counsel dated June 29, 2015 accepting RIOC's proposal to limit the requests in the manner to reduce much of the responsive information by 70% contingent on RIOC agreeing to produce documents by a date certain. In that communication, we stated:

[I]n order to proceed in this manner, we require agreement on a reasonable date certain by which RIOC will produce documents in response to our FOIL request letters dated May 21 and June 8, 2015. It has been approximately six weeks since we submitted our first FOIL request letter and RIOC has yet to produce a single document. Considering *we have narrowed the above requests to exclude 70% of the employees*, RIOC should be able to provide us with a reasonable production date.

(emphasis added). To date, RIOC has not bothered to respond to our request for a date certain production date nor produced one single page of information.

Should you have any questions or like to discuss this matter, please feel free to contact me at (212) 709-8340 or via email at ajr@ajrotondi.com.

Very truly yours,

Anthony Rotondi

Enclosures

cc:    Charlene Indelicato (via email)
       Susan Rosenthal (via email)

4

TAB 1

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

May 21, 2015

**VIA ELECTRONIC MAIL**

Arthur Eliav,
    Associate General Counsel
Roosevelt Island Operating Corporation
591 Main Street
Roosevelt Island, NY 10044

Re:  FOIL Request

Dear Mr. Eliav:

I represent Donald Lewis and write pursuant to the Freedom of Information Law to request the production of the materials set forth in the enclosed "Requests."

I understand that many of the requested items literally are available with the simple click of a mouse. We trust that such materials will be produced immediately. For the few items that may not be readily available, we request such materials be produced on a rolling basis. We additionally request the production of all materials in electronic form.

Although I am not a reporter, this information will be made available to a reporter or to interested members of the public. Disclosure of the requested information is in the public interest because it is likely to contribute significantly to the public understanding of operation or activities of the government, including RIOC, and is not being sought for commercial purposes. As such, I request a waiver of all fees in the unlikely event that any fees attach to RIOC's response.

As you know, the New York Freedom of Information Law requires a response time of five business days. If access to the requested documents will exceed five business days, please contact me with the expected production date.

Further, should RIOC deny any or all of this request, please cite each specific exemption RIOC relies upon for its refusal to release the information and notify me of the appeal procedures available to me under the law.

We anticipate your full cooperation.

Very truly yours,

Anthony Rotondi

Enclosure
AJR/fb

We hereby request all documents or information in whatever form retained, including correspondence, emails, notes, voice mails, etc. related in *any way* to the issues and/or categories of materials set forth below.[1]

1) RIOC's policies, practices, and procedures and documents reflecting the implementation, failure to implement, adherence to, or failure to adhere to such policies, practices and procedures;

2) Hiring, promotions, resignations, terminations, salary increases, and salary adjustments, including without limitation communications with any RIOC Director or the Executive Chamber concerning this matter;

3) Changes to office door locks;

4) Employee use of RIOC vehicles both while on-duty and off-duty, including documents (such as log books) reflecting actual use of the vehicle, mileage, damage, use during weekends, use during vacation time and taxable benefits;

5) Misconduct and discipline of employees, including but not limited to, Mr. Santo Verta;

6) Personnel files of current and former RIOC employees, including but not limited to, hirings, terminations, performance evaluations and disciplinary actions;

7) Organizational charts;

8) Salary and payroll information regarding all employees, including salary increases or salary adjustments for any employees and any purported explanation, justification or support for such increases; including but not limited to the actual salary of every RIOC employee as of April 15, 2015;

9) Allegations of discrimination, harassment or hostile work environment against RIOC or its employees;

10) Complaints filed by any RIOC employee, including EEOC complaints and internal complaints filed by RIOC employees;

11) RIOC Employee handbooks;

12) RIOC budgets for fiscal years January 1, 2008 to present, including but not limited to budget packages provided to the RIOC Board of Directors for approval;

13) Anthony Jones matter including without limitation communications with any RIOC Director or the Executive Chamber concerning this matter;

---

[1] The terms "document" and "information" are to be construed as broadly as possible under applicable law and unless otherwise specified, the time-period for this request is January 1, 2008 through present.

14) Public purpose funds including without limitation communications with the any RIOC Director or the Executive Chamber concerning this matter;

15) Requests and/or analysis of need for additional staffing by any RIOC department, including requests for a paralegal, administrative assistant, fellow and/or a seasonal employee;

16) Communications from April 1, 2013 through present with any individuals affiliated with the following Island projects: Cornell Tech, Manhattan Park, Rivercross, Westview, Roosevelt Landings, Island House, Four Freedoms State Park and the Aerial Tramway, including communications with any RIOC Director concerning these projects; and

17) Good Shepherd Plaza Streetscaping Project, including but not limited to, the final contract and the financial analysis of the project.

18) The destruction of RIOC documents from January 1, 2015 through present.

20) The "Ten Step Process,, for Internal Complaints;

21) The "Ten Step Process,, for External Complaints; and

22) Allegations of retaliation against RIOC or any RIOC executive.

TAB 2

## Anthony J. Rotondi

**From:** Arthur Eliav <Arthur.Eliav@rioc.ny.gov>
**Sent:** Friday, May 29, 2015 4:28 PM
**To:** Anthony J. Rotondi
**Cc:** Lada Stasko
**Subject:** Re: FOIL REQUEST

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before August 21, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 5/21/2015 1:35 PM >>>
Mr. Eliav,

Please disregard prior email and see attached correspondence and request pursuant to FOIL.

/AJR

ANTHONY J. ROTONDI
5 Columbus Circle, Suite 800
New York, NY 10019
212-709-8340
www.ajrotondi.com

TAB 3

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Monday, June 01, 2015 1:29 PM |
| **To:** | 'Arthur Eliav' |
| **Cc:** | 'Lada Stasko' |
| **Subject:** | RE: FOIL REQUEST |
| **Attachments:** | RIOC FOIL REQ.PDF |

Mr. Eliav,

Thank you for your email of May 29 below responding to our May 21 Freedom of Information Law request. RIOC's statement that it "will notify you of our progress on or before August 21, 2015" is patently unreasonable and as such pursuant to N.Y. Public Officers Law Section 89(4)(a) constitutes a constructive denial of our FOIL request. Accordingly, this correspondence shall serve as a formal appeal of RIOC's denial. Please forward this correspondence with the attached initial request to the appropriate head, chief executive or governing body of RIOC, or the person designated by such head, chief executive, or governing body (the "Appeal Officer"). Additionally, please provide me with contact information for that individual. I look forward to the Appeal Officer fulfilling his/her obligation to "fully explain in writing to the person requesting the record the reasons for further denial, or provide access to the record sought."

Please be advised that we will not countenance any further attempts by RIOC to delay wrongfully production of the requested information. Should we not receive a satisfactory response from the Appeal Officer, we will seek to compel production of the requested information via Article 78 and an Order to Show Cause. In any such proceeding, RIOC will be unable to justify the reasonableness of its August 21, 2015 "notify you of our progress" date. That date would be patently unreasonable as a production date, let alone a date simply to inform us of RIOC's " progress."

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

**From:** Arthur Eliav [mailto:Arthur.Eliav@rioc.ny.gov]
**Sent:** Friday, May 29, 2015 4:28 PM

1

**To:** Anthony J. Rotondi
**Cc:** Lada Stasko
**Subject:** Re: FOIL REQUEST

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before August 21, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 5/21/2015 1:35 PM >>>

Mr. Eliav,

     Please disregard prior email and see attached correspondence and request pursuant to FOIL.

/AJR

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
212-709-8340
www.ajrotondi.com

2

TAB 4

| From: | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
|---|---|
| Sent: | Friday, June 05, 2015 10:47 AM |
| To: | 'Arthur Eliav' |
| Cc: | 'Lada Stasko' |
| Subject: | RE: FOIL REQUEST |

Mr. Eliav,

In my below email of June 1, I requested that you forward my June 1 correspondence with the attached initial request to the "Appeal Officer" and provide me with contact information for that individual. I trust that you have forwarded my June 1 correspondence but I have yet to receive the Appeal Officer's contact information. Kindly immediately forward that information. As you know, the Appeal Officer's response to my appeal is due within ten days of my June 1, 2015 appeal. In the event that your failure to provide the Appeal Officer's identity was other than inadvertent, you should be well aware that RIOC will find no relief from the ten-day deadline by concealing the identity of the Appeal Officer.

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

From: Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
Sent: Monday, June 01, 2015 1:29 PM
To: 'Arthur Eliav'
Cc: 'Lada Stasko'
Subject: RE: FOIL REQUEST

Mr. Eliav,

Thank you for your email of May 29 below responding to our May 21 Freedom of Information Law request. RIOC's statement that it "will notify you of our progress on or before August 21, 2015" is patently unreasonable and as such pursuant to N.Y. Public Officers Law Section 89(4)(a) constitutes a constructive denial of our FOIL request. Accordingly, this correspondence shall serve as a formal appeal of RIOC's denial. Please forward this correspondence with the attached initial request to the appropriate head, chief executive or governing body of RIOC, or the person

1

TAB 5

**Anthony J. Rotondi**

**From:** Arthur Eliav <Arthur.Eliav@rioc.ny.gov>
**Sent:** Friday, June 05, 2015 11:22 AM
**To:** Anthony J. Rotondi
**Cc:** Lada Stasko; Susan Rosenthal
**Subject:** RE: FOIL REQUEST

Mr. Rotondi:

RIOC will respond to your inquiry within ten business days.

Best,

Arthur

Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/5/2015 10:46 AM >>>
Mr. Eliav,

In my below email of June 1, I requested that you forward my June 1 correspondence with the attached initial request to the "Appeal Officer" and provide me with contact information for that individual. I trust that you have forwarded my June 1 correspondence but I have yet to receive the Appeal Officer's contact information. Kindly immediately forward that information. As you know, the Appeal Officer's response to my appeal is due within ten days of my June 1, 2015 appeal. In the event that your failure to provide the Appeal Officer's identity was other than inadvertent, you should be well aware that RIOC will find no relief from the ten-day deadline by concealing the identity of the Appeal Officer.

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

TAB 6

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Monday, June 08, 2015 10:55 AM |
| **To:** | 'Arthur Eliav' |
| **Cc:** | 'Lada Stasko'; 'Susan Rosenthal' |
| **Subject:** | RE: FOIL REQUEST |

Mr. Ellav:

      Thank you for your response below. In the event that certain of the language therein was other than unintentional, I must point out that although your email refers to my prior communication as an "inquiry," my communication of June 1 was an "appeal", and not a mere "inquiry." Second, RIOC's response to the appeal is due 10 business from June 1, and not from the date of your June 5 email or any later date.

      More troubling, however, is RIOC's unwillingness or inability to identify and provide contact information for its FOIL Appeal Officer notwithstanding two separate requests for that information. It seems apparent, from RIOC's conduct in the aggregate – including from its August 21, 2015 "notify you of our progress" date and its continued concealment of the identity of the FOIL Appeal Officer – that RIOC is engaging in gamesmanship to delay and/or avoid complying with its obligations under FOIL. Accordingly, please consider this communication a request pursuant to FOIL for the following information:

      The identity of the RIOC Appeal Officer.

      Should RIOC fail to provide that information within the requisite time, please immediately forward an Appeal to the mysterious and veiled RIOC Appeal Officer.

      /AJR

## Anthony J. Rotondi
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

---

**From:** Arthur Eliav [mailto:Arthur.Eliav@rioc.ny.gov]
**Sent:** Friday, June 05, 2015 11:22 AM
**To:** Anthony J. Rotondi
**Cc:** Lada Stasko; Susan Rosenthal
**Subject:** RE: FOIL REQUEST

Mr. Rotondi:

RIOC will respond to your inquiry within ten business days.

Best,

TAB 7

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
(212) 709-8340
www.ajrotondi.com

June 8, 2015

**VIA ELECTRONIC MAIL**

Arthur Eliav
   Associate General Counsel
Roosevelt Island Operating Corporation
591 Main Street
Roosevelt Island, NY 10044

Re:  FOIL Request

Dear Mr. Eliav:

As you know, I represent Donald Lewis.  I write pursuant to the Freedom of Information Law to request the production of the materials itemized on the attached list.  As with my FOIL request of May 21, 2015 ("May Request"), I understand that many of the requested items are available with a mouse click.  We expect that such materials will be produced immediately.  For the few items that may not be readily available, we request that such materials be produced on a rolling basis.  We additionally request the production of all materials in electronic form.

Please be advised that any documents (as defined below) possessed by the RIOC Board of Directors, which may be responsive to this FOIL request, as well as our May Request, are considered RIOC documents and must be produced.  Likewise, in both the May Request and this FOIL request, the term "present" means up to the date that RIOC produces the information.

Although I am not a reporter, this information will be made available to a reporter or to interested members of the public.  Disclosure of the requested information is in the public interest because it is likely to contribute significantly to the public understanding of operation or activities of the government, including RIOC, and is not being sought for commercial purposes.  As such, I request a waiver of all fees in the unlikely event that any fees attach to RIOC's response.

As you know, FOIL requires a response within five business days.  If access to the requested documents will exceed five business days, please contact me with the expected production date.

Further, should RIOC deny any or all of this request, please cite each specific exemption RIOC relies upon for its refusal to release the information and notify me of the appeal procedures available to me under the law, including the elusive identity of RIOC's Appeal Officer.

Very truly yours,

Anthony Rotondi

Enclosure
AJR/ea

We hereby request all documents or information in whatever form retained, including correspondence, emails, notes, voice mails, etc. related in *any way* to the issues and/or categories of materials set forth below.[1]

1) Training of the RIOC Board of Directors, including without limitation, any Board Manuals;

2) EZ Pass records for all RIOC vehicles from January 2013 through present;

3) Time sheets and disciplinary records for all RIOC executives and administrative staff (including the engineering department) from January 2013 through present, insofar as such time sheets are not contained in previously requested personnel files;

4) Monitoring by RIOC executives or senior staff of arrival at, or departure from, work of any RIOC administrative staff employee (including the engineering department);

5) Terminations, administrative leaves or suspensions of RIOC employees from January 2013 through present including, but limited to, communications with any RIOC Director concerning the terminations;

6) Duties and responsibilities of the RIOC President and CEO, Chief Financial Officer and Board of Directors;

7) All severance and/or settlement agreements with RIOC employees;

8) Provision to any RIOC employee of free housing on Roosevelt Island as a condition/benefit of employment or representation to any employee or potential employee that such housing would be provided as a condition/benefit of employment; and

9) Waivers to any RIOC employee authorizing use of any RIOC vehicle when such employee is not on actual RIOC business, including transportation to or from the RIOC office.

---

[1]The terms "document„ and "information„ are to be construed as broadly as possible under applicable law and unless otherwise specified, the time-period for this request is January 1, 2008 through present.

TAB 8

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Arthur Eliav <Arthur.Eliav@rioc.ny.gov> |
| **Sent:** | Monday, June 15, 2015 5:09 PM |
| **To:** | Anthony J. Rotondi |
| **Subject:** | Re: FOIL REQ. NO. 2 |
| **Attachments:** | RIOC FOIL REQ NO 2_1.pdf |

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before September 9, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/8/2015 11:26 AM >>>

Mr. Eliav:


Please see attached correspondence.


/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

TAB 9



**ROOSEVELT ISLAND
OPERATING CORPORATION**
of The State of New York

Andrew M. Cuomo
Governor

Charlene M. Indelicato
President/Chief Executive Officer

Frances A. Walton
Vice President/Chief Financial Officer

Susan G. Rosenthal
Vice President/General Counsel

BOARD OF DIRECTORS

Jamie Rubin, Chairperson
Fay Fryer Christian
Dr. Katherine Teets Grimm
David Kraut
Mary Beth Labate
Howard Polivy
Michael Shinozaki
Margaret Smith

June 15, 2015

**VIA EMAIL (air@airotondi.com)**
Anthony J. Rotondi, Esq.
5 Columbus Circle, Suite 800
New York, NY 10019

Re:   Freedom of Information Law (FOIL) request dated May 21, 2015

Dear Mr. Rotondi:

The Roosevelt Island Operating Corporation (RIOC) is in receipt of your email dated June 1, 2015, appealing the FOIL Officer's response and acknowledgment dated May 29, 2015 to your FOIL request received May 22, 2015. I have reviewed your request and respectfully find that the FOIL Officer's acknowledgement was not a "constructive denial". On the contrary, the FOIL Officer advised you that RIOC is performing a diligent search and that you will be advised of our progress on or before August 21, 2015.

In Matter of *Data Tree, LLC v. Romaine*, the New York State Court of Appeals noted that "there is no specific time period in which the agency must grant access to the records. Indeed, the time needed to comply with the request may be dependent on a number of factors, including the volume of the request and the retrieval methods." *9 N.Y.3d 454, 465 (2007)* RIOC is required to provide records "in a time ... which is reasonable in view of the attendant circumstances." *Ibid.* Given the volume of your request as well as limited staff time, 60 business days is not unreasonable.

Your request contains 22 categories of documents from as far back as January 2008 through the present. Many of the requests consist of numerous subcategories. Some of the requests are extremely broad. For example, one item requests "personnel files of current and former RIOC employees, including but not limited to, hiring, terminations, performance evaluations and disciplinary actions." This would require RIOC staff to locate and review such files at RIOC offices and archive facilities, and as appropriate redact information protected by the exemptions set out in Section 87 of FOIL, such as unwarranted invasion of personal privacy

(Section 87(2)(b)) and intra-agency material (Section 87(2)(g)). Same holds true for many other items you have requested.

In light of the scope of your request and RIOC's ongoing diligent search and review process, your appeal is respectfully denied.

Thank you for your attention.

Very truly yours,

Charlene M. Indelicato
President/Chief Executive Officer

cc: NYS Committee on Open Government

**TAB 10**

## Anthony J. Rotondi

Mr. Rotondi, I am the General Counsel of RIOC and have reviewed the FOIL requests heretofore forwarded to us. The purpose of this e-mail is to suggest a conversation between us to help narrow or clarify the requests. If you agree that such a call would be helpful, please advise when it would be convenient. Thanks. Susan Rosenthal

TAB 11

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Susan Rosenthal <Susan.Rosenthal@rioc.ny.gov> |
| **Sent:** | Friday, June 19, 2015 4:16 PM |
| **To:** | Anthony J. Rotondi |
| **Subject:** | RE: Conference Information |

I have confirmed that there are 3 unions for 1) Public Safety Officers 2) grounds workers and porters; and 3) Teamsters--- bus drivers, mechanics, handy-people. These union employees plus seasonals and temps account for approximately 70% of all staff. Please advise if you agree to narrow requests 2, 6, 8 by excluding any of these categories. Thanks

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 3:05 PM >>>
It's 48465. Don just used it. If you give me your direct number I can just conference you in.

# Anthony J. Rotondi
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Susan Rosenthal [mailto:Susan.Rosenthal@rioc.ny.gov]
**Sent:** Friday, June 19, 2015 3:01 PM
**To:** Anthony J. Rotondi
**Subject:** Re: Conference Information

THE PIN IS INCORRECT

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 11:20 AM >>>
For our 3 p.m. call, please call 585-632-5945 and use PIN: 48465. Thanks.

1

TAB 12

**Anthony J. Rotondi**

**From:** Anthony J. Rotondi <AJR@AJROTONDI.COM>
**Sent:** Monday, June 29, 2015 10:09 AM
**To:** 'Susan Rosenthal'
**Subject:** RE: Conference Information

Ms. Rosenthal,

My apologies for the delayed response, your email was misdirected while my email service was being transferred to a new system. We will agree to narrow request numbers 2, 6, and 8 by excluding from RIOC's response the following employees:

(i)     Public Safety Officers;
(ii)    Grounds workers and porters;
(iii)   Teamsters (bus drivers, mechanics, handy-people);
(iv)   Seasonal workers; and
(v)    Temporary workers.

We, however, reserve the right to renew those requests in the future. Moreover, in order to proceed in this manner, we require agreement on a reasonable date certain by which RIOC will produce documents in response to our FOIL request letters dated May 21 and June 8, 2015. It has been approximately six weeks since we submitted our first FOIL request letter and RIOC has yet to produce a single document. Considering we have narrowed the above requests to exclude 70% of the employees, RIOC should be able to provide us with a reasonable production date. Please let me know whether RIOC agrees to proceed as set forth above, and if so, a date that RIOC proposes as the production date. Thank you.

Regards,

/AJR

---

**From:** Susan Rosenthal [mailto:Susan.Rosenthal@rioc.ny.gov]
**Sent:** Friday, June 19, 2015 4:16 PM
**To:** Anthony J. Rotondi
**Subject:** RE: Conference Information

I have confirmed that there are 3 unions for 1) Public Safety Officers 2) grounds workers and porters; and 3) Teamsters---bus drivers, mechanics, handy-people. These union employees plus seasonals and temps account for approximately 70% of all staff. Please advise if you agree to narrow requests 2, 6, 8 by excluding any of these categories. Thanks

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 3:05 PM >>>
It's 48465. Don just used it. If you give me your direct number I can just conference you in.

# Anthony J. Rotondi

**EXHIBIT F**

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Wednesday, October 14, 2015 9:35 PM |
| **To:** | Robert.freeman@dos.ny.gov |
| **Subject:** | Request for Advisory Opinion & Appeal |
| **Attachments:** | RIOC FOIL REQ.PDF; Untitled attachment 00076.htm |

Mr. Freeman:

I write further to my August 26, 2015 Request for an Advisory Opinion ("Opinion Request") submitted to the NY COOG concerning FOIL requests my client, Mr. Donald Lewis, submitted to RIOC over four months ago. In the interests of keeping the NY COOG updated, attached is (i) an additional FOIL request to RIOC dated September 3, 2015; (2) RIOC's September 11, 2015 boilerplate "notify you of our progress" response, which effectively denies the request (below); and (iii) Mr. Lewis' October 7, 2015 appeal of that denial (below).

Additionally, I would greatly appreciate the opportunity to briefly discuss the Opinion Request with you, but have been unable to reach you despite leaving multiple telephone messages with your office over the last several weeks. I understand that you likely have a busy schedule and given my inability to establish contact by telephone, I figured rather than continue to trouble your assistant with messages, perhaps we could agree on a time to have a brief chat. I am available tomorrow afternoon or Friday between 2:00 and 5:00. If neither of those windows works for you, please suggest a time(s) when you will be available and I will work around your schedule.

Thank you for your time.

Best regards,

Anthony J. Rotondi

Begin forwarded message:

> **From:** "Anthony J. Rotondi" <AJR@AJROTONDI.COM>
> **Date:** October 7, 2015 at 10:54:05 PM EDT
> **To:** "'Charlene Indelicato'" <Charlene.Indelicato@rioc.ny.gov>
> **Cc:** "'Susan Rosenthal'" <Susan.Rosenthal@rioc.ny.gov>, "'Lada Stasko'" <Lada.Stasko@rioc.ny.gov>, "'Arthur Eliav'" <Arthur.Eliav@rioc.ny.gov>
> **Subject: FW: FOIL request acknowledged**
>
> Ms. Indelicato,
> I write in regard to RIOC's email of September 11, 1015 (below) responding to Mr. Lewis' September 3, 2015 Freedom of Information Law request. RIOC's statement therein that it "will notify you of our progress on or before December 9, 2015" is patently unreasonable and as such pursuant to N.Y. Public Officers Law Section 89(4)(a) constitutes a constructive denial of our FOIL request. Accordingly, this correspondence shall serve as a formal appeal of RIOC's denial.
> Setting aside that RIOC's December 9, 2015 date is patently unreasonable either as a "notify you of our progress" date or a production date, RIOC repeatedly has made "notify you of our progress" representations and without exception has failed to satisfy

those representations.  Indeed, more than four months have passed since the first FOIL request and RIOC has yet to provide a single progress update.  Rather, RIOC seems content to repeat the same empty mantra that it "will notify you of our progress."  It is obvious that RIOC's conduct is simply an attempt to delay wrongfully production of the requested information.  RIOC's conduct both violates FOIL and is in direct contravention of the NYS Executive Chamber's stated intent to "revers[e] the long held resistance to transparency that FOIL provides" as noted in a March 16, 2015 Executive Chamber communication entitled "Uniform State Email Retention and FOIL Policy."  (See http://goo.gl/YfrVyq)

Because RIOC has failed "to provide access to the record sought," it is obliged to "fully explain in writing . . . the reasons for further denial."  Considering that many of the documents literally are at your fingertips (a few mouse clicks or keystrokes away) we do not see how RIOC can put forth any such explanation in good faith, which likely explains why RIOC has failed to attempt to do so during the more than four months that have transpired since our first FOIL request.

/AJR

---

**From:** Stasko, Lada (RIOC) [mailto:Lada.Stasko@rioc.ny.gov]
**Sent:** Friday, September 11, 2015 3:01 PM
**To:** AJR@AJROTONDI.COM
**Cc:** Rosenthal, Susan (RIOC) <Susan.Rosenthal@rioc.ny.gov>; Eliav, Arthur (RIOC) <arthur.eliav@rioc.ny.gov>
**Subject:** FOIL request acknowledged

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before December 9, 2015.

Sincerely,


**Lada V. Stasko**
**Assistant General Counsel**
**Roosevelt Island Operating Corporation**
591 Main Street
New York, NY 10044
Tel. 212-832-4540 ext. 326
Fax 212-832-4582

> **From:** "Anthony J. Rotondi" <AJR@AJROTONDI.COM>
> **Date:** September 3, 2015 at 1:33:12 PM EDT
> **To:** 'Arthur Eliav' <Arthur.Eliav@rioc.ny.gov>
> **Cc:** 'Susan Rosenthal' <Susan.Rosenthal@rioc.ny.gov>, 'Charlene Indelicato' <Charlene.Indelicato@rioc.ny.gov>
> **Subject:** FOIL REQUEST

All:

Please see attached correspondence.

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
(212) 709-8340
www.ajrotondi.com

September 3, 2015

<u>VIA ELECTRONIC MAIL</u>
Arthur Eliav
    Associate General Counsel
Roosevelt Island Operating Corporation
591 Main Street
Roosevelt Island, NY 10044

Re:   <u>FOIL Request</u>

Dear Mr. Eliav:

      As you know, I represent Mr. Donald Lewis. I write pursuant to the Freedom of Information Law to request the production of the materials itemized on the attached list. I understand that the materials requested in item numbers one through four below are readily retrievable and request such items be produced without delay as required under law. For the few items that may not be readily retrievable, we request that such materials be produced on a rolling basis. We additionally request the production of all materials in electronic form.

      Please be advised that any documents (as defined below) possessed by the RIOC Board of Directors, which may be responsive to this FOIL request, as well as our May 21 FOIL Request and June 8 FOIL Request, are considered RIOC documents and must be produced. Likewise, with respect to our May Request, June Request and this FOIL request, **the term "present" means up to the date that RIOC produces the information**. It appears as if certain of the materials produced by RIOC on August 21, 2015 may not have been up to date.

      This information will be made available to a reporter or to interested members of the public. Disclosure of the requested information is in the public interest because it is likely to contribute significantly to the public understanding of operation or activities of the government, including RIOC, and is not being sought for commercial purposes. As such, I request a waiver of all fees in the unlikely event that any fees attach to RIOC's response.

      As you know, FOIL requires a response within five business days. If access to the requested documents will exceed five business days, please contact me with the expected production date.

      Further, should RIOC deny any or all of this request, please cite each specific exemption RIOC relies upon for its refusal to release the information.

Very truly yours,

Anthony Rotondi

Encl.
cc: Charlene M. Indelicato, CEO & President
Susan Rosenthal, General Counsel & Vice President

We hereby request the following documents or information[1] in whatever form retained for the time-period of January 1, 2010 through present:

1) Agreements concerning the Rivercross residential housing complex located on Main Street on Roosevelt Island;

2) Offering Plans concerning the Rivercross residential housing complex located on Main Street on Roosevelt Island;

3) Insurance policies for RIOC, including but not limited to, Directors and Officers liability insurance, excess liability insurance, and umbrella liability insurance;

4) Document retention, preservation and/or destruction policies for RIOC; and

5) Correspondence, emails, notes, voice mails, etc. related to the materials requested in items numbered one through four above.

---

[1] The terms "document" and "information" are to be construed as broadly as possible under applicable law.

**EXHIBIT G**

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

August 26, 2015

**VIA ELECTRONIC MAIL**

Executive Director Robert J. Freeman
NYS Committee on Open Government
  Department of State
One Commerce Plaza
99 Washington Avenue, Suite 650
Albany, NY 12231

Re: Request for an Advisory Opinion
    Roosevelt Island Operating Corporation Failure to Comply With FOIL

Dear Director Freeman:

I am the attorney for Mr. Donald Lewis on whose behalf I submitted a letter dated August 19, 2015 ("August 19 Letter" ) concerning Freedom of Information Law ("FOIL") May 21, 2015 and June 8, 2015 requests (individually the "May Requests" and "June Requests," together, the "Requests") to the Roosevelt Island Operating Corporation ("RIOC"). In our August 19 Letter we stated that "[i]n the interests of not consuming the resources of your office, we are not requesting an Advisory Opinion at this time." RIOC's actions subsequent to March 19 compel us now to seek an advisory opinion from the New York State Committee on Open Government ("NYS COOG") concerning RIOC's refusal to comply with its FOIL obligations.

**I.      RIOC'S ACTIONS SUBSEQUENT TO THE AUGUST 19 LETTER**

Our belief that an Advisory Opinion is now necessary is reinforced by an August 21, 2015 "production" by RIOC and the August 24, 2015 letter from RIOC to the NY COOG ("RIOC August 24 Letter").

### a. RIOC's August 21, 2015 Perfunctory "Production"

On August 21, 2015 – just two days after receiving our August 19 Letter to your office – RIOC sent us what was most likely a reactionary perfunctory "production" ("August 21 Production") that was entirely inadequate and completely at odds with FOIL. RIOC's August 21 Production – that took RIOC *more than 90 days* to produce – ignored the vast majority of our requests and consisted of *only two types of documents*: (i) electronic copies of RIOC's organizational charts; and (ii) electronic copies of final budgets (without any of the related materials we requested). Additionally, notwithstanding RIOC's prior refusal to commit to a production date based on its position that it will instead *"advise you of our progress"* in *three months*, RIOC's August 21 Production incredulously does not even "advise [us] of [its] progress" – completely ignoring its prior promise of a long-anticipated reveal regarding progress. Instead, RIOC now claims that this ever-elusive "progress" information will be forthcoming in

*another two months – over five months* after receiving our Requests. RIOC's "production" is simply another transparent delay tactic further illustrating RIOC's failure to comply with FOIL.

### b. *RIOC's August 24, 2015 Letter to the NYS COOG*

RIOC's August 24, 2015 letter to the NYS COOG ("RIOC August 24 Letter") is misleading for the following reasons:

*First*, the statement therein that "[w]orking together, we were able to limit some of these requests" is inaccurate. Rather, as addressed more fully in the timeline below, we offered to narrow certain requests by 70% in exchange for RIOC agreeing to provide a reasonable production date. RIOC never responded to that offer and never provided a reasonable production date. Yet, RIOC disingenuously seems to proceed as if some agreement had been reached – which it had not. More egregiously, RIOC misrepresents to the NYS COOG that we reached an agreement.

*Second*, the August 24 letter states, "some records have been delivered to Mr. Rotondi and we will continue to do so on a rolling basis." As previously noted, these records (RIOC's sole production in the three months since the Requests) were produced apparently in response to our August 19 letter to the NYS COOG detailing RIOC's dilatory conduct. The "production" consisted of just two types of documents: (i) electronically available organizational charts; and (ii) electronically available final budgets (with none of the related documents we requested). RIOC could have provided these items with little or no effort more than three months ago but instead chose to produce them one "business day" before it responded to the NY COOG concerning our complaints about its conduct. It is not beyond conjecture that RIOC produced these items simply so that it could represent to the NYS COOG that it was cooperating and producing documents, when the opposite is true.

*Third*, while RIOC now states that department heads were contacted to gather records, it does not state when those department heads were contacted. Given RIOC's conduct to date, we question whether these department heads were contacted in a timely manner and whether or not they have taken any meaningful steps with respect to our Requests. Significantly, we note again then when we spoke to Ms. Rosenthal on June 19 – almost *one month after* our initial Requests – she indicated that she had not yet communicated with the RIOC's IT Director concerning our requests.

*Fourth*, we are hard pressed to believe that RIOC is "working diligently on this" (as represented in its letter) when so many responsive materials are a mouse click away, yet RIOC has failed to produce a single piece of paper in over 90 days and only did so after receiving our August 19 Letter to the NY COOG.

## II. QUESTIONS SUBMITTED FOR ADVISORY OPINION

We respectfully submit the following questions and proposed answers regarding whether or not RIOC's conduct violates FOIL and request the NY COOG provide an advisory opinion

regarding the same.

**QUESTION NO. 1**: Does RIOC's continued refusal to commit to a production "date certain" for more than 90 days constitute a violation of FOIL?

*ANSWER*: *Yes.*

**QUESTION NO. 2**: Does RIOC's continued refusal to provide a production "date certain" for more than 90 days claiming instead that it will provide "updates on progress" months later and failure to even provide such updates constitute a violation of FOIL?

*ANSWER: Yes.*

**QUESTION NO. 3**: Does RIOC's unreasonable delay in production and failure to produce "readily retrievable" information for more than 90 days constitute a violation of FOIL?

*ANSWER: Yes.*

To assist with your analysis, although much of the relevant information is set forth in our August 19 Letter, we have again provided in the "Factual Background" section below the relevant timeline and supporting materials.

## III.   FACTUAL BACKGROUND[1]

- **Tab 1**: May 21, 2015 FOIL requests to RIOC. We believe that many of the items sought in the May Requests, as well as our June Requests discussed below, are available literally with a mouse click. The following are examples of the types of documents that should be "readily retrievable": (i) RIOC Employee Handbooks; (ii) Board Manuals for RIOC Board of Directors; (iii) The "Ten Step Process for External Complaints;" (iv) Duties and Responsibilities for the RIOC President and CEO, Chief Financial Officer and Board of Directors; and (v) All severance and settlement agreements with RIOC employees.[2]

  These items constitute a subset of the materials that we believe are "readily retrievable" and that there is "no basis for a lengthy delay in disclosure." (*See* COOG Advisory Opinion – FOIL-AO-14137, July 14, 2003) To be clear, we see no reason why virtually all of the requested materials have not been produced already; however, we cite these examples because their lack of production for months is particularly egregious.

- **Tab 2**: May 29, 2015 email response from RIOC to the May Request. RIOC waits until the last day to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC takes the vague position that it is "performing a diligent

---

[1]  Each of the items set forth in this "timeline" are attached herewith as exhibit "Tabs."

[2]  Additional items that should be readily retrievable include, but are not limited to: (i) Salary and payroll information; (ii) Complaints filed by any RIOC employee, including EEOC complaints and internal complaints filed by RIOC employees; (iii) Good Shepherd Streetscaping Project final contract and financial analysis of the project; (iv) The "Ten Step Process for Internal Complaints"; (iv) EZ Pass Records for all RIOC vehicles from January 2013 through present; and (vi) RIOC's policies, practices and procedures.

search for the record you requested, and will *notify you of our progress* on or before August 21, 2015" – *three months* after the May Request.

- **Tab 3**: June 1, 2015 response to RIOC's May 29 correspondence in which we (i) object to RIOC's "*notify you of our progress*" date; (ii) appeal RIOC's denial and (iii) request that RIOC provide us with the identity of its appeals officer.

- **Tab 4**: June 5, 2015 email again requesting that RIOC provide us with the identity of the appeals officer, which it had yet to do.

- **Tab 5**: June 5, 2015 response to our request to identify RIOC's Appeals Officer in which RIOC continues its refusal to identify its appeals officer simply states, "RIOC will respond to your inquiry within 10 business days."

- **Tab 6**: June 8, 2015 email (i) objecting to RIOC's continued concealment of and refusal to provide the identity of RIOC's appeals officer; (ii) requesting for a third time that RIOC inform us of the identity of its Appeal Officer; and (iii) submitting a formal FOIL request for "[t]he identity of the RIOC appeal officer."

- **Tab 7**: June 8 FOIL Requests seeking additional information from RIOC. As with the May Requests, many of those items literally are a mouse click away and were requested on a rolling basis.

- **Tab 8**: June 15, 2015 email from RIOC in response to the June Requests. As with its response to the May Requests, RIOC waits until the last day to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC again takes the vague position that it is "performing a diligent search for the record you requested, and will *notify you of our progress* on or before September 9, 2015."

- **Tab 9**: June 15, 2015 Appeal Denial from RIOC CEO and President Charlene M. Indelicato, copied to the NYS Committee on Open Government ("RIOC Appeal Denial"). (The misleading nature of this denial was discussed in our August 18 Letter and again below.)

    Exemplary of the misleading nature of the RIOC Appeal Denial is Ms. Indelicato's citation in paragraph two of *In re Data Tree, LLC v Romaine*, for the proposition that "'there is no specific time period in which the agency must *grant access to the records*'" and that "RIOC is required *to provide records* 'in a time ... which is reasonable in view of the attendant circumstances.'" (Emphasis added) Ms. Indelicato then states, "Given the volume of your request as well as limited staff time, 60 business days is not unreasonable."

    *First*, to set a date three months out from the request – *i.e.* 90 days from the Requests – and then attempt to ameliorate the appearance of the three months by characterizing it as "60 business days" is inconsistent with common business practice, inaccurate and disingenuous.

    *Second*, and most significantly, the entire discussion regarding "*granting access to the records*" in paragraph two of the Appeal Denial is inapposite to RIOC's concept of "*advise you of our progress*." Whether characterized as "60 business days" or, more accurately, as "90 days," RIOC has made no commitment whatsoever to provide

access to the documents. Rather, RIOC has simply committed to "advise you of our progress."

*Third*, during a telephone conversation on June 19, 2015 – over one month after the Requests had been issued – RIOC's General Counsel, who is leading the response to our FOIL Request, informed Mr. Lewis and myself that she had yet to discuss the same with RIOC's information technology team. Not a confidence inspiring circumstance for the "advise you of our progress" report.

*Fourth*, after the Appeal Denial, in an effort to reach resolution, ***we offered to narrow certain requests to exclude 70% of the employees*** contingent upon RIOC providing a reasonable production date, however, RIOC never bothered to respond to our offer or to provide a production date, let alone a reasonable one.

- **Tab 10**: June 17, 2015 e-mail from RIOC's General Counsel suggesting a call "to help narrow or clarify the requests."

A call regarding the Requests took place on June 19, 2015 (the "June 19 Call") between RIOC's General Counsel, Mr. Lewis and myself. During that call, among other things, RIOC's counsel indicated that RIOC's technology team had not yet even been consulted regarding retrieval of the requested information.

- **Tab 11**: June 19, 2015 email from RIOC's counsel confirming the answers to certain issues raised during the June 19 Call and RIOC's inquiry regarding whether we would agree to narrow our Requests (in a manner that would ***reduce most of the information sought by approximately 70%***).

- **Tab 12**: June 29, 2015 e-mail to RIOC's counsel accepting RIOC's proposal to limit the Requests in the manner to reduce much of the responsive information by 70% contingent on RIOC agreeing to produce documents by a date certain. In that communication, we stated:

     [I]n order to proceed in this manner, we require agreement on a reasonable date certain by which RIOC will produce documents in response to our FOIL request letters dated May 21 and June 8, 2015. It has been approximately six weeks since we submitted our first FOIL request letter and RIOC has yet to produce a single document. Considering ***we have narrowed the above requests to exclude 70% of the employees***, RIOC should be able to provide us with a reasonable production date.

RIOC ignored and never responded to our June 29, 2015 offer to narrow the Requests in exchange for a reasonable production date

- **Tab 13**: August 18 Letter to the COOG detailing RIOC's dilatory conduct and refusal to comply with FOIL. (Attachments not included.)

- **Tab 14**: August 21, 2015 e-mail production from RIOC containing electronic copies of organizational charts and final budgets (without the related requested information.) (Attachments not included.)

- **Tab 15**: August 24, 2015 misleading RIOC letter in response to our August 18 Letter to COOG. (Discussed *supra* at pages 1-2)

- **Tab 16**: August 26, 2015 response to RIOC's August 21, 2015 "production" in which we express our disbelief with the paucity of the materials provided.

To date, RIOC still has refused to commit to a "date certain" for production. RIOC's dilatory conduct is further illustrated by its refusal to respond to our repeated requests simply to identify RIOC's Appeal Officer. Instead, after ignoring multiple inquiries, RIOC waited until the last day to respond to our appeal, revealing Ms. Indelicato's role as the Appeals Officer for the first time in that response. RIOC's dilatory conduct is further evidenced by RIOC not bothering to respond to our offer to narrow the Requests. RIOC also never bothered to respond to our offer to narrow the Requests contingent upon RIOC providing a reasonable production date – thereby rejecting our offer – and then inaccurately represented to the COOG that an agreement had been reached.

## IV.   RIOC'S VIOLATION OF FOIL

Based on the information we have provided, we believe that RIOC has failed to comply with FOIL. Specifically, RIOC has:

(i)     refused to provide a "date certain" for production;
(ii)    represented it would provide "progress updates", which RIOC has not done, instead of providing a "date certain" for production; and
(iii)   failed to produce "readily retrievable" information for over 90 days.

RIOC's conduct is in violation of the FOIL and stands in stark contrast to the spirit of transparency, which is the backbone of the law. The Committee on Open Government has instructively opined on its website (https://www.dos.ny.gov/coog/explanation.html) as follows in interpreting Section 89(3) of the Freedom of Information Law:

> **The amendments clearly are intended to prohibit agencies from unnecessarily delaying disclosure.** They are not intended to permit agencies to wait until the fifth business day following the receipt of a request and then twenty additional business days to determine rights of access, unless it is reasonable to do so based upon "the circumstances of the request." From our perspective, every law must be implemented in a manner that gives reasonable effect to its intent, and we point out that in its statement of legislative intent, §84 of the Freedom of Information Law states that "it is incumbent upon the state and its localities to extend public accountability *wherever and whenever feasible.*" **Therefore, when records are clearly available to the public under the Freedom of Information Law, or if they are readily retrievable, there may be no basis for a delay in disclosure.** As the Court of Appeals, the state's highest court, has asserted: "...the successful implementation of the policies motivating the enactment of the Freedom of Information Law centers on goals as broad as the achievement of a more informed electorate and a more responsible and responsive officialdom. By their very nature, such objectives cannot hope to be attained unless the measures taken to bring them about permeate the body politic to a point where they become the rule rather than the exception. The phrase 'public accountability wherever and whenever feasible' therefore merely punctuates with explicitness what in any event is implicit. (*Westchester News v. Kimball*, 50 NY2d 575, 579, 430 NYS2d 574 (1980)). (Italics emphasis in original; bold emphasis added.)

A similar analysis is set forth in a NYS COOG Advisory Opinion – FOIL-AO-14137, July 14, 2003, which relevantly states: "From my perspective, if records are clearly available to the public under the Freedom of Information Law and **if they are readily retrievable, there may be no basis for a lengthy delay in disclosure.**" (Emphasis added.) This advisory opinion continues quoting the same language from the "state's highest court, the Court of Appeals" in *Westchester News v. Kimball* in the block quote directly above.

Another recent Advisory by Opinion by the NYS COOG – FOIL-AO-19241, January 29, 2015 – illustrates that RIOC's "progress update" delays fail to comply with the FOIL and RIOC instead must provide a "date certain" for production, stating:

> First and perhaps most importantly, FOIL gives an agency two extensions when responding to requests….[I]f it is known from the start that more than 20 additional business days will be needed, or if toward the expiration of the 20 business day period indicated in the acknowledgement, it is determined that more time will be needed, **the agency must inform the applicant of the reason for the delay beyond 20 business days in writing and provide a "date certain" a self-imposed deadline, indicating a promised date by which access will be granted in whole or in part.** Again, that date must be reasonable based on attendant facts and circumstances. (Emphasis added.)

We believe that in light of this NYS COOG guidance, as well as the supporting New York State Court of Appeals law, RIOC's unreasonable, arbitrary and capricious actions are clearly in violation of both the letter and spirit of FOIL. We respectfully request that the NYS COOG issue an opinion advising RIOC that their conduct is in violation of FOIL (consistent with the "questions" and "answers" set forth *supra* at pages 2-3). We further respectfully request that the NYS COOG advise RIOC to remedy these violations in an appropriate manner.

We appreciate your office taking the time to review this matter. Should you have any questions or would like to discuss this matter, please feel free to contact me at (212) 709-8340 or via email at ajr@ajrotondi.com.

Very truly yours,

Anthony Rotondi

Enclosures
cc:     Charlene M. Indelicato, CEO & President (via email)
        Susan Rosenthal, General Counsel & Vice President (via email)

TAB 1

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

May 21, 2015

Arthur Eliav,
    Associate General Counsel
Roosevelt Island Operating Corporation
591 Main Street
Roosevelt Island, NY 10044

        Re: FOIL Request

Dear Mr. Eliav:

        I represent Donald Lewis and write pursuant to the Freedom of Information Law to request the production of the materials set forth in the enclosed "Requests."

        I understand that many of the requested items literally are available with the simple click of a mouse. We trust that such materials will be produced immediately. For the few items that may not be readily available, we request such materials be produced on a rolling basis. We additionally request the production of all materials in electronic form.

        Although I am not a reporter, this information will be made available to a reporter or to interested members of the public. Disclosure of the requested information is in the public interest because it is likely to contribute significantly to the public understanding of operation or activities of the government, including RIOC, and is not being sought for commercial purposes. As such, I request a waiver of all fees in the unlikely event that any fees attach to RIOC's response.

        As you know, the New York Freedom of Information Law requires a response time of five business days. If access to the requested documents will exceed five business days, please contact me with the expected production date.

        Further, should RIOC deny any or all of this request, please cite each specific exemption RIOC relies upon for its refusal to release the information and notify me of the appeal procedures available to me under the law.

        We anticipate your full cooperation.

Very truly yours,

Anthony Rotondi

Enclosure
AJR/fb

We hereby request all documents or information in whatever form retained, including correspondence, emails, notes, voice mails, etc. related in *any way* to the issues and/or categories of materials set forth below.[1]

1) RIOC's policies, practices, and procedures and documents reflecting the implementation, failure to implement, adherence to, or failure to adhere to such policies, practices and procedures;

2) Hiring, promotions, resignations, terminations, salary increases, and salary adjustments, including without limitation communications with any RIOC Director or the Executive Chamber concerning this matter;

3) Changes to office door locks;

4) Employee use of RIOC vehicles both while on-duty and off-duty, including documents (such as log books) reflecting actual use of the vehicle, mileage, damage, use during weekends, use during vacation time and taxable benefits;

5) Misconduct and discipline of employees, including but not limited to, Mr. Santo Verta;

6) Personnel files of current and former RIOC employees, including but not limited to, hirings, terminations, performance evaluations and disciplinary actions;

7) Organizational charts;

8) Salary and payroll information regarding all employees, including salary increases or salary adjustments for any employees and any purported explanation, justification or support for such increases; including but not limited to the actual salary of every RIOC employee as of April 15, 2015;

9) Allegations of discrimination, harassment or hostile work environment against RIOC or its employees;

10) Complaints filed by any RIOC employee, including EEOC complaints and internal complaints filed by RIOC employees;

11) RIOC Employee handbooks;

12) RIOC budgets for fiscal years January 1, 2008 to present, including but not limited to budget packages provided to the RIOC Board of Directors for approval;

13) Anthony Jones matter including without limitation communications with any RIOC Director or the Executive Chamber concerning this matter;

---

[1] The terms "document" and "information" are to be construed as broadly as possible under applicable law and unless otherwise specified, the time-period for this request is January 1, 2008 through present.

14) Public purpose funds including without limitation communications with the any RIOC Director or the Executive Chamber concerning this matter;

15) Requests and/or analysis of need for additional staffing by any RIOC department, including requests for a paralegal, administrative assistant, fellow and/or a seasonal employee;

16) Communications from April 1, 2013 through present with any individuals affiliated with the following Island projects: Cornell Tech, Manhattan Park, Rivercross, Westview, Roosevelt Landings, Island House, Four Freedoms State Park and the Aerial Tramway, including communications with any RIOC Director concerning these projects; and

17) Good Shepherd Plaza Streetscaping Project, including but not limited to, the final contract and the financial analysis of the project.

18) The destruction of RIOC documents from January 1, 2015 through present.

20) The "Ten Step Process,, for Internal Complaints;

21) The "Ten Step Process,, for External Complaints; and

22) Allegations of retaliation against RIOC or any RIOC executive.

TAB 2

## Anthony J. Rotondi

**From:** Arthur Eliav <Arthur.Eliav@rioc.ny.gov>
**Sent:** Friday, May 29, 2015 4:28 PM
**To:** Anthony J. Rotondi
**Cc:** Lada Stasko
**Subject:** Re: FOIL REQUEST

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before August 21, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 5/21/2015 1:35 PM >>>
Mr. Eliav,

Please disregard prior email and see attached correspondence and request pursuant to FOIL.

/AJR

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
212-709-8340
www.ajrotondi.com

1

TAB 3

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Monday, June 01, 2015 1:29 PM |
| **To:** | 'Arthur Eliav' |
| **Cc:** | 'Lada Stasko' |
| **Subject:** | RE: FOIL REQUEST |
| **Attachments:** | RIOC FOIL REQ.PDF |

Mr. Eliav,

Thank you for your email of May 29 below responding to our May 21 Freedom of Information Law request. RIOC's statement that it "will notify you of our progress on or before August 21, 2015" is patently unreasonable and as such pursuant to N.Y. Public Officers Law Section 89(4)(a) constitutes a constructive denial of our FOIL request. Accordingly, this correspondence shall serve as a formal appeal of RIOC's denial. Please forward this correspondence with the attached initial request to the appropriate head, chief executive or governing body of RIOC, or the person designated by such head, chief executive, or governing body (the "Appeal Officer"). Additionally, please provide me with contact information for that individual. I look forward to the Appeal Officer fulfilling his/her obligation to "fully explain in writing to the person requesting the record the reasons for further denial, or provide access to the record sought."

Please be advised that we will not countenance any further attempts by RIOC to delay wrongfully production of the requested information. Should we not receive a satisfactory response from the Appeal Officer, we will seek to compel production of the requested information via Article 78 and an Order to Show Cause. In any such proceeding, RIOC will be unable to justify the reasonableness of its August 21, 2015 "notify you of our progress" date. That date would be patently unreasonable as a production date, let alone a date simply to inform us of RIOC's " progress."

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

**From:** Arthur Eliav [mailto:Arthur.Eliav@rioc.ny.gov]
**Sent:** Friday, May 29, 2015 4:28 PM

1

**To:** Anthony J. Rotondi
**Cc:** Lada Stasko
**Subject:** Re: FOIL REQUEST

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before August 21, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 5/21/2015 1:35 PM >>>
Mr. Eliav,

Please disregard prior email and see attached correspondence and request pursuant to FOIL.

/AJR

ANTHONY J. ROTONDI
5 Columbus Circle, Suite 800
New York, NY 10019
212-709-8340
www.ajrotondi.com

2

TAB 4

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Friday, June 05, 2015 10:47 AM |
| **To:** | 'Arthur Eliav' |
| **Cc:** | 'Lada Stasko' |
| **Subject:** | RE: FOIL REQUEST |

Mr. Eliav,

      In my below email of June 1, I requested that you forward my June 1 correspondence with the attached initial request to the "Appeal Officer" and provide me with contact information for that individual. I trust that you have forwarded my June 1 correspondence but I have yet to receive the Appeal Officer's contact information. Kindly immediately forward that information. As you know, the Appeal Officer's response to my appeal is due within ten days of my June 1, 2015 appeal. In the event that your failure to provide the Appeal Officer's identity was other than inadvertent, you should be well aware that RIOC will find no relief from the ten-day deadline by concealing the identity of the Appeal Officer.

      /AJR

## Anthony J. Rotondi
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Monday, June 01, 2015 1:29 PM
**To:** 'Arthur Eliav'
**Cc:** 'Lada Stasko'
**Subject:** RE: FOIL REQUEST

      Mr. Eliav,

      Thank you for your email of May 29 below responding to our May 21 Freedom of Information Law request. RIOC's statement that it "will notify you of our progress on or before August 21, 2015" is patently unreasonable and as such pursuant to N.Y. Public Officers Law Section 89(4)(a) constitutes a constructive denial of our FOIL request. Accordingly, this correspondence shall serve as a formal appeal of RIOC's denial. Please forward this correspondence with the attached initial request to the appropriate head, chief executive or governing body of RIOC, or the person

TAB 5

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Arthur Eliav <Arthur.Eliav@rioc.ny.gov> |
| **Sent:** | Friday, June 05, 2015 11:22 AM |
| **To:** | Anthony J. Rotondi |
| **Cc:** | Lada Stasko; Susan Rosenthal |
| **Subject:** | RE: FOIL REQUEST |

Mr. Rotondi:

RIOC will respond to your inquiry within ten business days.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/5/2015 10:46 AM >>>
Mr. Eliav,

In my below email of June 1, I requested that you forward my June 1 correspondence with the attached initial request to the "Appeal Officer" and provide me with contact information for that individual. I trust that you have forwarded my June 1 correspondence but I have yet to receive the Appeal Officer's contact information. Kindly immediately forward that information. As you know, the Appeal Officer's response to my appeal is due within ten days of my June 1, 2015 appeal. In the event that your failure to provide the Appeal Officer's identity was other than inadvertent, you should be well aware that RIOC will find no relief from the ten-day deadline by concealing the identity of the Appeal Officer.

/AJR


**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

1

TAB 6

## Anthony J. Rotondi

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Monday, June 08, 2015 10:55 AM |
| **To:** | 'Arthur Eliav' |
| **Cc:** | 'Lada Stasko'; 'Susan Rosenthal' |
| **Subject:** | RE: FOIL REQUEST |

Mr. Ellav:

Thank you for your response below. In the event that certain of the language therein was other than unintentional, I must point out that although your email refers to my prior communication as an "inquiry," my communication of June 1 was an "appeal", and not a mere "inquiry." Second, RIOC's response to the appeal is due 10 business from June 1, and not from the date of your June 5 email or any later date.

More troubling, however, is RIOC's unwillingness or inability to identify and provide contact information for its FOIL Appeal Officer notwithstanding two separate requests for that information. It seems apparent, from RIOC's conduct in the aggregate – including from its August 21, 2015 "notify you of our progress" date and its continued concealment of the identity of the FOIL Appeal Officer – that RIOC is engaging in gamesmanship to delay and/or avoid complying with its obligations under FOIL. Accordingly, please consider this communication a request pursuant to FOIL for the following information:

The identity of the RIOC Appeal Officer.

Should RIOC fail to provide that information within the requisite time, please immediately forward an Appeal to the mysterious and veiled RIOC Appeal Officer.

/AJR

# Anthony J. Rotondi
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

**From:** Arthur Eliav [mailto:Arthur.Eliav@rioc.ny.gov]
**Sent:** Friday, June 05, 2015 11:22 AM
**To:** Anthony J. Rotondi
**Cc:** Lada Stasko; Susan Rosenthal
**Subject:** RE: FOIL REQUEST

Mr. Rotondi:

RIOC will respond to your inquiry within ten business days.

Best,

1

TAB 7

**ANTHONY J. ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
(212) 709-8340
www.ajrotondi.com

June 8, 2015

VIA ELECTRONIC MAIL

Arthur Eliav
  Associate General Counsel
Roosevelt Island Operating Corporation
591 Main Street
Roosevelt Island, NY 10044

   Re: FOIL Request

Dear Mr. Eliav:

   As you know, I represent Donald Lewis. I write pursuant to the Freedom of Information Law to request the production of the materials itemized on the attached list. As with my FOIL request of May 21, 2015 ("May Request"), I understand that many of the requested items are available with a mouse click. We expect that such materials will be produced immediately. For the few items that may not be readily available, we request that such materials be produced on a rolling basis. We additionally request the production of all materials in electronic form.

   Please be advised that any documents (as defined below) possessed by the RIOC Board of Directors, which may be responsive to this FOIL request, as well as our May Request, are considered RIOC documents and must be produced. Likewise, in both the May Request and this FOIL request, the term "present" means up to the date that RIOC produces the information.

   Although I am not a reporter, this information will be made available to a reporter or to interested members of the public. Disclosure of the requested information is in the public interest because it is likely to contribute significantly to the public understanding of operation or activities of the government, including RIOC, and is not being sought for commercial purposes. As such, I request a waiver of all fees in the unlikely event that any fees attach to RIOC's response.

   As you know, FOIL requires a response within five business days. If access to the requested documents will exceed five business days, please contact me with the expected production date.

   Further, should RIOC deny any or all of this request, please cite each specific exemption RIOC relies upon for its refusal to release the information and notify me of the appeal procedures available to me under the law, including the elusive identity of RIOC's Appeal Officer.

        Very truly yours,

        Anthony Rotondi

Enclosure
AJR/ea

We hereby request all documents or information in whatever form retained, including correspondence, emails, notes, voice mails, etc. related in *any way* to the issues and/or categories of materials set forth below.[1]

1) Training of the RIOC Board of Directors, including without limitation, any Board Manuals;

2) EZ Pass records for all RIOC vehicles from January 2013 through present;

3) Time sheets and disciplinary records for all RIOC executives and administrative staff (including the engineering department) from January 2013 through present, insofar as such time sheets are not contained in previously requested personnel files;

4) Monitoring by RIOC executives or senior staff of arrival at, or departure from, work of any RIOC administrative staff employee (including the engineering department);

5) Terminations, administrative leaves or suspensions of RIOC employees from January 2013 through present including, but limited to, communications with any RIOC Director concerning the terminations;

6) Duties and responsibilities of the RIOC President and CEO, Chief Financial Officer and Board of Directors;

7) All severance and/or settlement agreements with RIOC employees;

8) Provision to any RIOC employee of free housing on Roosevelt Island as a condition/benefit of employment or representation to any employee or potential employee that such housing would be provided as a condition/benefit of employment; and

9) Waivers to any RIOC employee authorizing use of any RIOC vehicle when such employee is not on actual RIOC business, including transportation to or from the RIOC office.

---

[1]The terms "document,, and "information,, are to be construed as broadly as possible under applicable law and unless otherwise specified, the time-period for this request is January 1, 2008 through present.

TAB 8

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Arthur Eliav <Arthur.Eliav@rioc.ny.gov> |
| **Sent:** | Monday, June 15, 2015 5:09 PM |
| **To:** | Anthony J. Rotondi |
| **Subject:** | Re: FOIL REQ. NO. 2 |
| **Attachments:** | RIOC FOIL REQ NO 2_1.pdf |

Mr. Rotondi:

The Roosevelt Island Operating Corporation of the State of New York hereby acknowledges receipt of the attached Freedom of Information Law request.

We are performing a diligent search for the records you requested, and will notify you of our progress on or before September 9, 2015.

Best,

Arthur


Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, New York 10044
(212) 832-4540 ext. 303
>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/8/2015 11:26 AM >>>

Mr. Eliav:


Please see attached correspondence.


/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

1

TAB 9

**ROOSEVELT ISLAND OPERATING CORPORATION** of The State of New York



Andrew M. Cuomo
Governor

Charlene M. Indelicato
President/Chief Executive Officer

Frances A. Walton
Vice President/Chief Financial Officer

Susan G. Rosenthal
Vice President/General Counsel

**BOARD OF DIRECTORS**

Jamie Rubin, Chairperson
Fay Fryer Christian
Dr. Katherine Teels Grimm
David Kraut
Mary Beth Labate
Howard Polivy
Michael Shinozaki
Margaret Smith

June 15, 2015

**VIA EMAIL (air@airotondi.com)**
Anthony J. Rotondi, Esq.
5 Columbus Circle, Suite 800
New York, NY 10019

Re:   Freedom of Information Law (FOIL) request dated May 21, 2015

Dear Mr. Rotondi:

The Roosevelt Island Operating Corporation (RIOC) is in receipt of your email dated June 1, 2015, appealing the FOIL Officer's response and acknowledgment dated May 29, 2015 to your FOIL request received May 22, 2015. I have reviewed your request and respectfully find that the FOIL Officer's acknowledgement was not a "constructive denial". On the contrary, the FOIL Officer advised you that RIOC is performing a diligent search and that you will be advised of our progress on or before August 21, 2015.

In Matter of *Data Tree, LLC v. Romaine*, the New York State Court of Appeals noted that "there is no specific time period in which the agency must grant access to the records. Indeed, the time needed to comply with the request may be dependent on a number of factors, including the volume of the request and the retrieval methods." *9 N.Y.3d 454, 465 (2007)*  RIOC is required to provide records "in a time ... which is reasonable in view of the attendant circumstances." *Ibid.* Given the volume of your request as well as limited staff time, 60 business days is not unreasonable.

Your request contains 22 categories of documents from as far back as January 2008 through the present. Many of the requests consist of numerous subcategories. Some of the requests are extremely broad. For example, one item requests "personnel files of current and former RIOC employees, including but not limited to, hiring, terminations, performance evaluations and disciplinary actions." This would require RIOC staff to locate and review such files at RIOC offices and archive facilities, and as appropriate redact information protected by the exemptions set out in Section 87 of FOIL, such as unwarranted invasion of personal privacy

(Section 87(2)(b)) and intra-agency material (Section 87(2)(g)). Same holds true for many other items you have requested.

In light of the scope of your request and RIOC's ongoing diligent search and review process, your appeal is respectfully denied.

Thank you for your attention.

Very truly yours,

Charlene M. Indelicato
President/Chief Executive Officer

cc: NYS Committee on Open Government

**TAB 10**

## Anthony J. Rotondi

**From:** Susan Rosenthal <Susan.Rosenthal@rioc.ny.gov>
**Sent:** Wednesday, June 17, 2015 9:26 AM
**To:** Anthony J. Rotondi; Arthur Eliav
**Subject:** RE: FOIL REQUEST


Mr. Rotondi, I am the General Counsel of RIOC and have reviewed the FOIL requests heretofore forwarded to us. The purpose of this e-mail is to suggest a conversation between us to help narrow or clarify the requests. If you agree that such a call would be helpful, please advise when it would be convenient. Thanks. Susan Rosenthal

TAB 11

| From: | Susan Rosenthal <Susan.Rosenthal@rioc.ny.gov> |
| Sent: | Friday, June 19, 2015 4:16 PM |
| To: | Anthony J. Rotondi |
| Subject: | RE: Conference Information |

I have confirmed that there are 3 unions for 1) Public Safety Officers 2) grounds workers and porters; and 3) Teamsters---bus drivers, mechanics, handy-people. These union employees plus seasonals and temps account for approximately 70% of all staff. Please advise if you agree to narrow requests 2, 6, 8 by excluding any of these categories. Thanks

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 3:05 PM >>>
It's 48465. Don just used it.  If you give me your direct number I can just conference you in.

# Anthony J. Rotondi
## 5 Columbus Circle, Suite 800
## New York, NY 10019
## Tel: 212-709-8340
## www.ajrotondi.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

From: Susan Rosenthal [mailto:Susan.Rosenthal@rioc.ny.gov]
Sent: Friday, June 19, 2015 3:01 PM
To: Anthony J. Rotondi
Subject: Re: Conference Information

THE PIN IS INCORRECT

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 11:20 AM >>>
For our 3 p.m. call, please call 585-632-5945 and use PIN: 48465.  Thanks.

TAB 12

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Monday, June 29, 2015 10:09 AM |
| **To:** | 'Susan Rosenthal' |
| **Subject:** | RE: Conference Information |

Ms. Rosenthal,

My apologies for the delayed response, your email was misdirected while my email service was being transferred to a new system. We will agree to narrow request numbers 2, 6, and 8 by excluding from RIOC's response the following employees:

(i)     Public Safety Officers;

(ii)    Grounds workers and porters;

(iii)   Teamsters (bus drivers, mechanics, handy-people);

(iv)   Seasonal workers; and

(v)    Temporary workers.

We, however, reserve the right to renew those requests in the future. Moreover, in order to proceed in this manner, we require agreement on a reasonable date certain by which RIOC will produce documents in response to our FOIL request letters dated May 21 and June 8, 2015. It has been approximately six weeks since we submitted our first FOIL request letter and RIOC has yet to produce a single document. Considering we have narrowed the above requests to exclude 70% of the employees, RIOC should be able to provide us with a reasonable production date. Please let me know whether RIOC agrees to proceed as set forth above, and if so, a date that RIOC proposes as the production date. Thank you.

Regards,

/AJR

---

**From:** Susan Rosenthal [mailto:Susan.Rosenthal@rioc.ny.gov]
**Sent:** Friday, June 19, 2015 4:16 PM
**To:** Anthony J. Rotondi
**Subject:** RE: Conference Information

I have confirmed that there are 3 unions for 1) Public Safety Officers 2) grounds workers and porters; and 3) Teamsters---bus drivers, mechanics, handy-people. These union employees plus seasonals and temps account for approximately 70% of all staff. Please advise if you agree to narrow requests 2, 6, 8 by excluding any of these categories. Thanks

>>> "Anthony J. Rotondi" <AJR@AJROTONDI.COM> 6/19/2015 3:05 PM >>>
It's 48465. Don just used it. If you give me your direct number I can just conference you in.

**Anthony J. Rotondi**

1

TAB 13

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

August 19, 2015

**VIA ELECTRONIC MAIL**

Executive Director Robert J. Freeman
NYS Committee on Open Government
    Department of State
One Commerce Plaza
99 Washington Avenue, Suite 650
Albany, NY 12231

Re: <u>Roosevelt Island Operating Corporation FOIL Appeal Denial</u>

Dear Director Freeman:

I am the attorney for Donald Lewis on whose behalf I submitted to the Roosevelt Island Operating Corporation ("RIOC") the Freedom of Information Law ("FOIL") requests dated May 21, 2015 (the "May 21 Requests") referenced in the attached appeal denial letter from Charlene M. Indelicato dated June 15, 2015 (the "June 15 Appeal Denial") on which your office was copied. Mr. Lewis also submitted a second FOIL request dated June 8, 2015 (the "June 8 Requests" collectively, with the May 21 Requests, the "Requests"). Because it appears that prior correspondence related to the May 21 Requests was not included with the June 15 Appeal Denial, I write to provide you with those materials (as well subsequent correspondence and correspondence regarding the June 8 Requests), which illustrate the dilatory manner in which RIOC has handled the Requests.

Although RIOC's June 15 Appeal Denial standing alone may mislead the reader to conclude that RIOC's position is reasonable, the full record illustrates that position is in fact unreasonable as well as arbitrary and capricious. Strikingly, to date, RIOC has yet to produce one single piece of paper or even committed to a production date notwithstanding that: (i) many of the requested items are available with a simple mouse click; (ii) we requested the materials be produced on a rolling basis; (iii) three months have passed since the requests; and (iv) we offered to narrow certain Requests to exclude 70% of the employees, contingent on RIOC providing a reasonable production date. RIOC's response has simply been to state that it will *"advise you of our progress"* on arbitrarily selected dates that are *three months* after the FOIL Requests dates.

Exemplary of the misleading nature of the Appeal Denial is Ms. Indelicato's citation in paragraph two of *In re Data Tree, LLC v Romaine*, 9 N.Y.3d 454 (2007), for the proposition that "'there is no specific time period in which the agency must *grant access to the records*'" and that "RIOC is required *to provide records* 'in a time … which is reasonable in view of the attendant circumstances.'" (emphasis added) Ms. Indelicato then states, "Given the volume of your request as well as limited staff time, 60 business days is not unreasonable." As set forth below, RIOC's position is untenable for myriad reasons:

1

- *First*, to set a date three months out from the request – *i.e.* 90 days from the Requests – and then attempt to ameliorate the appearance of the three months by characterizing it as "60 business days" is inconsistent with common business practice, inaccurate and disingenuous.

- *Second*, and most significantly, the entire discussion regarding "*granting access to the records*" in paragraph two of the Appeal Denial is inapposite to RIOC's concept of "*advise you of our progress*." Whether characterized as "60 business days" or, more accurately, as "90 days," RIOC has made no commitment to provide access to the documents. Rather, RIOC has simply committed to "advise you of our progress."

- *Third*, during a telephone conversation on June 19, 2015 -- over one month after the requests had been issued -- RIOC's General Counsel, who is leading the response to our FOIL Request, informed Mr. Lewis and myself that she had yet even to discuss the same with RIOC's information technology team; not a confidence inspiring circumstance for the "advise you of our progress" report.

- *Fourth*, after the Appeal Denial, in an effort to reach resolution, *we offered to narrow certain requests to exclude 70% of the employees*, but RIOC still would not agree to provide any production date, let alone a reasonable production date.

Considering the apparent lack of diligence by RIOC, we are also concerned that RIOC has not taken any steps to preserve and secure responsive documents from its Board of Directors. RIOC's dilatory conduct is further illustrated by its refusal to respond to our repeated request simply to identify RIOC's Appeal Officer. Instead, after ignoring multiple inquiries, RIOC waited until the last day to respond to our appeal, revealing Ms. Indelicato's role as the Appeals Officer for the first time in that response.

We are aware that we will need to seek redress in another forum to receive a binding resolution. In the interests of not consuming the resources of your office, we are not requesting an Advisory Opinion at this time, although we may do so in the future. In the interim, we believe the NYS Committee on Open Government is entitled to the entire record to form a full understanding of the issues and not be misled by RIOC's one-sided and misleading Appeal Denial. Accordingly, below is a summary of the relevant written communications that Ms. Indelicato did not include with her Appeal Denial communication:

**Tab 1**: Mr. Lewis' May 21, 2015 FOIL requests. I understand that the majority of the requested items literally are available with a simple click of a mouse and could be made available within minutes.

**Tab 2**: RIOC'S May 29, 2015 email response to the May Request. RIOC waits until the last date for it to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC takes the vague position that it is "performing a diligent search for the record you requested, and will *notify you of our progress* on or before August 21, 2015" – *three months* after the May Request.

**Tab 3**: A. Rotondi's June 1, 2015 response to RIOC's May 29 correspondence in which we (i) object to RIOC's *"notify you of our progress"* date; (ii) appeal RIOC's denial and (iii) request that RIOC provide us with the identity of its appeals officer.

**Tab 4**: A. Rotondi June 5, 2015 email again requesting that RIOC provide us with the identity of the appeals officer, which it had yet to do.

**Tab 5**: RIOC's June 5, 2015 response to our request to identify RIOC's Appeals Officer in which RIOC continues its refusal to identify its appeals officer simply states, "RIOC will respond to your inquiry within 10 business days."

**Tab 6**: A Rotondi June 8, 2015 email (i) objecting to RIOC's continued concealment of and refusal to provide the identity of RIOC's appeals officer (ii) requesting for a third time that RIOC inform us of the identity of its Appeal Officer and (iii) submitting a formal FOIL request for "[t]he identity of the RIOC appeal officer."

**Tab 7**: Mr. Lewis' June 8, 2015 FOIL Requests seeking additional information. As with the May 21 Requests, many of those items literally are available with a simple click of a mouse and were requested on a rolling basis.

**Tab 8**: RIOC'S June 15, 2015 email response to the June 8 Requests. As with its response to the May 21 Requests, RIOC waits until the last day for it to respond, does not provide any of the information sought and does not commit to a production date. Rather RIOC again takes the vague position that it is "performing a diligent search for the record you requested, and will *notify you of our progress* on or before September 9, 2015."

**Tab 9**: RIOC's June 15, 2015 Appeal Denial, copied to the NYS Committee on Open Government.

**Tab 10**: RIOC General Counsel Susan Rosenthal's June 17, 2015 email suggesting a call "to help narrow or clarify the requests."

A call regarding the requests took place on June 19, 2015 (the "June 19 Call") between RIOC's General Counsel, Mr. Lewis and myself. During that call, among other things, RIOC's counsel indicated that RIOC's technology team had not yet even been consulted regarding retrieval of the requested information.

**Tab 11**: June 19, 2015 email from RIOC's counsel confirming the answers to issues raised during the June 19 and RIOC's inquiry regarding whether we would agree to narrow our requests (in a manner that would *reduce most of the information sought by approximately 70%*).

**Tab 12**: Correspondence to RIOC's counsel dated June 29, 2015 accepting RIOC's proposal to limit the requests in the manner to reduce much of the responsive information by 70% contingent on RIOC agreeing to produce documents by a date certain. In that communication, we stated:

[I]n order to proceed in this manner, we require agreement on a reasonable date certain by which RIOC will produce documents in response to our FOIL request letters dated May 21 and June 8, 2015. It has been approximately six weeks since we submitted our first FOIL request letter and RIOC has yet to produce a single document. Considering *we have narrowed the above requests to exclude 70% of the employees*, RIOC should be able to provide us with a reasonable production date.

(emphasis added). To date, RIOC has not bothered to respond to our request for a date certain production date nor produced one single page of information.

Should you have any questions or like to discuss this matter, please feel free to contact me at (212) 709-8340 or via email at ajr@ajrotondi.com.

Very truly yours,

Anthony Rotondi

Enclosures

cc:    Charlene Indelicato (via email)
       Susan Rosenthal (via email)

4

TAB 14

# Anthony J. Rotondi

**From:**             Eliav, Arthur (RIOC) <arthur.eliav@rioc.ny.gov>
**Sent:**              Friday, August 21, 2015 4:32 PM
**To:**                 Anthony J. Rotondi (AJR@AJROTONDI.COM)
**Cc:**                 Rosenthal, Susan (RIOC); Stasko, Lada (RIOC)
**Subject:**          May 21, 2015 FOIL request - Part I
**Attachments:**     RIOC Org Charts.zip; 12 budgets.zip

Mr. Rotondi:

In connection with your Freedom of Information Law request dated May 21, 2015, attached please find materials responsive to items:

#7 – "Organizational charts"; and

#12 – "RIOC budgets for fiscal years January 1, 2008 to present, including but not limited to budget packages provided to the RIOC Board of Directors for approval".

Due to the quantity of documents, the files have been combined into two (2) .zip files.  Please let me know if you have any difficulty opening the files, and I will work on providing them to you in another format.

Roosevelt Island Operating Corporation will continue to search and review additional materials responsive to your request and provide them to you on a rolling basis.  We will update you on our progress in writing on or before October 20, 2015.

Thank you for your attention.

Best,

Arthur

------

Arthur G. Eliav
Associate General Counsel
Roosevelt Island Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, NY 10044
(212) 832-4540 ext. 303

TAB 15

**ROOSEVELT ISLAND**
**OPERATING CORPORATION**
of The State of New York



Andrew M. Cuomo
Governor

Charlene M. Indelicato
President/Chief Executive Officer

Frances A. Walton
Vice President/Chief Financial Officer

Susan G. Rosenthal
Vice President/General Counsel

BOARD OF DIRECTORS

James S. Rubin, Chairperson
Fay Fryer Christian
Dr Katherine Teets Grimm
David Kraut
Mary Beth Labate
Howard Polivy
Michael Shinozaki
Margaret Smith

August 24, 2015

**VIA ELECTRONIC MAIL**
Executive Director Robert J. Freeman
NYS Committee on Open Government
   Department of State
One Commerce Plaza
99 Washington Avenue, Suite 650
Albany, NY 11231

    Re: <u>FOIL Requests of Donald Lewis</u>

Dear Mr. Freeman,

I am General Counsel of Roosevelt Island Operating Corporation and I am in receipt of the letter of August 19, 2015 written to you by counsel for Mr. Lewis, Anthony Rotondi. Apparently, Mr. Rotondi is not seeking any action from you, but is apprising you of his belief that RIOC is acting in a dilatory manner in handling the requests. I strongly disagree with this conclusion.

Mr. Lewis requested documents in thirty-three (33) categories covering many years and all employees. Working together, we were able to limit some of these requests. Directors responsible for departments, which are custodians of certain of these records, were instructed to gather responses. These departments include IT, Fiscal, and Human Resources. Some records have been delivered to Mr. Rotondi and we will continue to do so on a rolling basis.

RIOC has taken steps to preserve and secure responsive documents from its Board of Directors and a "litigation hold" has been forwarded to all employees and the Board Members.

As I explained to Mr. Rotondi in our telephone call, I began working at RIOC on June 1, 2015, and I am working diligently on this, other FOIL requests, and all legal issues facing our authority. We have a legal department with just two other attorneys. RIOC will continue to produce documents responsive to the requests on a rolling basis as they become available.

If you wish to discuss this further, please feel free to contact me at (212) 832-4540. Thank you for your time and attention to this matter.

                                Very truly yours,

                                Susan G. Rosenthal

cc:    Charlene Indelicato (via email)
       Anthony Rotondi (via email)

TAB 16

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

August 26, 2015

**VIA ELECTRONIC MAIL**

Susan Rosenthal, Esq.
General Counsel & Vice President
Roosevelt Island Operating Corporation
591 Main Street
New York, NY 10044

Re: <u>FOIL Requests of May 21, 2015 and June 8, 2015</u>

Dear Ms. Rosenthal:

I write to express my concern regarding RIOC's email and "production" dated August 21, 2015 and letter to the New York State Committee on Open Government ("NYS COOG") dated August 24, 2015. As you are aware, we submitted FOIL Requests more than three months ago for a number of categories of documents, many of which are readily electronically available. Although, we appreciate receiving the materials, I find it incredulous that after *more than 90 days*, the only materials RIOC produced are electronic copies of organizational charts and electronic copies of final budgets. With little effort, RIOC certainly could have produced these minor items within days of receiving our requests.

Further, the paltry nature of the production suggests that the materials may have been produced simply as a response to my August 19, 2015 letter to the NYS COOG. More concerning is that the scant production combined with its timing – one business day before RIOC's letter to the NYS COOG – suggests the production may have been made solely to support RIOC's representation to the NYS COOG that RIOC had produced documents in response to the FOIL Requests. In any event, given the paucity of this production, as well as RIOC's August 24 letter to the COOG, we are now compelled to seek an advisory opinion from the Committee.

I additionally note that in response to our May 21, 2015 Requests, RIOC represented on May 29, 2015 that it would "notify you of or progress on or before August 21, 2015." Nonetheless, that date has passed but neither the August 21 email accompanying RIOC's "production" nor your August 24 letter to the NY COOG, provides any update regarding RIOC's progress.

Moreover, I was surprised to read RIOC's misrepresentation to the NYS COOG that "[w]orking together, we were able to limit some of the requests." Rather, my June 29, 2015 e-mail offered to narrow certain requests by 70% in exchange for RIOC agreeing to provide a reasonable production date. RIOC never responded to that offer and never provided a reasonable production date. Accordingly, no agreement has been reached.

Very truly yours,

Anthony Rotondi

**EXHIBIT H**

**ANTHONY ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

October 29, 2015

**VIA ELECTRONIC MAIL & 1ˢᵗ CLASS MAIL**

Executive Director Robert J. Freeman
NYS Committee on Open Government
  Department of State
One Commerce Plaza
99 Washington Avenue, Suite 650
Albany, NY 12231

     Re: <u>Communications Concerning RIOC's FOIL Misconduct</u>

Dear Mr. Freeman:

     Further to my email of October 14, 2015, I write to express my concern about your silence in response to my repeated efforts to discuss with you the Request for Advisory Opinion related to the FOIL requests my client Mr. Donald Lewis submitted to the Roosevelt Island Operating Corporation ("RIOC") over four months ago. As you may recall, my October 14 correspondence stated:

> [I] have been unable to reach you despite leaving multiple telephone messages with your office over the last several weeks. I understand that you likely have a busy schedule and given my inability to establish contact by telephone, I figured rather than continue to trouble your assistant with messages, perhaps we could agree on a time to have a brief chat.

I then proposed flexible potential times for such discussion, but have received silence in response.

     The absence of any response is particularly puzzling considering that Mr. Lewis describes you as one of the most responsive individuals he interacted with during his tenure at RIOC. Further, he, as well as others whom have interacted with you professionally, specifically confirm your practice of promptly and professionally returning phone calls and e-mails the same day or the very next business day. That practice also is consistent with our understanding of the spirit and essence of the NYS COOG with regards to offering guidance to the public.[1] In this situation, as members of the public seeking such guidance, we unfortunately and oddly been unable to even have a simple phone call.

     Indeed, I have called and left multiple messages with your office over the past two months. When you are not in the office, I leave messages with the person who answers your phone. When you

---

[1] The COOG website states: "[T]he Committee on Open Government... oversees and advises the government, public, and news media on Freedom of Information, Open Meetings, and Personal Privacy Protection Laws. The Committee offers guidance in response to phone inquiries, prepares written legal advisory opinions..."

Page 1 of 3

are in the office, the person who answers your phone requests my name, puts me hold, checks your availability, then returns to the phone and either states that your or unavailable and asks for my contact information or something in nature of "Mr. Freeman is on a call and will call you back" and asks for my contact information. Nevertheless, you have not returned even one my multitude of calls.

In stark contrast to my futile efforts to establish any communication, when RIOC's General Counsel Susan Rosenthal sent a letter to you (on August 24, 2015 at 5:00 p.m. by e-mail) replete with misrepresentations – and although Ms. Rosenthal did not request a response – you responded just nine minutes later at 5:09 p.m.

The NYS COOG's silence is particularly troubling considering that RIOC's dilatory and obstructionist conduct is precisely the type of behavior that is not countenanced in the NYS COOG advisory opinions, which I have reviewed. Moreover, your silence is particularly confusing and out-of-character given my understanding of your noteworthy professionalism and well-established and long-practiced dedication to resolving FOIL concerns. Further, as we noted in earlier correspondence, RIOC apparently sees fit to act in direct odds with the desire of the New York State Executive Chamber to "revers[e] the long held resistance to transparency that FOIL provides" as noted in a letter dated March 16, 2015 concerning "Uniform State Email Retention and FOIL Policy."[2] In light of the NYS COOG's prior advisory opinions, as well as the above-referenced guidance from the Executive Chamber, I am troubled as to why in this instance you have decided not only to ignore me, but appears to us that the NYS COOG is also ignoring RIOC's misconduct.[3]

The NYS COOG may find it suspicious, as have Mr. Lewis and I, that last week RIOC President and CEO Charlene M. Indelicato stepped aside as RIOC's FOIL Appeals Officer and designated that role to RIOC's Compliance and Internal Controls Officer. We note that the Appeals Officer role has been filled by the RIOC President and CEO for at least the last five (5) years and likely even longer. It is not a stretch to suggest this essential shell game is an implicit admission of RIOC's misconduct and that RIOC's positions (including the prior Appeals responses that Ms. Indelicato herself signed) are unreasonable, untenable and unsupportable. Rather than face the inevitable proverbial music, Ms. Indelicato has removed herself as the Appeals Officer in an attempt to avoid responsibility for RIOC's specious positions.

In any event, if there is a legitimate reason why you have been ignoring my repeated efforts to get in contact with you for the last two months, I believe that you would have relayed such reason. We do not feel it productive or necessary at this time to engage in speculation concerning the motivation or potential outside influences for such drastically out-of-character behavior but nonetheless feel it necessary to preserve the record for future use. Accordingly, we respectfully request that the NYS COOG preserve any and all documents, correspondence and communications concerning Mr. Lewis'

---

[2]  A copy of the March 16, 2015 letter is available at *http://goo.gl/YfrVyq*

[3]  I note that although RIOC made a production on October 20, 2015, that production largely consists of policies and procedures given employees on the first day of employment, and could have been produced to us in five minutes. Nonetheless, RIOC waited almost four (4) months to produce the materials. RIOC's prior two so-called "productions" likewise contained items that could have been produced in mere minutes yet took months to produce. Should RIOC's most recent "production" be designed to mislead the NYS COOG (when drafting it advisory opinion) into believing that RIOC's conduct is not in violation of FOIL, we implore the NYS COOG to not be misled by any such tactic, which we can, and will, refute, should the NYS COOG doubt that RIOC's productions are anything more than a sham.

FOIL requests, including but not limited to, any and all documents, communications and correspondence (electronic and otherwise) that the NYS COOG has received from any party concerning Mr. Lewis' FOIL requests.

Thank you for your time.

Very truly yours,

Anthony Rotondi

**EXHIBIT I**

**COMMITTEE ON OPEN GOVERNMENT**

STATE OF NEW YORK
DEPARTMENT OF STATE
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE
ALBANY, NY 12231-0001
TELEPHONE: (518) 474-2518
FAX: (518) 474-1927
WWW.DOS.NY.GOV

COMMITTEE MEMBERS
ROANN M. DESTITO
PETER D. GRIMM
M. JEAN HILL
KATHY HOCHUL
HADLEY HORRIGAN
MARY BETH LABATE
CESAR A. PERALES
DAVID A. SCHULZ
STEPHEN B. WATERS

CHAIRPERSON
FRANKLIN H. STONE

EXECUTIVE DIRECTOR
ROBERT J. FREEMAN

December 15, 2015

Anthony Rotondi
5 Columbus Circle
New York, NY 10019

<u>The staff of the Committee on Open Government is authorized to issue advisory opinions. The ensuing staff advisory opinion is based solely upon the information presented in your correspondence, except as otherwise indicated.</u>

Dear Mr. Rotondi:

We are in receipt of your request for an advisory opinion regarding the manner in which the Roosevelt Island Operating Corporation responded to your Freedom Information Law request. Please accept our apologies for the delay in response.

Please note that the Committee on Open Government is authorized to issue advisory opinions regarding application of the Freedom of Information (FOIL). Neither the Committee nor its staff is empowered to investigate or to compel a public body to behave in a certain manner; however, to the extent that issues regarding FOIL have been raised, we offer the following comments.

By way of background, the Freedom of Information Law provides direction concerning the time and manner in which agencies must respond to requests. Specifically, §89(3)(a) of the Freedom of Information Law states in part that:

> "Each entity subject to the provisions of this article, within five business days of the receipt of a written request for a record reasonably described, shall make such record available to the person requesting it, deny such request in writing or furnish a written acknowledgement of the receipt of such request and a statement of the approximate date, which shall be reasonable under the circumstances of the request, when such request will be granted or denied.... If an agency determines to grant a request in whole or in part, and if circumstances prevent disclosure to the person requesting the record or records within twenty business days from the date of the acknowledgement of the receipt of the request, the agency shall state, in writing, both the reason for the inability to grant the request within twenty business days and a date certain within a reasonable period, depending on the circumstances, when the request will be granted in whole or in part."

Accordingly, it has long been advised that when an agency is unable to deny or provide access to records within five business days, it must provide a written response indicating either that it will respond within the next twenty business days, or that it is unable to respond until a certain date, providing both the date and the reasons for requiring additional time. Although we recognize that there are occasions when an agency will require an extension of time beyond that which it initially predicted, there is no provision in the statute for



**NEW YORK STATE OF OPPORTUNITY.** | **Department of State**

repeated extensions. The agency must, however, indicate the date by which it will respond, based on what is reasonable in consideration of attendant circumstances.

When an agency fails to comply with the time limits, or denies access to records, the Freedom of Information Law permits the applicant to file an administrative appeal, and, if the agency fails to comply with the law on appeal, judicial review pursuant to Article 78 of the Civil Practice Law and Rules. We note how the legislature chose to distinguish the two types of denials in §89(4)(a), as follows:

> "...any person denied access to a record may within thirty days appeal in writing such denial to the head, chief executive or governing body of the entity, or the person therefor designated by such head, chief executive, or governing body, who shall within ten business days of the receipt of such appeal fully explain in writing to the person requesting the record the reasons for further denial, or provide access to the record sought"

and further,

> "Failure by an agency to conform to the provisions of subdivision three of this section shall constitute a denial."

Because it distinguished between the two types of denials, one in writing and the other due to a failure to respond in a timely manner, it is our opinion that the Legislature intended that there may be two types of appeals. One, from a denial of access in writing based on an exception to rights of access, and another, from a constructive denial of access as a result of the agency's failure to comply with the time limits for response required by §89(3)(a).

As stated above, there is no provision in the statute for repeated extensions. In my view, the agency's five-business day acknowledgement letters, letting you know of its intent to "notify you of our progress" on or before a date three months in the future is inconsistent with the law. The agency, in its acknowledgement letter should either notify you of its intent to respond within 20 business days, or "if circumstances prevent disclosure to the person requesting the record or records within twenty business days from the date of the acknowledgement of the receipt of the request, the agency shall state, in writing, both the reason for the inability to grant the request within twenty business days *and a date certain within a reasonable period, depending on the circumstances*, when the request will be granted in whole or in part." (emphasis added)

We do not know the volume or complexity of the records which the agency has determined to be responsive to your request. I would suggest the agency carefully review your requests, as well as the attendant circumstances regarding its ability to respond, and provide you, in writing, with a reason for the delay, and a date certain when the request will be granted in whole or in part.

In an effort to enhance understanding of and compliance with FOIL, copies of this response will be sent to the agency records access officer.

I hope that I have been of assistance.

Sincerely,

Kristin O'Neill
Assistant Director

cc:     Christopher Dor, RIOC FOIL Officer

**EXHIBIT J**

| | | Dor, Christopher (RIOC) | RE: Batch 1/6 - Freedom of Information Law Request | Tue 12/29/2015 4:29 PM |
|---|---|---|---|---|
| | | Dor, Christopher (RIOC) | RE: Batch 1/6 - Freedom of Information Law Request | Tue 12/29/2015 4:20 PM |
| | 📎 | Dor, Christopher (RIOC) | RE: Batch 1/6 - Freedom of Information Law Request | Tue 12/29/2015 4:19 PM |
| | 📎 | Dor, Christopher (RIOC) | RE: Batch 1/6 - Freedom of Information Law Request | Tue 12/29/2015 4:15 PM |
| | | Dor, Christopher (RIOC) | RE: Batch 1/6 - Freedom of Information Law Request | Tue 12/29/2015 2:09 PM |
| | 📎 | Dor, Christopher (RIOC) | Special Batch (Vehicle Logs) - Freedom of Information Law | Thu 12/24/2015 4:09 PM |
| | 📎 | Dor, Christopher (RIOC) | Batch 6/6 - Freedom of Information Law Request | Thu 12/24/2015 4:08 PM |
| | 📎 | Dor, Christopher (RIOC) | Extra Batch #7 - Freedom of Information Law | Thu 12/24/2015 3:54 PM |
| | 📎 | Dor, Christopher (RIOC) | Batch 5/6 - Freedom of Information Law Request | Thu 12/24/2015 3:41 PM |
| | 📎 | Dor, Christopher (RIOC) | Batch 4/6 - Freedom of Information Law Request | Thu 12/24/2015 3:41 PM |
| | 📎 | Dor, Christopher (RIOC) | Batch 3/6 - Freedom of Information Law Request | Thu 12/24/2015 3:40 PM |
| | 📎 | Dor, Christopher (RIOC) | Batch 1/6 - Freedom of Information Law Request | Thu 12/24/2015 3:30 PM |
| | | Dor, Christopher (RIOC) | RE: Freedom of Information Law Request - Batch 3 | Thu 12/24/2015 3:08 PM |
| | 📎 | Dor, Christopher (RIOC) | Freedom of Information Law Request - Batch 5 | Thu 12/24/2015 3:04 PM |
| | 📎 | Dor, Christopher (RIOC) | Freedom of Information Law Request - Batch 2 | Thu 12/24/2015 3:03 PM |
| | 📎 | Dor, Christopher (RIOC) | Freedom of Information Law Request - Batch 4 | Thu 12/24/2015 3:02 PM |
| | 📎 | Dor, Christopher (RIOC) | Freedom of Information Law Request - Batch 3 | Thu 12/24/2015 3:01 PM |
| | 📎 | Dor, Christopher (RIOC) | Freedom of Information Law Request - Batch 3 | Thu 12/24/2015 2:38 PM |

# EXHIBIT K



STATE OF NEW YORK
**OFFICE OF THE INSPECTOR GENERAL**
**OFFICE OF THE WELFARE INSPECTOR GENERAL**
**OFFICE OF THE WORKERS' COMPENSATION FRAUD INSPECTOR GENERAL**

EMPIRE STATE PLAZA
AGENCY BLDG. 2, 16TH FLOOR
ALBANY, NEW YORK 12223
(518) 474-1010

61 BROADWAY, SUITE 2100
NEW YORK, NEW YORK 10006
(212) 635-3150

65 COURT STREET, 6TH FLOOR
BUFFALO, NEW YORK 14202
(716) 847-7118

CATHERINE LEAHY SCOTT
INSPECTOR GENERAL

December 21, 2015

Anthony J. Rotondi, Esq.
5 Columbus Circle, Suite 800
New York, New York 10019

RE: FOIL 082-2015

Dear Mr. Rotondi:

I am responding to your FOIL request dated December 15, 2015, and am sending you the following documents:

1. Emails between you and Investigative Counsel Kenneth Michaels, the subject of which is "RIOC";

2. A document, "Notes/transcription of RIOC Meeting 5/21/15, starting at approximately 6:10 in recording";

3. A memo you provided to Mr. Michaels dated June 18, 2015;

4. An email you sent to Mr. Michaels dated June 11, 2015 regarding "potential witnesses contact info"; and

5. Emails between you and Mr. Michaels, the subject of which is "contact info".

We are in possession of no additional responsive documents.

Sincerely,

Stephen Del Giacco
Records Access Officer

Enclosures

**EXHIBIT L**



STATE OF NEW YORK
**OFFICE OF THE INSPECTOR GENERAL**
**OFFICE OF THE WELFARE INSPECTOR GENERAL**
**OFFICE OF THE WORKERS' COMPENSATION FRAUD INSPECTOR GENERAL**

EMPIRE STATE PLAZA
AGENCY BLDG. 2, 16TH FLOOR
ALBANY, NEW YORK 12223
(518) 474-1010

61 BROADWAY, SUITE 2100
NEW YORK, NEW YORK 10006
(212) 635-3150

65 COURT STREET, 5TH FLOOR
BUFFALO, NEW YORK 14202
(716) 847-7118

CATHERINE LEAHY SCOTT
INSPECTOR GENERAL

August 29, 2016

Anthony J. Rotondi
5 Colombus Circle, Suite 800
New York, New York 10019

RE: FOIL Request 016-2016

Dear Mr. Rotondi:

I am writing in response to your Freedom of Information Law (FOIL) request seeking "all materials related to complaints made to the New York State Office of the Inspector General ('NYS OIG') concerning the Roosevelt Island Operation Corporation ('RIOC') and/or any of the employees of RIOC for the time period June 1, 2011 through present." On the morning of May 16, 2016, I called your office and left a message with a female receptionist asking that you return my call with regard to clarifying your FOIL request. To date, I have not received a return phone call.

Your request is not specific enough to utilize our recordkeeping system. It would require a herculean effort to respond to your request, as each agency file since June 1, 2011 would need to be searched in order to determine whether any records fall within the scope of your request. As such, your FOIL request is denied pursuant to §89(3) as it does not reasonably describe the records sought.

You have the right to appeal the denial of access to records noted above by addressing a written appeal to Michele Host, Chief Counsel, within 30 days.

Sincerely,

Rita Reynolds
Records Access Officer

**EXHIBIT M**

**ANTHONY J. ROTONDI**
5 Columbus Circle
New York, NY 10019
www.ajrotondi.com
(212) 709-8340

April 13, 2017

<u>VIA ECF</u>
The Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 430
New York, NY 10007

Re: <u>*Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)(SN) Discovery*</u>

Dear Judge Netburn:

I write on behalf of Plaintiff, Donald Lewis, to request a conference with the Court regarding the Court's ruling on the parties' letter dated April 2, 2017 (the "<u>April 2 Letter</u>") and establishing an unbiased discovery schedule that does not unfairly prejudice Plaintiff and preclude Plaintiff from obtaining the discovery necessary to prove his claims for trial. Plaintiff understands that all counsel are available on April 13, if the Court is available.

Plaintiff again implores the Court to allow discovery to proceed in an organized and cost-effective manner that does not unfairly prejudice Plaintiff as does the current chaotic schedule that (i) stacks the decks against Plaintiff; (ii) causes Plaintiff to incur unnecessary attorneys' fees and costs;[1] and (iii) severely impairs / completely precludes Plaintiff from obtaining crucial evidence. The prejudice heaped upon Plaintiff is particularly unfair given Plaintiff's diligence in prosecuting his claims, his compliance with discovery obligations, and his efforts to conduct organized discovery.[2]

The documents necessary to establish Plaintiff's claims are almost exclusively within the possession of Defendants. However, notwithstanding Plaintiff's timely service of discovery requests, Court Orders required Plaintiff to wait *four (4) months* before receiving documents responding to

---

[1] As indicated in the April 2 Letter, depositions have been left open pending the parties' resolution of document production issues. Setting aside all the inefficiencies related to attorney time, each continued deposition adds approximately $1,000 to the costs of that deposition, totaling approximately $26,000.

[2] Plaintiff's unavailing efforts at conducting organized discovery, *inter alia*, included: (i) negotiations with defense counsel; (ii) requests for the Court's assistance; (iii) applications for Court relief; and (iv) even providing RIOC's new counsel with copies of RIOC's own document production when they were unable to obtain the documents from RIOC's prior counsel. Plaintiff had to file a motion for Defendants to comply with the basic obligation of filing Initial Disclosures to which the Court admonished Plaintiff that "the parties [are reminded] ... of their obligations under Rule 1 of the Federal Rules of Civil Procedure to construe these Rules 'to secure the just, speedy and inexpensive determination' of this case [and that] Rule 1 thus 'discourage[s] overuse, misuse, and abuse of procedural tools that increase cost and result in delay.'" (Orders at Docket Nos. 85, 86) In a November 22, 2016 Discovery Status Letter, Plaintiff stated: "[If] the Parties are unable to reach agreement – which unfortunately now appears to be the more likely outcome – counsel will apprise the Court of additional particularities regarding the issues ... and seek the Court's assistance." (Docket No. 89) In response, the Court Ordered that "The parties are instructed to work more conscientiously to reach agreements and compromise on a discovery schedule before making any application to the Court to resolve any dispute that may arise." (Docket No. 90). Plaintiff fared no better in his efforts to bring Defendants' discovery defaults to the Court's attention, which resulted in Orders granting Defendants numerous deadline extensions and requiring Plaintiff to first respond to Defendants' discovery requests (that Defendants sent to Plaintiff months after Plaintiff served his discovery requests). Plaintiff's efforts to obtain organized discovery are detailed in many docket entries, including Plaintiff's December 28, 2016 letter to the Court (without exhibits), annexed as Tab A.

those requests and required Plaintiff to begin depositions *five 5 days* after receiving those documents (which presupposed Defendants providing a good faith document production). Plaintiff repeatedly objected that the few days between Defendants' scheduled document production and commencement of depositions would hamstring Plaintiff and provide insufficient time to resolve any production issues.

True to Plaintiff's concerns, after four months of Defendants regaling the Court with tales of herculean efforts being made to respond to Plaintiff's document requests, Defendants produced hardly any documents, producing approximately 1,500 pages of documents in total for all Defendants, most that are publicly available or correspondence from Plaintiff's counsel to Defendants' counsel.[3] The few other documents appear specifically selected to support Defendants' pretextual reason *de jour* for Plaintiff's unlawful termination. Other documents were withheld on unsupportable claims of privilege. These are a few examples of the deficiencies; the pervasiveness renders the productions equivalent to not making a production. The absence of meaningful document productions especially prejudices Plaintiff here because documents exclusively are possessed by Defendants and almost all witnesses are current and former employees of Defendant (whom Plaintiff's counsel is ethically precluded from contacting) or government officials who have coordinated efforts with Defendants.[4] Under these conditions, Plaintiff was required to proceed with depositions without the benefit of documents.

Plaintiff has been attempting to resolve production issues with defense counsel but after Defendants' productions were made, Defendant RIOC went through two changes in counsel, first from Melick to the Chandler Law Firm and then to Bond Schoeneck & King ("Bond"). With the involvement of Melick's managing partner, Robert Powers, and the substitution of Bond, defense counsel expressed a willingness to comply with discovery obligations (and apologized for certain unsupportable positions taken in the past). Defense counsel also agreed to correct deficiencies by, *inter alia*, searching for additional documents, running electronic search terms, and potentially producing documents that appear to have been withheld on unsupported claims of privilege, but the process has been time-consuming.[5] Accordingly, it appeared that counsel were working cooperatively towards resolution of the production issues, the parties left depositions open pending resolution of those issues, and jointly sought extension of the discovery deadline. However, with the denial of the extension requested in the April 2 Letter, Defendants' behavior regressed, with Defendants either concerned with, or seeking to take unfair advantage of, the certainty that the current disjointed

---

[3] Plaintiff will not list each deficiency now but reserves and does not waive his rights regarding those deficiencies. Attached as Tab B is a list of some production issues that Plaintiff sent to Defendants.

[4] Permitting witness testimony to stand while depriving Plaintiff the benefit of documentary evidence to impeach that testimony is particularly prejudicial to Plaintiff given Defendants' willingness to misrepresent facts. For example, in applying for the position as RIOC's president, Defendant Indelicato – an attorney – falsely claimed in her application (obtained by Plaintiff outside the discovery process) that she had never "been named as a defendant or respondent in any agency proceeding or civil litigation" notwithstanding at the time having been named as a Defendant in at least two Federal employment discrimination lawsuits filed in the SDNY and an unknown number of administrative complaints. (See Page 9, Response to Question 8(f) on Defendant Indelicato's Application obtained outside the discovery process, annexed as Tab C.) As another example, Defendant McDade, *RIOC's Director of Human Resources* that she did nothing to search for, collect, or produce documents in response to Plaintiff's Document Requests and then testified that under Defendant Indelicato evaluations and self-evaluations of RIOC executives, like Plaintiff, were not done. However, RIOC possesses emails -- not produced -- directly contradicting that testimony. Additionally, hours have been spent with conflicting testimony regarding whether RIOC executives were terminated for cause, resigned, and / or received severance, which easily could have been resolved had Defendants produced the requested documentation.

[5] For example, Melick did not provide Bond with copies of the documents that Melick produced on behalf of RIOC during its representation. To avoid additional delay, Plaintiff produced RIOC's own production to RIOC's new counsel for the parties' discussions to even begin regarding correcting the deficiencies. Additionally, although Bond agrees with Plaintiff that it appears most of the previously withheld "privileged documents" may not be privileged and therefore Bond would be willing to produce those documents, Bond indicated that they have been unable to obtain for their review copies of those documents from Melick and Plaintiff obviously cannot provide Bond with those documents.

schedule provides insufficient time for the resolution of document production issues and completion of continued depositions – a situation of Defendants' own creation by their delay in responding to discovery requests and deficient productions.[6]

Denial of the extension the parties requested in the April 2 Letter, further unduly prejudices Plaintiff to the benefit of Defendants because, *inter alia*, Plaintiff is taking all but one of the many necessary depositions and all the documents are in the Defendants' possession. Plaintiff respectfully submits that forcing Plaintiff to conduct discovery in this haphazard and chaotic fashion (without resolution of document issues and leaving all depositions open) guarantees Plaintiff will be precluded wrongfully from obtaining crucial evidence and directly contravenes tenets of Federal practice, including FRCP Rule 1 direction "to secure the just, speedy and inexpensive determination" of actions. Plaintiff is at a loss to understand any justifiable reason for him to be unfairly prejudiced in this manner, particularly given the considerable efforts Plaintiff undertook to achieve an organized discovery process. Plaintiff who prosecuted his claims diligently, complied with his discovery obligations and obligations under the FRCP and Court rules should not be unfairly prejudiced – as he has been for much of the discovery period – for Defendants' defaults and deficiencies.

Plaintiff remains willing to continue to work to resolve the production deficiencies cooperatively with defense counsel so that depositions may proceed in an organized fashion. However, Plaintiff respectfully submits that if the Court will not provide the parties with the necessary time to resolve production issues and flexibility to adjust the deposition schedule accordingly (without which Plaintiff will be precluded from obtaining the needed documents and testimony), the Court should fashion a remedy that penalizes Defendants – and not Plaintiff – for Defendants' delays in responding to discovery and deficient productions. Accordingly, Plaintiff requests a Court conference to resolve the foregoing.

Respectfully submitted,

/s/

Anthony J. Rotondi

Cc:     Hon. Andrew L. Carter, Jr.
        Melick & Porter
        Bond Schoeneck & King

---

[6] For example, in the deposition after denial of the April 2 extension request, Defense counsel asked to exam the Defendant before Plaintiff completed his examination to which Plaintiff agreed considering the deposition needed to be continued because of the deficient document production. Defense counsel then posed leading questions, resulting in the witness altering / recanting prior testimony and then refused to allow Plaintiff even a few minutes to exam the witness regarding her altered testimony.

**Tab A**

**ANTHONY J. ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
www.ajrotondi.com
(212) 709-8340

December 28, 2016

VIA ECF
The Hon. Sarah Netburn.
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 430
New York, NY 10007

Re: *Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)(SN) Discovery*

Dear Judge Netburn:

I represent Plaintiff, Mr. Donald Lewis, in the above-referenced action and regret to inform the Court that notwithstanding Plaintiff's efforts to resolve discovery issues in good faith, Defendants continue to refuse to comply with even the most basic of discovery obligations making it abundantly clear that the Court's involvement is necessary for discovery to proceed in any organized manner. Initially, Plaintiff apologies for the tardy submission of this letter, and respectfully requests that the Court accept the submission nunc pro tunc to December 27.

In sum, for more than one year Defendants' entire strategy has been designed to delay and waste time at all costs including misconduct and essentially to "hide the ball" and obstruct Plaintiff. Certain relevant background and facts are detailed below:

### I. Civil Case Management Plan.

Plaintiff invested significant time negotiating a Joint Proposed Case Management Order ("CMO") and attempting to convince defense counsel, Holly Rogers of Melick & Porter, that in Plaintiff's counsel's opinion, an initial proposed discovery period in excess of 4 months would not be well-received. Nonetheless, Plaintiff's efforts were wasted when after numerous discussions and exchanges of several drafts, the parties could not submit a joint proposed CMO because Defendants insisted on requesting between 5 ½ and 6 ½ months for fact discovery, while simultaneously unnecessarily restricting certain rights afforded to Plaintiff.

### II. Initial Disclosures.

On September 20, 2016, Your Honor held a Case Management Conference ("CMC") in the instant action. Pursuant to FRCP the parties were to exchange initial after the CMC. Nonetheless, Defendants repeatedly refused to provide their initial disclosures, and only did so after Plaintiff filed his Initial Disclosures and a Motion to Preclude, which was filed based on, among other reasons, Plaintiff's experience with defense counsel's delay tactics and with the near certainty that absent such motion, Defendants likely still would not have served their initial disclosures.[1]

---

[1] The Court issued its decision denying Plaintiff's Motion to Preclude while Plaintiff was finalizing a Reply that, among other things, would have established that Defendants Opposition to the Motion contained blatantly false statements designed to mislead the Court into finding in Defendants' favor. Because the Order was issued before the Reply was finalized, Plaintiff opted to not trouble the Court with further submissions on the Motion.

1

### III. Plaintiff's Discovery to Defendants All of Which Remain Outstanding and to Which Defendants Have Not Served a Single Response or Produced a Single Piece of Paper.

Since the Court's CMC, Plaintiff served, *inter alia*, the following:

➤ On October 10, 2016, Plaintiff served Requests for the Production of Documents to Defendant Roosevelt Island Operating Corporation ("RIOC") and all individually named Defendants.

➤ On October 14, 2016, Plaintiff served a Notice to Depose each individual Defendant in November and December 2016 and to depose the following current RIOC employees in December 2016: Mark Rothman; Gretchen Robinson; Karlene Jean; Erica Spencer-El; Lada Stasko; Arthur Eliav; and John McManus.[2]

➤ On October 19, Plaintiff served Defendant RIOC with Interrogatories.

➤ On October 20, Plaintiff served Defendant Smith with Requests for Admission. ("RFAs")

➤ On October 21, Plaintiff served Defendant Smith with Interrogatories.

➤ On October 23, Plaintiff served Defendant Grimm with Interrogatories and RFAs.

➤ On October 24, Plaintiff served Defendant Shinozaki with Interrogatories and RFAs.

➤ On October 29, Plaintiff served Defendant Polivy with Interrogatories and RFAs.

➤ On October 29, Plaintiff served Defendant Kruat with Interrogatories and RFAs.

➤ On October 30, Plaintiff served Defendant Labate with Interrogatories and RFAs.

➤ On November 1, Plaintiff served Defendant Towns with Interrogatories and RFAs.

➤ On December 27 after defense counsel continued staling scheduling the depositions of the non-party witnesses identified in Defendants Initial Disclosures, Plaintiff scheduled and issued Subpoenas Duces Tecum for Messrs. Alphonso David, Michael Volforte, Andrew Kennedy and Mike Kendall.[3]

### IV. Defendants' Discovery to Plaintiff On the Eve of the Joint Discovery Status Update.

➤ Two months after the CMC and on the eve of the November 17 deadline for the First Discovery Status Report, defense counsel emailed Defendants' First Request for the Production of Documents and Interrogatories and on November 14 sought to depose Plaintiff on Monday, December 19. (The deadline for the First Discovery Status Report was then extended to November 21.)

➤ On Friday, December 16 at approximately 6 p.m., in response to Plaintiff's inquiry regarding whether Defendants intended to proceed with Plaintiff's Deposition noticed for Monday, defense counsel indicated for the first time that they never intended to proceed with Plaintiff's deposition because they had emailed the deposition notice contemporaneous with the document discovery and made each returnable simultaneously so that they would not receive Plaintiff's discovery responses in advance of the requested deposition date.[4]

### V. Defendants' Lack of Response to Plaintiff's Discovery Requests.

➤ Rather than responding to any of Plaintiff's written discovery demands to Defendants, by letter dated October 27, (the "October 27 Extension Request") defense counsel claimed: "each Defendant

---

[2] Plaintiff already has been prejudiced by Defendants' delay tactics in the unfortunate passing of RIOC employee Mark Rothman, who Plaintiff understands may have been directed by certain Defendants to destroy documents.

[3] Currently awaiting Mr. Kendall's confirmation.

[4] Plaintiff was prepared to serve his discovery responses and objections on December 16, but after discussions with defense counsel and considering Defendants' utter failure to respond to any long-overdue discovery requests, Plaintiff did not serve his responses. However, on December 26, Plaintiff served his Responses and Objections to Defendants' Document Requests and today will serve his Objections and Responses to Defendants Interrogatories to Plaintiff.

will require additional time to complete beyond the November 9, 2016 deadline to respond to the first of the discovery requests that the Plaintiff issued on October 10, 2016 . . . we are writing to request a reasonable extension of the deadline(s) for the respective Defendants to respond to written discovery items issued by the Plaintiff to *December 9, 2016, or 30 days from the date that any item of written discovery is/was issued,* whichever is later. (emphasis added)

➢ By letter dated December 8, defense counsel again claimed that they "will require an additional three weeks . . . to respond to the Plaintiff's requests for production" (relayed at various times by Ms. Rogers as December 30 and December 31). (emphasis added)

Plaintiff did not agree to any requested extensions but engaged in discussions to attempt reaching a mutually agreeable overall discovery schedule, which proved to be futile owing to defense counsel's bad faith conduct as described *infra* at Section VI, *infra*.

**VI.** **Plaintiff's Attempts to Negotiate a Good Faith Resolution of Discovery Issues Was a Futile Waste of Time Because Of Defendants Bad Faith Conduct.**

In more than 21 years in the profession (during which Plaintiff's counsel likely handled, managed and/or supervised upwards of one thousand cases across the U.S. and internationally) the sheer and utter nonsense, ridiculous conduct, and flagrant disregard for the rules that defense counsel has exhibited rivals that of any adversary, save one who the court ultimately precluded from taking any discovery from my client. Just some of the nonsensical and dilatory positions taken by defense counsel include:

➢ Ms. Rogers repeatedly claiming that "you [Plaintiff] have all the documents because Defendants produced them to you in response to the FOIL requests," while claiming in the same conversation that Defendants required additional time to respond to the document requests because of the burden on counsel to produce the documents Ms. Rogers just asserted were all previously produced.

➢ Offering deposition dates for each of the individual Defendants to create the misimpression of cooperating with discovery and then:

    (i)    On the eve of the First Joint Status Letter deadline informing Plaintiff that Defendants had no intention of producing any of Defendant RIOC's corporate documents prior to the depositions thereby forcing Plaintiff to depose each Defendant at least twice;

    (ii)   On the eve of the Second Joint Status Letter deadline informing Plaintiff that notwithstanding that the offered deposition dates were months after the discovery due dates, Defendants had no intention of responding to all of the discovery requests prior to the depositions, forcing Plaintiff to depose each Defendant at least twice;

    (iii)  On the eve of the Second Joint Status Letter deadline, taking the cavalier position that ***Defendants would not commit to any date at all*** by which any Defendants other than RIOC would respond to outstanding discovery requests and would only agree to "***see what I can do*** if you give me a list of the response you want prioritized but ***I'm not making any promises or committing to any dates***," notwithstanding that the responses were all already long overdue.

    (iv)  Claiming for the first time just minutes prior to the filing of the Second Status Letter that Defendants required Plaintiff to be one of the first witnesses to be deposed, notwithstanding Defendants' months of delay in even seeking Plaintiff's deposition.

➢ Months of delaying noticed RIOC employee depositions by not only failing to provide deposition dates, but refusing to even confirm basic inquiries such as whether Melick represents the RIOC employees, by repeatedly claiming "***I don't know if we represent the non-party employees.***"

➢ Months of refusing to confirm whether Melick would arrange scheduling of the non-party witnesses listed in Defendants' Initial Disclosures, claiming "I don't know whether we will arrange those depositions."

➤ For no valid reasons, offering deposition dates in essentially the exact opposite chronological order noticed on Plaintiffs' Notice of Depositions to Defendants and then incredulously claiming Defendants were unaware that there was any order to the noticed depositions notwithstanding that the Notice of Depositions contained a chart chronologically listing the dates and the names of the deponents.

Plaintiff's counsel has expended significant efforts in attempting to reach resolution without troubling the Court, only for defense counsel to thwart those efforts through illusory scheduling representations and last minute notices that Defendants will once again flout deadlines and obligations. We are weeks away from the scheduled close of discovery and Defendants have not responded to a single outstanding discovery requests, have refused to provide deposition dates for any RIOC employee witnesses and have even refused to inform Plaintiff whether Melick is representing the non-party RIOC employees, with Ms. Rogers claiming she does not know who she represents. What is even more egregious is defense counsel's cavalier attitude towards flouting Defendants obligations under the FRCP and to respond to discovery coupled with their continued willingness to submit blatantly false statements to the Court.

Indeed, Ms. Rogers reaction after learning that her attempts to stymie Plaintiff from scheduling certain non-party depositions was the familiar practice of submitting court filings containing misrepresentations, half-truths, outright falsehoods, and attempts to shift blame and create a false record with self-serving inaccurate correspondence. Plaintiff respectfully submits that Ms. Rogers entire December 28 submission should be disregarded as such. Plaintiff will not address each of the points but will address just a few misrepresentations as examples.

First, Ms. Rogers sought Plaintiff's consent (which was not given) to extend the required status letter for another week seemingly indicating a desire to continue negotiations ostensibly through the close of discovery and *ad infinitim* while she offers illusory solutions, refuses to provide deposition dates, refuses to commit to responding to written discovery by any date at all, and changes positions minutes before the filing of required discovery updates. Ms. Rogers disingenuously pretends to be shocked that Plaintiff was not willing to play along with her gamesmanship, even though counsel acknowledged during telephone discussions last week that an impasse had been reached on several issues requiring the Court's involvement because of Defendants refusal to cooperate in the most basic of issues.

The first paragraph of Ms. Rogers' letter states:

The undersigned unfortunately did not hear from Plaintiff's counsel until 4:00 p.m. today after it was necessary for the undersigned counsel to inquire of Plaintiff's counsel as to whether he would be available today to confer regarding the joint status letter. Plaintiff responded by once again conveying his unwillingness to confer in good faith.

However, in reality on December 27, Ms. Rogers first left a voice message with my office at 3 p.m. and then at 3:05 p.m. emailed a request for Plaintiff to consent to an extension of the discovery status letter. Plaintiff's counsel responded via email by 3:18 pm and by 3:54 emailed to Ms. Rogers the letter dated December 27, 2016 annexed hereto as Exhibit A along with an offer to discuss anything -- all in under one hour. In response, Ms. Rogers sent a flurry of accusatory self-serving emails designed to alter the record and then went dark. Plaintiff could establish the spurious nature of nearly each assertion in Ms. Rogers December 28 correspondence. However, the problem is the comfort that Ms. Rogers displays in constantly attempting to mislead two federal court judges through the submission of misleading and blatantly false misrepresentations over the past approximate one year, which comfort seems to increase with each occasion that goes unchecked.

4

Plaintiff's counsel has never needed to trouble a court with such a ministerial task as scheduling depositions and does so in this case having exhausted other alternatives. Indeed, it is now a mere three weeks prior to the scheduled end of discovery and Defendants steadfastly have refused to comply with even the most basic of their obligations. In contrast to Defendants' dilatory conduct, Plaintiff diligently prosecuted this action notwithstanding that his counsel is a solo practitioner and during much of this time was otherwise occupied receiving medical treatment through outpatient hospitalization. Defense counsel on the other hand is a large law firm with six regional offices. Additionally, Defendant RIOC has at least 6 attorneys on staff available to work on this matter. Specifically, (1) recently appointed President Susan Rosenthal, who formerly served as General Counsel and appeared before Your Honor in that role on this matter; (2) General Counsel Jacqueline Flug; (3) Associate General Counsel Arthur Eliav; (4) Associate Counsel Lada Stasko; (5) New Excelsior Legal Fellow Chris Dor, who Ms. Rosenthal represented is specifically tasked with handling issues related to this matter; and (6) Gretchen Robinson, who technically serves as an Internal Controls and Compliance Officer, but who is an admitted attorney and is frequently relied on to preform legal work at RIOC.

Nonetheless, Defendants are incapable or unwilling to respond to single simple discovery requests for months on end. And only even sent any discovery requests to Plaintiff on the eve of the First Status Letter due date. Ms. Rogers repeated excuse is that she cannot handle responding to Plaintiff's discovery requests in a timely manner -- or even commit to any date certain whatsoever of doing so -- because her firm represents all the Defendants and it is time-consuming for her to respond on behalf of each Defendant. If Melick lacks the capacity to represent all Defendants, Melick should not have undertaken that representation.[5] Indeed, it is foreboding that such effort had to be expended just to attempt to have Defendants comply in any manner with their discovery FRCP obligations and any substantive issues regarding the adequacy of Defendants' responses remain a complete unknown because Defendants have sought to engage in misconduct and blatantly frivolous and transparent gamesmanship instead of working on their discovery obligations.

Accordingly, Plaintiff respectfully requests that the Court (i) "so order" the deposition schedule set forth in the correspondence attached as Exhibit A; (ii) hold a conference so that Defendants will be made to comply with their discovery obligations or be penalized for their failure to do so; and (iii) such further relief as the Court deems just and appropriate.

Respectfully submitted,

Anthony J. Rotondi

---

[5] Indeed, it is unclear how Melick represents Ms. Indelicato -- who might be described as orchestrating Plaintiff's unlawful termination -- and the Resident Director Defendants, who as the Court may recall: (i) expressed shock upon learning of Plaintiff's unlawful termination; (ii) subsequent to Plaintiff's unlawful termination were overheard yelling at Defendant Indelicato that "you [Indelicato] lied to us [the Resident Directors]"; (iii) provided Plaintiff with a glowing written recommendation; (iv) urged Plaintiff "to not take what had been done to him lying down;" and (v) expressed a desire to compensate Plaintiff for his unlawful termination.

# Tab B

## GENERAL ISSUES / DEFICIENCIES REGARDING DEFENDANTS' PRODUCTIONS [1]

1. Confirm verbal representations made on numerous occasion that Defendants have not withheld any documents from production for any of the objections listed in their responses other than on privilege grounds and that all documents withheld have been listed on the privilege logs.

2. RIOC's counsel indicated that a chart identifying documents produced with its corresponding document request number but that chart has not been received.

3. Privilege logs lack sufficient information regarding drafter of documents, sender, and all recipients.

4. Many documents listed on the logs are not privileged and do not even involve counsel. Some of these documents were discussed during depositions and their production requested.

5. There is no email correspondence, including between Lewis/Gabay, Lewis/Eliav, Lewis/Stasko, Lewis/Indelicato and Lewis/Steiner.

6. Defendant Indelicato produced emails that no other Defendant produced, including RIOC. How is that possible for Indelicato to produce emails from the Corporate files but RIOC did not produce the documents.

7. No documents related to the *Anthony Jones* matter, including with Jackson Lewis.

8. No documents regarding use of outside counsel (invoices, emails etc.) including Jackson Lewis, Carter Ledyard, and Harris Beach

9. 4-16-15 Memo from Don Lewis re Excelsior Program: Cherry-picked documents trying to show the fellow was hired in response to Lewis request but Indelicato denied the request when he submitted and those documents were not produced.

10. No documents related to first IG report. Only one draft was produced. There are no other drafts or correspondence etc. There are numerous documents regarding the investigation and report that were not produced.

11. No documents related to OIG complaint concerning Walton salary issues.

12. No documents from internal RIOC investigation initiated by Howard Polivy concerning Walton salary issues.

13. No documents from internal RIOC investigation initiated by Howard Polivy concerning allegations of discrimination at RIOC.

14. No documents from internal RIOC investigation initiate by Howard Polivy concerning general allegations of misconduct at RIOC.

15. No communications between Indelicato and the OIG, including but not limited to communications with Robert Werner, Phil Foglia and Cathy-Leahy Scott.

16. No Affirmative Action Plan produced.

17. No documents regarding Good Shepherd Project were produced.

18. No termination documents / letters / notices for anyone, including executives.

19. No resignation documents / letters / notices for anyone, including executives.

20. No severance or settlement documents /letters for anyone, including executives.

---

[1] The following are some deficiencies in Defendants' productions, is not exhaustive, and is submitted without prejudice to supplementation and / or otherwise.

21. Othniel Maragh made multiple complaints to the Board, but only Kraut produced some and the list of recipients has been removed.

22. No e-mails from Erica Spencer to Board or anyone regarding her concerns.

23. No e-mails from Karline Jean regarding any of her concerns.

24. No documents regarding preparation of the EEOC Position Statement responding to Lewis' Charge.

25. No e-mails from Rie Arai regarding any of her concerns.

26. No e-mails from Lada Stasko or Arthur Eliav.

27. Christian stated that there was an e-mail circulating among the board about severance for Lewis but nothing produced.

28. No e-mails at all between multiple Board members.

29. No e-mails from McDade to Lewis and other executives about evaluations.

30. Defendant LaBate produced no documents. Advise whether Defendant LaBate is requiring Plaintiff to serve a subpoena on her employer for documents.

31. Only three documents produced that involve Claudia McDade who was head of personnel.

32. Not one e-mail with C. Indelicato and the Board after Lewis was terminated even though Board was upset with the termination.

33. Only a few cherry-picked documents concerning the Excelsior Fellow application.

34. Assembly member Seawright sent RIOC a letter regarding discrimination allegations / salary misconduct that has not been produced.

35. Documents were produced in some haphazard manner by which counsel took documents and allocated among various defendants and did not produced duplicates if one defendant had the same documents as another defendant so there is no way to determine who had what document.

36. No documents created by, sent by, or sent to from Gretchen Robinson, who would have been involved in creating, sending, or receiving relevant documents, particularly documents concerning staffing and internal investigations.

37. No documents produced related to EEOC position statement.

38. In multiple instances produced materials related to filling executive positions created post-Lewis termination where it appears minorities received the positions but next to nothing was produced regarding filling positions prior to Lewis' termination.

39. Did not produce the actual EEOC complaint from Rie Liu.

40. Defendant Grimm stated the document in her production were not all provided by her and were mixed and matched from other sources.

41. Defendant Shinozaki and other individual Defendants testified about turning over numerous documents to their counsel but just a few pages were produced and hardly any documents listed on their privilege logs, if any.

**Tab C**





### All Information is Strictly Confidential

The Appointments Questionnaire is designed to gather detailed information from potential appointees/nominees to positions which may become available within the administration of Governor Andrew M. Cuomo. **Every question must be answered. If a question is inapplicable, write "N/A" in the answer space provided. Please attach a copy of your current resume, birth certificate, passport, relevant diplomas, and, if applicable, marriage certificate, divorce decree, or military form DD-214.**

Please return the completed material to the following address:

> Deborah Morris
> Office of General Services
> Center for Recruitment and Public Service
> Corning Tower, 41st Floor
> Albany, New York 12242

## SECTION 1

| NAME AND CONTACT INFORMATION | | |
|---|---|---|
| *LAST* | *FIRST* | *MIDDLE* |
| Indelicato | Charlene | Marie |
| *MAIDEN NAME (IF APPLICABLE)* | *ALL OTHER NAMES USED* | |
| N/A | N/A | |

Have you used a name other than the one given above? If so, please set forth the name(s) and explain why:

No

| ADDRESSES FOR THE LAST 5 YEARS | (LIST CURRENT ADDRESS FIRST) |
|---|---|

█████████████████████████████████████████████████████████████

| STREET NUMBER AND NAME | CITY | STATE | ZIP CODE | DATES RESIDED TO |
|---|---|---|---|---|
| STREET NUMBER AND NAME | CITY | STATE | ZIP CODE | DATES RESIDED TO |
| STREET NUMBER AND NAME | CITY | STATE | ZIP CODE | DATES RESIDED TO |
| STREET NUMBER AND NAME | CITY | STATE | ZIP CODE | DATES RESIDED TO |

## PERSONAL ID INFORMATION

| SEX M☐ F☒ | PLACE OF BIRTH (CITY, STATE) ███ NYC | SOCIAL SECURITY NUMBER ████████ |
|---|---|---|
| CITIZEN YES☒ NO☐ | IF NO, NATURALIZED ☐     RESIDENT ALIEN ☐ | INS # |
| PARENT # 1 NAME (INCLUDING MAIDEN NAME IF APPLIC.) Vincent Indelicato | PARENT # 2 NAME (INCLUDING MAIDEN NAME IF APPLIC.) Rosetta Indelicato | |
| DRIVER'S LICENSE? YES☒ NO☐ | ISSUING STATE NY | CLASS D | EXPIRATION DATE 9-25-20 | DRIVER LICENSE # ██████ |

## MARITAL INFORMATION

IF MORE THAN ONE, LIST ALL, WITH MOST RECENT FIRST. IF MORE SPACE IS NEEDED, CONTINUE BELOW OR ATTACH A SEPARATE SHEET OF PAPER.

| ☒SINGLE        ☐MARRIED ☐DOMESTIC PARTNER  ☐DIVORCED ☐SEPARATED | DATE OF MARRIAGE | LOCATION (CITY, STATE) |
|---|---|---|
| SPOUSE (INCLUDE MAIDEN NAME IF APPLICABLE) | OFFICIANT | |
| SPOUSE'S DOB | SPOUSE'S PLACE OF BIRTH | SPOUSE'S OCCUPATION/EMPLOYER/BUSINESS ADDRESS |
| IF DIVORCED, GROUNDS FOR DIVORCE | CIVIL INDEX NUMBER | DATE OF DIVORCE | LOCATION OF DIVORCE FILING |

2

## PREVIOUS MARRIAGE(S)

| NAME OF FORMER SPOUSE/DOMESTIC PARTNER (INCLUDE MAIDEN NAME IF APPLICABLE) | DATE OF MARRIAGE | LOCATION (CITY, STATE) |
|---|---|---|
| **N/A** | | |
| OFFICIANT | DATE OF DIVORCE | LOCATION OF DIVORCE FILING |
| GROUNDS FOR DIVORCE | CIVIL INDEX NUMBER | |

ORDERS OF PROTECTION – If you've ever been the subject of an Order of Protection, list date & location of same.

| NAME OF FORMER SPOUSE/DOMESTIC PARTNER (INCLUDE MAIDEN NAME IF APPLICABLE) | DATE OF MARRIAGE | LOCATION (CITY, STATE) |
|---|---|---|
| OFFICIANT | DATE OF DIVORCE | LOCATION OF DIVORCE FILING |
| GROUNDS FOR DIVORCE | CIVIL INDEX NUMBER | |

## EDUCATION   IF MORE SPACE IS NEEDED, CONTINUE BELOW OR ATTACH A SEPARATE SHEET OF PAPER.

| NAME OF HIGH SCHOOL | ADDRESS (Town & State) | DATES ATTENDED | DEGREE |
|---|---|---|---|
| St Jean Baptiste | 173E75th St, NY,NY 10021 | 9/64 to 6/68 | HS diploma |
| NAME OF COLLEGE OR UNIVERSITY | ADDRESS (Town & State) | DATES ATTENDED | DEGREE |
| St. Johns University | 8000 Utopia Pkwy, Queens NY | 9/68 to 6/72 | BA |
| NAME OF COLLEGE OR UNIVERSITY | ADDRESS (Town & State) | DATES ATTENDED | DEGREE |
| Pace Law School | 78 North Broadway, White Plains, NY | 9/76 to 6/79 | JD |
| NAME OF COLLEGE OR UNIVERSITY | ADDRESS (Town & State) | DATES ATTENDED to | DEGREE |

## MILITARY   YES ☐   NO ☒

| Air Force ☐   Army ☐ Coast Guard ☐   Marine Corps ☐ Navy ☐ | RESERVES ☐ National Guard ☐ | SERVICE NUMBER: Proof of Service – Attach copy of DD-214 |
|---|---|---|

TYPE OF DISCHARGE: _____

3

| Licenses/Certifications | List all professional licenses, bar standings and/or certificate, including registration numbers, that applicant holds or has ever held and whether licenses, standings or certifications are current. If license or certification has ever been suspended and/or revoked, please explain in the space below: | | |
|---|---|---|---|
| **LICENSE OR CERTIFICATION**<br>NYS Attorney | **REGISTRATION**<br># 1685361<br>1st Judicial Dept.<br>1980 | **EXPIRES**<br>2014 | **SUSPENDED OR REVOKED**<br>YES ☐  NO ☑ |
| **LICENSE OR CERTIFICATION**<br>Real Estate Broker | **REGISTRATION**<br>N/A | **EXPIRES**<br>expired | **SUSPENDED OR REVOKED**<br>YES ☐  NO ☑ |
| **LICENSE OR CERTIFICATION**<br>notary | **REGISTRATION**<br>N/A | **EXPIRES**<br>expired | **SUSPENDED OR REVOKED**<br>YES ☐  NO ☑ |
| **LICENSE OR CERTIFICATION** | **REGISTRATION** | **EXPIRES** | **SUSPENDED OR REVOKED**<br>YES ☐  NO ☐ |

Additional License/Certification Information:

| EMPLOYMENT FOR THE LAST 5 YEARS | PLEASE LIST ANY PART TIME POSITIONS, ADJUNCT PROFESSORSHIPS, AND SELF EMPLOYMENT. |
|---|---|
| *NAME OF PRESENT EMPLOYER AND YOUR CURRENT TITLE*<br>City of Mount Vernon, Commissioner of Planning and Development | *DATES OF EMPLOYMENT*<br>1/2012  TO PRESENT |
| *ADDRESS*<br>One Roosevelt Square , Mount Vernon , NY 10550 | *TELEPHONE NUMBER*<br>914 699 7230 |
| *NAME OF PREVIOUS EMPLOYER AND YOUR FINAL TITLE*<br>Guidepost Solutions LLC, Consultant as CCB Consultant LLC | *DATES OF EMPLOYMENT*<br>2/2011  TO 12/2011 |
| *ADDRESS*<br>415 Madison Ave, NY, NY 10017 | *TELEPHONE NUMBER*<br>212 817 6700 |
| *NAME OF PREVIOUS EMPLOYER AND YOUR FINAL TITLE*<br>The Roffe Group PC attorney, researcher | *DATES OF EMPLOYMENT*<br>3/2010  TO 12/2010 |
| *ADDRESS*<br>111 Washington Ave Albany, NY | *TELEPHONE NUMBER*<br>518 432 7841 |
| *NAME OF PREVIOUS EMPLOYER AND YOUR FINAL TITLE*<br>Westchester County, Count Attorney | *DATES OF EMPLOYMENT*<br>2/2001  TO 1/2010 |
| *ADDRESS*<br>148 Martine Ave, White Plains , NY 10601 | *TELEPHONE NUMBER*<br>914 995 2690 |
| *NAME OF PREVIOUS EMPLOYER AND YOUR FINAL TITLE* | *DATES OF EMPLOYMENT*<br>TO |
| *ADDRESS* | *TELEPHONE NUMBER* |

4

| REFERENCES | (NON RELATIVES) – INCLUDE AT LEAST ONE (1) WORK REFERENCE. | | |
|---|---|---|---|
| **NAME** Andrew Spano | **ADDRESS** 2 Trump Park Shrub Oak , NY 10588 | | **YEARS KNOWN** approximately 20 |
| **HOME TELEPHONE NUMBER** | **WORK TELEPHONE NUMBER** | **CELLULAR PHONE NUMBER** 1 914 582 7548 | |
| **NAME** Andrew Roffe | **ADDRESS** 1192 Park Ave  NY NY10128 | | **YEARS KNOWN** more than 15 |
| **HOME TELEPHONE NUMBER** 1 212 828-8895 | **WORK TELEPHONE NUMBER** 1 212 451 2921 | **CELLULAR PHONE NUMBER** 1 917 596 4998 | |
| **NAME** Elisa Burns, M.D. | **ADDRESS** 211 Pound Ridge, Bedford , NY 10506 | | **YEARS KNOWN** more than 20 |
| **HOME TELEPHONE NUMBER** 1 914 234 0639 | **WORK TELEPHONE NUMBER** | **CELLULAR PHONE NUMBER** 1914 826 0855 | |
| **NAME** Sylvia Fabriani | **ADDRESS** 43 Crescent Terrace, Bedford Hills, NY | | **YEARS KNOWN** more than 20 |
| **HOME TELEPHONE NUMBER** 1 914 241 1835 | **WORK TELEPHONE NUMBER** 1 914 241 2400 | **CELLULAR PHONE NUMBER** 1 914 953-9552 | |
| **NAME** Kitley Covill | **ADDRESS** 70 Witlockville Road, Katonah, NY 10536 | | **YEARS KNOWN** about 12 |
| **HOME TELEPHONE NUMBER** 1914 232 6948 | **WORK TELEPHONE NUMBER** | **CELLULAR PHONE NUMBER** 1914 552 9345 | |
| **WORK** Lawrence Schwartz | **ADDRESS** Office of the Governor, State Capitol, Albany 12224 | | **YEARS KNOWN** more than 10 |
| **HOME TELEPHONE NUMBER** | **WORK TELEPHONE NUMBER** 1 518 474 4246 | **CELLULAR PHONE NUMBER** | |

| UNEMPLOYMENT INSURANCE | If you've ever collected UNEMPLOYMENT INSURANCE, list Dates/Time frame of receipt... |
|---|---|
| HAVE YOU EVER COLLECTED UNEMPLOYMENT INSURANCE? · YES [ ]   · NO [✓] | IF YES, LIST DATES OF RECEIPT |

5

| CONTINUED INFORMATION | IF NECESSARY |
|---|---|

_____

_____

_____

_____

_____

_____

_____

**AFFIDAVIT:**

I affirm that the above information is true and accurate. I also understand that a State Police Investigator will be contacting me in the near future to complete the investigation. I agree to this investigation and realize that all information supplied by me will be held in the strictest of confidence.

2/3/2013
_____
Date

_____
Signature

6

## SECTION 2

| RETIREMENT | Please list any retirement plan (pension, deferred compensation or other) for you or your spouse/partner from which you are currently drawing or eligible to draw benefits. | |
|---|---|---|
| SELF: | PLAN: **NYS Retirement Fund** | Currently Drawing/ Eligible to Draw YES☑  NO☐ |
| SPOUSE: | PLAN: | Currently Drawing/ Eligible to Draw YES☐  NO☐ |

1. Please list any <u>uncompensated</u> board position, office, trusteeship, directorship, partnership, or position of <u>any</u> nature, held by <u>you or your spouse</u> with any organization, firm, corporation, partnership or other association. (You may attach a current resume if necessary.)

| Position | Organization | Self/Spouse |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |

2. Please list all governmental positions (federal, state or local) in which you have served or presently are serving, <u>including</u> uncompensated positions on governmental boards and commissions. Please indicate dates.

| Government Entity | Position | Dates |
|---|---|---|
| Please see attached resume | N/A | |
| | | |
| | | |
| | | |

3. Identify any civic, educational or charitable organizations of which you are a member. Specify the name and address of the organization, the dates of your membership, whether such organization has a contract with or otherwise receives money from New York State or any municipality within New York State, and any title that you held in the organization.

| ORGANIZATION | ADDRESS | DATE(S) OF MEMBERSHIP TITLE | NYS CONTRACT/ MONEY RECEIVED (IF ANY): |
|---|---|---|---|
| please see attached resume | | other than NYS Bar Association no lo longer a member | rosa has had a contract with the state to my knowledge |
| | | | |
| | | | |
| | | | |

7

4.  Please indicate any relationship which any of the organizations listed in response to **questions 1, 2, and 3, above as well as your current employer,** have with any State entity (i.e. licensing, regulatory, contractual, funding, etc.).

| Organization | State Entity | Relationship |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |

5.  Identify all memberships and offices held in political parties or election committees during the past ten years.

| Organization | Office Held | Dates | Compensation Received |
|---|---|---|---|
| N/A | | | YES ☐   NO ☐ |
| | | | YES ☐   NO ☐ |
| | | | YES ☐   NO ☐ |

6.  If you received compensation, please provide the particulars.

# N/A

7.  Unless otherwise specifically asked to complete a Financial Disclosure statement by the appointing authority, please list below all sources of income, and estimated amounts for each source in excess of $1,000, for you and your spouse **for the last twelve months.** Sources of income include, **but are not limited to,** state salary, income from other compensated employment whether public or private, directorships and other fiduciary positions, contractual arrangements, teaching income, partnerships, honorariums, lecture fees, consultant fees, bank and bond interest, dividends, real estate rents, and sale or exchange of real or other property. Indicate whether income is paid to you, your spouse, or jointly. **This includes compensated positions listed above. If you filed a Financial Disclosure statement pursuant to Public Officers Law section 73-a for the past year, that may be filed with this statement in lieu of supplying the information below.**

*Time Period Covered* 1/1/12 to present

| Source and Nature | Income | Self/Spouse |
|---|---|---|
| City of Mount Vernon | approximately $145,000 | self |
| City of Mount Vernon Urban | | |
| City of Mount Vernon IDA | | |

8.  If you answer "YES" to any of the following questions, please provide a detailed explanation. Attach a separate sheet if necessary.

| | | Y | N |
|---|---|---|---|
| (a) | Have you ever been convicted of, or entered into a plea of guilty or nolo contendere to any felony or misdemeanor which has not been sealed? | | ✔ |
| (b) | Have you ever been convicted of or pleaded guilty to a motor vehicle offense, excluding parking tickets or other non-moving violation, or have you ever had your license suspended or revoked? | | ✔ |
| (c) | Have you ever been disciplined by any court, administrative agency, professional association, disciplinary committee or other professional group, or the subject of any proceeding, inquiry or investigation by any professional association, including bar association, of which you were or are a member? | | ✔ |
| (d) | Are there any criminal actions or proceedings currently pending against you? | | ✔ |
| (e) | Have you ever had an employment discrimination or sexual harassment charge filed against you that has been substantiated or otherwise upheld by a court of law, administrative agency, arbitrator or grievance committee or such charge settled or otherwise resolved with a finding or acknowledgement that you were at fault? | | ✔ |
| (f) | Are you presently, or have you ever been named as a defendant or respondent in any agency proceeding or civil litigation? | | ✔ |
| (g) | Has any business in which you are or were an owner, officer, director or partner, been a plaintiff or a defendant in a civil lawsuit? | | ✔ |
| (h) | Is anyone currently threatening to sue you or any business in which you are an owner, officer, director or partner? | | ✔ |
| (i) | Are there currently any unsatisfied liens or judgments against you or any business in which you are an owner, officer, director or partner? | | ✔ |
| (j) | Do you believe that you need any accommodations by your employer in order to perform the duties that may be required by the position you seek? | | ✔ |
| (k) | Are you in arrears on any child support and/or maintenance obligations? | | ✔ |
| (l) | Are you or any businesses in which you are an owner, officer, director or partner in default of tax obligations to federal, state or local authorities? | | ✔ |
| (m) | Are there any tax liens currently assessed or pending against you, any business in which you are an owner, officer, director or partner, or any real property in which you have a beneficial or legal interest? | | ✔ |
| (n) | Are you in arrears on the repayment of any loans? | | ✔ |
| (o) | Were you ever expelled, suspended, placed on probation, or subject to any other disciplinary action while attending college or graduate school? | | ✔ |
| (p) | Are you a resident of New York State? | ✔ | |
| (q) | Do you, or any immediate family member own or have any interest in real property that has been cited for health, safety or environmental violations by federal, state or local authorities? | | ✔ |
| (r) | Have you or any member of your immediate family engaged in any lobbying activities within the last five years? | | ✔ |
| (s) | Have you or any member of your immediate family previously registered with the Temporary Commission on Lobbying, the Public Integrity Commission, or Joint Commission on Public Ethics? | | ✔ |
| (t) | Have you failed to file your federal or state income tax returns at any time within the last ten years? | | ✔ |
| (u) | Have you ever had an order of protection entered against you in a court proceeding? | | ✔ |
| (v) | Have you ever been cited for contempt of any court, legislative, civil or criminal investigative body or grand jury? | | ✔ |
| (w) | Have you, your spouse or any corporation, firm, partnership or other business enterprise or non-profit organization or other institution in which you or your spouse have served as an owner, officer, director, trustee or partner ever filed a petition for | | ✔ |

9

| | Y | N |
|---|---|---|
| bankruptcy under the U.S. Bankruptcy Code? | | |
| (x) Within the last 5 years, have you employed any domestic or household help, including but not limited to a housekeeper, babysitter, nanny or gardener for whom you did not pay withholding taxes or other employment-related assessments (including but not limited to unemployment insurance or workers' compensation payments)? | ☐ | ☑ |
| (y) With respect to such individuals identified in (x), were such individuals United States citizens or documented aliens? | ☐ | ☑ |
| (z) Have you ever been involuntarily terminated from a job or position or resigned from a job or position after being informed that you would be involuntarily terminated? | ☐ | ☑ |
| (aa) Have you ever maintained a weblog ("blog")? If so, please provide URL address, and dates on which the blog was maintained, or which you wrote? | ☐ | ☑ |
| (bb) Do you have any relationship, personal or professional, with any persons employed by or engaged in business with the agency, board or authority to which you seek appointment? | ☐ | ☑ |
| (cc) Do you have any commitments or agreements to pursue outside employment, with or without compensation, while you may be employed by the State of New York? | ☐ | ☑ |
| (dd) Do you, your spouse or immediate family member own or have any interest in any real property which during the time of such ownership has been cited for health or environmental violations, been condemned or closed, or been determined to contain hazardous materials by any federal, state, or local authority? | ☐ | ☑ |

10.

| | Y | N |
|---|---|---|
| Are there any matters which may involve a conflict of interest or an appearance of such a conflict or any problem in connection with your appointment to the position for which you are being considered, which are not fully covered by your answers to this questionnaire? | ☐ | ☑ |

If yes, please set forth the pertinent facts below, including an explanation of how you would propose to resolve such conflict of interest or problem (e.g. divestiture, removal, resignation, etc.)

_____

_____

_____

11.

| | Y | N |
|---|---|---|
| All appointees subject to confirmation by the Senate must consent to review. Do you consent to a copy of this questionnaire being reviewed by the Senate Finance Committee if you are nominated for the position you seek? | ☑ | ☐ |

10

**EXHIBIT N**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

DONALD LEWIS,

                    Plaintiff,


          -against-            Index No.
                               16-CV-03071(ALC)

THE ROOSEVELT ISLAND OPERATING
CORPORATION, et al.,

                    Defendants.
------------------------------------X

                         30 Wall Street
                         New York, New York
                         March 27, 2017
                         10:23 A.M.


     DEPOSITION of MICHAEL SHINOZAKI, one

of the Defendants herein, taken by the

attorney for the Plaintiff, pursuant to

Court Order, and held at the above-stated time

and place, before Nancy Laskaris, a Notary

Public of the State of New York.

2       record at 10:32 A.M.

3               (Plaintiff's Exhibit 31, letter

4       dated May 19, 2015, was marked for

5       identification as of this date.)

6       Q.      Mr. Shinozaki, I've handed you

7  Exhibit 31, Plaintiff's Exhibit 31, which is a

8  letter dated May 19, 2015 from me to

9  Ms. Indelicato, the redline document

10  preservation for former RIOC general counsel

11  Donald Lewis.

12              Do you recall seeing this document?

13      A.      No.  I don't recall seeing this

14  document.

15      Q.      Were you aware of the existence of

16  this document prior to me handing it to you?

17              MR. GARDNER:  Objection to the form.

18      You can answer.

19      A.      This specific document, no.

20      Q.      Were you aware of the contents of

21  this document?

22              MR. GARDNER:  Objection to the form.

23      You can answer.

24      A.      The specific contents of that

25  document, no.

2        Q.      Do you -- withdrawn.

3        A.      I wasn't upset.  I was saying you

4    were being rude and unprofessional.

5        Q.      I would disagree about that because

6    your attorney wasn't here but besides that, I

7    mean, being precise and on time and punctual is

8    important to you?

9        A.      Yes.

10       Q.      Complying with rules is important to

11   you?

12       A.      Yes.

13       Q.      Complying with your obligations is

14   important to you?

15       A.      Yes.

16               MR. ROTONDI:  Let's mark this.

17               (Plaintiff's Exhibit 32, Plaintiff's

18        first request for production, was marked

19        for identification as of this date.)

20       Q.      Mr. Shinozaki, the court reporter

21   has handed you Plaintiff's Exhibit 32.  Have you

22   seen this document before?

23       A.      This specific document, I'm not

24   sure.  I reviewed a bunch of documents but this

25   specific one probably.

2        Q.      When you say you reviewed a bunch of

3    documents, you mean in this case?

4        A.      Yes.

5        Q.      What documents have you reviewed in

6    this case?

7        A.      I would have to review the stack to

8    see -- to tell you whether or not I remember

9    that precise document or not.

10        Q.      What documents do you recall seeing

11    that have the caption of the case on it like

12    Exhibit number 32 has or similar to that, either

13    listing Roosevelt Island Corporation, et al or

14    the other Defendant's as well?

15        A.      Um, I remember seeing documents with

16    that header on it.  I don't remember all the

17    details of the document at this time.

18        Q.      You do not recall either way whether

19    you have seen Exhibit 32 beforehand, before the

20    court reporter handed it to you?

21        A.      I do not recall that particular

22    document.  I have reviewed several other

23    documents, which were provided by defense

24    counsel.  I cannot say with one hundred percent

25    certainty whether this was that exact document

 2          (Whereupon, at this time there was a

 3      pause in the proceeding.)

 4          THE VIDEOGRAPHER:  Back on the

 5      record at 12:53 P.M.

 6      Q.    Sir, can you please turn to Exhibit

 7  8 in the first binder of the exhibits you have

 8  in front of you?

 9      A.    Yes, sir.

10      Q.    Please turn to the document labeled

11  Smith 000428 which is about midway through

12  Exhibit A in the bottom right corner.

13      A.    Which document, sir?

14      Q.    428 Smith 000428 in the back.  It's

15  an employee status change form.  Have you seen

16  this document before?

17      A.    No.

18      Q.    Never?

19      A.    Not to my knowledge.

20      Q.    Any understanding as to why

21  Ms. Smith would have this document?

22      A.    I do not know why she would have

23  this document unless she requested it.

24      Q.    It is an employee status change

25  form, correct, from RIOC?

2       A.      Yes.

3       Q.      The first document, 428 relates to

4    employee Frances A. Walton?

5       A.      Yes.

6       Q.      Walton, W-A-L-T-O-N?

7       A.      Yes.

8       Q.      Salary one hundred and thirty

9    thousand, in the middle there?

10      A.      Yes.

11      Q.      Biweekly breakdown, five thousand?

12      A.      Yes.

13      Q.      Location code 1100?

14      A.      Yes.

15      Q.      Signed by the president

16   Ms. Indelicato?

17      A.      Yes.

18      Q.      Signed by the head of human

19   resources Claudia McDade?

20      A.      Yes.

21      Q.      429, Frances Walton, Walton,

22   W-A-L-T-O-N?

23      A.      Yes.

24      Q.      Location code 1100?

25      A.      Yes.

2        Q.     New salary one thirty-two, six zero

3   two, point six five?

4        A.     Yes.

5        Q.     Biweekly breakdown five thousand one

6   hundred and ten cents?

7        A.     Yes.

8        Q.     Signed by Ms. Indelicato, correct?

9        A.     Yes.

10       Q.     Ms. Walton?

11       A.     Yes.

12       Q.     Ms. Indelicato again and Ms. McDade?

13       A.     I assume that's her signature, it's

14   in scribble but...

15       Q.     Assuming that it's not a forged

16   signature?

17       A.     Well, no, I don't know what her

18   signature looks like so I'm assuming that's

19   hers.

20       Q.     Well, you see where it says

21   president and the signature is virtually

22   identical to department head.

23       A.     In both case though it's scribbled,

24   so...

25       Q.     I would like you to skip over 430

2    and now go to 431.  Another employee status

3    change form.  This is effective 4/1/2013?

4         A.    Yes.

5         Q.    Frances Walton, W-A-L-T-O-N?

6         A.    Yes.

7         Q.    New salary one forty-eight, nine five

8    six, point zero, zero?

9         A.    Yes.

10        Q.    Biweekly breakdown five thousand

11   seven hundred and twenty-nine point zero eight?

12        A.    Yes.

13        Q.    Signed by Ms. Indelicato as the

14   president?

15        A.    Yes.

16        Q.    Ms. Walton, CFO?

17        A.    Yes.

18        Q.    Ms. McDade, human resources?

19        A.    Yes.

20        Q.    Next one 432, Frances Walton,

21   W-A-L-T-O-N?

22        A.    Yes.

23        Q.    Signed by President Indelicato?

24        A.    Yes.

25        Q.    Ms. Walton?

2        A.      Yes.

3        Q.      Ms. McDade?

4        A.      Yes.

5        Q.      Please turn back to Exhibit 430,

6    page 430, I'm sorry.  This is the one that

7    relates to the increase that Ms. Walton received

8    that became a question, correct?

9        A.      I believe so.  I don't know if this

10   is the one that related to that specific

11   question but, yes, I'll go with that.

12       Q.      How is Ms. Walton's name spelled on

13   it, on this document?

14       A.      It appears to be mistyped.

15       Q.      W-A-T-O-N, correct?

16       A.      Yes.

17       Q.      The new salary is one forty-two,

18   eight hundred annually?

19       A.      Yes.

20       Q.      There is no breakdown as in all the

21   other forms we looked at for Ms. Walton?

22       A.      Yes.

23       Q.      Who signed this document?

24       A.      Ms. Indelicato.

25       Q.      Anyone else?

2          A.          No.

3          Q.          Does that concern you that

4     Ms. Walton didn't sign this one as the rest?

5          A.          That Ms. Walton didn't, no.  It

6     concerns me that Ms. McDade didn't.

7          Q.          Does that give you -- withdrawn.

8                      You never saw this document 430

9     before, correct?

10         A.          No, I've never seen this.

11         Q.          Having seen it now, would

12    you -- seeing this document today, do you

13    believe any further steps are necessary to

14    determine whether the raise for Ms. Walton was

15    authorized or not?

16         A.          I did not see these documents before.

17         Q.          I understand.

18         A.          Whether or not they were authorized,

19    if they were within the budget that had

20    previously been approved then they were able to

21    make those changes.  It appears it was not

22    properly documented because one of them is not

23    signed by human resources.

24         Q.          Well, one of the allegations is that

25    the raise was hidden from the board, correct?

Michael Shinozaki                    138

2    A.    I believe so, yes.  That was one of

3    the allegations.

4    Q.    Right.  So if the raise was hidden

5    from the board, doesn't this document 430

6    concern you that it was created afterwards to

7    hide the fact that the raise was hidden from the

8    board?

9          MR. GARDNER:  Objection.

10   A.    Do I find it concerning seeing these

11   documents now for the first time?

12   Q.    Yes, that's correct.

13   A.    Yes.

14   Q.    Are you going to take any other

15   steps now to investigate whether this raise

16   was authorized to Ms. Walton?

17         MR. GARDNER:  Objection.

18   A.    It will be an item for our

19   compliance officer to review.

20   Q.    Who is your compliance officer?

21   A.    Gretchen.

22   Q.    Gretchen?

23   A.    I don't know the last name.

24   Q.    Robinson.  Does she have a computer

25   background like yourself?

2      A.      She's -- she knows how to use the

3 computer.  I don't know that she has a computer

4 background.

5      Q.      You know how to use a computer?

6      A.      Yes, sir.

7      Q.      Who is better equipped to determine

8 whether this document was falsified or not,

9 you or Ms. Robinson?

10              MR. GARDNER:  Objection to form.

11 You can answer.

12      A.      I do not know her qualifications to

13 perform a forensic --

14      Q.      Do you think her qualifications are

15 as good as yours in that regard?

16      A.      No, sir.

17      Q.      What would you do to determine if

18 this document was falsified?

19      A.      Depends upon the nature of the

20 investigation.  It could involve reviewing the

21 original source documents, interviewing people,

22 making sure that the document matches the dates.

23      Q.      The original source document could

24 be an electronic document in this case, correct?

25      A.      No, sir.

2        Q.      Why not?

3        A.      It potentially could but given the

4    fact the way these signatures are laid out and

5    the different weights and the smoothness of some

6    of the different strokes, unless they were using

7    certain types of digitizing to capture the

8    signature, it would be choppier than that.

9        Q.      Right so -- I'm sorry go ahead.

10       A.      So my initial path without doing a

11   full forensic analysis would be this was done on a

12   piece of paper and scanned it.

13       Q.      Based on the signatures?

14       A.      Based on the signatures and

15   the -- yeah the written material, the typed

16   materials can be done at any time.

17       Q.      Right so it's possible that this is

18   a form on the computer, correct?

19       A.      Correct.

20       Q.      That it was filled out with the

21   information typed in, correct?

22       A.      Correct.

23       Q.      And then printed?

24       A.      Yes.

25       Q.      And then signed?

2      A.      That would be the initial guess yes,

3   sir.

4      Q.      So if you had access to the computer

5   system, you would be able to tell when this

6   document was created?

7      A.      On the initial computer system by

8   reviewing the metadata of the files and the

9   changes to the file system, there were a number

10   of steps that can be done to determine when the

11   files were created and when they were last

12   modified and when they were printed.

13              That information would be held in a

14   variety of places on the files system.

15      Q.      Where would it be held at RIOC?

16      A.      I don't know who actually prepared

17   this document.

18      Q.      You would need the electronic data

19   in native form, correct?

20      A.      To -- depending upon on the level of

21   depth you needed to go, you would either need

22   the original document, you would probably need

23   the original document to see when they were

24   signed, check the signatures on the paper.

25              You would probably need -- the next

2    level would be the copies of the file themselves

3    because many -- depending on which program they

4    used to generate this file, it could have been

5    Word, Adobe Acrobat, it could have been any

6    number of document preparation tools.

7                Those different applications would

8    post certain metadata into the files.  The

9    computer on which the documents were created

10   would have information on the file system.

11       Q.      Are you aware that Mr. Lewis

12   requested that the documents that were produced

13   to him be produced in native format and

14   electronic format?

15       A.      I remember seeing that in the

16   instructions that I received which is why I

17   provided all of the materials that they had.

18       Q.      To your attorneys?

19       A.      To the attorneys, yes.

20       Q.      But your attorneys didn't provide it

21   to us in that format, are you aware of that?

22       A.      No, sir.

23       Q.      They scrubbed out all the data.

24       A.      That's not accurate because if they

25   scrubbed out all the data you'd have blank

2    pages.

3        Q.      They scrubbed out the metadata?

4        A.      That I'm not aware of.

5        Q.      Considering that you are more

6    experienced in the area of cyber technology, do

7    you plan on taking any steps to investigate this

8    document 430?

9        A.      You are asking me to speculate what

10   I may or may not do in the future?

11       Q.      I'm asking what your intention is

12   right now sitting here, do you intend to take

13   any measures or steps?

14       A.      This would be an item to bring up in

15   the Governor's committee, for the board to

16   review the internal controls.

17       Q.      You were aware of the allegations

18   concerning Ms. Walton's raise, correct?

19       A.      After the fact, right.

20       Q.      So do you think this would have been

21   a key piece of information for you to have had

22   at the time that you became aware of the

23   allegations?

24           MR. GARDNER:  Objection.  You can

25       answer.

2        A.        For me personally, yes.

3        Q.        Are you disappointed that you are

4    only learning about this questionable document

5    for the first time during today's deposition?

6        A.        Yes, sir.

7        Q.        Did you know Mr. Chironis filed a

8    complaint with the inspector general's office

9    regarding the raise to Ms. Walton?

10       A.        I'm aware of that yes, sir.

11       Q.        Are you aware that the only

12   individual that he named as a subject of that

13   investigation was Ms. Indelicato?

14       A.        I believe I heard that in his

15   e-mail, yes.

16       Q.        Does that give you additional cause

17   for concern regarding this document that was

18   only signed by Ms. Indelicato?

19       A.        Yes, sir.

20                 MR. ROTONDI:  Let's take a break.

21                 THE VIDEOGRAPHER:  Going off the

22       record at 1:04 P.M.

23                 (Whereupon, at this time there was a

24       pause in the proceeding.)

25                 THE VIDEOGRAPHER:  Back on the

2      record at 3:07 P.M.

3                (Whereupon, at this time there was a

4      pause in the proceeding.)

5                THE VIDEOGRAPHER:  Back on the

6      record at 3:09 P.M.)

7      A.      What is your question in this

8  context?

9      Q.      Sir, were you aware on or around

10  October of 2015 that counsel for Mr. Lewis and

11  counsel for RIOC and yourself were discussing a

12  possible mediation of Mr. Lewis' claims before

13  he even filed the EEOC complaint and before he

14  filed a federal litigation?

15                MR. GARDNER:  Objection.  You can

16      answer.

17      A.      I'm trying to recall if it ever came

18  up in discussions what the status of the issue

19  was.  There was a lot of discussions about why

20  we weren't being told what happened and we were

21  generally informed not discuss it because it was

22  pending litigation.

23                So it kind of, you know, we didn't

24  respond to any inquiries from the press or any

25  inquires from Don or any inquires from anyone

2   else.

3          Q.     Sir, this is not an inquiry from

4   Don.  This is an inquiry from myself -- well,

5   actually I'll represent to you that I was called

6   by the attorneys at Melick and Porter who wanted

7   to have a mediation regarding Mr. Lewis' claims

8   and if you read my e-mail at the bottom page

9   six, Mr. Lewis requested three things in order

10  to have a mediation.

11              First one, the parties agree on an

12  acceptable mediator and forum, which is a given,

13  right?  You can't have a mediation unless you

14  agree to it.

15              The third one is the parties and

16  county use their best efforts so that any

17  mediation occurred without undue delay; that's a

18  given.

19              The second one was all

20  parties -- request that all parties listed in

21  the Notice of Claim be present at the mediation

22  and I indicated that we were willing to hold the

23  mediation after hours or on the weekend so

24  scheduling wouldn't be an issue.

25              Are you aware that you were listed

2    on the Notice of Claim, Mr. Lewis' Notice of

3    Claim?

4         A.      I believe so.  I'm not certain.

5         Q.      So, again, were you aware in October

6    of 2015 that possible resolution to Mr. Lewis'

7    claims were being discussed before he filed the

8    EEOC complaint, before he filed the federal

9    litigation and before he was sued?

10             MR. GARDNER:  Object to the form but

11         you can answer.

12         A.      I remember there was discussion

13   about it because the board itself was interested

14   in what was going on.  Was it conveyed to us in

15   any type of formal discussion, no, because it

16   was being handled by insurance counsel and they

17   will let us know the outcome.

18         Q.      Well, Mr. Lewis really just wanted

19   the directors to participate from page six at

20   the bottom, correct?

21             And I'm representing to you that the

22   Notice of Claim listed the directors.

23         A.      He wanted the directors involved but

24   we generally are instructed not to get involved

25   directly with because it's handled with various

2    counsels, either contracted counsel or

3    otherwise.

4        Q.    This was not a direct mediation with

5    you, this was through your attorneys?

6        A.    Yeah.

7        Q.    But you were not given the

8    opportunity to participate in that mediation,

9    were you?

10       A.    No.

11       Q.    You were not informed of that

12   potential mediation, were you?

13       A.    I do not recall if we were told if

14   anything was taking place because there was a

15   lot of discussion, general discussion because we

16   were curious as to what was going on and how we

17   were going to, you know, bring the executive

18   staff up to full strength because we knew we had

19   vacancies.

20            The exact day to day interactions of

21   any mediation, I don't recall.  We were always

22   asking what was going on.

23       Q.    And nobody would tell you?

24       A.    Not particularly, no.

25       Q.    Let me ask you this, when you take

2    Exhibit B the complaint on its whole and did you
3    have the time to read it carefully?  Do you need
4    more time?
5         A.     Carefully is subjective.  I read
6    things sometimes very carefully.  What are you
7    referring to?
8         Q.     Well, taking Exhibit B as a whole
9    and the correspondence back and forth, does it
10   appear to you that your counselor was trying to
11   keep you out of the mediation?
12              MR. GARDNER:  Objection.
13        A.     Can I comment on their state of
14   mind?
15        Q.     No, I'm asking you to comment on the
16   appearance of the correspondence.  Does it
17   appear from the correspondence that you were
18   being omitted from the process?
19              MR. GARDNER:  Objection.
20        Q.     Of a potential mediation?
21        A.     The -- that's a matter of opinion
22   whether the board was being shielded because the
23   counsel that was provided to us was not -- did
24   not feel the need to bring in the board who
25   really does not get involved in day-to-day

2    activities of the firm, of the agency,

3    authority.

4         Q.    Do you really think that's up to

5    counsel to make a decision of whether you should

6    be sued or not?

7              MR. GARDNER:  Objection.

8         A.    That's kind of inflammatory.  Do we

9    enable -- do we enable our counsel to -- under

10   their fiduciary relationship with us to seek

11   after the best interest and we were empowered by

12   the insurance companies and the other folks in

13   the state that counsel is being provided to us,

14   yes, we did, we did trust that that was the

15   situation.

16        Q.    It doesn't bother you that you were not

17   informed of a potential mediation that could

18   have prevented you from being a defendant in a

19   lawsuit?

20             MR. GARDNER:  Objection to the form.

21        A.    You're talking about two years in

22   retrospect.  Two years in retrospect, would it

23   have been potentially useful information to know

24   that this was taking place at that time, it

25   probably would have been.

**EXHIBIT O**

**ANTHONY ROTONDI**
5 Columbus Circle
New York, NY 10019
[ajr@ajrotondi.com](mailto:ajr@ajrotondi.com)
(212) 709-8340

August 12, 2015

*Via Overnight Mail &Facsimile*

Director Kevin J. Berry
EEOC New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

> *Re: Charge of Discrimination Filed By Former Roosevelt Island Operating Corporation General Counsel Donald Lewis.*

Dear Director Berry:

I represent Donald Lewis, Esq. ("Complainant") and write to file a charge on his behalf against his former employer the Roosevelt Island Operating Corporation ("RIOC") and certain of its officers and directors as set forth below.

1. **Complainant:** Complainant's information is as follows but he should be contacted through my office:

   > Donald Lewis (*former RIOC General Counsel and Vice President*)
   > 87 Kings Point Road
   > Great Neck, NY 11024

2. **Complainant's Counsel:**

   > Anthony J. Rotondi
   > 5 Columbus Circle
   > New York, NY 10019
   > (212) 709-8340

3. **Respondents**: Complainant files charges against the following entity and individuals ("Respondent(s)"):

   a. Roosevelt Island Operating Corporation
      591 Main Street
      Roosevelt Island, NY 10044
      (212) 832.4540

   b. Charlene M. Indelicato, RIOC President and CEO (individually and in an official capacity) ("Indelicato")

   c. Frances Walton, RIOC CFO and VP (individually and in an official capacity) ("Walton")

    d.  RIOC Board of Directors during the relevant events (the "Board")
    e.  RIOC Individual Directors during the relevant events (individually and in an official capacity) (the "Directors" or "Director Respondents")

## 4.  *The nature of the Charge:*

RIOC employs approximately 100 to 150 employees. From October 31, 2011 through April 24, 2015, Complainant who is African-American was employed as the General Counsel and Vice President for RIOC. From September 2012 to May 2013, Complainant served as Acting President and CEO while continuing his role as General Counsel. During his tenure at RIOC, Complainant reported instances of misconduct, illegality, discrimination and disparate treatment occurring at RIOC. Complainant had a reasonable, good faith belief that such violations had occurred. As set forth below, Complainant was discriminated against, suffered in a hostile work environment, was retaliated against and ultimately wrongfully terminated.

In May 2013, Respondents RIOC, Board and Directors hired Indelicato as RIOC's President. During the time set forth below in Section 3, Respondent Indelicato, and at times in concert with Walton, among other things, subjected Complainant to continual:

    (i)     discrimination, disparate treatment, retaliation and harassment based upon race and national origin /ethnicity;
    (ii)    discrimination, disparate treatment retaliation and harassment based upon gender;
    (iii)   discrimination, disparate treatment, retaliation and harassment based upon Complainant's reporting, among other things, misconduct, disparate treatment, discrimination and a hostile work environment; and
    (iv)   exposure to a hostile and abusive work environment.

Additionally, when Complainant in good faith reported unlawful acts, misconduct, discrimination, disparate treatment, preferential treatment, and a hostile work environment at RIOC, Complainant was retaliated against, subjected to further harassment, hostility, discrimination and disparate treatment and was ultimately unlawfully terminated from Complainant's employment by Respondent Indelicato under false pretenses through a discriminatory, retaliatory and ultra vires act.

Respondents RIOC, the Board and the Directors, among other things, were negligent and/or reckless in hiring Indelicato by failing to exercise their duties by properly vetting Indelicato including, but not limited to, Indelicato's role as a Defendant in at least two prior Federal employment discrimination lawsuits. Further, RIOC, the Board and the Director Respondents failed to supervise appropriately Indelicato and Walton and failed to prevent or correct misconduct, disparate treatment, discrimination and unlawful conduct at RIOC. The Board and the Director Respondents conduct thereby breached their duties, including fiduciary duties, duties to act in accordance with RIOC's bylaws, duty to exercise independent judgment, and duty to exercise reasonable care, skill and diligence.

Respondents' acts and omissions violated federal and state civil rights laws (including but not limited to anti-discrimination protections, due process rights, and protection against violation of first amendment rights and against retaliation.) Among other things, Respondents' acts and omissions violated both Federal and State law, certain of which fall under the EEOC's jurisdiction. Federal and State laws violated include: Title VII; 42 USC Section 1983; 42 USC Section 1981; Whistleblower Acts; The New York State Human Rights Law; New York City Human Rights Law; NY Labor Law Section 740; Negligent, reckless and intentional torts; Respondeant superior; Vicarious Liability; Wrongful Termination; Post-termination Retaliation; Unlawful Retaliation; Unlawful Discrimination; Failure to Supervise; Negligent Supervision; Negligent Hiring; Infliction of Emotional Distress; Breach of Contract; Interference with Contract; Defamation.

**5.  *The time when the unlawful actions occurred:***

The Respondents' actions complained of occurred from May 2013 through April 24, 2015, when Complainant was unlawfully terminated and continues thereafter. Respondents' retaliatory, discriminatory, disparate treatment and hostility towards Complainant continued and continues after his unlawful termination by, among other things, disseminating false information regarding Complainant's termination and with respect to post-termination benefits and severance.

**6.  *Damages***

As a result of Respondents' illegal acts and omissions, Complainant suffered substantial harm and damages (which continue to accrue) for which he seeks redress.

Complainant requests that in addition to investigating Complainant's Charge, the EEOC file the charge with all appropriate State and local agencies. Complainant will cooperate fully with the agencies in processing his charge in accordance with their procedures. Please advise as soon as possible whether the EEOC will prosecute Complainant's charge or whether the EEOC will issue a right to sue letter so that Complainant may proceed with his claims in the appropriate fora.

Very truly yours,

Anthony J. Rotondi

I, Donald Lewis, have read the above charge and declare under penalty of perjury that the above is true and correct.

Dated: August 12, 2015

Donald Lewis

# <u>Particulars Of EEOC Charge</u>

# Contents

I.     NATURE OF CLAIMS & PARTIES.................................................................3

    A.    **Complainant and Respondents** ...........................................................3

       (i)      Complainant Donald Lewis......................................................3

       (ii)     Respondent Roosevelt Island Operating Corporation ..................3

       (iii)    Respondent Charlene M. Indelicato (individually and in an official capacity)........................3

       (iv)    Respondent Frances A. Walton (individually and in an official capacity)................................5

       (v)     Respondent Claudia McDade (individually and in an official capacity)..................................5

       (vi)    Respondent The RIOC Board of Directors During the Relevant Events .................................6

       (vii)    The Respondent RIOC Individual Directors During the Relevant Events (individually and in an official capacity)...................................7

    B.    **Nature of Claims** .............................................................................8

    C.    **Respondents' Post-Termination Concealment of Their Unlawful Conduct**..............9

II.     **THE FABRICATED GROUNDS FOR LEWIS' TERMINATION**.....................10

    A.    **Lewis' Friday Evening Termination By Email, Without Notice And Based Upon Fabricated Grounds** ......................................................10

    B.    **The Board Refutes the Statements in Indelicato's Termination E-mail and Denies Involvement in the Termination Decision But Fails to Supervise Indelicato and/or Take Any Corrective Action** ...............................11

III.    **THE DISCRIMINATORY, ABUSIVE AND HOSTILE TREATMENT OF LEWIS** ............13

    A.    **The Troubling Pattern of Discrimination – EEOC Complaints and Federal Employment Discrimination Lawsuits** ..........................................13

    B.    **Abusive, Hostile, Humiliating, and Disrespectful Treatment of Lewis** ....................14

    C.    **Indelicato's Manipulative, Hostile and Abusive Conduct Towards Lewis In Connection with a Report from the OIG** ........................................16

    D.    **Disparate Treatment of Lewis Regarding Compensation and Attempts to Cover-up Improper Raises** ........................................................17

    E.    **Other Racially Inappropriate Remarks by Indelicato, McDade and Walton** ........................19

    F.    **Exclusion of Lewis From Meetings**.........................................................20

    G.    **Respondents' Mistreatment of the Legal Department Headed by Lewis** ................21

IV.    **ADDITIONAL DISCRIMINATORY CONDUCT IN RIOC's OFFICE** ................24

    A.    **Monitoring Black Employees But Not White Employees**.............................24

**B.** Higher Compensation and Titles When Positions are Filled by White Employees versus Black Employees ................................................................................................................ 25

**C.** Demeaning Tasks Requested of Minority Employees including Blacks .................................. 25

**V.** PREFERENTIAL TREATMENT OF CAUCASIAN AND ITALIAN EMPLOYEES ............ 26

**A.** The Gross Preferential Treatment of an Italian Employee by Indelicato .............................. 26

**B.** Walton's Undisclosed and Potentially Criminal Salary Raise with the Assistance of Indelicato and McDade ................................................................................................................ 27

**VI.** RETALIATION AGAINST LEWIS FOR REPORTING WRONGDOING AT RIOC ........ 29

**VII.** FAILURE OF THE BOARD AND INDIVIDUAL DIRECTORS TO FULFILL THEIR DUTIES ........................................................................................................................................ 30

**VIII.** WITNESSES ............................................................................................................................ 31

**A.** Witnesses to the Claims Asserted .............................................................................................. 31

**B.** Considerations Regarding Respondents' Potential Undue Influence Upon Witnesses .......... 31

# I.     NATURE OF CLAIMS & PARTIES

## A.  Complainant and Respondents

### (i)     Complainant Donald Lewis

The Roosevelt Island Operating Corporation ("RIOC" or "Corporation") wrongfully terminated Mr. Donald Lewis ("Lewis" or "Complainant"), who is a 42 year-old Black male of Jamaican descent from his position as Vice President and General Counsel of RIOC.[1]  Lewis was employed at RIOC from October 31, 2011 through April 24, 2015.  From September 2012 through May 2013, Lewis continued in his role as General Counsel while simultaneously serving as Acting President and CEO, as well as essentially filling the vacant Vice President of Operations position. Lewis occupied all of three executive positions by himself – i.e., he performed the duties assigned to three full-time paid executives – but was not compensated in any manner for this increased workload.  Additionally, throughout his tenure, Lewis never received a negative performance evaluation.  Rather, without exception, the RIOC Board of Directors has praised Lewis for his work and work ethic.  Indeed, just two weeks prior to his termination, Lewis received a performance based salary increase.  After being unlawfully terminated, Respondents replaced Lewis, as General Counsel with Susan Rosenthal ("Rosenthal"), who like all of the remaining executives at RIOC is a White female over 60 years old.

### (ii)     Respondent Roosevelt Island Operating Corporation

RIOC was created by the State of New York as a public benefit corporation; it is the mission of RIOC to plan, design, develop, operate, maintain and manage Roosevelt Island.  (RIOC and each Respondent listed below are collectively referred to as the "Respondents.")

### (iii)     Respondent Charlene M. Indelicato (individually and in an official capacity)

Respondent Charlene M. Indelicato ("Indelicato") is RIOC President and CEO.  In or around May 2013, the RIOC Board of Directors appointed Indelicato to her position.  Indelicato is a White female over 60 years old of Italian descent, self-described as "unemployable," presumably due to behavior, which has resulted in at least two discrimination cases filed against her in federal court in prior government positions.  In one prior federal discrimination lawsuit, Indelicato, was sued by a former United States Marine for, among other things, gender discrimination.  This was foreboding of her conduct to come with respect to the RIOC executive structure and Lewis.

In addition, Indelicato consistently mispresents and fabricates facts and often makes things up as she goes along to further whatever self-serving agenda she may have.  Indeed, Indelicato's termination e-mail to Lewis (discussed in detail below) is illustrative of her penchant for misstating the truth and speaks volumes about Indelicato's credibility or lack thereof.

---

[1]  Lewis also served as Secretary to the Board of Directors and Ethics Officer for the Corporation.

*(a) The All Older Female White Executive Team Under Indelicato*

The last full executive RIOC team, prior to Indelicato's appointment, was comprised of a female Hispanic (President & CEO), a male White (VP & CFO), a male Hispanic (VP of Operations), and a male Black (VP & General Counsel). The racial and gender makeup of the executives was 50% Hispanic, 25% Black (for a total of 75% Minority), 25% White, 75% male and 25% female. ***Under Indelicato, the profile of the executive positions at RIOC has changed to 0% Hispanic, 0% Black, 0% Minority, 100% White, and 100% female.***[2]

*(b) The Gross Pattern of Discrimination Against Blacks Under Indelicato*

Strikingly, of the four Blacks employed in the RIOC Main Office located at 591 Main Street (which hosts approximately twenty employees) when Indelicato arrived, all four have filed EEOC charges of discrimination, and the fourth, Lewis, was abruptly fired by Indelicato under false pretenses. ***In sum, 100% of the Black employees that worked in the RIOC Main Office when Indelicato was hired have filed EEOC complaints***, and those Black employees constituted approximately 20% of the total employees in the Main Office when Indelicato was hired.

*(c) The Absence of EEOC Complaints by RIOC Main Office Employees Under Prior Presidents and Acting President Lewis Compared to the Troubling Pattern of EEOC Complaints Under Indelicato*

Notably, during Lewis' tenure as General Counsel and Acting President, ***prior to Indelicato's hire, there was not a single EEOC complaint filed by a Main Office employee against RIOC executives concerning discrimination, abusive treatment, hostile work environment or retaliation***. In addition, Complainant is unaware of any other of these of types of complaints filed against RIOC executives by employees in the RIOC Main Office for several administrations spanning at least 10 years prior to Indelicato's hire.

It is commonly understood among investigators that although one complaint may not be indicative of a particular respondent's conduct, more than one complaint of a similar nature can be strongly indicative of a pattern of behavior. This is particularly true when the conduct is very similar and atypical for the setting, the complainants are unknown to each other, the wrongful conduct occurred in a completely different setting, and the only common thread in the instances is the respondent and the similarity of respondent's conduct. Such a troubling conclusion is evidenced by the facts in this charge concerning Indelicato and the prior federal discrimination lawsuits filed against Indelicato (particularly the complaint against Indelicato by a United States Marine discussed below). A conclusion that Indelicato has a penchant for discrimination, abusive treatment and retaliation is unavoidable.

---

[2] The VP of Operations executive position was eliminated under Indelicato as discussed below.

*(d) Indelicato's Immediate Effort to Replace Lewis as General Counsel*
*with Her White Female Friend*

Tellingly, at the very beginning of her tenure, Indelicato attempted to get Lewis out of the position of General Counsel and bring in a White female friend (who Indelicato eventually attempted to create an enhanced salary for and hire in an Internal Controls and Compliance role as discussed below). Indelicato approached Lewis, requested he shift from VP/General Counsel to VP of Operations, and said it would be great for his career, how she had worn different hats and it would be "a great thing." Lewis refused and Indelicato asked again on multiple occasions. Lewis continually refused.

      (iv)    <u>Respondent Frances A. Walton (individually and in an official capacity)</u>

Respondent Walton ("Walton") is RIOC Vice President and Chief Financial Officer and commenced employment in or around and January 2014. Respondents hired Walton after she (according to Indelicato) fell out of favor at the Empire State Development Corporation (another NYS entity) where she was previously employed. Indelicato also stated on more than one occasion that Walton "had been thrown a life raft" and was "on a short leash" and needed the position at RIOC to "help her with her pension." Respondent Walton also is a White female who is a more than 60 years old.

Walton, as CFO of the Corporation is responsible for, among other items, safeguarding the Corporation's assets and preparation of financial reports and budgeting. Notwithstanding this key financial role, Walton, with the assistance of Indelicato and Respondent Claudia McDade gave herself an over $10,000 undisclosed, unauthorized and potentially criminal raise. When Lewis reported this issue, among other items, he was terminated by one of Walton's co-conspirators, Indelicato, in a blatant act of retaliation.

While Indelicato and McDade aligned themselves with Walton regarding her illicit raise, Walton aligned herself with Indelicato and McDade's discriminatory conduct. For example, Walton referred to an approximate 30-year old Black male RIOC employee of Jamaican descent as "that boy," claimed without any support that this employee "looks like he's high on drugs," and that photographs of him looked like "gang" pictures. According to RIOC's former Human Resources assistant, Walton has also echoed certain blatantly racist comments about Black employees made by RIOC's Director of Human Resources Claudia McDade set forth directly below.

      (v)    <u>Respondent Claudia McDade (individually and in an official capacity)</u>

Respondent Claudia McDade ("<u>McDade</u>") is the Director of Human Resources and is also an older White female. Upon information and belief, McDade is of Italian descent as is Indelicato. Respondent McDade has been employed at RIOC for approximately nine years in total. Walton and Lewis were the only Vice Presidents during the much of the events at issue; however, McDade was treated by Indelicato and Walton as if she was a Vice President as well.

McDade's conduct is particularly reprehensible considering that as Director of Human Resources she should be available to all employees for an objective review of their concerns.

Rather than be objective, McDade apparently has made blatantly racist comments, taken sides by aligning herself with bad actors Indelicato and Walton and discriminated against Black employees rather than be objective.

Particularly egregious, when a new Human Resources assistant commenced working for McDade subsequent to Indelicato's hire, McDade, according to this assistant, instructed the assistant not to talk to certain RIOC employees:

> **"[B]ecause they are Black** and they think they are treated unfairly just because of their skin so don't ever talk to them and stay away from them."

Upon the filing of EEOC complaints by certain of these employees, McDade apparently stated to this same new assistant,

> "Look at what they do, because they are Black. **Black people are always looking to make some money, some easy money**."

It appears as if certain of McDade's conduct has been in exchange for monetary benefits, which she has received through the actions of Respondents. Indeed, separate and apart from a 2% raise received by all staff, as well as a performance based increase, McDade received a third unusual so-called "salary adjustment." As a result, McDade's salary has increased substantially since Indelicato and Walton have been in office.

McDade received this almost $10,000 increase despite resigning her position to accept other employment, and subsequently returning to RIOC. Significantly, McDade's resignation was on the heels of discrimination complaints at RIOC, and McDade stating upon her departure that she was leaving because she "didn't want to deal with all this mess that Charlene and Frances are creating." McDade's ability to return with Indelicato's blessing after quitting was in direct contradiction to the policy and practice under Indelicato who stated on more than one occasion "once you leave RIOC, it is a sign of disloyalty, and you do not return; we wouldn't even consider that."[3] Not only was McDade allowed to return, but also she was given this questionable "salary adjustment" apparently in exchange for supporting the discriminatory, abusive and retaliatory misconduct of the other Respondents and the illicit raise that Walton awarded to herself.

(vi)    Respondent The RIOC Board of Directors During the Relevant Events

The RIOC Board of Directors (the "Board") sets RIOC policy and is responsible for the business affairs of the corporation. The Board is also responsible for the hiring and firing of executives and, among other things, the conduct of executives while in office.

---

[3] Indeed, when a former Russian RIOC Director of Engineering suggested he might want to return to RIOC, Indelicato stated without equivocation: "Is he crazy? Once you leave, that's it. It's a sign of disloyalty. If you leave, you do not come back." Apparently, special accommodations were made for McDade.

(vii)   The Respondent RIOC Individual Directors During the Relevant Events (individually and in an official capacity)

Pursuant to its enabling legislation, RIOC is governed by a Board of Directors that is composed of nine members, including the Commissioner of the New York State Division of Housing and Community Renewal (or his or her designee), who serves as the Chair; the Budget Director (or his or her designee); and seven public members appointed by the Governor with the advice and consent of the Senate (the "Individual Directors", "Directors" or "Director Respondents"). Of the seven public members, two members are recommended by the Mayor of New York City and five members must be Roosevelt Island residents ("Resident Directors").

**Current RIOC Board Members**

| Member | Last Appointed | Current Term Expires |
|---|---|---|
| Commissioner of DHCR | Ex-officio | |
| Director, Division of the Budget | Ex-officio | |
| Katherine ("Kathy") Teets Grimm, MD (Resident) | 1/26/10 | 6/10/13 |
| Margaret ("Margie") Mary Elizabeth Smith (Resident, NYC Mayor Appointee) | 1/26/10 | 7/1/13 |
| Michael Shinozaki (Resident) | 1/26/10 | 6/10/13 |
| Fay Fryer Christian (Resident) | 6/19/08 | 5/19/10 |
| David Kraut (Resident) | 6/19/08 | 6/10/11 |
| Howard Polivy (Resident, NYC Mayor appointee) | 5/12/09 | 12/27/11 |
| Vacant | 6/3/11 | 6/10/15 |

As indicated in the chart, each of the six Resident Directors are sitting in expired seats, which leaves them in a tenuous position subject to removal at any time. Additionally, at least four of the Resident Directors reside in the Rivercross housing complex located on Roosevelt Island. Rivercross is currently engaged in negotiations with New York State concerning the setting of new rent, tax and other financial terms in connection with the conversion of Rivercross from a subsidized housing complex to a private condominium. The result of the negotiations will

determine the extent of potential windfall financial gains to these Resident Directors. Accordingly, these Directors are beholden to Indelicato – who repeatedly states that she has connections in the Albany power structure – as she has a direct influence over these Directors' capacity to remain on the Board.

### B. Nature of Claims

Complainant was terminated by Indelicato, which was the culmination of a torrent of abuse, discrimination, a hostile work environment, and unlawful retaliation. Lewis was replaced as General Counsel by yet another White female, Susan Rosenthal.

The actions of Indelicato, set forth throughout this charge, are particularly egregious considering that she is a high-ranking Government executive, had policy-making authority and set RIOC policies. For much of Indelicato's tenure – and through Lewis' termination and continuing thereafter – Indelicato, acted in concert with Walton and McDade (who are also high-ranking Government executives who had policy-making authority and set certain RIOC policies). RIOC, Indelicato, Walton and McDade subjected Lewis to continual:

- discrimination, disparate treatment, retaliation and harassment based upon race and national origin /ethnicity;
- discrimination, disparate treatment retaliation and harassment based upon gender;
- discrimination, disparate treatment, retaliation and harassment based upon Complainant's reporting, among other things, misconduct, disparate treatment, discrimination and a hostile work environment; and
- exposure to a hostile and abusive work environment.

The RIOC Board of Directors during the relevant events were responsible by their own acts and/or omissions, as well as through the unlawful actions of RIOC, Indelicato, Walton and McDade.

Respondents' acts and omissions constituted a "continuing violation" of federal and state civil rights laws (including but not limited to anti-discrimination protections, due process rights, and protection against violation of first amendment rights and against retaliation.) Among other things, Respondents' acts and omissions violated both Federal and State law, certain of which fall under the EEOC's jurisdiction. Federal and State laws violated include[4]:

| | |
|---|---|
| Title VII | Negligent, Reckless and Intentional |
| 42 USC Section 1983, including |   Torts |
|   1st Amendment retaliation | Respondeant Superior |
|   14th Amendment equal | Vicarious Liability |
|     protection, including race and | Wrongful Termination |
|     gender | Post-termination Retaliation |
|   14th Amendment due process | Unlawful Retaliation |
| 42 USC Section 1981 | Unlawful Discrimination |

---

[4] Certain of the claims listed (and others not listed) relating to Respondents' conduct fall outside the EEOC's purview. Complainant's election to list (or not list) those claims or additional claims is without prejudice and shall not be construed as a waiver. Complainant expressly preserves and does not waive any and all claims against any and all potential additional respondents.

| Whistleblower Acts | Failure to Supervise |
| The New York State Human | Negligent Supervision |
| Rights Law | Negligent Hiring |
| New York City Human Rights | Infliction of Emotional Distress |
| Law | Breach of Contract |
| NY Labor Law Section 740 | Interference with Contract |
| | Defamation. |

In addition, Respondents each either wrongfully created a policy or practice, failed to follow a policy or practice, wrongfully followed a policy or practice and/or failed to create an appropriate policy or practice resulting in the claims discussed herein. The policies and practices implicated include, without limitation, policies and practices with regard to RIOC's:

• By-Laws
• Code of Ethics
• Enabling Legislation
• Policies Regarding Payment of Salary, Compensation and Reimbursements to Chief Executive Officer and Senior Management
• Equal Employment Opportunity Policy Statement
• Harassment Policy Statement
• Reporting of Misconduct and Protection against Any Adverse Personnel Action
• Exit Interviews
• Fiduciary Responsibilities, as set forth in relevant ABO Guidance.
• Separate Oversight and Executive Management Functions, as set forth in ABO Guidance.
• Governance Committee Responsibilities
• Audit Committee Responsibilities
• Preclusion from return to employment at RIOC after leaving the Corporation

## C. Respondents' Post-Termination Concealment of Their Unlawful Conduct

While there are limited exhibits attached to this charge, Complainant is currently unable to provide a more comprehensive documentary record due to RIOC's continued efforts to conceal its misconduct.[5]

---

[5] Lewis submitted Freedom of Information Law ("FOIL") requests to RIOC over four months ago seeking documents, many of which are available with a mouse-click and would be relevant to the misconduct at issue, and would also be of interest to the public. FOIL requires that RIOC produce those readily retrievable documents without delay. Nonetheless, RIOC has produced virtually zero documents and instead desires to operate behind a veil of secrecy with no transparency or accountability.

Equally troubling, on July 23, 2015, Lewis requested a copy of his personnel file from McDade. It has been nearly three months but RIOC has yet to provide Lewis with a copy of his file. There is no legitimate reason for this information to be withheld and such surreptitious conduct is, at best, troubling.

## II.    THE FABRICATED GROUNDS FOR LEWIS' TERMINATION

### A.  Lewis' Friday Evening Termination By Email, Without Notice And Based Upon Fabricated Grounds

Notwithstanding Lewis' dutiful service to RIOC, on Friday, April 24, 2015 at 4:20 p.m., while Lewis was out of the office due to illness, he was fired effective immediately via an e-mail from Indelicato containing typographical errors that any two-second proofread should have corrected.  To be clear – after almost four years of dedicated service – ***shortly after Indelicato learned that Lewis had reported a troubling pattern of discrimination against Blacks at RIOC and potentially criminal conduct concerning Walton's illicit salary raise in which Indelicato and McDade were involved, Lewis was terminated in a blatant action of retaliatio***n.

To date – six months subsequent to Complainant's termination – the sole purported reason provided by Respondents for the dismissal of Lewis was set forth in Indelicato's e-mail, which falsely stated:

> "The Chairman and the Board have decided to take the counsel's office in a different direction."

Indelicato's e-mail continued:

> "Therefore, after conferring with the Chairman and the Board, we are asking for your immediate resignation."

***This has proven to be a flat out lie by Indelicato***.  (Indelicato's e-mail and Lewis' response are annexed as Tabs 1 and Tabs 2.)

The urgency Indelicato created regarding Lewis' removal – sending a hurried typo-ridden e-mail on a Friday at 4:20 p.m. ***terminating his employment in less than an hour*** (5 p.m.), appears to have been Indelicato adjusting her misconduct because of prior experience she had.  In that case, when attempting unlawfully to terminate another employee in a prior governmental position, the employee had time to act and her Supervisor overturned Indelicato.  Specifically, a prior complaint against Indelicato in that matter states:

> On April 4, 2001, Indelicato demanded Plaintiff's resignation within two days, advising him that absent the resignation she would fire him.  In making that demand and threat, Indelicato intended to retaliate against Plaintiff. . .
>
>  Indelicato's demand/threat as referenced supra ***was overruled by the then male Deputy Westchester County Executive*** – to whom Plaintiff in detail reported the ***systemic and pervasive gender-based hostile work environment*** in the County Attorney's Office – a circumstance that resulted in Indelicato's personal animus towards Plaintiff increasing geometrically. (*See* Tab 4, Complaint at Paragraphs 10, 11; emphasis added.)

Indelicato apparently feared that she may be overruled once again – this time by RIOC's Board – so she tried to ensure the Board had no opportunity to do so by making the termination

immediate. Critically, pursuant to RIOC's By-laws (annexed as <u>Tab 3</u>), executives like Lewis are not to be removed without Board action.[6] In addition, the **powers of the RIOC President** are clearly set forth in the By-laws and **do <u>not</u> include the power to remove executives**.[7] Significantly, Indelicato did not copy even one Resident Director on her termination e-mail, presumably in an effort to circumvent the Directors from overturning Indelicato's decision and communicating with Lewis concerning the same. Based on the Director quotes directly below, it is unsurprising that Indelicato feared she would be overruled.

### B. The Board Refutes the Statements in Indelicato's Termination E-mail and Denies Involvement in the Termination Decision But Fails to Supervise Indelicato and/or Take Any Corrective Action

The Friday evening of his termination and over the weekend, Lewis spoke with the all of the Resident Directors who expressed shock, dismay and confusion that Lewis had been terminated. Among the quotes from the Directors during these conversations:

- "**I had no idea**. I tried to get a hold of Charlene in her car and I couldn't. What was the reason? **I hope the termination letter didn't say anything about the Board. We had nothing to do with this.** If you need a letter from us consider it done. If you need a reference, you got it. We will push to get you a package, because you definitely deserve a package. I'll be in touch." – RIOC Director Margie Smith, April 26, 2015.

  Ms. Smith **did not know whether the termination letter said anything about the Board, or even what the letter said at all**, because (as state above) Indelicato did not to copy the Resident Directors on the termination e-mail.

- "**I was not informed. I was not given a reason. You should not take this lying down**. The only way you should go is if they gave you a super great package. We should have been informed. You should be given a great recommendation. I don't like not knowing what happened." – RIOC Director Fay Christian, April 24, 2015.

- "**I'm very troubled by the way this happened. I really enjoyed working with you and I was shocked to hear**. I wish you the very best." – RIOC Director Dr. Kathy Grimm, April 24, 2015.

- "**I don't know what happened. I was not involved in the decision**. These things happen and we don't know why. I'll try to work up some support. I can be a reference." – RIOC Director Howard Polivy, April 24, 2015.

- "**I was totally surprised**. With [former RIOC President] Steve Shane we wanted him gone. With you, we didn't and I was surprised to hear. No one wanted you gone. **It really bothers me that we weren't even asked**, that we are not given control over executives that we were just informed, not asked." – RIOC Director Michael Shinozaki, April 26, 2015.

---

[6] *See* <u>Tab 3</u>, Article IV, Section 3 at Page 6.
[7] *See* <u>Tab 3</u>, Article IV, Section 5 at Pages 6,7.

- "*What news?  I had no idea*." – RIOC Director of Budget Board Designee Mike Kendall's response to Lewis informing him on Monday April 27, 2015 that Lewis had been fired on Friday.  Kendall did not even know Lewis had been terminated.

Director Respondents have repeated similar views in subsequent conversations with Lewis. Indeed, over one month later, Director Respondents made the following statements to Lewis.

- "Everyone agreed [you should get a package], I remember there was an e-mail going around and no one was against that… *[Incredulously] she said it was us [as reason for your dismissal]?  I can't believe that.  That's what everyone is upset about*." – RIOC Director Fay Christian, June 1, 2015.

- Agreeing Lewis was "*getting overwhelmingly screwed here*," Smith stated, "You gotta to do what you gotta do here, and *we'll all tell the truth, and that will only help*." – Director Margie Smith, June 1, 2015.

- "*She [Indelicato] said it was the Board!!!  The Board had nothing to do with this* . . .We asked her about a severance package and she said we couldn't do it. . .  I said it wasn't fair that he didn't get a severance package." – Director Dr. Kathy Grimm, June 1, 2015.

- "I asked specifically: am I being asked about this decision or am I being informed and after a lot of hemming and hawing *I was told I was being informed*. . . *we are suddenly informed that you were gone* and we were not notified earlier that there were any issues or problems with you even when we specifically asked, *I was pissed off.*" – RIOC Director Michael Shinozaki, June 1, 2015.

Certain Directors also have publicly expressed concern with the termination of Lewis and reaffirmed that they had no involvement with the decision.  For example, during a RIOC Board meeting on May 21, 2015, approximately one month after the dismissal of Lewis, the following statements were made by Directors, in the presence of the entire Board and met with no objection from any of the Respondents all of whom were present:

- "I'm not even sure why we bother with the vote [concerning a new General Counsel] . . . because *we had no choice in either decision*." – RIOC Director Mr. Shinozaki May 21, 2015 referring to the decision to terminate Lewis and to hire a replacement.

- "*I'm not happy with Mr. Lewis' absence here*, there's a lot of questions I have that have not been answered….why dismiss him….I would not have dismissed him….*whatever the case we're in the dark*…" – RIOC Director Fay Christian May 21, 2015.[8]

---

[8]   The comments of Directors Shinozaki and Christian during the May 21, 2015 Board Meeting are included in the discussion starting at approximately 11:00 at the following link: http://goo.gl/26UcKg

Indeed, this public Board Meeting yet again clearly illustrates that Indelicato lied.[9] As noted earlier, the Resident Directors are sitting in expired seats and this may explain why even though they clearly disagreed with Indelicato's action, they did not properly exercise their duties, failed to take corrective action, and failed to follow RIOC's established policies and practices, including regarding exit interviews.

The Board's failure to properly exercise their duties and instead choose to toe-the-line and keep their heads in the sand so as not to upset Indelicato is further evidenced by their steadfast failure to accept Lewis' offer to conduct an exit interview. In fact, following his termination, Lewis had several conversations with Director Polivy who each time represented that he would set up such an exit meeting in the next few days and would handle coordinating the same. Polivy never came through, Lewis reached out to certain other Directors, but an exit meeting was never scheduled despite Lewis' efforts.

The fact that Lewis, who reported discriminatory misconduct and potential criminality, was immediately "thrown out the door," via e-mail, after almost four years of service, with absolutely no notice, without a single discussion, based on a complete fabrication, with no severance and without an opportunity to seek new employment is egregious, punitive, and reprehensible.

### III. THE DISCRIMINATORY, ABUSIVE AND HOSTILE TREATMENT OF LEWIS

#### A. The Troubling Pattern of Discrimination – EEOC Complaints and Federal Employment Discrimination Lawsuits

The two prior employment discrimination lawsuits in federal court against Indelicato were and should have been a sign of things to come.[10] A news article entitled *"Ex-Marine Sues 'Man-Hating' W'Chester Lady Lawyers"* concerning one of the lawsuits against Indelicato is annexed as Tab 7. Indeed, Ms. Indelicato, with the support of the Respondents, has continued her discriminatory anti-male behavior at RIOC. Tellingly, virtually every new employee hire in RIOC's Main Office (at 591 Main Street where Indelicato is situated) during Indelicato's tenure have been women:

(i)     VP & General Counsel (Susan Rosenthal);
(ii)    VP & Chief Financial Officer (Francis Walton);
(iii)   Internal Controls & Compliance Officer (Gretchen Robinson);
(iv)    Former Director of Information Technology (Marguerite Beirne);
(v)     Current Director of Information Technology (Indranie Sanichar);
(vi)    Community Relations Assistant (Jessica Murray);

---

[9] Annexed as Tab 6 is an article entitled *"RIOC Board Reluctant in a Hire"* which outlines concerns raised by Directors during the May 21, 2015 Board meeting regarding Lewis's termination from the General Counsel position and subsequent replacement by Susan Rosenthal. The article contains quotes from Directors Polivy, Christian, Shinozaki and Grimm. Nonetheless, the Directors failed to take any corrective action.

[10] The complaint to one case and the docket to the other case are annexed as Tab 4 and Tab 5, respectively.

 

(vii)    Former Human Resources Assistant (Rie Arai);
(viii)   Current Human Resources Assistant (Lisa Couqant-Tote); and
(ix)    Executive Assistant (Deborah Indelicato Aquilino).

In addition, as noted, ***100% of the Black employees that worked in the RIOC Main Office when Indelicato was hired have filed EEOC complaints,*** and those four Black employees constituted approximately 20% of the total employees in the Main Office when Indelicato was hired. Furthermore, as noted, under Indelicato, Respondents have established a RIOC executive structure, which contains ***zero males and zero minorities,*** and instead the RIOC executive positions are now filled by ***all White and all female*** individuals.

### B.  Abusive, Hostile, Humiliating, and Disrespectful Treatment of Lewis

Under Indelicato's reign, Lewis suffered in a hostile work environment where race, ethnicity and gender formed the basis for the high-handed decisions of Indelicato, who was continually supported by Walton and McDade.  It was not uncommon for Indelicato to comport herself in a disturbing manner, yelling, screaming and cursing in response to legitimate questions from Lewis to which she had no adequate response.

This hostile screaming at the male Lewis appears to be a pattern of behavior for Indelicato.  Indeed, a previously filed federal lawsuit by a United States Marine against Indelicato – in connection with her role in another governmental position – alleges:

"Male staff including James Robertson, are publicly degraded due to their gender by Indelicato, who has screamed so loudly at them in the presence of subordinate staff that she could be heard through the walls of several offices."[11]

Likewise, Indelicato frequently screamed at Lewis in a manner that could clearly be heard through office walls, so that the Office Manager and Lewis' staff – Arthur Eliav (Associate General Counsel) and Lada Stasko (Assistant General Counsel) – could hear Indelicato demeaning and berating Lewis.[12]

Indelicato would also frequently subject Lewis to the "silent treatment" for entire days, a tactic which was never directed at Walton or McDade.  The silent treatment by superiors is widely recognized as a highly abusive form of treatment by superiors in the workplace.[13]

---

[11]  *See* <u>Tab 4</u>, Complaint at Paragraph 21.

[12]  Indelicato, Lewis and Walton's offices were within mere inches of each other on the ground floor in the RIOC Main Office.  The other employees with offices on the ground floor at RIOC, on the other end of the office, were Arthur Eliav and Lada Stasko.  Office Manager Karline Jean also regularly sat on the first floor.  The remaining RIOC employees are situated on a basement level beneath the first floor.

[13] *See* Top Workplace Bullying Tactics http://www.workplacebullying.org/top-25/)

Walton and McDade were never subjected to Indelicato's tirades and hostility, which were commonplace towards Lewis. Certain examples of the abusive, hostile and discriminatory treatment of Lewis include:

- Indelicato had Lewis carry a watermelon she purchased from a local fruit stand by the F-Train subway entrance back to the RIOC Main office on or around July 21, 2014.

- On September 8, 2014, Indelicato yelling at Lewis and saying he "TOSSED [HER] UNDER THE BUS." Lewis had simply responded to an e-mail from Director Shinozaki concerning scheduling a meeting and stated, "I've spoken to Charlene and Wednesday is not going to work." This resulted in a screaming tirade.

- On November 17, 2014, during a staff meeting, there was a conversation about people waiting on the Air Tram platform when the F subway-train is out of service. Indelicato questioned Armando Cordova, an employee of Leitner-Poma, the entity that operates the Air Tram for RIOC. To move the conversation along, Lewis made the simple point that the Tram runs at full capacity when the F train is down. Indelicato literally almost jumped over table to argue with Lewis. Certain staff were visibly disturbed.

- On November 19, 2014, during a meeting concerning the Cultural Center attended by multiple RIOC employees and Director Howard Polivy, Lewis tried to speak and was rudely and bluntly interrupted by Indelicato. As this precise behavior from Indelicato had happened before – that is, refusing to let Lewis speak or complete a sentence – Lewis stated, "I guess I won't speak until I'm told to." Others in room were clearly uncomfortable with Indelicato's outburst. Polivy sought Lewis out after the meeting to apologize to Lewis for Indelicato's behavior and claimed, "I'll talk with her later."

- On December 15, 2014, during a meeting concerning a scheduled Island running race and planned construction, Lewis made a comment to advance the discussion concerning the race potentially conflicting with the construction project. Indelicato interrupted Lewis again and made an abrasive point about not being able to do the work during the weekend. Lewis said he never suggested doing so and Indelicato interrupted him again. At end of issue, former Director of Engineering James Mortimer stated he agreed with the position of Lewis. Indelicato was incensed.

- On February 4, 2015, during a meeting with a representative from the Department of Labor and Armando Cordova concerning the Air Tram, Indelicato acted in an openly hostile manner toward Lewis throughout the meeting and snatched a document from his hand that was needed for legal files. Indelicato subsequently refused to provide Lewis with the document or a copy and Lewis needed to contact the DOL representative at a later date to obtain a copy. Indelicato subjected Lewis to the silent treatment for virtually the rest of the day, was well as the next day on February 5, 2015.

- On the morning of March 4, 2015, Lewis simply inquired when Indelicato would have a moment to discuss an issue. The following abusive exchange ensued: Lewis: "Do you have a second?" Indelicato: "NO!" Lewis: "When you have a moment let me know."

Indelicato: "Can I JUST DO ONE THING AT A TIME!" Indelicato yelled at the top of her lungs.

This type of yelling, screaming and abuse Indelicato directed at Lewis was never directed at his Walton and McDade.

The examples provided above are just a sampling of the abusive and discriminatory treatment of Lewis, which has continued even after his dismissal. Disturbingly, Complainant has learned that Respondents have made disparaging, false and defamatory comments concerning Lewis following his termination.

Additional examples of hostile and abusive treatment of Complainant related to certain additional troubling issues at RIOC are fleshed out in detail below.

### C. Indelicato's Manipulative, Hostile and Abusive Conduct Towards Lewis In Connection with a Report from the OIG

As noted, Indelicato attempted to get Lewis out of his position as General Counsel almost immediately upon her employment at RIOC in order to bring in her White female friend. When Lewis refused to step aside, Indelicato employed additional manipulative and abusive tactics towards Lewis in connection with an investigation the New York State Inspector General's Office ("OIG") conducted concerning RIOC.

Prior to Indelicato's arrival, Lewis not only reported inappropriate credit card use at RIOC which was a key issue in the investigation, but also served as an invaluable point person for the OIG in assisting with gathering information.[14] Notwithstanding the assistance which Lewis had provided, Indelicato seized on the OIG investigation as a vehicle to further expose Lewis to a hostile work environment and even coopted the investigation, consistently endeavoring to cut Lewis out of the loop. While during his multitude of conversations with the OIG's office over the almost year and a half that the investigation was conducted, Lewis was never once asked about his use of a RIOC credit card.[15]

Indelicato frequently stated how she had a close friend working in the OIG who takes care of things for her. Interestingly, after Indelicato took over and attempted to complete cut Lewis out of the loop, the Report negatively mentioned Lewis' credit card use. Indelicato then seized on this oddly fortuitous opportunity to try undermine Lewis' standing and to subject him to further abusive conduct. Indeed, Indelicato began to harass Lewis about paying back the expenses and ultimately accosted him one day screaming, "DON, YOU BETTER PAY TODAY BECAUSE IF YOU DON'T YOU WILL BE FIRED!" Indelicato continued by disclosing that she had lied to the OIG's office and said, "YOU NEED TO PAY RIGHT NOW BECAUSE I TOLD THEM THAT

---

[14] Indeed, in or around June 2014, Bob Werner ("Werner"), Chief Investigator at the New York State Inspector General, stated to Lewis: "Don, you are one of the most helpful point people I've ever worked with."

[15] Lewis had used his credit card on three occasions, each time after receiving authorization from the then RIOC President. When Lewis reported to the Chamber the pervasive inappropriate credit card use in September 2012, he disclosed his own use as well. Lewis was thanked by the Chamber for doing the right thing and told he would not have any issues concerning his use.

YOU ALREADY DID!"  Significantly, directing an employee to take an action and threatening them with termination as the only alternative is entirely inappropriate and grossly hostile and abusive.  Ultimately, even though he was the point person for much of the investigation, and the fact that no one from the OIG ever raised Lewis' expenses during the almost two-year investigation, because Lewis feared for his job, and Indelicato's repeated statements about her connections within the OIG's office, Lewis paid back the expenses.

**D. Disparate Treatment of Lewis Regarding Compensation and Attempts to Cover-up Improper Raises**

Both Walton and McDade received raises under Indelicato, yet Lewis who served in three-executive roles for nine months, received nothing.  Upon Indelicato's hiring, Lewis requested to be paid for at least the salary differential during his nine months as Acting President and CEO, while continuing in his role as General Counsel and Vice President, and essentially filling the Vice President of Operations position.  This differential had been paid to a former RIOC employee who was similarly situated to Lewis.  Lewis' request was denied and Indelicato assured him that he would receive a raise in the future to make up for it.

(1) The Illicit Walton Raise

Quite to the contrary, Walton who had been working at RIOC for only a year, with Indelicato's assistance, in or around January 2015 gave herself an exorbitant, concealed and potentially criminal raise discussed below. ***McDade assisted with this misconduct event though McDade apparently told her assistant at the time, Rie Arai, this action was "totally fraud."***

(2) The Questionable McDade Raise

In addition, McDade was also provided a raise in 2015 notwithstanding that she had resigned RIOC for another job in or around December 2014, which resignation was apparently related to subsequent testing required to maintain the position.  McDade was permitted to return to RIOC in or around January 2015, even though, as previously noted, it was contrary to Indelicato's stated policy.

McDade's conduct is particularly reprehensible considering that as Director of Human Resources, she is an individual that should be available to employees for an objective review of their concerns.  Rather than be an objective participant, McDade apparently has made blatantly racist comments (set forth above), taken sides by aligning herself with the misconduct of Indelicato and Walton, and discriminated against Black employees.  Interestingly, McDade's salary has jumped from $94.4K to $113.1K since Indelicato and Walton have been in office.

While certain of this additional compensation resulted from 2% across the board raises, and performance based increases given to most of RIOC staff, McDade also received a questionable $9,631 "salary adjustment" in late 2014.  McDade also apparently received another phantom approximate $2,000 raise the following year.  The timing of these raises strongly suggest that McDade was "bought off" to conceal Walton's illicit raise which McDade has herself referred to as "totally fraud" (according to her former assistant, Rie Arai).

Despite these raises afforded to Walton and McDade, Lewis simply was awarded the same across the board increase and performance bonus, which were provided to almost all RIOC staff, including Walton and McDade, which was separate and apart from the raises discussed above.

Again, Complainant was not given the types of raises provided to Walton and McDade, notwithstanding that Lewis:

    (i)      had been working at RIOC for almost four years;

    (ii)     served in three executive positions for nine-months; and

    (iii)    was denied payment for the salary differential for his time as Acting President and CEO, and was told that he would be provided a raise.

                (3) <u>Disparate Treatment of Complainant Concerning<br>Post-Employment Severance and Benefits</u>

Lewis was also treated less favorably than certain former White RIOC executives and employee directors with respect to his accrued time and benefits, including at least one employee whose employment ended due to abusive behavior towards staff.

**(D)    Indelicato's Thinly Veiled Attempts to Create the False Impression That Negative Employment Decisions Concerning Black Employees Were Being Made by Blacks**

Another instance where race played the prominent role in Indelicato's directives to Lewis was in the termination of Black engineering employee of Trinidadian descent, Kay Hart. Lewis was directed by Indelicato through McDade, on or around March 25, 2015, to attend a termination meeting the next day of this Black employee. Lewis had virtually no involvement whatsoever with the employee's role at RIOC and advised McDade that he would not sit in on the interview. Indelicato was incensed and then substituted Lewis with another Black person –by directing the fairly new Internal Controls and Compliance Officer Gretchen Robinson, who also had virtually no involvement with this employee, to sit in on the termination. Indelicato clearly wanted a Black involved in firing a Black person. This is a repeated pattern of Indelicato manipulating to have Blacks deal with Blacks. Lewis reported this to the Executive Chamber less than a month prior to his termination and stated he was fearful of retaliation.

A similar example of race playing a role in Indelicato's decisions was her failure to call Director Fay Christian, who is Black, to the inform her of Lewis' termination, instead, Indelicato had the Black Chairman of the RIOC Board Darryl Towns call Christian, while Indelicato herself called the other non-Black Directors. Indelicato also rarely communicated with the Black Christian, withholding information from Christian regarding many issues, while communicating almost on a daily basis with Directors Polivy and Smith who are White.

On September 27, 2014, when Christian asked Indelicato to schedule a discussion concerning a Black employee, Indelicato immediately approached Lewis and directed him to deal with Christian concerning this Black employee. This was quite a departure from Indelicato's typical behavior, which was to dominate conversations and rarely allow anyone else to speak. Significantly, Lewis had zero involvement with the work of this employee who was supervised by Walton and whom Walton, McDade and others met with on multiple occasions concerning work issues. Indelicato's directive to Lewis to lead the conversation with the Black Director was clearly race-based, and was done on more than one occasion.

In a similar vein, when a Black employee was out of the office one day for personal issues, Indelicato claimed to be worried about the employee's well-being and directed Lewis to call the

employee to check up on him. Lewis informed Indelicato that it was more appropriate that Human Resources (McDade) place such a phone call and that he should not have to call just because he is also Black. Indelicato was furious. Lewis reported these race-based directives to the Chamber on multiple occasions.

### E. Other Racially Inappropriate Remarks by Indelicato, McDade and Walton

There are multiple additional instances of Indelicato's discriminatory, hostile and inappropriate behavior towards Lewis, as well as offensive racially charged statements by Indelicato and McDade. For example:

(1) <u>Inappropriate Remarks By Indelicato</u>

- Indelicato upon returning from a meeting she had with a representative from the 114th precinct on August 7, 2013 stated to Lewis: "he has a beautiful complexion, just like yours."

- Indelicato who is Sicilian stated to Lewis on multiple occasions, "Sicilians are also Black."

- Indelicato stating to Lewis on October 8, 2013 in response to complaint a female employee made about another employee allegedly raising his voice: "She's a WASP. They don't yell at people. Ethnic people like us are always yelling at people."

- Indelicato's disparagement and undermining of Black's was not limited to RIOC. ***Indelicato's has made offensive comments concerning the Black Counsel to the Governor of New York State, Alfonso David*** who served as an attorney for LAMBDA Legal earlier in his career. Indelicato has stated:

  "***Alphonso checks off a lot of boxes,*** that's why he has his position. But he's just a figurehead. Other people counsel the Governor, but he doesn't on real issues and ***he's an empty suit meddling in a bunch of agencies business because he has nothing better to do***."

  Indelicato has further remarked, "Everyone says Alphonso is impossible to work with and no one likes dealing with him." Walton has tagged along with these statements offering on more than one occasion: "Alphonso is difficult to work with."

- Indelicato referred to pictures on the Myspace page of a Black employee of Jamaican descent, Othniel Maragh, as "gang" pictures during an October 8, 2014 with representatives from the New York State Inspector General's office. Notwithstanding that certain of the pictures are Maragh: (i) wearing a suit; (ii) at a graduation; and (iii) posing with friends who were also Black.

- Indelicato stated on more than one occasion: "I can not hire a Caribbean woman as Director of Engineering because a Caribbean man cannot take a Caribbean woman as a boss."

      (2) <u>Inappropriate Remarks By Walton</u>

- Walton had made similar "gang" comments about Maragh and has referred to Black employee of Caribbean descent as "that boy" on several occasions. Walton has also without any support whatsoever opined that Maragh "looks like he's high on drugs."

- According to a former Human Resources Assistant, Rie Arai who is Asian-American, Walton would belittle her in a "nasty" manner and say things such as, "speak clearly because you're English is bad, I can't communicate with you, I don't think you understand English."

      (3) <u>Inappropriate Remarks by McDade</u>

- Indelicato and Walton were not alone in making such offensive comments. Complainant understands that a former assistant for McDade, Rie Arai, was given offensive race-based directives. Specifically, McDade, according to Arai, instructed her not to talk to certain RIOC employees:

     "[B]ecause they are Black and they think they are treated unfairly just because of their skin so don't ever talk to them and stay away from them."

Upon the filing of EEOC complaints by certain of these employees, McDade apparently stated to Arai:

     "Look at what they do, because they are Black. Black people are always looking to make some money, some easy money."

According to Arai, Walton echoed these derogatory comments about Blacks made by McDade.

### F. Exclusion of Lewis From Meetings

Indelicato regularly would hold meetings with McDade and Walton to the exclusion of Lewis who should have been included as General Counsel and Vice President of the Corporation. While Indelicato frequently stated that, her meetings were open to all staff and made her calendar available to executives and administrative assistants, this was simply a subterfuge. Indelicato would frequently convene these clandestine meetings with Walton and/or McDade without notice or scheduling, and hold them behind closed doors.

The three women would also hide information from Lewis and in one instance when Lewis requested Walton copy him on certain e-mails, Indelicato berated Lewis stating he was "acting like a first grader." Other staff noted these exclusionary practices of Indelicato, Walton and McDade.

An issue concerning the Cultural Center on the Island was specific instance where Lewis was excluded from certain meetings. From Thursday February 19, 2015 through February 23, 2015 there was much discussion concerning the Cultural Center on Roosevelt Island. Lewis did not immediately agree with Indelicato's approach and said he would like more time to consider. This was met with yelling, condescension and abusive behavior from Indelicato over the next few days.

Walton engaged in underhanded manipulation of the situation further enraging Indelicato.[16] Virtually every discussion concerning this issue resulted in Indelicato yelling and screaming, particularly at Lewis and at Robinson who is Black. Indeed, after berating Lewis on the morning of February 23, 2015 (following Walton's underhanded tactic) Lewis was again thrown out of Indelicato's office in a fit of rage. Indelicato subjected Lewis to the silent treatment for the rest of the day and had at least one meeting that day concerning the Cultural Center, as well as meetings on other days concerning the Center, where Lewis was excluded.

In addition, Walton and Indelicato excluded Lewis from certain discussions related to the Rivercross housing development. As previously noted, at least four of the RIOC Directors reside in Rivercross and will be directly affected financially by such negotiations. There was no legitimate basis to exclude Lewis from these discussions.

Lewis also was excluded from discussions among Walton, McDade and Indelicato concerning the suspension and termination of an Italian employee, Santo Verta, who received preferential treatment from Indelicato as discussed below.

Furthermore, Lewis was excluded and completely kept in the dark concerning the illicit Walton salary raise and only found by chance well after the fact by chance. Lewis was also excluded from the discussions leading up to the submission of proposed raises for other staff.

## G. Respondents' Mistreatment of the Legal Department Headed by Lewis

Respondents consistently tried to undermine the Legal Department headed by Lewis, while the departments headed by Indelicato, Walton and McDade never faced any resistance, and, to the contrary, were provided with raises and/or additional staff. Indeed, virtually every request for additional staffing or additional pay for the Legal Department was summarily by Indelicato. Lewis requested a paralegal; Indelicato would not even entertain the request and started shouting. Stasko reiterated the request for a paralegal through Lewis, Indelicato would have none of it. Quite to the contrary, once Rosenthal replaced Lewis, the Legal Department was almost immediately provided additional assistance.

---

[16] Specifically, Walton had a meeting with Robinson and Lewis about the issue on Friday afternoon at approximately 3:00 p.m. (after Indelicato, as had been her Friday practice, had already left the office for the day). Walton, Robinson and Lewis disagreed with Indelicato's approach and discussed an alternative. Walton specifically stated to Robinson and Lewis that no one should raise the issue with Indelicato until there was an ironclad alternative. Incredibly, on Monday morning (the next business day), Walton reported to Indelicato that Lewis and Robinson were attempting to somehow undermine Indelicato's plan. Indelicato was enraged and directed additional vitriol at Lewis and Robinson who is Black.

> (1) An Excelsior Fellow is Denied Lewis and Provided to His White Female Successor

In or around April 16, 2015, Lewis requested an Excelsior fellow and Indelicato stated flatly that, "you're not getting a fellow; Excelsior fellows do not come to agencies like RIOC." A little over one month later Rosenthal replaced Lewis as General Counsel, and in a complete about face; Indelicato supported the hiring of an Excelsior fellow for the Legal Department, which was done almost immediately. Furthermore, shortly after Rosenthal replaced Lewis, Indelicato, Walton and McDade hired an "Executive Assistant" for the first time, a luxury that was never afforded Lewis who had every single request for additional help rejected.

> (2) Lewis' Legal Department Receives No Assistance While the Departments of Walton and Indelicato Receive Reinforcement

In stark contrast to Lewis' exercises in futility, Walton faced literally no resistance from Indelicato in not only getting additional staff, but also giving raises to much of her staff, in addition to her own raise.

> (3) Lewis' Legal Budget is Surreptitiously Slashed 50% By Indelicato and Walton without Input from Lewis.

The Fiscal Year 2015-16 budget narrative drafted primarily by Indelicato and Walton states that essentially every department at RIOC was under stress and needed more personnel and/or more pay, yet the Legal Department had its budget cut by over 50% in a surreptitious action taken by Indelicato and Walton without even discussing the major slash with Lewis.

Indeed, the budget for Fiscal Year 2015-16 was yet another instance where Indelicato and Walton collaborated against Lewis. After multiple discussions with the fiscal team, the Legal Department submitted a requested budget of $475,000. On or around October 3, 2014, Indelicato approached Lewis about reducing the Legal budget and asked Lewis if it was acceptable to reduce the Legal budget by $50,000 to $425,000. In the spirit of cooperation, Lewis agreed. Then, without any further discussion with Lewis whatsoever, notwithstanding the fact that all of their offices were within mere inches of one another, Indelicato and Walton submitted a budget for sign off to the office of the Director of Budget **with the Legal budget reduced by 50%** to approximately $243,000.

On October 14, 2014, when Lewis attempted to discuss this major reduction to the Legal budget – after a call between Indelicato, Walton and Lewis with the Executive Chamber in Indelicato's office – Indelicato screamed at Lewis "I DON'T NEED TO DEAL WITH THIS SH*T!" and stormed out the door. Indelicato continued that Lewis somehow interrupted her and shouted, "THIS IS A PROBLEM!" Indelicato continued: "I GUESS WE HAVE TRUST ISSUES!" Indelicato then yelled, "YOU KNOW WHAT [FRANCES], JUST GIVE HIM ANOTHER $200,000 BECAUSE I DON'T WANT TO DEAL WITH THIS SH*T!" (This was not done.) Indelicato was yelling so loudly – and at the risk of sounding overly dramatic – that foam literally was forming on the sides of Indelicato's mouth. Lewis was fearful of retaliation.

Subsequent to her screaming outburst concerning the Legal budget on the morning of October 14, 2014, Indelicato gave Lewis the silent treatment for virtually the rest of the day. The next morning on October 15, 2014, Indelicato's silent treatment of Lewis continued for much of the day. This silent treatment was a frequent tactic used by Indelicato against Lewis. This silent treatment was never directed at Walton or McDade.

On October 14, following Indelicato's screaming tirade, Eliav, Stasko and Lewis were meeting in Eliav's office when Walton entered to discuss the Legal Budget issue with Lewis. During the course of the ensuing conversation, Walton stated with tears in her eyes, "I'm really sorry. I should have spoken with you first. It was wrong." This was of course an empty gesture. Walton's office was directly across from Lewis' and there were countless opportunities for her to address a 50% cut in his budget with Lewis, which she never did.

Lewis discussed this budget issue and Indelicato's behavior with the Chamber. Lewis also discussed these issues with Directors Polivy, Grimm and Kraut, all of whom did nothing to address the situation. Lewis also informed each of the Directors that he was fearful of retaliation for raising the issue.

(4) Indelicato's Opposition to Mandatory Litigation Holds

Indelicato also tried to obstruct the Legal Department's task of keeping track of litigation holds.[17] Indelicato – who is an attorney and frequently refers to herself as "an attorney by trade" – stated to Stasko on or around December 17, 2014, that she: (i) she "does not need to respond to litigation holds," (ii) she is "not staff," and (iii) that receiving such holds "is insulting." Lewis had a discussion with Indelicato the next day where she repeated much of the same and after much screaming and yelling Indelicato eventually conceded that, she needed to respond to the holds.

(5) Indelicato's Abusive Treatment of Lewis' Staff

In addition, Indelicato's behavior to both members of Lewis' staff, Arthur Eliav and Lada Stasko was consistently rude, demeaning and abusive. Both Stasko and Eliav are of Russian descent, and in addition to other hostile behavior, Indelicato on more than one occasion made disparaging remarks about Russians and Eastern Europeans. For example, on March 12, 2014, Indelicato said of a former RIOC employee: "He was a Russian immigrant; he was always seeing the glass half empty." On several other occasions, Indelicato has stated, "Eastern Europeans . . . have the mentality that the cup is half empty." Indelicato also frequently gave Stasko and Eliav the silent treatment.

As one example, Stasko once went on a two-hour lunch for another employee's birthday, who is Black. Stasko almost never went out to lunch and unlike many other RIOC employees was at her desk working hard virtually every day and virtually all day. Lewis had approved the extra hour for lunch but understands that when Stasko returned to the office, Indelicato summoned Stasko, Anna Rankin (former Community Relations assistant) and Karline Jean (Office Manager)

---

[17] A "litigation hold" is a lawfully required process that an organization uses to preserve all forms of relevant information when litigation is reasonably anticipated.

into her office and berating Stasko. Indelicato was so enraged that Rankin was driven to tears as a result on Indelicato's outburst directed at Stasko.

Indelicato also attempted to threaten Lewis concerning Stasko's performance evaluation. On September 19, 2014, Indelicato screamed at Lewis "I will quit if she asks for a paralegal again… we'll see what happens when you fill out her evaluation!" The clear implication was that Lewis needed to give Stasko a negative evaluation or he somehow would be in trouble.

In a meeting with Directors Smith, Polivy and Grimm on January 2, 2015, Indelicato began to blame Stasko for the spike in employee complaints at RIOC. When Lewis attempted to suggest that Stasko was not to blame, Indelicato angrily threw Lewis out of her office. None of the Directors did anything to intervene.

In another instance, Indelicato yelled at Lewis, on June 6, 2014 about Arthur Eliav allegedly not responding to her e-mail question about Strecker Lab and claiming it is the same as the Italian employee Santo Verta who would go days, weeks and months without responding to e-mails without reproach. Eliav had initially received Indelicato's request on a late afternoon, was out the next two days for religious holidays, and prepared a comprehensive response for Indelicato his next business day in the office. According to Indelicato, this was somehow worthy of yelling and screaming at Lewis and claiming that this was similar to Verta simply repeatedly ignoring e-mails for weeks at a time. (The gross preferential treatment that Verta, who is of Italian descent, received is discussed below.) Walton also frequently made disparaging, unjustified, unsupported and uninformed statements about Eliav and Stasko.

In addition, in one of Stasko's first conversations with Indelicato she tried to discuss certain of her concerns, Indelicato dismissively instructed Stasko to "start looking for another job," which appears to be part of the Indelicato playbook when employees express concerns. Indeed, a prior discrimination complaint filed against Indelicato in federal court (in connection with a prior governmental position) reads:

> "On April 6, 2001, Plaintiff expressed a concern to Indelicato regarding the pervasive, gender-hostile work environment to which he was daily subjected. In response Indelicato advised him: "When that happens, you don't complain, you just leave. Michael, you just leave."[18]

## IV.   ADDITIONAL DISCRIMINATORY CONDUCT IN RIOC's OFFICE

There was additional troubling raced-based behavior with Black employees being treated in a less favorable manner by Respondents' than their White counterparts, spearheaded by Indelicato, Walton and McDade.

### A.  Monitoring Black Employees But Not White Employees

Upon information and belief, under Indelicato and/or Walton's direction, with McDade's assistance, tracked the daily time in and time out of two non-union RIOC employees. One

---

[18] *See* <u>Tab 4</u>, Complaint at Paragraph 18.

employee is Black and of Jamaican descent, Othniel Maragh; the other employee is Black and of Trinidadian descent, Kay Hart. Neither was White nor Italian.

## B. Higher Compensation and Titles When Positions are Filled by White Employees versus Black Employees

(1) The Denial of a "Vice President" Title to an Black Employee

Indelicato also attempted to get an enhanced salary for an Internal Controls and Compliance position so she could pay a White female friend significantly more than that position had offered historically. This is the same White female friend who Indelicato attempted to have Lewis leave his General Counsel position for around the time Indelicato began her employment at RIOC.

RIOC's Compliance position traditionally payed approximately $58,000. On the heels of a report from the New York State Office of the Inspector General ("OIG") which took RIOC to task for not having an Internal Controls and Compliance Officer, and recommending one be hired, Indelicato pushed not to just reinstitute the position but said that it needed to be at a salary of $120,000 and needed to be a Vice Presidential role. At Indelicato's behest, the RIOC Board eliminated the long-standing position of the VP of Operations and replaced it with a VP - Internal Controls and Compliance. Shortly thereafter, Indelicato brought in her White female friend to interview for the position, and Indelicato was prepared to present her to the Board for the position at a salary of $120,000.

The White female candidate decided not to take accept the position. Apparently, no other interviews were conducted for quite some time and the position was put in the budget as "Vacant" with a salary of $110,000 and a title of VP - Internal Controls & Compliance.

Ultimately, Gretchen Robinson, who is Black, was hired. Significantly, for two fiscal years the line item in the budget for this vacant position listed the title as "VP - Internal Controls and Compliance," – which is an "executive" position. Indelicato, however, did not see fit to hire Robinson as a VP. Apparently, the title of VP would only have been afforded to a White candidate. In addition, Robinson also was not paid the enhanced $120,000 that had been pushed for the White female who did not accept the position.

(2) A Black Employee Is Selected for a Position and the Salary is Immediately Dramatically Reduced

In another recent instance, RIOC had an opening for an assistant to Community Relations Specialist Erica Spencer-EL, who is Black. Upon information and belief, this position was originally posted at a salary of approximately $55,000, and multiple candidates were reviewed Eventually Spencer-EL decided on a Black candidate. Upon learning that there was a desire to hire a Black individual for the position, Indelicato, McDade and Walton somehow decided that the position was no longer worthy of the approximately $55,000 (which salary had been posted and advertised for approximately six months) and instead cut the salary by over $15,000 (*i.e.* a 25% reduction) to $38,000. The Black candidate did not accept the position.

## C. Demeaning Tasks Requested of Minority Employees including Blacks

Indelicato also had minority staffers walk her dog, Karma, which she brought to the office

on multiple occasions. Erica Spencer and Fernando Vargas both walked Indelicato's dog. Indelicato apparently believed that having Blacks and Hispanics walk her dog and pick up its feces after it went to the bathroom was somehow part of their official job responsibilities.[19]

## V.    PREFERENTIAL TREATMENT OF CAUCASIAN AND ITALIAN EMPLOYEES

Under the reign of Indelicato, wrongdoing was given a pass for certain favored White, Italian and/or female employees. When Lewis reported, attempted to stop or to redress such wrongs, he became the victim of further abuse and retaliation.

### A. The Gross Preferential Treatment of an Italian Employee by Indelicato

The circumstances involving RIOC employee Santo Verta ("Verta") illustrates both Indelicato's preferential treatment of a White and Italian employee, and her hostile, abusive and discriminatory behavior toward Lewis. Verta admitted to taking a RIOC vehicle without authorization, in or around June 1, 2014, across state lines and "totaling" the vehicle, which came to be known by virtually the entire RIOC staff and many Island residents. Notwithstanding this egregious misconduct, Indelicato initially failed to take any disciplinary action against Verta and attempted to prevent Lewis from reporting the incident to the OIG, insisting to Lewis and other staff that an investigation be done internally, presumably so Indelicato could cover up for Verta. On June 6, 2014, after discussing Indelicato's refusal with the Chamber, Lewis insisted the incident be reported. Indelicato was incensed, yelling and screaming, however, Lewis said they could call Chambers together or he would call alone. Realizing she could not stop Lewis from reporting Verta's misconduct, Indelicato grudgingly agreed to call OIG together.

Just five days later, on June 11, 2014, Indelicato did not agree with a concern Lewis raised about Indelicato's suggested approach for dealing with an investigation into the incident. Indelicato began screaming at Lewis and claiming he said her approach was acceptable three days earlier (which was not true). Lewis noted that he is entitled to consider issues as counsel and Indelicato stormed into her office shouting "I CAN'T BELIEVE HE CHANGED HIS MIND!" and slammed her office door.

Indelicato's venom towards Lewis concerning anything related to Verta continued and on June 30, 2014, in response to Lewis expressing his concern about the inaction, Indelicato screamed at Lewis: "GET THE FU*K OUT OF MY OFFICE!"[20]

A staff meeting just a few minutes earlier preceded this June 30, 2014 blow-up from Indelicato. During the meeting, Indelicato was running down a not-present African American employee with a physical disability for apparent failure to have chairs removed from the pier from

---

[19]   Indelicato has additionally made gratuitous disparaging remarks about former Hispanic RIOC executives who according to Indelicato received favorable treatment in a report issued by the New York State Inspector General (the "OIG") concerning RIOC. For example, Indelicato has repeatedly stated that the (i) OIG did not seek prison time for the former Hispanic RIOC President because her father is a New York State Supreme Court Justice and that (ii) the OIG did not include a former Hispanic employee in the report because of his influence in the Latin-American political community and potential damaging effects on the second term campaign for the Governor.

[20]   This was not the only time that Indelicato had thrown Lewis out of her office – and was stated in tone of voice and language that was never used towards Walton and McDade.

a weekend event. Many in the meeting were visibly shocked and appalled that Indelicato could be taking such a hard line about a simple oversight on the one hand and on the other hand, Verta's action of stealing and totaling a vehicle could happen with zero discipline meted out by President Indelicato. This disparity was exacerbated because Verta was present during the meeting and piling on Indelicato's criticism of the Black employee. Lewis attempted to address this differential treatment with Indelicato in her office after the meeting and, as noted, Indelicato became enraged and demanded Lewis to "GET THE F*CK OUT OF MY OFFICE!" Indeed, any time Lewis attempted to discuss disparate treatment of employees with Indelicato, she became so enraged, it was not possible to have a meaningful conversation.

Then again, on July 17, 2014, Indelicato berated Lewis loudly in her office concerning the Verta issue. Indelicato claimed that Lewis somehow tied her hands with respect to disciplining Verta initially, which was an unmitigated lie. Indelicato then shouted at Lewis again and demanded he get out of her office again.

Four days later on July 21, 2014, during a staff meeting Indelicato refused to make eye contact with Lewis and gave him the silent treatment yet again.

It was not until Verta engaged in another similar egregious act of misconduct almost three months later that he was suspended and ultimately terminated. Even then, Indelicato continued to show preferential treatment to Verta. For example, both former Director of Engineering, James Mortimer, and Director of Operations, Cyril Opperman, suggested Verta be subjected to drug testing, however, Indelicato resisted.

On September 18, 2014, Indelicato abrasively dismissed the recommendation of Lewis to lock the suspended Verta out of the computer network. Indelicato's "reasoning" was because "that's not his thing." Lewis made that suggestion on the phone after he was advised that Walton, McDade and Indelicato were having another meeting in McDade's office where Lewis was excluded.

On September 19, 2014, just two days after Verta's suspension, Indelicato gave Lewis the silent treatment virtually the entire day. Presumably, Indelicato somehow blamed Lewis for the problems of Verta who she referred as "a good Italian boy who lives with his mother" during a meeting with representatives from the OIG on September 17, 2014. McDade also apparently stated to her assistant, Rie Arai, "we don't want to fire Santo because he's a good kid." This kid glove treatment of Verta stands in stark contrast to the treatment of Black employees under Indelicato.

Lewis reported to the Chamber Indelicato's inappropriate preferential treatment of Verta and noted that Black employees would in no way receive such passes. On or around March 31, 2015, the date of Verta's termination, Lewis again reported historical preferential treatment of Verta to the Chamber and stated he was fearful of retaliation.

## B. Walton's Undisclosed and Potentially Criminal Salary Raise with the Assistance of Indelicato and McDade

On another occasion, Walton with the assistance of Indelicato, manipulated her salary to award herself an approximately $10,000 unauthorized and illicit raise which was intentionally

concealed from Lewis as well as the public. There was no Board action and no public disclosure of this raise.[21] The timing of this unauthorized action by Walton is interesting because it is well known that Walton intends to retire in the near future and it is not clear how this unauthorized raise may increase her pension benefits.[22]

Upon learning of Walton's illicit raise, on March 6, 2015, Lewis immediately reported the matter to the Chamber and communicated his fear that Indelicato would retaliate if she were made aware of his report. McDade, who is in charge of processing payroll, also was involved in concealing this raise from Lewis and the public, even though she upon information and belief eventually stated to her then assistant that the actions of Walton and Indelicato constituted "totally fraud."

### C. Indelicato's Directives Based on Purely Racial Grounds

These were not the only items of reporting from Lewis that resulted in retaliation. At approximately the same time, Lewis reported to the Chamber his concerns about Indelicato's giving him directives based purely on racial grounds and his concern about the pervasive problems in the office concerning Indelicato's disparate mistreatment of Black employees. Lewis expressed his fear that if these concerns were communicated to Indelicato, he would be the victim of retaliation. Lewis' concerns were eventually communicated to Indelicato, and Indelicato retaliated by terminating Lewis.

### D. Black Employees' Work Scrutinized and Criticized More Harshly Than the Work of White and Italian Employees

In addition, White and Italian employees were held to a lower standard concerning their writing by Indelicato and Walton than Black employees. For example, a former Black engineering employee, Kay Hart or Trinidadian descent, was frequently criticized by Indelicato and Walton for her writing. Quite to the contrary, White and Italian employees were given passes. For example, Indelicato stated on January 13, 2014 that Italian engineering employee, Fred Cagnetto, was "not a paper person" and therefore should not be held accountable for his writing. The Italian employee had sent an e-mail to wrong recipients. Walton pointed it out. Indelicato brushed it aside: "oh, he's is not a paper person." Walton responded: "Whatever works." Complainant also understands that Director of Operations Cyril Opperman who is White was given similar passes by Indelicato.

---

[21] The RIOC By-Laws require Board approval in the setting of executive salaries. (See Tab 3, Article IV, Section 9 at Page 8.) This was not done with the unauthorized raise that Walton apparently granted to herself.

[22] Less than a year after she was hired, in September 2014, Walton as CFO oversaw the creation of a proposed budget for fiscal year 2015-2016, which was circulated with a "staffing plan" that set for Walton's "current" salary as $132,603. This proposed budget specifically set forth proposed raises for other staff almost all of whom were involved in payroll/salary almost all of whom would need to be complicit in keeping Walton's concealed and unauthorized raise a secret. The proposed budget was approved by the Board in December 2015 and reflected raises for other staff, which were to take effect at beginning of fiscal year April 2015, but did not include anything about a raise for Walton and represented her "current" salary as $132,603. As it turns out, it appears that less than 30 days after the fiscal year 2015-16 budget had been approved by the RIOC Board, (and after multiple meetings had been convened and multiple documents circulated which reflected Walton's salary as $132,600 for fiscal year 2014-2015), Walton, in concert with Indelicato and McDade, secretly raised her salary to around $142,800 effective around January 2015. As such, not only did Walton not disclose her self-dealt raise, but also she ensured it was retroactive to a date three months prior to the raises that were actually disclosed and approved.

## VI.   RETALIATION AGAINST LEWIS FOR REPORTING WRONGDOING AT RIOC

On the morning of April 8, 2015, there was a call with Indelicato, Walton, Lewis, Robinson and members of the Executive Chamber, Keisha Santiago ("Santiago") and Julia Kupiec ("Kupiec"). Kupiec whose involvement with RIOC began in or around February 2015 – was on the call and Lewis had recently reported to Kupiec:

(1)   Walton's potentially criminal salary manipulation with Indelicato's assistance;

(2)   the disturbing trend of Black employees filing EEOC and other claims of discrimination;

(3)   Indelicato's giving raced-based directives such as directing Lewis, such as to sit on the termination of an Black employee who Lewis had nothing to do with and then sending another Black employee in Lewis' place; and

(4)   Indelicato's gross preferential treatment of the Italian Verta before he was finally suspended and terminated.

During the April 8 call, Kupiec blurted out, "Don, you said there are things you want to discuss with me, but aren't comfortable with Charlene [Indelicato] hearing!" This statement by Kupiec was in response to Lewis reminding Kupiec – during a disagreement about scheduling – that earlier in the week she had requested Lewis join a call with the Governor's Office of Employee Relations concerning employment complaints at RIOC and requested Lewis take the call from a "discreet location." The purpose of the "discreet location" was because of Lewis' offices proximity to Indelicato's and the chance that he could be overheard or that Indelicato would enter his office regularly in the middle of phone call. Kupiec desired Lewis take the call concerning all the employment strife at RIOC (for which Indelicato was a centerpiece) in a location where Lewis could speak freely – a "discreet location" – and not worry about being overheard by Indelicato.

Following that April 8 call, Indelicato said to Lewis, "You know I'm going to call Julia to find out what these issues are." Lewis then exited Indelicato's office and discussed with Eliav that Kupiec had breached his requested confidentiality concerning his reporting of Indelicato's misconduct and that Lewis was fearful of retaliation. Lewis immediately attempted to get Keisha Santiago of the Chamber on the telephone and eventually did speak her that day and conveyed his concern that Kupiec had breached his confidentiality and requested, among other things, that Santiago speak to Kupiec about Lewis's concerns. Eliav was with Lewis when he called from outside of the Starbucks on Roosevelt Island.

Indelicato – who has previously said of Kupiec on more than one occasion, "[Julia's] a kid who doesn't know what's she doing and she won't last long" – then had at least one phone call with Kupiec at around 7:00 p.m. on April 15, 2015 and Lewis was specifically instructed by Indelicato not to join the call.

On the morning of April 16, 2015, in response to Lewis' question about the 7:00 call the

night before, Indelicato refused to provide any specifics and instead said: "It was immaterial. I fell on my sword." Lewis asked again, "What happened?" Indelicato repeated: "It's immaterial." A few days later Indelicato complained about Lewis reporting Walton's potentially criminal salary manipulation, which was presumably one of the topics Indelicato "found out" from Kupiec, in addition to Lewis' reporting of issues concerning discriminatory practices in the office. By the end of the week, Lewis was fired by Indelicato in a blatant act of retaliation.

## VII. FAILURE OF THE BOARD AND INDIVIDUAL DIRECTORS TO FULFILL THEIR DUTIES

Notwithstanding the high regard in which they held Lewis, the RIOC Board of Directors failed to fulfill multiple duties concerning Indelicato, as well as Walton and McDade. Among other things, the RIOC Directors were negligent and/or reckless in hiring Indelicato by failing to exercise their duties by properly vetting Indelicato including, but not limited to, Indelicato' s role as a Defendant in at least two prior Federal employment discrimination lawsuits. Notably, during the Board meeting when Indelicato was hired by Board vote, Director Dr. Kathy Grimm expressed displeasure that:

> "*[R]eferences haven't been adequately checked*," and continued, "*I heard some things on the subway here today coming to this meeting that disturbed me* and I feel obliged to abstain."[23]

Dr. Grimm was presumably referencing the lawsuits, yet without any diligence done, the Board voted to approve Indelicato's hire.

Lewis also reported to Directors Howard Polivy, Dr. Kathy Grimm and David Kraut his concerns regarding the troubling pattern of discrimination in the office. These Directors indicated they would discuss the issue with their fellow Directors, yet apparently, nothing was done to rectify the situation of which Lewis complained. Instead, the Directors upon information and belief informed Indelicato of Lewis' complaints.

Furthermore, as noted, the Director Respondents have publicly admitted following the termination of Lewis that they have not fulfilled certain of their duties and had nothing to do with Complainant's dismissal. Indeed, RIOC, the Board and the Individual Directors failed to supervise appropriately Indelicato, Walton and McDade and failed to prevent or correct misconduct, disparate treatment, discrimination and unlawful conduct at RIOC. The Board and the Director Respondents conduct thereby breached their duties, including fiduciary duties, duties to act in accordance with RIOC's By-laws, duty to supervise RIOC executives; duty to exercise independent judgment, and duty to exercise reasonable care, skill and diligence.[24]

---

[23]  Dr. Grimm's comments can be heard at around the 4:58 mark of the video found at the following link, which is from a RIOC Board of Directors meeting dated April 4, 2013:  https://goo.gl/sWHJHk

[24]  Certain of these claims will be pursued in another forum; however, this information has been included because it is germane to the present charge.

## VIII.  WITNESSES

### A.  Witnesses to the Claims Asserted

The following individuals are witnesses to the claims of Lewis:

(i)      Rie Arai – Former Human Resources Assistant
(ii)     Armando Cordova – Poma-Leitner Employee
(iii)    Arthur Eliav – Associate General Counsel
(iv)     Kay Hart – Former Project Manner
(v)      Karline Jean – Office Manager
(vi)     Anna Rankin – Former Community Relations & Coordination
(vii)    Gretchen Robinson  – Internal Controls and Compliance Officer
(viii)   Erica Spencer-EL – Community Relations Specialist
(ix)     Lada Stasko – Assistant General Counsel
(x)      Fernando Vargas – Grounds Supervisor

### B.  Considerations Regarding Respondents' Potential Undue Influence Upon Witnesses

With respect to witnesses, Lewis notes that the problems inherent in any EEOC investigation with witnesses who are also current employees is magnified substantially in the current situation.

*First*, because Lewis spoke out about discrimination and potentially criminal conduct but rather than Respondents addressing his concerns, Respondents thereafter unlawfully terminated Complainant who was one of only two vice presidents and one of the three executive members. Lewis was also the most senior member of the executive team, by far, and clearly highly respected by the Board of Directors as evidenced by the quotes throughout this charge.

*Second*, during Respondents' course of misconduct, including Complainant's termination, and continuing thereafter, RIOC, Indelicato, Walton and McDade have acted with disturbing impunity.   It would not be surprising, and actually, understandable if current employees listed as witnesses may be reluctant to participate fully in any EEOC investigation.  This is particularly relevant in this case considering the retaliatory behavior complained about in the instant case, the prior vindictive behavior of Respondents, and small size (both in number of employees and space occupied) of the RIOC Main Office in which many of the witnesses were or are located.

*Third*, with respect to nonemployee witnesses (such as contractors seeking to maintain business relationships with RIOC), Respondents have significant leverage in the form of such things as approval for certain requests from those nonemployee witnesses. Those nonemployee witnesses understandably may be reluctant to come forward to aid a former employee thereby risking their relationship with the Respondents – who remain in their positions – and have proven themselves to be vindictive.

*Fourth*, upon information and belief, Indelicato, Walton and McDade have already begun the process of attempting to intimidate and threated potential witnesses to the claims of Lewis.

In sum, witnesses may be fearful that truthful testimony adverse to the Respondents will put their employment or relationship with RIOC at risk. Indeed, Complainant understands that certain of the witnesses listed are already reluctant to testify and have expressed this precise fear.

I, Donald Lewis, have read the above charge and declare under penalty of perjury that the above is true and correct.

Dated: October 21, 2015

_____
Donald Lewis

# EXHIBIT P

**[EXHIBIT REMOVED FROM ECF SYSTEM DUE TO SENSITIVE OR CONFIDENTIAL INFORMATION CONTAINED WITHIN]**

**EXHIBIT Q**

**REBUTTAL OF CLAIMANT DONALD LEWIS TO POSITION STATEMENT OF RESPONDENT ROOSEVELT ISLAND OPERATING CORPORATION**

Claimant, Donald Lewis, submits this Rebuttal in response to the Position Statement of Respondent Roosevelt Island Operating Corporation ("RIOC" or "Respondent") dated December 22, 2015 (the "Statement") in connection with the EEOC Charge submitted by Claimant on August 12, 2015. The Position Statement provides virtually no evidence, witness names, or support to contradict the detailed, sworn and highly specific allegations in the Charge. Instead, the Statement consists almost exclusively of false, generalized, conclusory and wholly unsupported defamatory statements, pretextual assertions regarding RIOC's claimed basis for Claimant's termination, and specious red herring and strawman arguments designed to deliberately mislead the reader and deflect attention from the real issues to which RIOC has no defense.

The Statement's pretextual defenses and fabricated rationales, including, among other items, defamatory statements concerning purported work issues with Claimant are being raised for the first time almost one year after Claimant was terminated and in some cases almost three years after the alleged conduct purportedly occurred. Rather than support a position that RIOC did not act unlawfully towards Claimant, the Statement further evidences Respondent's wrongful conduct, even conceding that Claimant was terminated based on his lawful reporting of misconduct. Respondent has failed to provide the EEOC with any specific evidence to contest Claimant's Charge allegations – because Respondent cannot – and instead Respondent has chosen the textbook strategy of a wrongful actor with no defense for its conduct by submitting a Statement teeming with defamatory remarks against Claimant which, among other things, are (i) blatantly false; (ii) offensive; (iii) actionable; and (iv) cause Claimant to suffer additional damages.

This Rebuttal will not address the entirety of assertions in the Statement because, among other reasons, Respondent's ever-shifting pretextual bases for Claimant's termination, coupled with Respondent's failure to proffer virtually any evidence or specifics to support its generalized assertions, fails to create any plausible inference that there was a legally justifiable reason for Respondent's treatment of Claimant, including his termination. Claimant affirmatively states that he disagrees with all of the assertions in the Position Statement which can be read in a negative context towards Claimant, and provides below just a few examples of the obtuse nature of RIOC's Position Statement.[1]

By way of example, RIOC's claim in the Statement that "Lewis' mishandling of the Jones matter was a major factor involved in his termination" borders on the bizarre and is clearly a pretext. (Statement at p. 2) By Respondent's own admission, news of the Jones incident and related protests took place as early as February 2013. (Statement at p. 2) Claimant was not

---

[1] Claimant's election to not respond to all of the specious allegations in the Statement shall not be construed as an admission or agreement to those assertions in this forum or any other forum and Claimant expressly reserves and does not waive the right to contest those allegations in this forum or any other forum.

terminated until April 2015, over two years later. Relying on the Jones matter now in an effort to justify the unlawful dismissal defies credulity. *First*, no one ever expressed any dissatisfaction with Claimant's handling of the Jones matter. *Second*, all decisions regarding the Jones matter were made in conjunction with discussions and directions from the Executive Chamber. *Third*, to assert that Claimant was terminated more than two years after the incident occurred is specious at best and on its face pretextual. These are just a few of the plethora of reasons that this assertion is entirely unsupportable and patently absurd.

As another example, Respondent resorts to offering straw man arguments – by blatantly misrepresenting Claimant's allegations – in an unavailing effort to refute the Charge. Specifically, Respondent asserts that Claimant alleged that "McDade's salary adjustment was ***unauthorized***" and proceeds in great length to explain why the McDade raise was not "unauthorized" and even states the claim that it was "unauthorized" is ***"actually ridiculous."*** (Statement at p. 7) (emphasis added) However, Claimant ***never alleged*** that McDade's salary adjustment was "unauthorized." Instead, Claimant stated that the McDade raise was "***questionable***" given prior stated policies by RIOC President Charlene M. Indelicato concerning RIOC employees who sever employment with RIOC and wish to return. (Charge at p. 6, 17) (emphasis added) Because Respondent has no defense to its unlawful conduct, Respondent is not only fabricating purported reasons for Claimant's dismissal, but also fabricating Claimant's allegations and then knocking down Respondent's own straw man allegation in an effort to divert attention from the real issues concerning its unlawful treatment of Claimant.

In another instance, Respondent attempts to refute allegations by ignoring the actual substance of the allegation and mischaracterizing the same. Specifically, the Statement misrepresents a Charge "allegation" as: "Allegation: Indelicato regularly would hold meetings to the exclusion of Lewis who should have been included as Vice President and General Counsel." (Statement at p. 11) The Statement then "responds" by stating "Indelicato's schedule is transparent and open to all staff. . . [a]t no point has Complainant been told that he was not allowed to attend a meeting." (Statement at p. 11) This completely ignores and mischaracterizes the language in the Charge, which affirmatively states that Ms. Indelicato's calendar was open and never stated Claimant was "told" not to attend meetings.[2] (Charge at p. 20) Thus, Respondent again attempts to create the illusion that it is refuting allegations in the Charge – which it cannot – by setting up a straw man allegation and then knocking down its own straw man. Use of these tactics illuminate Respondent's inability to credibly respond to the real allegations in the Charge.

The Position Statement is also rife with purported issues concerning Claimant's work and work ethic that are absolutely fictitious. Claimant was not once in almost four years spoken to about any negative issues concerning his work performance, work ethic or work product. Indeed, the statements of the RIOC Board of Directors during their conversations with Claimant

---

[2] The Charge states: "While Indelicato frequently stated that, her meetings were open to all staff and made her calendar available to executives and administrative assistants, this was simply a subterfuge. Indelicato would frequently convene these clandestine meetings with Walton and/or McDade without notice or scheduling, and hold them behind closed doors." (Charge at p. 20)

following his termination as set forth in the sworn Charge, as well as the Directors public comments during a Board Meeting shortly thereafter, completely belie Respondent's blatant fabrications regarding Claimant's work. (Charge at p. 11, 12)

Based upon the reasons set forth above, the evidence included in the Charge, the Position Statement's absence of evidence, support, specifics or witness names to contradict the detailed, sworn and highly specific allegations in the Charge, Claimant respectfully submits that the EEOC should issue a determination finding "Reasonable Cause" concerning the Charge.


I, Donald Lewis, have read the above rebuttal and declare under penalty of perjury that the above is true and correct.

Dated: January 20, 2016