**EXHIBIT R**

**TAB 1**

Holly G. Rogers
(203) 596-0500
hrogers@melicklaw.com

October 22, 2015

ROBERT P. POWERS
JOHN F. ROONEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL A. BYRNE
MARK S. BODNER
JEREMY I. STEIN (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. GUFTIN *(RI)
T. DOS URBANSKI *(RI)
ERIN J.M. ALARCON *(NH)
JOHN A. CALETRI *(RI)
ROBERT S. LUDLUM *(NY & CT)
SHANNON MCQUEENEY DOHERTY *(NY)
JARED B. GIROUX
CHRISTOPHER D. GEORGE
JOHN G. WHEATLEY *(ME)
KATHLEEN A. FEDERICO
KATHRYN T. ROGERS *(RI)
DONALD P. HEALY
BRIAN C. DAVIS
RENÉ M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MOHAN SREENIVASAN (CT)
CANDACE M. EDAM
HOLLY G. ROGERS (CT & NY)

OF COUNSEL
JOHN A. SARAKEENY
GRETA T. HUTTON (CA)

*ALSO ADMITTED

ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
2 PARK CENTRAL DRIVE, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2021

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-5269

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0500
FAX (203) 721-8532

2 INTERNATIONAL DRIVE, SUITE 110
PORTSMOUTH, NH 03801
(603) 627-0010
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 541-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-2611
FAX (818) 539-2613

*Via USPS regular mail*
Anthony J. Rotondi
Attorney for Donald Lewis
5 Columbus Circle, Suite 800
New York, NY 10019

      Re:    *Notice of 50-H Hearing*

Dear Mr. Rotondi:

      Enclosed please find the Notice of 50-H Hearing of Donald Lewis pursuant to § 50-h of the General Municipal Law. My clients still remain interested in attempting to resolve this matter through mediation. As such, the enclosed Notice preserves my clients' right to conduct a § 50-h examination of Mr. Lewis should any mediation efforts ultimately prove unsuccessful, or should you no longer be interested in mediation. When you last spoke with me colleague Jeremy Stein on October 9th, you were going to discuss the possibility of mediation with your client and our suggested mediator Ruth Raisfeld. To date we have not heard back from you. Please contact me immediately upon receipt of this notice so that we may discuss your client's intentions.

                        Sincerely,

                        Holly G. Rogers

HGR/nd

# NOTICE OF 50-H HEARING

ANTHONY J. ROTONDI
5 COLUMBUS CIRCLE, SUITE 800
NEW YORK, NY 10019

      Re:    Claimant Name: Donald Lewis
               Lewis v. Roosevelt Island Operating Corporation et al.

Dear Mr. Rotondi:

Please take notice that, pursuant to Section 50-h of the General Municipal Law (GML), claimant is mandated by law to appear before the undersigned at the following location, at the date and time specified below, to be orally examined under oath relative to the occurrence and extent of injuries for which the above claim is made:

      Date of Hearing:    December 2, 2015
      Time of Hearing:    10:00 a.m.

      Location of Hearing:  MELICK & PORTER
                        830 THIRD AVENUE, 5TH FLOOR
                        NEW YORK, N.Y. 10022
                        (212) 541-7236

**Please note that prior to the hearing, you will be called by the law office above to confirm the date and time of the hearing. At that time you can request a language translator for your client, if necessary. <u>If you confirm the hearing date and you and/or the claimant subsequently fail to appear for the hearing, you will be charged for any legal, translator and/or stenographic fees that the respondents incur.</u>**

By: _Holly G. Rogers_
    Holly G. Rogers

**TAB 2**

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | Tuesday, November 10, 2015 7:57 PM |
| **To:** | 'Jeremy I. Stein' |
| **Subject:** | RIOC 50H and Mediation |



img-X27075212-0001.pdf

Jeremy,

Attached is a communication from your associate Holly Rogers, requesting that Mr. Lewis appear for a 50h hearing.  As there is no provision for a 50h hearing in RIOC's enabling statute, kindly advise the source of RIOC's claimed authority for the demand.

Additionally, as a point of clarification, it appears that Ms. Rogers is either confused or misinformed.  Prior to receiving this letter, I had never heard Ms. Rogers name and had never interacted or communicated with her with regard to mediation or otherwise.  Nonetheless, the letter states, "we have not heard back from you" regarding a potential mediation.  However, you and I had been communicating by telephone and email prior to Ms. Rogers' letter.  Equally confusing is that Ms. Rogers' letter imports urgency that I "contact [her] immediately upon receipt of this notice so that we may discuss your client's intentions" regarding mediation, but Ms. Rogers sent her communication via regular mail, without a fax or email copy, which defies any urgency regarding her request that I contact her "immediately upon receipt of this notice."

Setting all that aside, please advise whether I am correct that I should continue to direct any further discussions regarding a potential mediation to you.

In that regard, from our last communications regarding selection of a mediator, I understood that you would be getting back to me this past Friday afternoon after your client meeting.  Please advise whether you have any update in that regard.  Thanks.

Regards,

AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

*****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
*****************************************************

*****************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
*****************************************************

**TAB 3**

| From: | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
|---|---|
| Sent: | Tuesday, December 1, 2015 7:57 PM |
| To: | 'Jeremy I. Stein' |
| Cc: | hrogers@melicklaw.com |
| Subject: | RIOC 50H |

Jeremy,

Hope you and yours had an enjoyable Thanksgiving holiday.

Regarding RIOC's request to conduct a 50H of Mr. Lewis, I have not received a response to my requests to identify RIOC's claimed authority to conduct the requested 50H. I assume from the absence of a response that RIOC is unable to provide any such authority and RIOC is therefore withdrawing its request to conduct a 50H of Mr. Lewis. If that is not the case, please promptly advise me so that we can expeditiously reach a resolution as Mr. Lewis is of course prepared to comply with any lawful obligations he may have in that regard, and, if required, we can set a mutually agreeable date. Thanks.

Regards,

Anthony

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**EXHIBIT S**

TAB 1

## Anthony J. Rotondi

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | 3-16-16 5:09 PM |
| **To:** | 'Jeremy I. Stein' |
| **Cc:** | 'Holly G. Rogers' |
| **Subject:** | RE: RIOC |

Jeremy:

The lack of veracity in your e-mail is astounding, including the statement that I have somehow "taken [your] e-mail out of context." The documented terms of our mediation agreement are clear and unambiguous to anyone who can read. You plainly agreed to certain mediation terms in writing and are now breaching that agreement and desperately attempting to obfuscate the record by misrepresenting telephone discussions between us, as well as with the proposed mediator. In light of the clear written record, your desperate attempt to go on the offensive by incredulously claiming that I somehow "mean only to obstruct any meaningful chance of resolving this case with a neutral" is absurd.

To the contrary, Melick has played games and obstructed the process while Mr. Lewis remains unemployed and continues to incur damages based on your clients' and your conduct. It appears that Melick's strategy regarding mediation has been to cause delay and waste my time and Mr. Lewis' time with false representations. While this strategy is consistent with Respondents' penchant for fabrication, it does not serve their interest and instead appears to be designed to advance the interests of the Executive Chamber.

Rest assured that your strategy of delay and relying on false representations will serve no purpose other than to increase the damages that a jury ultimately will award Mr. Lewis. Indeed, I look forward to questioning your clients under oath regarding the slew of varying positions and blatant misrepresentations they have disseminated concerning Mr. Lewis' termination, as well as our efforts at mediation. A sophisticated jury in the Southern District of New York will clearly see through the plethora of nonsensical and irreconcilable fabrications.

/AJR

---

**From:** Jeremy I. Stein [mailto:jstein@melicklaw.com]
**Sent:** Tuesday, March 15, 2016 3:52 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Holly G. Rogers <hrogers@melicklaw.com>
**Subject:** RE: RIOC

Anthony:

I had made it very clear over the telephone, numerous times, that we were not going to bring all of the board of directors to the mediation, and that we would only be bringing those people who were absolutely necessary to facilitate settlement. This was repeated when we spoke to the proposed mediator. You have taken my e-mail out of context. Since you are unwilling to compromise on the most basic issue related to this mediation, it is clear that you mean only to obstruct any meaningful chance at resolving this case with a neutral. My clients are no longer interested in mediation at this time.

Please feel free to call me to discuss this matter further if your position changes or you wish to present us with a more reasonable demand or proposed resolution.

Jeremy I. Stein
Partner
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
jstein@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Tuesday, March 15, 2016 11:01 AM
**To:** Holly G. Rogers
**Cc:** Jeremy I. Stein
**Subject:** RE: RIOC

Holly,

I have forwarded Melick & Porter's recently revised proposed mediation terms to Mr. Lewis. Nonetheless, I am certain you are aware of the wholly disingenuous nature of the positions advanced in your correspondence regarding the previously agreed mediation terms. Melick's effort to obfuscate its reneging on an agreement reached five months ago – as outlined below – and the concomitant lack of good faith in advancing those positions seriously jeopardizes the possibility of any pre-suit settlement.

*First*, two partners from Melick (Jeremy Stein and Mark Mazurczak) contacted me in September 2015 to propose mediation. My October 7, 2015 e-mail below clearly stated that Mr. Lewis was agreeable to mediation contingent upon the three simple provisions set forth therein, ***including that all Respondents be present.*** Because Melick had already proposed mediation, there was no need for Melick to confirm that Melick and its clients were generally agreeable to mediation. Jeremy's October 8 email response unequivocally indicated that Melick and its clients agreed to mediation on Mr. Lewis' proposed terms. To claim in your email below that "[t]here was never an agreement reached that all parties on the notice of claim would be present at the mediation" – and instead now state that RIOC intends to have Susan Rosenthal and a mysterious "representative of the Board to be determined by RIOC" attend a mediation – is unbelievable.

2

That Melick and its clients had already proposed mediation in September is plainly evident from my October e-mails with Jeremy. Indeed, there would be no reason for Jeremy in his October 8 response to state "our client is agreeable to mediation," – which had already been established – unless it was to accept the straightforward terms in my October 7 e-mail. Tellingly, my e-mail unambiguously stated:

> Please let me know whether RIOC agrees to proceed *in this manner*. I cannot imagine that any of our requests prevent mediation, but *if this is unacceptable, please advise in what regard*. (Emphasis added.)

Jeremy's response likewise was plain and clear: "We are agreeable to mediation."

*Second*, the claim in your March 7, 2016 e-mail below that Jeremy's October 8, 2015 e-mail somehow meant to convey that "since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7" defies credulity. In an October 2 e-mail I requested that Jeremy "confirm whether [it] remains the case" that Melick "was not representing RIOC in regards to Mr. Lewis' FOIL requests." Jeremy's response on this FOIL issue could not have been clearer:

> *I do not have any further information on the FOIL issues. I am waiting to hear back from my client contact who is currently in China*, so I appreciate your patience. As soon as I can get an answer I will relay that to you. (Emphasis added.)

To now claim that this "out of the country" reference somehow relates to the already agreed upon mediation, and not FOIL, is absurd.

Melick's current attempts at creating a wholly manufactured, revisionist, and unsupportable history are unfortunate. In reliance on Melick's agreement to our proposed mediation terms, for five months Mr. Lewis and myself have invested our time (as well as the time of multiple mediators and their assistants) in furtherance of mediation. Because Melick and its clients are now breaching that agreement it is likely that our efforts were a needless expenditure of resources.

Considering that RIOC President Indelicato has told blatant untruths about, among other things, Mr. Lewis termination and the other Respondents' actions related thereto, it is inappropriate to have a veiled mediation that excludes the Respondent Directors. This is particularly the case given the apparent conflict of interest between Ms. Indelicato and the individual Director Respondents given Ms. Indelicato's publicly confirmed misrepresentations.

Further, should the case continue through trial, there is a very real risk of personal judgments being entered against the individual Respondents for punitive damages under myriad statutory provisions. As you know, current law, public policy and contractual terms prohibit coverage or indemnification for punitive damages awards under insurance policies and

indemnity agreements. Under such circumstances, it is improper to shield the Respondent Directors from a mediation process thereby depriving those individuals as well as the insurer(s) of a potential settlement that could resolve Mr. Lewis's claims thereby avoiding any risk of personal exposure to the individual Respondents. It is unclear who is making these decisions that affect the exposure of the individual Respondents (as well as Respondents' insurer(s)), which you have oddly refused to identify). This conduct, however, seems consistent with the manner in which the Executive Chamber and the resident Respondent Directors interact.

I additionally note that excluding the individual Respondents makes little sense from Melick's perspective. Respondents covered by insurance and indemnity provisions who are excluded from a mediation (that could resolve the matter and prevent litigation) would surely look to their counsel to justify their exclusion from the process if suit is later filed against those respondents. This conflict would be magnified in the event that a judgment, which imposes personal, uninsurable and unindemnifiable liability is entered against those individual Respondents (as is very likely with respect to Mr. Lewis's claims).

It appears that the only entity that would benefit from holding a mediation on Melick's materially revised terms is the Executive Chamber. In such case, the Executive Chamber – neither an intended beneficiary under the insurance policy(s) nor a potential beneficiary of indemnity provisions – would control benefits that are meant to inure to the individual Director Respondents.

Finally, requesting us to "confirm . . . if [Mr. Lewis] intends on providing a reduced and more reasonable demand in advance of the mediation" in the very same communication in which Melick advances outlandish positions to justify its breach of the previously agreement quite frankly is offensive. Additionally, from your communication and our prior discussions, it appears that Melick and the Executive Chamber do not appreciate adequately the seriousness of the Respondents' misconduct and the overwhelming incontrovertible evidence in Mr. Lewis' favor.

Again I have forwarded your email to Mr. Lewis and will confer with him regarding your recently revised mediation terms and revert. Nonetheless, to avoid jeopardizing the possibility of pre-suit settlement, I again request that Melick and its clients honor the previously agreed terms.

/AJR

---

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Monday, February 29, 2016 5:51 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Jeremy I. Stein <jstein@melicklaw.com>
**Subject:** RE: RIOC

Anthony:

4

As discussed, the email from Jeremy to you on October 8, 2015 (that you have provided below) states only that our client is agreeable to mediation, and that since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7, 2015.

There was never an agreement reached that all parties on the notice of claim would be present at the mediation.

In our last discussion, I informed you of who my client intends to have present at the mediation. That has not changed.

Please confirm whether or not your client intends on participating in mediation, and, if so, if he intends on providing a reduced and more reasonable demand in advance of the mediation, as discussed last week.

Best regards,

**Holly G. Rogers**
Attorney
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Monday, February 29, 2016 5:32 PM
**To:** Holly G. Rogers
**Subject:** FW: RIOC

Holly,

Below is the email I mentioned during our prior conversations in which Jeremy indicated that Melick & Porter represents all parties on the Notice of Claim and agreed on their behalf, among other things, that as a condition of the mediation "all parties listed in the notice of claim be present at the mediation." In that same email, I offered "to hold the mediation after hours or on a weekend should scheduling be an issue" to accommodate the respondents -- as I indicated might be necessary during the recent conversation you and I had with Ms. Jansenson.

As you can imagine, I do not see how Jeremy can now "deny" that an agreement was reached regarding the presence of all parties in the mediation (as you indicated he has during our discussion last week). Such a "denial" would be a complete 180 change in position from having all the individual respondents present at the mediation to having none of the individual respondents present. Please circle back with Jeremy and advise regarding whether the prior agreement will be honored and your clients will be present at the mediation. Thank you.

-    Anthony

5

**From:** Jeremy I. Stein [mailto:jstein@melicklaw.com]
**Sent:** Thursday, October 08, 2015 5:59 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** RE: RIOC

Anthony:

We are agreeable to mediation.  Please be advised that Melick & Porter represents all parties on the Notice of Claim.  I do not have any further information on the FOIL issues.  I am waiting to hear back from my client contact who is currently in China, so I appreciate your patience.  As soon as I can get an answer I will relay that to you.

As discussed, we would suggest using Ruth Raisfeld as a mediator, who is a little more reasonable given your prior concerns with the cost of JAMS. If that is agreeable to you, we will obtain her availability.  Please feel to call me with any concerns you might have.



Jeremy I. Stein
Partner
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT  06702
Main: (203) 596-0500
Fax: (203) 721-8532
jstein@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~  NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Wednesday, October 07, 2015 12:34 PM
**To:** Jeremy I. Stein
**Subject:** RE: RIOC

Jeremy,

Further to our discussion regarding your inquiry of whether Mr. Lewis would consider submitting a demand or participating in a mediation to explore early resolution of his claims, he is willing to participate in a mediation with the very simple provisos set forth below:

(i)     the parties agree on an acceptable mediator and forum;

(ii)    all parties listed in the notice of claim be present at the mediation (We are willing to hold the mediation after hours or on a weekend should scheduling be an issue); and

(iii)   the parties and counsel use their best efforts so that any mediation occurs without undue delay.


Please let me know whether RIOC agrees to proceed in this manner.  I cannot imagine that any of our requests prevent mediation, but if this is unacceptable, please advise in what regard.  Feel free to contact me should you care to discuss prior to circulating to your client(s).

Additionally, I have not received a response to my email of October 2 seeking clarification of the parties that Melick & Porter represents and the specific matters. Kindly confirm whether Melick & Porter represents any parties listed in the notice of claim other than RIOC so that I may contact any remaining parties or their counsel, as necessary.

Please advise regarding the mediation and Melick & Porter's representation by noon on Friday, October 9. Otherwise, I will assume that RIOC does not desire to participate in a mediation and that Melick & Porter represents RIOC and no other parties and only with regards to the notice of claim. Thank you.

/AJR

---

From: Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
Sent: Friday, October 02, 2015 5:06 PM
To: 'Jeremy I. Stein' <jstein@melicklaw.com>
Subject: RIOC

Jeremy,

I will be following up with Mr. Lewis over the weekend regarding our call yesterday after which I will forward to you the email that we discussed concerning a potential mediation. In the interim, I would appreciate it if you could clear up the two issues below for me.

I recently read an email relating to FOIL requests from Mr. Kraut (one of RIOC's directors) to Mr. Lewis in which Mr. Kraut seemed to indicate that RIOC had retained counsel for the FOIL issues. I understood from our first discussion that Melick & Porter was not representing RIOC in regards to Mr. Lewis' FOIL requests. Could you please confirm whether that remains the case. Additionally, if you know of another firm representing RIOC on the FOIL issues, I would appreciated it if you let me know who that is so that I communicate with the appropriate persons/firm.

I understand that Melick & Porter represents the RIOC corporate entity with respect to Mr. Lewis's notice of claim, but I am not certain whether Melick represents the RIOC Executives, RIOC's Board of Directors, or the Individual Directors. Could you please let me know either way, again, so that I communicate with the appropriate persons/firm. Thanks.

- Anthony

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

*****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

TAB 2

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Holly G. Rogers <hrogers@melicklaw.com> |
| **Sent:** | 5-24-16 1:09 PM |
| **To:** | 'Anthony J. Rotondi' |
| **Cc:** | Jeremy I. Stein |
| **Subject:** | Draft letter requesting extension of time to respond to the complaint |
| **Attachments:** | 2016.5.19 corr to judge re- met to plead.pdf |

Anthony:

As discussed, attached is a draft of the letter to the Court requesting an extension of time to respond to the complaint. We are requesting an extension to July 8, 2016.  Please promptly advise as to whether or not Plaintiff  consents to the requested extension.

Best regards,

**Holly G. Rogers**
**Attorney**
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT  06702
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

1

# M|P  MELICK & PORTER

Holly G Rogers
(203) 533-6255
Facsimile: (203) 721-8532
hrogers@melicklaw.com

May 24, 2016

ROBERT P. POWERS
JOHN F. ROONEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL R. BYRNE
MARK S. BODNER
JEREMY I. STEIN (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. GUTTIN *(RI)
T. DOS URBANSKI *(RI)
JOHN A. CALTRIP*(RI)
ROBERT S. LUDLUM*(NY & CT)
SHANNON McQUEENEY DOHERTY*(NY)
JARED D. GIROUX
JOHN G. WHEATLEY *(ME)
CHRISTOPHER D. GEORGE
DONALD P. HEALY
BRIAN C. DAVIS
RENE M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MOURN SREDENVASAN (CT)
HOLLY G. ROGERS (CT)
ANTHONY G. DePASQUALE
ERINN M. GLOSSER
ALEX A. ROMANO (RI)
RANDI L. CALABRESE (CT)

OF COUNSEL
ERIN J.M. ALARCON *(NH)
JOHN A. SAKAKEENY
GRETA T. HUTTON (CA)

*ALSO ADMITTED

ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
371 TURNPIKE ROAD, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2021

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-6269

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0200
FAX (203) 721-8532

195 ELM STREET
MANCHESTER, NH 03101
(603) 627-0010
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 341-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-2611
FAX (818) 539-2613

MELICKLAW.COM

**Via ECF**

Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re: *Lewis v. Roosevelt Island Operating Corporation et al.*
> *Civil Action No. 16-CV-03071 - ALC*

Dear Judge Carter:

This office represents the defendants in the above-referenced action (the "Defendants"). The Defendants respectfully submit this letter to request an extension of time to July 8, 2016 to respond to Plaintiff's complaint. Each of the multiple Defendants were served on different days and by different methods. Therefore, the current deadline for each Defendant to respond to the complaint varies. However, this request precedes the earliest current deadline for any Defendant to respond to the complaint. This is the Defendants' first request for an extension of time to respond to the complaint.

The requested extension is necessary to gather information from our clients, including reviewing service of process as to each Defendant, and to prepare the necessary responsive pleadings. Plaintiff's counsel has consented to the extension of time requested herein. Accordingly, Defendants respectfully request that the Court extend their time to respond to the complaint to July 8, 2016.

Respectfully submitted,

HOLLY G. ROGERS

By: /s/ Holly G. Rogers
Holly G. Rogers, Esq.
Melick & Porter, LLP
Attorney for Defendants
830 3rd Avenue, 5th Floor
New York, NY 10022

Melick & Porter, LLP
May 24, 2016
Page 2


cc: **Via ECF**
    Anthony J. Rotondi
    Attorney for Plaintiff
    5 Columbus Circle, Suite 800
    New York, N.Y. 10019

TAB 3

Holly G Rogers
(203) 533-6255
Facsimile: (203) 721-8532
hrogers@melicklaw.com

# M|P MELICK & PORTER

ROBERT P. POWERS
JOHN F. ROONEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL R. BYRNE
MARK S. BODNER
JEREMY I. STEIN (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. GUTTIN *(RI)
T. DOS URBANSKI *(RI)
JOHN A. CALETRI *(RI)
ROBERT S. LUDLUM *(NY & CT)
SHANNON MCQUEENEY DOHERTY*(NY)
JARED B. GIROUX
JOHN G. WHEATLEY *(ME)
CHRISTOPHER D. GEORGE
DONALD P. HEALY
BRIAN C. DAVIS
RENÉ M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MOHAN SREEDHVASAN (CT)
HOLLY G. ROGERS (CT)
ANTHONY G. DEFARQGALE
ERINN M. GLOSTER
ALEX A. ROMANO (RI)
RANDI L. CALABRESE (CT)

OF COUNSEL
ERIN J.M. ALARCON *(NH)
JOHN A. SAKAKEENY
GRETA T. HUTTON (CA)

*ALSO ADMITTED

ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
371 TURNPIKE ROAD, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2921

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-6269

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0590
FAX (203) 721-8532

195 ELM STREET
MANCHESTER, NH 03101
(603) 627-9810
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 541-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-2611
FAX (818) 539-2613

MELICKLAW.COM

May 27, 2016

**Via ECF**

Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re:   *Lewis v. Roosevelt Island Operating Corporation et al.*
>       *Civil Action No. 16-CV-03071 - ALC*

Dear Judge Carter:

This office represents all of the defendants in the above-referenced action (the "Defendants"). The Defendants respectfully submit this letter to request an extension of time to June 20, 2016 to respond to Plaintiff's complaint. Each of the multiple Defendants were served on different days and by different methods. Therefore, the current deadline for each Defendant to respond to the complaint varies. However, upon in formation and belief, this request precedes the earliest current deadline for any Defendant to respond to the complaint. This is the Defendants' first request for an extension of time to respond to the complaint.

The requested extension is necessary to gather information from our clients, including reviewing service of process as to each Defendant, and to prepare the necessary responsive pleadings. Plaintiff's counsel has consented to the extension of time to June 20, 2016.

Defendants reserve the right to seek additional time to respond to the complaint, if necessary. Defendants originally requested that the Plaintiff consent to an extension of time to respond to the complaint to July 8, 2016, but the Plaintiff would only consent to an extension to June 20, 2016. Additionally, Plaintiff was unwilling to provide the undersigned counsel with copies of the affidavits of service as to the Defendants. As such, Defendants may need additional time to review service of process as to each Defendant, gather information from our clients, and to prepare the necessary responsive pleadings.

Accordingly, Defendants respectfully request that the Court extend their time to respond to the complaint to June 20, 2016, as consented to by the Plaintiff, while reserving the right to request additional time should it be necessary.

Melick & Porter, LLP
May 27, 2016
Page 2

Respectfully submitted,

HOLLY G. ROGERS

By: /s/ Holly G. Rogers
    Holly G. Rogers, Esq.
    Melick & Porter, LLP
    Attorney for Defendants
    830 3rd Avenue, 5th Floor
    New York, NY 10022

cc: **Via ECF**
    Anthony J. Rotondi
    Attorney for Plaintiff
    5 Columbus Circle, Suite 800
    New York, N.Y. 10019

TAB 4

# M|P  MELICK & PORTER

Holly G Rogers (203) 533-
6255 Facsimile: (203)
721-8532
hrogers@melicklaw.com

ROBERT P. POWERS
JOHN F. ROONEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL R. BYRNE
MARK S. BODNER
JEREMY I. SILVERFINE (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. GUTBIN *(RI)
T. DOS URBANSKI *(RI)
JOHN A. CALBITO*(RI)
ROBERT S. LUDLUM*(NY & CT)
SHANNON McQUEENEY DOHERTY*(NY)
JARED B. GIROUX
JOHN G. WHEATLEY *(ME)
CHRISTOPHER D. GEORGE
DONALD P. HEALY
BRIAN C. DAVIS
RENÉ M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MOHAN SREENIVASAN (CT)
HOLLY G. ROGERS (CT)
ANTHONY G. DEPASQUALE
BRINN M. GLOSTER
ALEX A. ROMANO (RI)
RANDI L. CALABRESE (CT)

OF COUNSEL:
ERIN J.M. ALARCON *(NH)
JOHN A. SAKAKEENY
GRETA T. HUTTON (CA)

*ALSO ADMITTED

ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
371 TURNPIKE ROAD, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2921

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-6269

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0500
FAX (203) 721-8532

195 ELM STREET
MANCHESTER, NH 03101
(603) 627-0010
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 541-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-2611
FAX (818) 539-2613

MELICKLAW.COM

May 2427, 2016

**Via ECF**

Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:    *Lewis v. Roosevelt Island Operating Corporation et al.*
        *Civil Action No. 16-CV-03071 - ALC*

Dear Judge Carter:

This office represents all of the defendants in the above-referenced action (the "Defendants"). The Defendants respectfully submit this letter to request an extension of time to July 8June 20, 2016 to respond to Plaintiff's complaint. Each of the multiple Defendants were served on different days and by different methods. Therefore, the current deadline for each Defendant to respond to the complaint varies. However, upon in formation and belief, this request precedes the earliest current deadline for any Defendant to respond to the complaint. This is the Defendants' first request for an extension of time to respond to the complaint.

The requested extension is necessary to gather information from our clients, including reviewing service of process as to each Defendant, and to prepare the necessary responsive pleadings. Plaintiff's counsel has consented to the extension of time requested herein.to June 20, 2016.

Defendants reserve the right to seek additional time to respond to the complaint, if necessary. Defendants originally requested that the Plaintiff consent to an extension of time to respond to the complaint to July 8, 2016, but the Plaintiff would only consent to an extension to June 20, 2016. Additionally, Plaintiff was unwilling to provide the undersigned counsel with copies of the affidavits of service as to the Defendants. As such, Defendants may need additional time to review service of process as to each Defendant, gather information from our clients, and to prepare the necessary responsive pleadings.

Accordingly, Defendants respectfully request that the Court extend their time to respond to the complaint to July 8, 2016June 20, 2016, as consented to by the Plaintiff, while reserving the right to request additional time should it be necessary.

Melick & Porter, LLP
May 27, 2016
Page 2

Respectfully submitted,

HOLLY G. ROGERS

By: /s/ Holly G. Rogers
Holly G. Rogers, Esq.
Melick & Porter, LLP
Attorney for Defendants
830 3rd Avenue, 5th Floor
New York, NY 10022

~~Melick & Porter, LLP~~
~~May 24, 2016~~
~~Page 2~~

cc: **Via ECF**

TAB 5

## Anthony J. Rotondi

**From:** Anthony J. Rotondi <AJR@AJROTONDI.COM>
**Sent:** 5-20-16 11:38 AM
**To:** 'Holly G. Rogers'
**Subject:** RE: Affidavits of service

Holly,

The affidavits of service will be filed and processed as required under the applicable rules.

- Anthony

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Friday, May 20, 2016 9:50 AM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** Affidavits of service

Anthony:

Please provide us with copies of affidavits of service for each defendant at your earliest convenience.

Best regards,

**Holly G. Rogers**
Attorney
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

TAB 6

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 22 of 39
Case 1:16-cv-03071-ALC   Document 38   Filed 06/01/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 29   Filed 05/29/16   Page 2 of 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.  1:16-cv-03071-ALC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*      Mr. Michael Shinozaki

was received by me on *(date)*      MAY 9, 2016                                 .

☐ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

☒ I left the summons at the individual's residence or usual place of abode with *(name)*      Vladimir and Tim

(concierge / doorman)                                       , a person of suitable age and discretion who resides there,

on *(date)*   May 12, 2016          , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date:  MAY 30, 2016

_____
*Server's signature*

JACK CATALAN
*Printed name and title*

102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:

Service attempted on May 9, 2016 at 40 River Road, Apt 11M Roosevelt Island, New York 10044
Doorman/Concierge advised that Defendant no longer resided
in that building.  Attorney provided updated residence below.
Service done on May 12, 2016 at updated residence 30 River Road Apt, 14C Roosevelt Island, NY 10044. Left with Vladimir and
Tim who are the concierge / doorman (of suitable age and discretion) in the lobby of Defendant's residence followed by mailing to
the same address. Vladimir / Tim denied access to Defendant's Apt.. Package was left to be secured in mail-room for Defendant's pick-up.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 23 of 39
Case 1:16-cv-03071-ALC   Document 37   Filed 06/01/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 39   Filed 05/20/16   Page 2 of 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*          Mr. Howard Polivy

was received by me on *(date)*     MAY 9, 2016

☐ I personally served the summons on the individual at *(place)*

on *(date)*                                 ; or

☑ I left the summons at the individual's residence or usual place of abode with *(name)*   Jamie Dejesus

(concierge / doorman)                          , a person of suitable age and discretion who resides there,

on *(date)*  May 9, 2016            , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*                                                    , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                       ; or

☐ I returned the summons unexecuted because                                              ; or

☐ Other *(specify):*

My fees are $                for travel and $                 for services, for a total of $                  .

I declare under penalty of perjury that this information is true.

Date:   MAY 30, 2016

_____
*Server's signature*

JACK CATALAN
*Printed name and title*

102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:

Service at 531 Main Street, Apt 1019, Roosevelt Island NY 10044
on person of suitable age and discretion followed by mailing to same address.

Jamie Dejesus is the concierge / doorman in the lobby of Defendant's residence. Mr. Dejesus denied access to Defendant's
apartment. Mr. Dejesus accepted the package for delivery to Defedant
advised that the package would be secured in the building mail room awaiting resident's pick up and that resident would
receive two email notifications regarding the package.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 24 of 39
Case 1:16-cv-03071-ALC   Document 36   Filed 06/01/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 30   Filed 05/20/16   Page 2 of 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.   1:16-cv-03071-ALC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*     Dr. Katherine Grimm

was received by me on *(date)*     MAY 9, 2016          .

☐ I personally served the summons on the individual at *(place)*

on *(date)*                           ; or

☑ I left the summons at the individual's residence or usual place of abode with *(name)*     Jamie Dejesus

(concierge / doorman)                          , a person of suitable age and discretion who resides there,

on *(date)*  May 9, 2016         , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*                                   , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                           ; or

☐ I returned the summons unexecuted because                                   ; or

☐ Other *(specify):*


My fees are $              for travel and $              for services, for a total of $              .

I declare under penalty of perjury that this information is true.

Date:  MAY 30, 2016

*Server's signature*

JACK CATALAN
*Printed name and title*

102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:
Service at 531 Main Street, Apt 227, Roosevelt Island NY 10044
on person of suitable age and discretion followed by mailing to same address.

Jamie Dejesus is the concierge / doorman in the lobby of Defendant's residence. Mr. Dejesus denied access to Defendant's apartment. Mr. Dejesus accepted the package for delivery to Defendant and advised that the package would be secured in the building mail-room awaiting resident's pick up and that resident would receive two email notifications regarding the package.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 25 of 39
Case 1:16-cv-03071-ALC   Document 35   Filed 06/01/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 39   Filed 05/20/16   Page 2 of 2

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.   1:16-cv-03071-ALC

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   MR. DAVID KRAUT

was received by me on *(date)*   MAY 9, 2016        .

☒ I personally served the summons on the individual at *(place)*   540 MAIN STREET, APT 460

ROOSEVELT ISLAND, NY 10044                        on *(date)*  MAY 12, 2016      ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)*                   , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____        on *(date)*                 ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.


Date:   MAY 30, 2016

_____
*Server's signature*

JACK CATALAN
*Printed name and title*


102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:

ATTEMPTED SERVICE ON 5/9/16 NO ANSWER AT DOOR.

SERVICE ON 5/12/16 INDIVIDUAL AT DOOR ACKNOWLEDGED
THAT HE WAS DAVID KRAUT, STATED "I KNOW WHAT THIS IS"
AND ACCEPTED THE ENVELOPE
CONTAINING THE SERVICE DOCUMENTS.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 26 of 39
Case 1:16-cv-03071-ALC   Document 34   Filed 06/01/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 20   Filed 05/20/16   Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:16-cv-03071-ALC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____ **Ms. Fay Freyer Christian** _____

was received by me on *(date)*   MAY 9, 2016 _____   •

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☑ I left the summons at the individual's residence or usual place of abode with *(name)*   **Jamie Dejesus**

(concierge / doorman) _____ , a person of suitable age and discretion who resides there,

on *(date)*  May 9, 2016 _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ •

I declare under penalty of perjury that this information is true.

Date:  MAY 30, 2016 _____

_____
*Server's signature*

JACK CATALAN
*Printed name and title*


102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:

Service at 531 Main Street, Apt 1308, Roosevelt Island NY 10044
on person of suitable age and discretion followed by mailing to same address.

Jamie Dejesus is the concierge / doorman in the lobby of Defendant's residence. Mr. Dejesus denied access to Defendant's apartment. Mr. Dejesus called Ms. Christian's apartment and Ms. Christian asked that the package be left with Mr. Dejesus. Mr. Dejesus advised that the package would be secured in the building mail room awaiting resident's pick up and that resident would receive two email notifications regarding the package.

Case 1:16-cv-03071-ALC-SN  Document 49-1  Filed 06/16/16  Page 27 of 39
Case 1:16-cv-03071-ALC  Document 33  Filed 06/01/16  Page 1 of 1
Case 1:16-cv-03071-ALC  Document 29  Filed 05/20/16  Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:16-cv-03071-ALC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*     **Ms. Charlene Indelicato**

was received by me on *(date)*    MAY 13, 2016

☒ I personally served the summons on the individual at *(place)*    112 Main Street, Dobbs Ferry NY

on *(date)*  **May 13, 2016**        ; or

I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)*                 , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*                          , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                 ; or

☐ I returned the summons unexecuted because                          ; or

☐ Other *(specify)*:


My fees are $               for travel and $               for services, for a total of $               .

I declare under penalty of perjury that this information is true.

Date:  MAY 30, 2016

_____
*Server's signature*

JACK CATALAN
*Printed name and title*


102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*

Additional information regarding attempted service, etc:
Service done in hand at Defendant's place of business. Defendant confirmed that she was Ms. Indelicato and stated "service, right".

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Roosevelt Island Operating Corporation Board of Directors

was received by me on *(date)*   May 12, 2016 .

[ ] I personally served the summons on the individual at *(place)*

on *(date)*                              ; or

[ ] I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)*                              , and mailed a copy to the individual's last known address; or

[ ] I served the summons on *(name of individual)*                              , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                              ; or

[ ] I returned the summons unexecuted because                              ; or

[X] Other *(specify)*:

I left the summons at the individuals' actual place of business with *(name)* A. Moskowitz, a person of suitable age and discretion who is employed there, on *(date)* May 13, 2016, and mailed a copy to the individuals' actual place of business.

My fees are $   for travel and $   for services, for a total of $   .

I declare under penalty of perjury that this information is true.

Date:   6/2/2016

_____
Server's signature

Jack Catalan
*Printed name and title*

102-40 62 Avenue, Forest Hills NY 11375

*Server's address*

Additional information regarding attempted service, etc:

Case 1:16-cv-03071-ALC-SN   Document 48-1   Filed 06/16/16   Page 29 of 39
Case 1:16-cv-03071-ALC   Document 3079   Filed 06/02/16   Page 2 of 2
Case 1:16-cv-03071-ALC   Document 41   Filed 06/02/16   Page 1 of 1

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Ms. Frances Walton

was received by me on *(date)*   May 20, 2016   .

[ ] I personally served the summons on the individual at *(place)*

on *(date)*                          ; or

[ ] I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)*                    , and mailed a copy to the individual's last known address; or

[ ] I served the summons on *(name of individual)*                                         , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                          ; or

[ ] I returned the summons unexecuted because                                        ; or

[X] Other *(specify):*
I served the summons by affixing the summons to the door of individuals dwelling place / usual place of abode at 530 East 20th Street, Apt. 11E, NY, NY 10009 on May 28, 2016 and by mailing the summons to the individual on May 28, 2016 at her last known residence indicating "personal and confidential".

My fees are $  for travel and $  for services, for a total of $   .

I declare under penalty of perjury that this information is true.

6/2/2016
Date:

*Server's signature*

Jack Catalan
*Printed name and title*

102-40 62 Avenue, Forest Hills NY 11375

*Server's address*

Additional information regarding attempted service, etc:
Attempts prior to affixing to door: May 20, 2016 @ 9:40 a.m.; May 20, 2016 @ 1:10 p.m.; May 24, 2016 @ 2:00 p.m.; May 28, 2016 @ 7:50 p.m.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 30 of 39
Case 1:16-cv-03071-ALC   Document 30-29   Filed 05/25/16   Page 2 of 2
Case 1:16-cv-03071-ALC   Document 42   Filed 06/02/16   Page 1 of 1

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Ms. Claudia McDade

was received by me on *(date)*   May 13, 2016

[ ] I personally served the summons on the individual at *(place)*

on *(date)*                                     ; or

[ ] I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)*                          , and mailed a copy to the individual's last known address; or

[ ] I served the summons on *(name of individual)*                                    , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)*                         ; or

[ ] I returned the summons unexecuted because                                         ; or

[X] Other *(specify)*:

I left the summons at the individual's actual place of business with *(name)* A. Moskowitz, a person of suitable age and discretion who is employed there, on *(date)* May 13, 2016, and mailed a copy to the individual's actual place of business.

My fees are $              for travel and $              for services, for a total of $

I declare under penalty of perjury that this information is true.
6/2/2016

Date:
                                                        *Server's signature*


                                                        Jack Catalan
                                                        *Printed name and title*

                                                        102-40 62 Avenue, Forest Hills NY 11375
                                                        *Server's address*

Additional information regarding attempted service, etc:
    I was informed the individual was in a meeting and could not meet me in the reception are.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 31 of 39
Case 1:16-cv-03071-ALC   Document 30-29   Filed 05/20/16   Page 2 of 2
Case 1:16-cv-03071-ALC   Document 43   Filed 06/02/16   Page 1 of 1

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Mr. Darryl Towns
was received by me on *(date)*   May 20, 2016

[ ] I personally served the summons on the individual at *(place)*
on *(date)*                    ; or

[ ] I left the summons at the individual's residence or usual place of abode with *(name)*
, a person of suitable age and discretion who resides there,
on *(date)*                    , and mailed a copy to the individual's last known address; or

[ ] I served the summons on *(name of individual)*                    , who is
designated by law to accept service of process on behalf of *(name of organization)*
on *(date)*                    ; or

[ ] I returned the summons unexecuted because                    ; or

[X] Other *(specify)*:

I left the summons at the individual's actual place of business 2 Park Avenue, NY NY with *(name)* A.J., a person of
suitable age and discretion who is employed there, on *(date)* May 20, 2016, and mailed a copy to the individual's
actual place of business.

My fees are $              for travel and $              for services, for a total of $

I declare under penalty of perjury that this information is true.
6/2/2016

Date:

_____
*Server's signature*

Jack Catalan
*Printed name and title*

102-40 62 Avenue, Forest Hills NY 11375
*Server's address*

Additional information regarding attempted service, etc:
First Attempt: 5/20/2016 at actual place of business.  I was told that individual had stepped out of the office.
Second attempt: 5/20/2016 The security officer at the individual's actual place of business called the individual's
office. In response, A.J. (a 30-35-year-old male black with a shaved head), approached me and stated "I was sent
down for Darryl Towns" and accepted the envelope containing the service papers.

Case 1:16-cv-03071-ALC-SN   Document 49-1   Filed 06/16/16   Page 32 of 39
Case 1:16-cv-03071-ALC   Document 39   Filed 06/02/16   Page 1 of 1
Case 1:16-cv-03071-ALC   Document 39   Filed 05/20/16   Page 2 of 2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:16-cv-03071-ALC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____ Ms. Margaret Smith _____

was received by me on *(date)*   MAY 9, 2016 _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☑ I left the summons at the individual's residence or usual place of abode with *(name)*   Jamie Dejesus

(concierge / doorman) _____ , a person of suitable age and discretion who resides there,

on *(date)*  May 9, 2016 _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date:  MAY 30, 2016 _____

_____
*Server's signature*

JACK CATALAN
*Printed name and title*


102-40 62 AVENUE, FOREST HILLS, NY 11375
*Server's address*


Additional information regarding attempted service, etc:

Service at 531 Main Street, Apt 1008, Roosevelt Island NY 10044
on person of suitable age and discretion followed by mailing to same address.

Jamie Dejesus is the concierge / doorman in the lobby of Defendant's residence. Mr. Dejesus denied access to Defendant's apartment. Mr. Dejesus accepted the package for delivery to Defedant and advised that the package would be secured in the building mail-room awaiting resident's pick up and that resident would receive two email notifications regarding the package.

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*    Roosevelt Island Operating Corporation

was received by me on *(date)*   May 12, 2016

[ ] I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

[ ] I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

[ ] I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

[ ] I returned the summons unexecuted because _____ ; or

[X] Other *(specify):*

I served the summons on the Defendant by delivering a copy to A. Moskowitz, Defendant's agent, at Defendant's place of business at 591 Main Street, Roosevelt Island NY on May 13, 2015, and mailed a copy to Defendant's place of business.

My fees are $   for travel and $ for services, for a total of $   .

I declare under penalty of perjury that this information is true.

Date: 6/3/2016
_____

_____
Server's signature

Jack Catalan
Printed name and title

102-40 62 Avenue, Forest Hills NY 11375
_____
Server's address

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:16-cv-03071-ALC

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Mary Beth Labate

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____
on *(date)* _____ ; or

☐ I left the summons at the individual's ~~residence or usual place of abode~~ actual place of business with *(name)*
Carole Deyo ~ Admin. Asst , a person of suitable age and discretion who ~~resides~~ is employed
there, on *(date* 5/24 , and mailed a copy to the individual's actual
place of business ~~last known address~~;

Or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: 5/27/16

_____
*Server's signature*

~~Christopher Warner~~

_____
*Printed name and title*

Additional information regarding attempted service, etc:

TAB 7

## Anthony J. Rotondi

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | 6-13-16 7:56 AM |
| **To:** | 'Holly G. Rogers' |
| **Cc:** | 'Jeremy I. Stein' |
| **Subject:** | RE: Extension of Time to Respond to the Complaint |

Holly,

Although I generally accommodate extension requests, Plaintiff does not consent to Defendants' request for another approximate 3 week extension to July 8 based upon, among other reasons: (i) Melick & Porter's at least 9-month representation of Defendants relating to these claims; (ii) Melick and Defendants' prior dilatory conduct; (iii) the duplicitous manner by which you sought to shift to Plaintiff the purported need for the extension in your correspondence to the Court; and (iv) misrepresentations that you have made regarding the proofs of service.

Moreover, I caution you to cease misrepresenting facts to the Court in your attempts to create a fictitious record. Such duplicitous conduct will not be tolerated.

/AJR

---

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Friday, June 10, 2016 10:13 AM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Jeremy I. Stein <jstein@melicklaw.com>
**Subject:** Extension of Time to Respond to the Complaint

Anthony:

We are hereby requesting that Plaintiff consent to an approximate 2 week additional extension of time (in light of the July 4th holiday) to **July 8** to respond to the complaint. We have just received the affidavits of service as to our clients within the last few days (and our earlier request for the affidavits was denied), and we need time to review service and confer with our multiple clients.

Please get back to me on this at your earliest convenience.

Best regards,

**Holly G. Rogers**
**Attorney**
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

TAB 8

# M | P  MELICK & PORTER

Holly G Rogers
(203) 533-6255
Facsimile: (203) 721-8532
hrogers@melicklaw.com

ROBERT P. POWERS
JOHN F. ROONEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL R. BYRNE
MARK S. BODNER
JEREMY I. STEIN (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. GUTTIN *(RI)
T. DOS URBANSKI *(RI)
JOHN A. CALETRI*(RI)
ROBERT S. LUDLUM*(NY & CT)
SHANNON MCQUEENEY DOHERTY*(NY)
JARED B. GIROUX
JOHN G. WHEATLEY *(ME)
CHRISTOPHER D. GEORGE
DONALD P. HEALY
BRIAN C. DAVIS
RENE M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MOHAN SREENIVASAN (CT)
HOLLY G. ROGERS (CT)
ANTHONY G. DEPASQUALE
ERINN M. GLOSTER
ALEX A. ROMANO (RI)
RANDI L. CALABRESE (CT)

OF COUNSEL
ERIN J.M. ALARCON *(NH)
JOHN A. SAKAKEENY
GRETA T. HUTTON (CA)


*ALSO ADMITTED


ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
371 TURNPIKE ROAD, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2021

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-6269

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0500
FAX (203) 721-8532

195 ELM STREET
MANCHESTER, NH 03101
(603) 627-0010
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 541-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-2611
FAX (818) 539-2613


MELICKLAW.COM

June 13, 2016

**Via ECF**

Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *Lewis v. Roosevelt Island Operating Corporation et al.*
      *Civil Action No. 16-CV-03071 - ALC*

Dear Judge Carter:

This office represents all of the defendants in the above-referenced action (the "Defendants"). The Defendants respectfully submit this letter to request an extension of time to July 8, 2016 to respond to Plaintiff's complaint. Plaintiff does not consent to the requested extension to July 8, 2016. Plaintiff previously consented to an extension of time for Defendants to respond to the complaint to June 20, 2016, which the Court approved.

In their first extension request dated May 27, 2016, Defendants asked the Plaintiff to consent to an extension of time to respond to the complaint to July 8, 2016, but the Plaintiff would only consent to an extension to June 20, 2016. One week prior on May 20, 2016, the undersigned counsel asked the Plaintiff to provide copies of the affidavits of service as to the multiple Defendants. However, Plaintiff was unwilling to provide copies of the affidavits of service. As such, Defendants noted in their previous correspondence to the Court the anticipated need for additional time to review service of process as to each Defendant once the affidavits of service were made available to them by the Plaintiff, to confer with and gather information from our multiple clients, and to prepare the necessary responsive pleadings. A copy of the Defendants' previous letter requesting their first extension of time to respond to the complaint is attached hereto as Exhibit "A" for the Court's reference.

The affidavits of service only became available to the undersigned counsel very recently when they were filed with the Court on June 1-3, 2016. The requested extension is necessary to confer with and gather information from our numerous clients, including reviewing service of process as to each Defendant (each of the multiple Defendants were served on different days and by different

Melick & Porter, LLP
June 13, 2016
Page 2

methods), and to prepare the necessary responsive pleadings. This is the Defendants' second
request for an extension of time to respond to the complaint.

Accordingly, Defendants respectfully request that the Court extend their time to respond
to the complaint to July 8, 2016, while reserving the right to request additional time should it be
necessary. If the Court needs additional information as to the need for the requested extension, we
will be happy to provide such information.

Respectfully submitted,

HOLLY G. ROGERS

By: /s/ Holly G. Rogers
Holly G. Rogers, Esq.
Melick & Porter, LLP
Attorney for Defendants
830 3rd Avenue, 5th Floor
New York, NY 10022

cc: **Via ECF**
Anthony J. Rotondi
Attorney for Plaintiff
5 Columbus Circle, Suite 800
New York, N.Y. 10019

**EXHIBIT T**

**ANTHONY J. ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

August 4, 2016

VIA ECF & ELECTRONIC MAIL
The Hon. Andrew L. Carter Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re: *Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)*
      <u>*Further to Case Management Conference Request & Opposition to Discovery Stay Request*</u>

Dear Judge Carter:

    I write further to Plaintiff's July 27, 2016 case management conference request to proceed with discovery and in opposition to Defendants' July 29, 2016 request for a stay of discovery.

### *I. Background*

    Plaintiff filed this action on April 25, 2016. All Defendants to the Action have been appearing through, Medick & Porter ("Melick") for approximately 90 days and Melick has been representing Defendants regarding these claims since at least September 2015. After securing two extensions, Defendants' waited until the last date of the deadline and instead of filing an Answer, filed a pre-motion letter seeking a pre-motion conference. The Court denied the request for a conference and set a briefing schedule for MTD. Defendants thereby effactually secured a third additional extension when the MTD deadline was set for July 29 in the scheduling order.

    In the interim, Plaintiff complied with Court Individual Practice Rule No. 3(B), waiting 90 days to request an Initial Case Management Conference, which Plaintiff requested on July 27. In a kneejerk reaction, Defendants opposed Plaintiff's request and first indicated their desire for a discovery stay. During the pendency of this Action defense counsel filed numerous other letters / letter motions, including requests for extensions to respond to the Complaint but never requested a stay of discovery notwithstanding their intent to file a Motion to Dismiss ("<u>MTD</u>"). (*See* Docket Nos. 31, 46, 50 and 52.)

    Based on, *inter alia*, Defendants' failure to establish a justifiable basis for the requested stay, Plaintiff's request to proceed with discovery should be granted and Defendants' belated request for a stay of discovery should be denied.

### *II. Defendants Have Not, Because They Cannot, Satisfy Their Burden Necessary For The Imposition Of A Stay.*

    As very recently summarized in *Mirra v. Jordan*, a district court has discretion to stay discovery pursuant to Rule 26(c), but the exercise of that discretion must be premised "***upon a showing of good cause***." 2016 U.S. Dist. LEXIS 30492, at *5 (S.D.N.Y. 2016) (emphasis added). In denying defendants' motion to stay pending resolution of motion to dismiss, the *Mirra* court further reaffirmed that:

> The party seeking a stay of discovery bears the burden of showing good cause. The pendency of a dispositive motion is ***not, in itself, an automatic ground for a stay***. Courts consider the following factors when determining whether a stay of discovery is appropriate

during the pendency of a dispositive motion: (1) whether the defendant has made a *strong showing* that the *plaintiffs claim is unmeritorious*; (2) the breadth of discovery (3) the *risk* of *unfair prejudice* to the party opposing the stay.

*Id.* (emphasis added) (internal citations and quotations omitted). Courts in this Circuit reject stays of discovery where, as here, defendants fail to establish good cause or fail to establish that the motion may *dispose of the entire action.* Indeed, in *Freund v. Weinstein*, the Court found that "while defendant may have *substantial arguments for dismissal of some of the claims*, this Court is doubtful that he will succeed in dismissing all of the claims against him," and therefore the Court denied defendants request for a stay of discovery. *Freund v. Weinstein*, No. 08- 1469, 2009 WL 2045530, at *1, *2 (EDNY July 8, 2009) (denying motion for discovery stay pending resolution of MTD where defendant failed to establish good cause); *see Mirra*, 2016 U.S. Dist. LEXIS 30492, at *8 & 9 (denying motion to stay and noting that "witnesses' memories are fading with time.")

### III. Adjudication Of Defendants' Motion To Dismiss Will Neither Dispose Of The Matter Nor The Need For Discovery.

Although Plaintiff cannot fully address the MTD in the context of this letter, a review of the Motion vis-à-vis the Complaint illustrates that contrary to Defendants' contention that "the pending motion is potentially dispositive," the Motion simply throws weak arguments to blanket each claim in the hopes that some will stick. Far from being dispositive, some of the arguments – such as claiming Defendant Indelicato lacked the necessary personal involvement or discriminatory intent – could not pass the "straight face test," let alone entirely dispose of the Action. (MTD, p. 15, 19-20)

Defendants assert *ad nauseam* that Plaintiff failed to plead sufficient facts but to support this rhetoric Defendants (i) misleadingly ignore specific factual Complaint allegations to the contrary; (ii) misleadingly characterize specific factual allegations as legal conclusions; (iii) inappropriately contest the truth of the Complaint allegations by asserting that the allegations are "*false*"; and (iv) equally if not most egregiously, claim that Plaintiff has not provided "*proof*" of the allegations in the Complaint. (*See e.g.* MTD at pgs. 5, 8, 9, 12, 13, 14, 19)

Defendants' confusion regarding the propriety of challenging factual allegations in the Complaint at the MTD stage perhaps is explained by defense counsel's focus in the MTD on cases deciding summary judgement motions and even appeals after trials instead of decisions on motions to dismiss. Indeed, nearly every case reviewed thus far cited in the MTD in support of propositions other than the simple elements of a claim, are decisions on motions other than MTD's. For example, such cases cited in the arguments of Defendants' MTD include:

- *Chin v. Port Auth. of N.Y. & N.J. Inc.*, 685 F.3d 135 (2d Cir. 2012) (appeal of jury verdict);
- *Simmons Grant v. Quinn Emanuel*, 915 F. Supp. 2d 498 (SDNY 2013) (decision on summary judgment motion);
- *Lopez v. Met. Life. Ins. Co.*, 930 F.2d 157 (2d Cir. 1991) (deciding appeal of bench trial and improperly cited in Defendants' MTD as a United States Supreme Court case);
- *Chan v. NYU Downtown Hospital*, 2006 WL 345853 (SDNY July 20, 2016) (decision on summary judgment motion);
- *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115 (2d Cir. 2010) (decision on summary judgment motion);
- *Davis-Molina v. Port Auth. of N.Y. & N.J.*, 2011 WL 4000997 (decision on summary judgment motion);
- *Heba v. New York State Division of Parole*, 537 F.Supp.2d 457 (decision on summary judgment motion);

- *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295 (2004) (decision on summary judgment motion);
- *Mathirampuzha v. Potter*, 548 F.3d 70 (2d Cir. 2008) (decision regarding summary judgment motion);
- *Gibson v. Brown*, 1999 WL 1129052 (decision regarding summary judgment motion);
- *Brown v. Henderson*, 257 F.3d 246 (2d Cir. 2001) (summary judgment motion decision);
- *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426 (2d Cir. 1999) (summary judgment motion decision);
- *White v. Pacifica Foundation*, 973 F.Supp.2d 363 (SDNY 2013) (summary judgement motion decision);
- *Baron v. Port Authority of New York*, 977 F.Supp. 646 (summary judgment motion decision);
- *Malley v. Briggs*, 475 U.S. 335 (1986) (summary judgment motion decision);
- *Robinson v. Via*, 821 F.2d 913 (2d Cir. 1987) (summary judgment motion decision);
- *Anderson v. Creighton*, 483 U.S. 635 (1987) (summary judgment motion decision);
- *Nieto v. San Perlita Independent School Dist.*, 894 F.2d 174 (5th Cir. 1990) (summary judgment motion decision);
- *Karoon v. New York City Transit Authority*, 241 A.D.2d 323 (1st Dept. 1997) (summary judgment motion decision); and
- *Lee ex rel. Estate of Lee v. J.B. Hunt Transport, Inc.*, 308 F.Supp.2d 310 (summary judgement motion decision).

Defendants' reliance on cases deciding post-discovery motions to support arguments advanced in their pre-discovery MTD is a glaring indication of the weakness of Defendants' MTD. Further, Defendants' reliance on those post-discovery decisions in the MTD to attempt to prevent Plaintiff from proceeding with discovery is ultimate in illogical arguments and specious bootstrapping.

Defendants' reliance on sovereign immunity as a basis to dismiss certain claims and preclude discovery are part of the same smoke screen that easily dissipates to reveal there is no support for those positions. *First*, Defendants assert that "it is ***well-established*** that RIOC specifically is entitled to protection from suit in federal court for purposes of sovereign immunity." (MTD at p. 4) To support this "well-established" law, Defendant cites two district court cases that are non-binding and non-controlling on this Action. (*See* MTD at p. 4, citing *Chafez v. Roosevelt Island Operating Corp.* 2000 WL 1277337 (SDNY, Sept. 8, 2000) and *Jones v. Roosevelt Island Operating Corp.et al.* 2013 WL 6504428 (SDNY, Dec. 7, 2013)). Moreover, as the smokescreen continues to dissipate it becomes clear that the Hon. Jed S. Rakoff, who presided over and issued the more recent of the decisions in *Jones*, does not share Defendants' view that the issue is "well-established." To the contrary, Judge Rakoff's rulings during the October 10, 2013 oral argument (referenced in the *Jones* decision) indicate the opposite is true. The transcript reveals the following exchange:

> THE COURT: Well, thank you very much. Both of you actually distilled the whole issue very, very nicely.
>
> I am going to grant the motion, although ***I agree with plaintiff's counsel that the issue is not totally free from doubt***, but on the whole I think Judge Buchwald's opinion is persuasive. I will write a short opinion so you will have something there for the purpose of any appeal, and in the meantime the case goes on and we already have the schedule set.
>
> So is there anything else we need to take up today?
>
> MR. LAWLOR: If I may, your Honor, with the dismissal of RIOC from this action, I'm not

totally sure of the interplay here, but could that be *without prejudice as to a filing in state court*? The issue that I had

THE COURT: Yes, it's with prejudice with respect to the folks we talked about earlier before we got to this issue, but here it's -- the wording "with prejudice" and "without prejudice" is awkward in a jurisdictional thing. This Court lacks jurisdiction over the claims we were just discussing *That in no way prevents you from filing those claims in state court.*

MR. LAWLOR: Thank you, your Honor.

THE COURT: And I will make that clear in the written opinion as well. Very good...

(TAB 1 annexed hereto, Transcript at p. 10) (emphasis added) (annexed hereto). Accordingly, Judge Rakoff not only makes clear that "*the issue is not totally free from doubt*" but also dovetails to Plaintiff's next point. Even assuming arguendo, Defendants were to succeed in federal court on their sovereign immunity defense, it would be a short-lived pyric victory at best because Plaintiff simply would re-file those claims in state court where discovery will proceed.

Notwithstanding the smokescreen arguments in Defendants' MTD premised on bootstrapped summary judgment motion decisions, this case will undoubtedly proceed to discovery, even assuming, arguendo, limited success of the MTD. Further, the discovery required for Plaintiff's claims will not differ materially between the various claims. Likewise, in the unlikely event that any Defendant is dismissed from the case, the discovery sought from the current parties as Defendants or as Non-Party witnesses through subpoenas will not materially differ.

### IV. *Plaintiff Will Be Further Prejudiced by A Stay of Discovery but Defendants Will Not Be Prejudiced by Denial of a Stay.*

A. Resolution of Plaintiff's Claims Already Have Been Delayed.

Plaintiff required an EEOC Right to Sue Letter and a Notice of Claim ("NOC") in order to file certain of his claims, which delayed initiation of his action. Moreover, Defense counsel bad faith actions in regard to the mediation further delayed and prejudiced Plaintiff. Defendants should not be permitted to engender further delay with a stay.

B. Defendants Gamed The System By Their 11th Hour Service Of A Pre-Motion Letter.

The requirement of a pre-motion letter and conference is now a common judicial practice that when appropriately followed by parties, serves the laudable goal of conserving judicial resources and avoiding unnecessarily incurring attorney fees on potentially avoidable motions. However, the opposite is accomplished when defendants wrongfully use that procedure to game the system and create additional delay. That is exactly what Defendants did by receiving seriatim extensions to respond to the Complaint, waiting until the eve of the last deadline to submit a 3 page pre-motion letter, listing basis such as the Complaint fails to plead sufficient facts for all claims and notifying the Court that it may later come up with additional motion basis. Accordingly, rather than benefit from a more efficient resolution of Plaintiff's claims, the resolution was further delayed when Defendants were then given another four weeks to file their MTD. By serving a deficient pre-motion letter at the 11th hour, Defendants unnecessarily built in another month's delay before filing their MTD. Certainly not the intent of the Individual Practice Rules nor the intent of the revised Federal Rules of Civil Procedure.

C. Having Inappropriately Sought To Depose Plaintiff, Defendants' Stay Request Rings Hollow.

As early as October 2015, Defendants served a notice to depose Plaintiff purportedly under General Municipal Law 50-h, which is inapplicable to this matter. (TAB 2, annexed hereto Notice

of Hearing.) In response to Plaintiff's demand for legal authority supporting the propriety of Defendants' deposition notice, Defendants dropped the issue, knowing full well that they lacked any basis to depose Plaintiff at that time. Defendants cannot have it both ways. Having sought to take Plaintiff's deposition -- without basis and even before the Complaint was filed -- Defendants cannot now try to hide behind a stay of discovery.

### D. Discovery Is Required Without Delay to Preserve Defendants' Testimony.

It is incontrovertible that as time passes memories fade. Plaintiff should not be denied the opportunity to secure necessary testimony that may be lost with the passage of additional time. Moreover, those considerations are amplified here because, contrary to the baseless assertions in the MTD, the Complaint alleges very specific details and quotes specific conversations, including many admissions by Defendants. Defendants, on the other hand, have been engaging in ever-shifting and continuously evolving and contradictory factual positions, which can be summarized as tell me what you know and I'll make up a new story to work around those facts. Experience proves that when such an ever-evolving defense is confronted by specific factual allegations, the more time that lapses between the events and a deponent's testimony, the more comfortable deponents become with responding "I do not recall," as a way of avoiding the potential consequences of contradictory statements under oath, resulting in transcripts of limited use replete with such responses.

Additionally, since the NOC filing, several key Defendants have left the employ of RIOC and the NYC area, including (i) Defendant Indelicato, RIOC's former President, CEO and a main Defendant actor (left RIOC's employ); (ii) Defendant Walton, RIOC's CFO (now retired); and (iii) Defendant Towns, RIOC's Chairman of the Board (vacated his position seeking employment).

### E. Discovery Is Required Without Delay to Preserve Defendants' Documentary Evidence.

It appears that since Plaintiff filed the NOC, Defendants already have removed certain document(s) from Defendants' files. Discovery is needed sooner rather than later to curb any further disappearance of documentary evidence and to preserve documentary evidence in Defendants' possession / control.

### F. Discovery Is Required Without Delay to Preserve Non-Party Testimony & Documents.

Additionally, Plaintiff anticipates the need to serve several non-party subpoenas for testimony and documents. The absence of a Case Management Order prevents Plaintiff from taking the necessary steps to attempt to preserve those documents and testimony not only from parties but from relevant non-parties as well.

## V. The Cases Defendants Cite in Defendants' July 29 Letter Are Unavailing.

### A. *Crawford-El v. Britton*, 523 U.S. 574 (1998).

For example, *Crawford-El v. Britton*, a decision on a case filed in 1989 in the District of Columbia relied on by Defendants is distinguishable on numerous grounds rendering it unavailing to Defendants.

Crawford-El was an "a litigious and outspoken prisoner in the...correctional system" who filed a *pro se* civil rights action subject to the Prisoner Litigation Reform Act. A quick search reveals that Plaintiff Crawford-El filed at least 13 cases in the District of Columbia alone. In contrast, Mr. Lewis -- an executive whose civil rights were violated -- has never been party to another suit.

Additionally, all the cases upon which Defendants rely for their stay request are cases files / decided in the 1990's. What the Federal courts viewed as acceptable timeframes for the resolution of claims vastly differ from todays' views. At that time simple cases could take upwards of six

5

years through resolution and trial-ready cases could wait years to be tried. Those timeframes were unavoidable because in the 1990's the Federal Courts were caught in a perfect storm of unfilled judicial vacancies and a deluge of case filings owed in substantial part to a major expansion of civil rights laws during the early 1990's. (*See generally*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT, CIVIL RIGHTS COMPLAINTS IN U.S. DISTRICT COURTS, 1990 – 2006 (annexed hereto as TAB 3) Not surprisingly, government and quasi-government entities often were defendants in those cases and also not surprisingly those same cases would often trigger sovereign immunity and qualified immunity issues. Accordingly, timeframes and stays of discovery -- that may have been reasonable and necessary under those circumstances where both the judiciary and public service attorneys representing government and quasi government defendants were triaging a flood of cases – likely would be viewed less favorably under the current environment. Recent amendments to the Federal Rules of Civil Procedure that emphasize a speedier resolution of claims support this view. Indeed, in January 2016, the FRCP were amended to shorten service of process from 120 days to 90 days and – as directly implicated in this Action -- the scheduling of initial case management conferences from 120 days to 90 days.

## B. *Rivera v. Heyman* 1997 WL 86394 (S.D.N.Y. Feb. 27, 1997) (not reported in F. Supp).

Defendant's' reliance on *Rivera v. Heyman* is equally unavailing. *First*, the *Rivera* MTD addressed the simple straightforward question of whether "the filing of charges of *disability* discrimination constituted a protected activity under Title VII," which the court found in its decision that such reporting did not appear to constitute protected activity under Title VII. *Rivera*, 1997 WL 86394 at * 2. More importantly, the *Rivera* court specifically held: "If the Court were convinced that Defendant had a *minimal probability of success on its dispositive motion* or that *such a motion was merely a delay tactic*, then a *stay of discovery would be denied*. *Id. at* * 1 (emphasis added).

## C. Defendants' Request For A Stay Should Be Denied As It Is "Merely A Delay Tactic" Condemned in *Rivera v. Heyman*, Upon Which Defendants Rely.

If there is any question that Defendants' request for a stay is "merely a delay tactic", Plaintiff respectfully submits that the Court need look no further than Exhibit B to the Complaint, which indisputably documents Defendants' bad faith dilatory conduct since 2015 when Plaintiff first filed his Notice of Claim. (A Bates Stamped copy is annexed hereto with relevant sections bracket for ease of reference) Melick engaged in a ploy to delay Plaintiff from filing his claim by proposing a pre-suit mediation. Plaintiff agreed to the mediation contingent on one primary term *i.e.*, that the parties to the Notice of Claim were present at the mediation. (TAB 4 hereto, Exhibit B to Cmplt.; Bates stamped and with certain key sections bracketed / underlined for ease of review.) After Melick agreed to the term on behalf of Defendants and after months of preparation that delayed Plaintiff (including interviewing potential mediators) Melick breached the one simple mediation term regarding the participation of the Defendants and called off the mediation.

If the Court still holds any reservation regarding Defendants' and their counsel's dilatory conduct, Plaintiff respectfully submits that the Court need look no further than their conduct in seeking extensions, where Ms. Rogers blamed Plaintiff for Defendants' purported need for an extension by falsely asserting that Plaintiff refused to provide proofs of service. Strikingly, when called out on the misrepresentation, Ms. Rogers then claimed that the three ECF courtesy copies sent to three different Melick attorneys were insufficient for Melick to evaluate defenses. Apparently, counsel somehow needed additional time because it was prevented from studying the proofs of service absent receiving additional courtesy copies directly from Plaintiff.

Plaintiff respectfully submits that any lingering doubt regarding Defendants' bad faith conduct and whether the requested stay "is merely a delay tactic" is easily resolved by considering

Defendants' June 17, 2016 correspondence to the Court. (Docket No. 50.) Incredulously, in that document, defense counsel, Ms. Holly Rogers, blames this Court for Defendants' purported need for additional time. In that request, Ms. Rogers claims an extension was needed because the Court had granted an extension request (before Plaintiff submitted his opposition) and then some two hours later vacated that extension to provide Plaintiff an opportunity to submit an opposition. According to Ms. Rogers, the extension was now needed in part because Melick had informed Defendants that their request was granted and in the intervening two hours before the Court vacated the Order "had the effect of disrupting and delaying Defendants' continuing efforts to confer with its multiple clients in preparation of their responsive pleading." (H. Rogers Letter, Docket No, 50) As if Defendants' entire defense strategy was irreparably altered during the intervening two hours while Defendants and counsel basked in the short-lived victory of a granted extension request that an additional extension was necessitated to deal with the fallout.

To fully appreciate the ludicrous nature of Defendants' excuse, some of the language from Ms. Rogers' letter is provided below. Ms. Rogers again, repeats the bizarre assertion that the three ECF courtesy copies of the proofs of service that Melick received via ECF were somehow insufficient and then blames this Court for Defendants' need for an extension:

> Defendants have been prejudiced in that their second extension request was granted on Tuesday, June 14, 2016, and *the undersigned counsel conveyed the granting of the extension to its multiple clients, only to have that order vacated later in the day, after its clients had already begun to proceed on the assumption that an extension had been granted. This had the effect of disrupting and delaying Defendants' continuing efforts to confer with its multiple clients in preparation of their responsive pleading.*
>
> ...
>
> *The extension is all the more necessary at this point in light of the prejudice, disruption, and delay to counsel's efforts to continue to confer with its multiple clients and prepare its case caused by the granting and then vacating of its second request for extension of time, and the lengthy time allowed Plaintiff to object to same, and Plaintiff's dilatory tactics in objecting to same.* This, coupled with Plaintiff's refusal to provide courtesy copies of the affidavits of service, *clearly shows a good faith basis* to request a very reasonable extension of time to respond to the complaint. Most importantly, the Plaintiff *has not demonstrated how he would be prejudiced* in any way by such a minor, but necessary extension of time.

Ms. Rogers' conclusion that the nonsensical positions in that letter "*clearly shows a good faith basis*" for an extension is truly remarkable. Also disturbing is Ms. Rogers cavalier view that her dilatory conduct and *ad seriatim* extension requests simply have no effect on and do not prejudice Plaintiff.

Significantly, Ms. Rogers omits from that letter that the previously granted extension request was premised on her letter request of June 13 (Docket No. 46) and was granted at 10:34 a.m. and vacated at 12:55 p.m. the same day. According to Ms. Rogers, those 2 ½ hours were sufficient to cause chaos to Melick's representation and yet Ms. Rogers asks the Court to stay discovery for months until a futile MTD (premised almost exclusively on case decisions determining post-discovery and post-trial motions) is briefed and decided.

Additionally, Ms. Rogers fails to mention that she was the cause of the Court having to vacate the previously granted extension request because she obtained that extension by clearly violating Individual Court Rule No. 1(D), which requires counsel to inform the Court of "the reasons given by the adversary for refusing to consent." Indeed, Plaintiff made it very simple for

Ms. Rogers to do so by providing her the reasons for the refusal by email on June 13, when Plaintiff's counsel informed Ms. Rogers that:

> Plaintiff does not consent to Defendants' request for another … extension … based upon, among other reasons: (i) Melick & Porter's at least 9-month representation of Defendants relating to these claims; (ii) *Melick and Defendants' prior dilatory conduct*; (iii) the *duplicitous manner by which you sought to shift to Plaintiff the purported need for the extension in your correspondence to the Court*; and (iv) *misrepresentations that you have made regarding the proofs of service*.

Had Ms. Rogers informed the Court – as counsel was required – of the reasons for Plaintiff withholding his consent, it is unlikely that the Court would have granted Defendants' extension request without providing Plaintiff an opportunity to submit an Opposition. Accordingly, it was defense counsel's own actions – in flouting the Court Rules and failing to inform the Court of the reasons for Plaintiff's refusal to consent in order to deceptively obtain an extension – that led to any of Melick's claimed turmoil based on 2 ½ hours. Critically, it was Ms. Rogers' actions that (i) unnecessarily wasted valuable and limited judicial resources; (ii) wasted the time and resources of Plaintiff and his counsel; (iii) caused Plaintiff to incur attorney's fees and costs; and (iv) delayed resolution of Plaintiff's claims.

In the unlikely existence of any residual doubt that Defendants' request is *"merely a delay tactic,"* consistent with Defendants' prior conduct, Plaintiff respectfully refers the Court to Defendants' submission of an evasive pre-motion letter and conference request on the eve of the penultimate extended deadline to respond to the Complaint. The deficient letter (i) was completely at odds with the purpose of requiring a pre-motion letter and conference and (ii) served no purpose other than to provide Defendants with a new third extended deadline to respond to the Complaint with a MTD.

The foregoing may appear as rehashing old issues but it is raised because these occurrences evidence the extent to which defense counsel and Defendants will go to delay resolution of the case and support the unavoidable conclusion that that the requested stay is *"merely a delay tactic,"* *which* the court in *Rivera* – cited and relied upon by Defendants – held support denial of a request to stay discovery.

### D. *Gandler v. Nazarov*, 1994 U.S. Dist. LEXIS 17885 at 12 (SDNY Dec. 14, 1994).

Defendants' reliance on *Gandler v. Nazarov*, likewise is misguided. The MTD in Gandler was based on the simple threshold issue of whether plaintiff had even obtained personal jurisdiction over defendant – a basis that clearly would have disposed of the entire matter. Defendants' herein did not raise personal jurisdiction as a basis in their MTD. As noted *supra*, Melick already depleted the use of that argument as a delay tactic in securing the two (three with the scheduling Order) prior extensions of time to respond to the Complaint. Apparently, Melick at long last is satisfied that (i) it has received sufficient number of courtesy copies of the proof of service and requires no further such courtesy copies; and (ii) the proofs of service have withstood Melick's scrutiny (whether legal, forensic, technological, or otherwise) that evidently required several extensions to complete.

Moreover, although Ms. Rogers conveniently omits it from its letter, in staying discovery the *Gandler* court specifically held that: "plaintiffs have not presented any evidence to suggest that they will be *unfairly prejudiced* by a stay." Clearly not the case here where Plaintiff learned that Defendants have already removed certain document(s) and the delay of depositions will hinder Plaintiff's' ability to obtain evidence to establish his claims.

Plaintiff respectfully submits that absolutely no legitimate purpose would be served by any

8

limitation on Plaintiff's discovery beyond those imposed under the FRCP. A stay would only delay discovery that inevitably will occur, allow Defendants' dilatory tactics to unnecessarily delay further the adjudication of Plaintiff's claims, and unnecessarily allow further degradation of the quality of deposition and document discovery available to Plaintiff.

For the reasons set forth above, Plaintiff respectfully requests that the Court: (i) Schedule a Case Management Conference for a date at the Court's earliest convenience; (ii) Deny Defendants' unwarranted request for a stay of discovery; and (ii) Such further relief as the Court deems appropriate.

Respectfully submitted,

Anthony Rotondi (AR1111)

Cc: Melick & Porter

9

TAB 1

1

DAATJONA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ANTHONY JONAS,

4              Plaintiff,

5        v.                              13 CV 2226 (JSR)

6  THE ROOSEVELT ISLAND OPERATING
   CORPORATION, et al.,
7
                Defendants.
8
   ------------------------------x
9                                       New York, N.Y.
                                        October 10, 2013
10                                      5:00 p.m.

11 Before:

12              HON. JED S. RAKOFF,

13                                      District Judge

14                   APPEARANCES

15 LAW OFFICE OF MICHAEL LAMONSOFF
        Attorneys for Plaintiff
16 BY:  RYAN LAWLOR

17 NEW YORK STATE ATTORNEY GENERAL'S OFFICE
        Attorneys for Defendants Roosevelt Island, Yee and
18 Laszczych
   BY:  JAMES COONEY
19
   DAVIS & FERBER
20      Attorneys for Defendants Torrens, Flaherty, Ankomah and
   Hernandez
21 BY:  IAN SACK

22

23

24

25

DAATJONA

1        (In open court, case called)

2        MR. LAWLOR:  For plaintiff, Ryan Lawlor with Michael

3   Lamonsoff's office.

4        MR. COONEY:  For defendants Roosevelt Island Operating

5   Corporation and Roosevelt Island Public Safety Department, as

6   well as Lieutenant Yee and Detective Laszczych, James Cooney,

7   Assistant Attorney General, New York State Attorney General's

8   Office.

9        MR. SACK:  For defendants Torrens, Hernandez, Flaherty

10  and Ankamah, Ian Sack from Davis & Ferber.  Good afternoon.

11       THE COURT:  Good afternoon.

12       We're here on a motion to dismiss by the individuals

13  and entities represented by the state, and I believe plaintiff

14  agrees that the claims against the Roosevelt Island Public

15  Safety Department should be dismissed.  Yes?

16       MR. LAWLOR:  That's correct, your Honor.

17       THE COURT:  Very good.  Now with regard to the claims

18  against defendants -- well, I'm not is quite sure how this is

19  pronounced, L-A-S-Z-C-Z-Y-C-H.

20       MR. COONEY:  Laszczych.

21       THE COURT:  Laszczych, of course, and Yee, Y-E-E, in

22  their personal capacities, I think, if I haven't missed

23  something, the only allegation made against them is as part of

24  a catch-all in paragraph 38, "At no time did any of the other

25  defendants take steps to intervene in, prevent or otherwise

DAATJONA

1   limit misconduct engaged in by defendants Ralph Torrens and

2   Raul Hernandez against plaintiff."

3        So is there anything else that you, if given the

4   opportunity to amend, would allege against those two

5   defendants?

6        MR. LAWLOR:  Your Honor, the names were provided to us

7   by counsel.  I put that in the declaration, I think it's my

8   Exhibit C.  As they are higher officers than just the regular

9   peace officers, the mother of the victim here, Ms. Vega,

10  indicated there were officers at the hospital when Mr. Jones

11  was still chained to the hospital bed.  I didn't want to, under

12  Rule 11, make that allegation if it was going to be unfounded,

13  but if the discovery could proceed, I would think that that

14  might be --

15       THE COURT:  This is, of course, the classic chicken

16  and egg problem.  Under federal law you need to make out at the

17  pleading stage a plausible claim.  And of course every

18  plaintiff's counsel says, with a certain common sense, well, I

19  need discovery, particularly as to the more remote kind of

20  defendants, and defense counsel says, with equal substance, you

21  shouldn't be able to sue someone if you don't already have a

22  plausible claim against them.  And 50 years ago the law -- the

23  federal law resolved that dilemma in the plaintiff's favor and

24  now resolves it in defendant's favor.  So there we are.

25       So I'm inclined to dismiss those claims unless you

DAATJONA

1    tell me you have something more.

2            MR. LAWLOR:  Just the fact that those names were

3    provided by the defendant as people involved in this incident.

4            MR. COONEY:  If I may, your Honor, to clarify, I did

5    provide on May 7, 2013 this letter that we're talking about.

6    What's interesting is actually the names I provided were

7    Detective Laszczych, Lieutenant Yee, and then Sergeant

8    Hernandez, Officer Torrens, who is already in the first

9    complaint, Officer Flaherty, Officer Ankomah, and then Officer

10   Michael.

11           In the amended complaint, plaintiff was able to or did

12   actually make, I think, plausible claims matching up actual

13   alleged violative conduct with Hernandez, Flaherty, and Ankomah

14   which were, again, newly named as provided by me in this

15   letter.

16           THE COURT:  So the point is he wasn't able to do it as

17   to the others.  So I am going to dismiss with prejudice the

18   claims against those two in their personal capacities.

19           So now we get to the real heart of the argument, which

20   is the claims against the Roosevelt Island Operating

21   Corporation as well as the two other -- the two state

22   representatives being sued in their official capacities.  I'm

23   not stating this as well as I should, but essentially the

24   question is the sovereign immunity question.  So let me hear

25   first from defense counsel, then from plaintiff's counsel, and

DAATJONA

1  then on rebuttal from defense counsel.

2      MR. COONEY:  Thank you, your Honor.

3      It's very well settled that the State of New York, its

4  entities and its employees in their official capacities, could

5  not be sued in federal court for monetary damages.

6      Now with RIOC and the case I cite, which is *Chafetz v.*

7  *Roosevelt Island* --

8      THE COURT:  So if I accept that case, you win.  But

9  I'm not required to accept that case.  It's a case by Judge

10  Buchwald, who I greatly respect, but she's a judge at the same

11  level I am.  So I guess the question is why should I go down

12  that road?

13      MR. COONEY:  This case, the *Chafetz* case, is actually

14  an employment discrimination case brought by a former high

15  ranking RIOC employee/official.  It's on all fours to this case

16  for the following reasons --

17      THE COURT:  To the issue that we're concerned with on

18  this part of the argument.

19      MR. COONEY:  Exactly.  When they looked at the factors

20  as given by the Second Circuit, I believe that all but two of

21  the factors point to RIOC being an arm of the state, and

22  therefore protected by sovereign immunity protections.

23      The key here is that -- and they mention this on page

24  5 of the printouts, but it's actually between 13 and 14:  The

25  parties agree -- I'm quoting here -- that the state is not

DAATJONA

1   obligated to satisfy RIOC's corporate debts -- then they quote

2   the RIOC enabling statute -- such as payroll and benefit

3   obligations, but is obligated to indemnify RIOC and its

4   employees against liabilities, claims or judgments arising out

5   of development, management, and operation of Roosevelt Island,

6   unquote.

7       That's precisely what is going on here.  These are

8   employees, the public safety officers, who are entitled to

9   representation by my office through New York State Public

10  Officers Law, Section 17, and if they are able to meet -- if

11  they take a hit or judgment, they are indemnified.  That comes

12  out of the state coffers.

13      In fact, this opinion goes, quote, the fact the State

14  Attorney General's Office is representing the defendant in this

15  action only lends further support to our conclusion, unquote,

16  that this is considered the state or an arm of the state.  So

17  although there is no circuit level precedent that RIOC is an

18  arm of the state, I believe these factors were fully decided

19  correctly in the *Chafetz* decision and should be followed here.

20      Thank you, your Honor.

21      THE COURT:  Thank you.

22      Let me hear from plaintiff's counsel.

23      MR. LAWLOR:  Thank you, your Honor.

24      As I point out in the brief, *Archer*, a case also at

25  the same level as the district court level, allowed the case to

DAATJONA

1    proceed against RIOC.

2          THE COURT:  And actually I am impressed that both of

3    you found, since neither of these were reported in the Fed

4    Supp., that you picked them up.  But in *Archer* the issue was

5    never really addressed, right?

6          MR. LAWLOR:  That's why --

7          THE COURT:  You're saying it's there by implication

8    because it's a jurisdictional or quasi jurisdictional argument,

9    but still there's no indication it was even brought to the

10   judge's attention.  Now he has an obligation ultimately

11   himself, but that doesn't mean he picked it up.  It's a bit

12   speculative is my point.

13         MR. LAWLOR:  I agree.  The FRCP 12(h)(3) would have

14   been where, I believe, he would have dismissed it for lack of

15   jurisdiction.

16         Also the *Hess* case, which counsel I don't believe

17   mentioned, but it's the same thing about where is the money

18   coming from.  *Chafetz* was 13 years ago.  If that is the same

19   circumstance now, I don't think I can disagree that that would

20   be -- it would implicate the state's coffers, that's an arm of

21   the state, and the 11th Amendment bars it from being brought

22   here.  At the time this motion was made there was no indication

23   that that is the case, it didn't have an applicable insurance

24   contract or something of the sort that would prevent the state

25   purse from being implicated.

DAATJONA

1          THE COURT:  Well, thank you very much.  Both of you

2     actually distilled the whole issue very, very nicely.

3          I am going to grant the motion, although I agree with

4     plaintiff's counsel that the issue is not totally free from

5     doubt, but on the whole I think Judge Buchwald's opinion is

6     persuasive.  I will write a short opinion so you will have

7     something there for the purpose of any appeal, and in the

8     meantime the case goes on and we already have the schedule set.

9          So is there anything else we need to take up today?

10          MR. LAWLOR:  If I may, your Honor, with the dismissal

11     of RIOC from this action, I'm not totally sure of the interplay

12     here, but could that be without prejudice as to a filing in

13     state court?  The issue that I had --

14          THE COURT:  Yes, it's with prejudice with respect to

15     the folks we talked about earlier before we got to this issue,

16     but here it's -- the wording "with prejudice" and "without

17     prejudice" is awkward in a jurisdictional thing.  This Court

18     lacks jurisdiction over the claims we were just discussing.

19     That in no way prevents you from filing those claims in state

20     court.

21          MR. LAWLOR:  Thank you, your Honor.

22          THE COURT:  And I will make that clear in the written

23     opinion as well.  Very good.  Anything else?

24          Good, thank you so much.

25          MR. COONEY:  Thank you, your Honor.

TAB 2

Holly G. Rogers
(203) 596-0500
hrogers@melicklaw.com

# M|P  MELICK & PORTER

October 22, 2015

ROBERT P. POWERS
JOHN F. RODNEY, III *(CT, DC, NH, NY, PA)
WILLIAM D. CHAPMAN
MICHAEL J. MAZURCZAK *(NY & WI)
ROBERT T. TREAT
WILLIAM L. KEVILLE, JR.
MICHAEL R. BYRNE
MARK S. BODNER
JEREMY I. STEIN (CT, DC, GA, MD, NY)
MATTHEW C. WELNICKI *(CT)
ADAM M. COTTER *(RI)
T. DOS URBANSKI *(RI)
FRITZ J.M. ALARCON *(MA)
JOHN A. CALISTRI(RI)
ROBERT S. LEDBLUE*(NY & CT)
SHANNON MC QUEENEY DOHERTY*(NY)
JARED B. GIROUX
CHRISTOPHER D. GEORGE
JOHN G. WHEATLEY *(ME)
KATHLEEN A. FEDERICO
KATHRYN T. ROGERS *(RI)
DONALD P. HEALY
BRIAN C. DAVIS
RENE M. PICKETT *(RI)
CAROLYN M. MILLER
EVA M. ZELNICK *(NY)
STEVEN M. BANKS (NY & CT)
CAMERON C. DAVIS
MEGAN SREENIVASAN (CT)
CANDACE M. SHAY
HOLLY G. ROGERS (CT & NY)

OF COUNSEL
JOHN A. SAKAKEENY
GRETA T. HUTTON (CA)

*ALSO ADMITTED.

ONE LIBERTY SQUARE
BOSTON, MA 02109
(617) 523-6200
FAX (617) 523-8130

WORCESTER COUNTY
2 PARK CENTRAL DRIVE, SUITE 120
SOUTHBOROUGH, MA 01772
(508) 452-2020
FAX: (508) 452-2021

49 WEYBOSSET STREET
PROVIDENCE, RI 02903
(401) 941-0909
FAX (401) 941-6769

76 CENTER STREET
WATERBURY, CT 06702
(203) 596-0500
FAX (203) 721-8532

2 INTERNATIONAL DRIVE, SUITE 110
PORTSMOUTH, NH 03801
(603) 627-0010
FAX (603) 627-0460

830 THIRD AVENUE
NEW YORK, NY 10022
(212) 541-7236
FAX (212) 840-8560

550 NORTH BRAND BOULEVARD, SUITE 1500
GLENDALE, CA 91203
(818) 539-3611
FAX (818) 539-2613

MELICKLAW.COM

*Via USPS regular mail*
Anthony J. Rotondi
Attorney for Donald Lewis
5 Columbus Circle, Suite 800
New York, NY 10019

Re:   *Notice of 50-H Hearing*

Dear Mr. Rotondi:

Enclosed please find the Notice of 50-H Hearing of Donald Lewis pursuant to § 50-h of the General Municipal Law. My clients still remain interested in attempting to resolve this matter through mediation. As such, the enclosed Notice preserves my clients' right to conduct a § 50-h examination of Mr. Lewis should any mediation efforts ultimately prove unsuccessful, or should you no longer be interested in mediation. When you last spoke with me colleague Jeremy Stein on October 9th, you were going to discuss the possibility of mediation with your client and our suggested mediator Ruth Raisfeld. To date we have not heard back from you. Please contact me immediately upon receipt of this notice so that we may discuss your client's intentions.

Sincerely,

Holly G. Rogers

HGR/nd

**NOTICE OF 50-H HEARING**

ANTHONY J. ROTONDI
5 COLUMBUS CIRCLE, SUITE 800
NEW YORK, NY 10019

Re:     Claimant Name:  Donald Lewis
        Lewis v. Roosevelt Island Operating Corporation et al.

Dear Mr. Rotondi:

Please take notice that, pursuant to Section 50-h of the General Municipal Law (GML),
claimant is mandated by law to appear before the undersigned at the following location, at the date
and time specified below, to be orally examined under oath relative to the occurrence and extent
of injuries for which the above claim is made:

Date of Hearing:     December 2, 2015
Time of Hearing:     10:00 a.m.

Location of Hearing:  MELICK & PORTER
                      830 THIRD AVENUE, 5TH FLOOR
                      NEW YORK, N.Y. 10022
                      (212) 541-7236

Please note that prior to the hearing, you will be called by the law office above to
confirm the date and time of the hearing.  At that time you can request a language
translator for your client, if necessary.  If you confirm the hearing date and you and/or the
claimant subsequently fail to appear for the hearing, you will be charged for any legal,
translator and/or stenographic fees that the respondents incur.

By: _____
    Holly G. Rogers

TAB 3



**U.S. Department of Justice**
Office of Justice Programs



# Bureau of Justice Statistics
# Special Report

August 2008, NCJ 222989

# Civil Rights Complaints in U.S. District Courts, 1990-2006

Tracey Kyckelhahn and Thomas H. Cohen, Ph.D.
*BJS Statisticians*

After the expansion of civil rights laws in the early 1990s, the number of civil rights cases filed in U.S. district courts increased from 18,922 in 1990 to 43,278 in 1997. Civil rights filings stabilized in the late 1990s and early 2000s and subsequently declined. From 2003 through 2006, civil rights filings in federal district courts decreased by almost 20%. During this period of growth and stabilization in civil rights litigation, the percent of civil rights claims concluded by trial declined from 8% in 1990 to 3% in 2006.

Other major findings in this report include—

- Civil rights cases in U.S. district courts declined from a high of 17% of all federal civil cases in 1998 to 13% in 2006.

- From 1990 through 2006, about 9 out of 10 civil rights filings involved disputes between private parties.

- Jury trials became more common than bench trials during the 17-year period covered in this report (figure 1).

- The percent of plaintiffs who won at trial between 1990 and 2006 remained steady at about a third.

- From 2000 through 2006, the median damage award for plaintiffs who won in civil rights trials ranged from $114,000 to $154,500.

- The combined 2000 through 2006 median jury award was $146,125; the median bench award was $71,500.

This report addresses trends in civil rights litigation in federal district courts and the outcomes of civil rights disputes. Information is presented on civil rights complaints filed and terminated in U.S. district courts concerning employment, housing and accommodations, welfare, voting rights, and other types of discrimination. The report also focuses on



**Civil rights jury trials increasingly more common than bench trials in U.S. district courts, 1990-2006**

Number of civil rights cases concluded by jury or bench trial

*Figure 1*

civil rights cases concluded by trial and examines who wins in civil rights trials and the damages awarded to plaintiff winners.

A civil rights claim arises when an individual or group asserts they have been discriminated against on the basis of their race, sex, religion, age, physical limitation, or previous condition of servitude. Most litigants in civil rights disputes are required to seek administrative remedies involving federal agencies such as the Equal Employment Opportunity Commission (EEOC), in the case of employment discrimination, or the U.S. Department of Housing and Urban Development (HUD), in the case of housing discrimination. Litigants not satisfied with these administrative outcomes can file a civil rights lawsuit in the federal courts to seek monetary or injunctive relief.

This study does not cover civil rights grievances filed, investigated, and resolved through administrative channels and agencies that enforce various federal civil rights discrimination laws such as the EEOC or HUD. This report also does not examine civil rights litigation in state courts. Because of limited data this study does not report the number of cases filed or terminated under specific titles and sections of the U.S. code. (See *Methodology*).

## Civil rights laws underwent a major expansion during the early 1990s

Civil rights laws underwent a major expansion during the early 1990s with the passage of the Americans for Disabilities Act of 1990 and the Civil Rights Act of 1991. The Civil Rights Act of 1991 amended several federal employment discrimination laws including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1871, the Age Discrimination in Employment Act of 1973, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. It also made available compensatory and punitive damages in certain discrimination claims, permitted jury trials for plaintiffs seeking monetary damages, and overturned several U.S. Supreme Court decisions, effectively broadening the scope of employment practices considered discriminatory.[*]

*Wards Cove Packing Co. v. Atonio, 109 S. Ct. 2115 (1989); Patterson v. McLean Credit Union, 109 S. Ct. 2363 (1989); Martin v. Wilks, 109 S. Ct. 2180 (1989); Price Waterhouse v. Hopkins, 109 S. Ct. 1775 (1989); Lorance v. At&T Technologies, 109 S. Ct. 2261 (1989); Equal Employment Opportunity Commission v. Aramco, 111 S. Ct. 1227 (1991); West Virginia University Hospitals v. Casey, 111 S. Ct. 1138 (1991).*

## Civil rights cases represent declining proportion of federal civil caseloads

Throughout the 1990s, civil rights claims accounted for an increasing proportion of federal civil caseloads in U.S. district courts. As a percent of all federal civil filings, civil rights filings increased from 9% in 1990 to nearly 17% in 1998 (figure 2). Civil rights filings stabilized at about 16% of federal civil caseloads from 1999 through 2003 and subsequently declined. By 2006, 13% of federal civil cases involved civil rights issues.

## Employment discrimination accounted for about half of all civil rights filings in U.S. district courts from 1990 to 2006

### Employment discrimination

Civil rights in an employment setting are violated when employers discriminate with regard to hiring, promotion or discharge practices, compensation, conditions and privileges of employment, or denial of employment opportunities (42 USC § 2000E-2; 29 USC §§ 621-634).

Throughout the 17-year period covered by this report, employment discrimination accounted for about half of all civil rights filings in U.S. district courts (figure 3). Civil rights cases involving employment discrimination demonstrated the same trend as overall civil rights filings with substantial increases in the 1990s. In 1990, 8,413 cases were filed with the number peaking at 23,796 in 1997. Employment discrimination filings stabilized between 1997 and 2004, and declined to 14,353 in 2006.



**Since 2003, civil rights cases have represented a declining proportion of federal civil caseloads**

Civil rights complaints as percentage of federal civil caseloads

*Figure 2*



**Civil rights cases involving employment discrimination demonstrated the same trend as civil rights cases overall, 1990-2006**

Number of civil rights cases filed in U.S. district courts

*Figure 3*

## Housing and accommodations

Pursuant to the Fair Housing Act of 1972 and amendments in 1988, discrimination is prohibited in the rental or lease of apartments, the sale of housing, and the financing of housing because of an individual's race, color, religion, sex, national origin, disability, or families with children. Complaints may also include discrimination in public accommodations such as restaurants or hotels (42 USC §§ 3601-3619; 15 USC § 1691).

Housing and accommodation civil rights claims represented 2% of all civil rights filings in 2006. These cases followed the same general trend as employment discrimination cases. There were 341 housing and accommodations related filings in 1990, a high of 1,315 filings in 2003, and a decline to 643 filings in 2006 (figure 4).

## Welfare and voting

A person's civil rights regarding welfare issues are violated when social security entitlements are denied based on an individual's race, color, religion, sex, or national origin. Violations of a person's civil rights related to welfare issues also include the denial of benefit income (e.g., annuity, pension, retirement, or disability benefit including veterans' compensation), the denial of rehabilitation and other services for families with dependent children, and the denial of benefits for individuals who are elderly, blind, or disabled, or whose income and resources are insufficient to meet the costs of necessary medical services.

Voting rights are violated when redistricting plans or election methods prevent minority voters from electing candidates of their choice. Situations related to voting rights violations include preventing voters from casting their ballots by denying them assistance or preventing voters from receiving assistance from a person of their choice. Failure to provide voting information and assistance in the language used by a substantial number of voters in a jurisdiction or failure to provide access to polling places for handicapped or elderly individuals are also situations related to voting rights violations (42 USC §§ 1973-1973e).

Civil rights cases involving welfare and voting issues did not follow the same general trend as housing and employment discrimination cases. Lawsuits involving welfare discrimination steadily declined from 129 to 56 cases between 1990 and 2006. In comparison, complaints alleging viola-

tions of voting rights peaked in 1992 and rose again in 2002. The increase in voting rights cases for these specific years was most likely the result of redistricting challenges following the 1990 and 2000 censuses. By 2006, the number of voting rights lawsuits had declined to about 150 cases.

## Other civil rights complaints

Available data on the statutory provisions litigated suggest that filings in the other civil rights complaints category dealt with diverse issues such as the civil rights of handicapped children, education of children and adults with disabilities, as well as vocational disabilities and rehabilitation discrimination.

Civil rights filings that were either unidentifiable or were in a category other than housing and accommodations, welfare, voting, and employment comprised about the same percentage of filings as those in the employment discrimination category. In 1990, 9,909 civil rights complaints listed as "other civil rights" were filed in U.S. district courts. From the mid-1990s through 2006, "other" filings remained constant at about 18,000 per year.



**Housing, voting rights, and welfare claims filed in U.S. district courts, 1990-2006**

Number of housing, voting, and welfare claims filed in U.S. district courts

*Figure 4*

## Most civil rights complaints involved private parties

From 1990 to 2006, around 9 in 10 civil rights filings involved disputes between private parties (table 1). The majority of private cases involved questions over interpretation and application of the U.S. Constitution, acts of Congress, or treaties ("federal question" jurisdiction) from parties in the same state.

"Diversity of citizenship" cases, which consisted of private parties from different states or parties of a state and citizens, corporations, or subjects of a foreign country, were a small percentage (under four percent) of private civil rights lawsuits filed during this period.

### Number of private civil rights lawsuits declined between 2004 and 2006

The number of civil rights lawsuits filed in U.S. district courts increased from 16,310 in 1990 to a peak of 40,361 in 1997 (not shown in table). Between 2004 and 2006 the number of filings declined 19%, from 37,374 to 30,405 (table 2). All categories of civil rights filings exhibited a decline over this two-year period.

### U.S. government more likely to be a defendant than a plaintiff

U.S. district courts exercise jurisdiction in civil actions that are either initiated by the U.S. government (U.S. plaintiff), or are brought against the U.S. government (U.S. defendant) for alleged civil rights violations. (28 USC § 1345; 28 USC § 1346).

Of the approximately 10% of civil rights filings that involved the U.S. government, cases in which the government was the defendant accounted for around 70% to 80% of civil rights filings from 1990 to 2006 (table 3). In 2006, 1,961 civil rights complaints were filed against the U.S. government, representing a 17% decline in the number of filings since 2000. As with overall case filings, about an equal percentage of employment discrimination and "other" cases involving civil rights violations were filed from 1990 to 2006, representing the majority of cases overall.

In comparison to filings involving two private parties or the U.S. government as the defendant, complaints filed by the U.S. government as the plaintiff did not show a clear trend between 1990 and 2006. Filings ranged from a high of 816 in 1991 to a low of 486 in 1996 (not shown in table). Since 2000, the number of civil rights cases filed by the U.S. government has declined by 21%. Cases in the "other" category accounted for a much smaller percentage of cases filed by the U.S. government, compared to private party and U.S. as defendant filings.

### Table 1. Federal subject matter jurisdiction of civil rights complaints filed in U.S. district courts, 1990-2006

| | | | Federal subject matter jurisdiction | | | |
|---|---|---|---|---|---|---|
| | | | Cases involving the U.S. government as— | | Private cases | |
| Year | Total cases filed | Total percent | Plaintiff | Defendant | Federal question | Diversity of citizenship |
| 1990 | 18,793 | 100% | 4.0 | 9.2 | 86.8 | -- |
| 1995 | 36,600 | 100% | 1.8 | 6.4 | 91.7 | -- |
| 2000 | 40,908 | 100% | 1.5 | 5.8 | 89.6 | 3.1 |
| 2001 | 40,910 | 100% | 1.7 | 5.7 | 89.7 | 2.9 |
| 2002 | 40,420 | 100% | 1.6 | 5.9 | 89.5 | 3.0 |
| 2003 | 40,516 | 100% | 1.5 | 5.7 | 90.1 | 2.7 |
| 2004 | 40,239 | 100% | 1.5 | 5.6 | 91.6 | 1.3 |
| 2005 | 36,096 | 100% | 1.5 | 6.0 | 91.8 | 0.7 |
| 2006 | 32,865 | 100% | 1.5 | 6.0 | 92.1 | 0.3 |

Note: Does not include prisoner petitions.
-- No cases recorded.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2).

### Table 2. Civil rights complaints involving a private suit filed in U.S. district courts, by type, 1990-2006

| | | Type of civil rights complaints involving private suits | | | | |
|---|---|---|---|---|---|---|
| Year | Total number | Employment | Voting | Housing | Welfare | Other* |
| 1990 | 16,310 | 6,936 | 114 | 284 | 107 | 8,869 |
| 1995 | 33,574 | 17,374 | 188 | 582 | 103 | 15,327 |
| 2000 | 37,888 | 19,245 | 141 | 1,202 | 73 | 17,227 |
| 2001 | 37,878 | 19,371 | 173 | 1,151 | 53 | 17,130 |
| 2002 | 37,391 | 19,225 | 209 | 1,231 | 61 | 16,665 |
| 2003 | 37,602 | 18,788 | 139 | 1,261 | 63 | 17,371 |
| 2004 | 37,374 | 18,040 | 152 | 1,169 | 54 | 17,959 |
| 2005 | 33,390 | 15,344 | 143 | 821 | 48 | 17,034 |
| 2006 | 30,405 | 13,042 | 122 | 593 | 49 | 16,599 |

*Types of civil rights cases within the "other" category cannot be distinguished.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2).

**Percent of civil rights cases concluded by trial declined from 8% in 1990 to 3% in 2006**

Of the 17,985 civil rights complaints disposed in 1990, 8% were terminated by trial, while in 2006, 3% of the 33,108 civil rights claims concluded in federal courts ended in a trial (table 4). Other cases concluded by a judgment remained steady during this period at about a quarter of terminations. This category of terminations included judgment by defaults, consent, motions before trial, and judgments through formal arbitration procedures adopted by the court.

The percentage of civil rights cases dismissed from U.S. district courts increased from 66% in 1990 to 75% in 2003, and decreased slightly to 72% in 2006. Civil rights dismissals followed the same trend as out of court settlements and voluntary dismissals. Out of court settlements rose from 31% to 39% of all civil rights dispositions between 1990 and 2003. Voluntary dismissals increased from 8% to 13%

of all civil rights dispositions between 1990 to 2003. Since 2003, both the settlement and voluntary disposition categories have declined slightly. Settlements accounted for 37% and voluntary dismissals accounted for 11% of civil rights dispositions by 2006.

The proportion of civil rights dismissals which occurred due to lack of jurisdiction declined from 8% in 1990 to 2% in 2006. From 1990 to 2006, civil rights cases dismissed because of want of prosecution remained at about 4%.

In 1990, welfare civil rights cases (3%) were the least likely to go to trial while employment discrimination cases (9%) were the most likely to reach trial (table 5). In 2006 the percent of civil rights cases ending in trial exhibited a smaller range across all categories, varying between two and three percent.

**Table 3. Civil rights complaints with the U.S. government involved as plaintiff or defendant filed in U.S. district courts, by type, 1990-2006**

| | U.S. government as plaintiff | | | | | | U.S. government as defendant | | | | | |
|------|-------|------------|--------|---------|---------|--------|-------|------------|--------|---------|---------|--------|
| Year | Total | Employment | Voting | Housing | Welfare | Other* | Total | Employment | Voting | Housing | Welfare | Other* |
| 1990 | 747 | 601 | 10 | 37 | 5 | 94 | 1,736 | 876 | 6 | 20 | 17 | 817 |
| 1995 | 668 | 410 | 8 | 115 | — | 135 | 2,358 | 1,275 | 12 | 38 | 13 | 1,020 |
| 2000 | 633 | 425 | 16 | 50 | — | 142 | 2,387 | 1,362 | 10 | 32 | 7 | 976 |
| 2001 | 710 | 516 | 7 | 55 | 1 | 131 | 2,322 | 1,270 | 15 | 43 | 7 | 987 |
| 2002 | 649 | 464 | 8 | 55 | 1 | 121 | 2,380 | 1,266 | 17 | 27 | 9 | 1,061 |
| 2003 | 599 | 445 | 3 | 34 | — | 117 | 2,315 | 1,294 | 5 | 20 | 2 | 994 |
| 2004 | 603 | 435 | 12 | 35 | 1 | 120 | 2,262 | 1,271 | 9 | 18 | 6 | 958 |
| 2005 | 534 | 420 | 8 | 42 | — | 64 | 2,172 | 1,166 | 15 | 22 | 6 | 963 |
| 2006 | 499 | 373 | 16 | 32 | — | 78 | 1,961 | 938 | 12 | 18 | 7 | 986 |

*Types of civil rights cases within the "other" category cannot be distinguished.
— No cases recorded.
Source: Annual Report of the Director. Washington, D.C.: Administrative Office of the U.S. Courts (table C-2). ,

**Table 4. Civil rights cases concluded in U.S. district courts, by disposition, 1990-2006**

| | | Percent of cases disposed | | | | | | | | |
|------|------------------------------------|-------|---------|-----------|----------------------|----------------------|-------|-------|--------------------|--------------------|
| | | Dismissed | | | | | | Judgment | | |
| Year | Number of complaints disposed[a] | Total | Settled | Voluntary | Lack of jurisdiction | Want of prosecution | Other | Total | Trial[b] | Other[c] |
| 1990 | 17,985 | 66.2% | 30.7% | 8.1% | 8.3% | 5.0% | 14.1% | 33.8% | 7.6% | 26.2% |
| 1995 | 30,175 | 69.4 | 33.4 | 11.8 | 2.0 | 4.1 | 18.1 | 30.6 | 6.0 | 24.6 |
| 2000 | 39,941 | 72.3 | 37.6 | 11.9 | 1.7 | 4.1 | 17.0 | 27.7 | 4.1 | 23.6 |
| 2001 | 38,612 | 73.9 | 38.9 | 12.2 | 1.8 | 4.0 | 17.0 | 26.1 | 3.8 | 22.3 |
| 2002 | 38,551 | 74.2 | 37.8 | 12.7 | 1.8 | 4.0 | 17.8 | 25.8 | 3.6 | 22.3 |
| 2003 | 37,624 | 74.7 | 38.5 | 12.8 | 1.9 | 4.0 | 17.5 | 25.3 | 3.4 | 22.0 |
| 2004 | 37,407 | 73.8 | 37.6 | 12.0 | 1.8 | 4.0 | 18.5 | 26.2 | 2.9 | 23.3 |
| 2005 | 36,929 | 73.6 | 38.1 | 11.8 | 1.7 | 4.1 | 17.9 | 26.4 | 3.0 | 23.5 |
| 2006 | 33,108 | 72.0 | 37.0 | 11.4 | 1.7 | 4.4 | 17.6 | 28.0 | 3.0 | 25.0 |

Note: Does not include prisoner petitions. Percentages may not sum to total due to rounding.
[a]Excludes transfers, remands, and statistical closures.
[b]Trial includes cases disposed of by jury trial, bench trial, and directed verdict. In some cases, the parties may have settled before the completion of the trial.
[c]Includes judgments by default, consent, a motion before trial, judgment of arbitrator or by some other final judgment method.
Source: Administrative Office of the U.S. Courts, Civil Master File.

## Jury trials increased as a percent of all trials

A jury trial is held before a jury—a selected body of persons sworn to give their verdict according to the evidence—and presided over by a judge. A bench trial is held in the absence of a jury and decided by a judge.

Jury and bench trials each accounted for about half of all civil rights trials concluded in federal district courts in 1990 (figure 1). By 2006, jury trials accounted for 87% of civil rights trials. The growth of jury trials can be partially attributed to Title VII of the Civil Rights Act of 1991, which allowed jury trials when a plaintiff sought punitive or compensatory damages in employment discrimination cases.

The percentage of employment discrimination trials involving a jury increased from 40% in 1990 to 86% in 2006 (not shown in a table). The percentage of other civil rights cases disposed of by jury trial increased from 66% in 1990 to 86% in 2006.

## On average, plaintiffs won a third of civil rights cases from 1990 to 2006; median damage awards ranged from $114,000 to $154,500

While the percent of civil rights cases terminated by trial declined, about a third of plaintiffs won their case at trial from 1990 to 2006 (table 6). The percent of plaintiff winners who received monetary damages declined from 83% in 1990 to 79% in 2006.

The estimated median damages awarded to plaintiffs showed no discernible pattern during the period covered by this report. Since 1990 the median damage awards have ranged from $114,000 in 2001 to $154,500 in 2005. In 2006 the median damages awarded to plaintiffs prevailing in civil rights trials was $150,000.

Civil rights complaints brought under Title VII of the Civil Rights Act of 1964 or the Americans with Disabilities Act of 1990 typically involve a compensatory award for economic damages. Damages may include losses associated with back pay, interest on back pay, lost benefits, attorney fees, some litigation costs, or other financial losses that the court deems appropriate as a result of the defendant's conduct.

The Civil Rights Act of 1991 extended the type of damages that could be sought by plaintiffs by allowing claims for non-economic compensatory damages and punitive damages. Non-economic compensatory damages reimburse the plaintiff for losses such as emotional pain, suffering, inconvenience, mental anguish, future monetary losses, as well as loss of enjoyment of life. Punitive damages are intended to punish a defendant who acted with recklessness, malice, or deceit, and can be awarded in addition to compensatory damages.

The Civil Rights Act of 1991 placed a cap on the total amount of compensatory and punitive damages that can be awarded, based on the size of the employer. The cap on awards does not apply to complaints of ethnic or racial discrimination.

Award amounts include both compensatory and punitive damages. For this report, the types of award amounts cannot be distinguished in the data. Monetary information presented in this report is for civil rights cases in which damages were awarded. Excluded from this analysis were civil rights complaints in which only court costs and/or attorneys fees were awarded.

**Table 5. Disposition of civil rights complaints concluded by trial by case type, in U.S. district courts, 1990 and 2006**

| | 1990 | | 2006 | |
|---|---|---|---|---|
| Case type | Number of complaints disposed | Percent concluded by trial* | Number of complaints disposed | Percent concluded by trial* |
| Employment | 8,206 | 8.7% | 15,950 | 3.2% |
| Housing | 290 | 6.6 | 718 | 2.2 |
| Voting | 125 | 5.6 | 118 | 2.5 |
| Welfare | 120 | 3.3 | 41 | 2.4 |
| Other | 9,244 | 6.8 | 16,281 | 2.8 |

Source: Administrative Office of the U.S. Courts, Civil Master File.
*Includes jury trials, bench trials, and directed verdicts.

**Table 6. Plaintiff winners and award amounts in civil rights complaints concluded by trial in U.S. district courts, 1990-2006**

| Year | Number of cases terminated by trial[a] | Percent plaintiff winners[b] | Monetary awards | |
|---|---|---|---|---|
| | | | Percent of plaintiff winners receiving monetary awards | Estimated median awards[b] |
| 1990 | 1,321 | 29.0% | 82.8% | ... |
| 1995 | 1,727 | 27.2 | 81.5 | $128,000 |
| 2000 | 1,600 | 34.1 | 76.3 | 152,100 |
| 2001 | 1,411 | 35.4 | 79.2 | 114,000 |
| 2002 | 1,314 | 32.3 | 76.7 | 120,400 |
| 2003 | 1,183 | 31.0 | 76.0 | 129,250 |
| 2004 | 951 | 30.8 | 76.8 | 128,400 |
| 2005 | 830 | 31.9 | 73.6 | 154,500 |
| 2006 | 717 | 30.8 | 78.7 | 150,000 |

... Not reported for the year 1990.
[a]Includes jury trials, bench trials, and directed verdicts.
[b]Civil rights trials in which both the plaintiff and the defendant won were excluded from the plaintiff winner and award calculation. Awards adjusted for inflation to 2006 dollars.
Source: Administrative Office of the U.S. Courts, Civil Master File.

## Jury awards higher than bench awards

A comparison of civil rights bench and jury trials necessitated combining trial data for the years 2000 through 2006 because of the limited number of bench trials concluded during this time period. The rate in which plaintiffs prevailed at trial did not differ appreciably between jury and bench trials. Plaintiffs won in about a third of trials litigated before either a jury or judge (table 7). Bench trials awarded monetary damages to 59% of plaintiff winners and jury trials awarded monetary damages to 81% of plaintiff winners from 2000 to 2006.

Cases disposed of by jury trial had a median award of $146,125. In comparison, cases disposed of by bench trial had a median award of $71,500. The 25th percentile for jury trials was $39,925 and the 75th percentile was $380,188. For bench trials, the 25th percentile was $17,880 and the 75th percentile was $292,500 (percentile data not shown in table).

## Employment discrimination plaintiff winners more likely to receive a monetary award

In all civil rights trials concluded between 2000 and 2006, employment discrimination plaintiff winners (81%) were most likely to receive a monetary award, followed by housing cases (74%), and other civil rights cases (72%).

Employment discrimination cases received a median award of $158,460 for cases concluded by trial between 2000 and 2006. The 25th percentile for employment discrimination cases was $52,065 and the 75th percentile was $374,265 (percentile data not shown in table). The median damage award for civil rights trials in the "other civil rights" category was $100,000. For other civil rights cases, the 25th percentile was $21,400 and the 75th percentile was $351,000.

## Case processing time constant between 1990 and 2006

The median number of months from filing to disposition for civil rights cases terminated in federal district courts varied slightly between 9 and 11 months from 1990 to 2006 (table 8). Employment discrimination cases generally had the longest median case processing time, varying between 11 and 13 months (not shown in table).

**Table 7. Plaintiff winners and median awards for civil rights cases concluded by trial or case type in U.S. district courts, 2000-2006**

| Trial or case type | Number of cases termi- nated by trial[a] | Percent plaintiff winners[b] | Percent of plaintiff winners receiving monetary awards | Median awards[b] |
|---|---|---|---|---|
| **Trial type** | | | | |
| Jury | 5,760 | 33.9% | 80.7% | $146,125 |
| Bench | 1,218 | 33.3 | 59.0 | 71,500 |
| **Case type[c]** | | | | |
| Employment | 3,809 | 36.7% | 80.9% | $158,460 |
| Housing | 115 | 42.6 | 73.5 | ... |
| Other | 3,013 | 29.7 | 71.6 | 100,000 |

Note: Civil rights trial data combine the years 2000 through 2006.
[a]Includes jury trials, bench trials, and directed verdicts.
[b]Civil rights trials in which both the plaintiff and the defendant won were excluded from the plaintiff winner and award calculation. Awards adjusted for inflation to 2006 dollars.
[c]Voting rights and welfare cases were too few to provide reliable data.
...Too few cases to calculate median award.
Source: Administrative Office of the U.S. Courts, Civil Master File.

**Table 8. Number of months from filing of complaint to disposition among civil rights cases concluded in U.S. district courts, 1990-2006**

| Year | Number disposed | Months Median | Months Mean |
|---|---|---|---|
| 1990 | 17,985 | 11.0 | 15.1 |
| 1995 | 30,175 | 9.8 | 12.6 |
| 2000 | 39,941 | 10.9 | 13.4 |
| 2001 | 38,612 | 10.6 | 13.0 |
| 2002 | 38,551 | 10.6 | 13.0 |
| 2003 | 37,624 | 10.6 | 13.3 |
| 2004 | 37,407 | 10.5 | 13.1 |
| 2005 | 36,929 | 10.7 | 13.2 |
| 2006 | 33,108 | 11.0 | 13.6 |

Source: Administrative Office of the U.S. Courts, Civil Master File.

**Prisoner petitions in state and federal courts, 1990-2006**

Various legislation and U.S. Supreme Court cases have allowed state and federal inmates to sue for violations of certain constitutional rights.

• In 1941, prisoners were permitted to file claims against state officials for violations of constitutional rights, including the right to religious freedom, freedom of speech and association, due process, racial discrimination, and cruel and unusual punishment. (*Ex parte Hull*, 312 U.S. 546 (1941))

• The U.S. Supreme Court granted inmates the right to bring lawsuits against federal officials who violate their constitutional rights in 1963. (*United States v. Muniz*, 374 U.S. 150 (1963))

From 1990 to 1996, prisoner petitions by federal inmates varied from about 900 to 1,200, with a high of 1,219 in 1996. Petitions from state inmates increased from 24,843 to 39,996. Total filings showed a steady increase from 25,992 in 1990 to 41,215 in 1996.

Following the passage of the Prison Litigation Reform Act of 1996, which restricted the rights of inmates to sue in federal court, complaints filed by federal (20%) and state (31%) inmates declined in 1997.

From 1999 to 2006, the number of civil rights prison petitions filed in U.S. district courts stabilized at about 24,500 cases filed on average per year. Prison petitions involving state inmates declined by 7% from 24,732 filings in 1999 to 23,122 filings in 2006. In comparison, federal inmate prison petitions increased from 962 filings in 1999 to 1,334 filings in 2004 and declined to 1,116 filings by 2006.

**State prison petitions declined after the Prison Litigation Reform Act of 1996**

Number of prisoner petitions filed in U.S. district courts

Note: Includes prisoner petitions involving civil rights and prison condition claims.

*Figure 5*

**Federal prisoner petitions filed in U.S. district courts ranged from a low of 910 in 1992 to a high of 1,334 in 2004**

Number of federal prisoner petitions filed in U.S. district courts

Note: Includes prisoner petitions involving civil rights and prison condition claims.

*Figure 6*

## Methodology

The primary source of data presented in this report is the Administrative Office of the U.S. Courts (AOUSC) Civil Master File. Data tabulations were prepared from the BJS staff analysis of source agency data sets. The federal civil rights categories used in this report were based on the codes established by the Administrative Office of the United States Courts. Case level information was provided by individual U.S. district courts that submitted data to the AOUSC. No detailed information was available on civil rights cases coded as "other". For civil rights cases that involved filing more than one action, the AOUSC instructed the plaintiff's attorney to select the most definitive code if the cause fit more than one nature of the lawsuit. It was the first nature of suit code that was used in the analysis for this report.

For civil rights complaints where more than one basis of jurisdiction applied, the case was coded according to the highest priority jurisdiction. Cases in which the U.S. government as plaintiff have the highest priority, followed by the U.S. government as defendant, and federal questions.

Calculations pertaining to trial winners and their award amounts were based on cases in which the winner and award amount were known and did not include instances where both parties won the case in part. Differences between known amounts and unknown amounts were not quantifiable.

The percent of cases concluded by jury trial, bench trial, and directed verdict was calculated using the disposition variable available in the AOUSC data (per the recommendation of the AOUSC). Because a previous BJS report used the procedural progress variable, the percents and number of cases may vary slightly between reports.

Although the courts record the title and section of the U.S. code for each case, this data field is not required by the AOUSC Statistics Division. It is not recommended for statistical analysis. For a more detailed explanation of the difficulties associated with the title and section fields of the AOUSC civil file, see the Report to the Subcommittee on Judicial Statistics on "Increase in Civil Rights Filings", prepared by the Analytical Services Office of AOUSC.

### Fiscal years

The AOUSC reports on federal caseloads by fiscal year rather than calendar year. The period covered by a fiscal year changed in 1992. Prior to 1992 the fiscal year started on July 1 and ended on June 30 of the next year. The change in 1992 resulted in the fiscal year beginning on October 1 and ending on September 30.

Earlier BJS reports on civil rights cases terminated in U.S. district courts were not modified to reflect the current definition. This report modifies slightly the findings of those earlier BJS reports. Data for fiscal years 1990 to 1992 use October 1 through September 30 as the fiscal year.

For a discussion of findings from earlier BJS studies on Civil Rights litigation in U.S. district courts, see Civil Rights Complaints in U.S. District Courts, 1990-98 (NCJ 173427) at <http://www.ojp.usdoj.gov/bjs/abstract/crcusdc.htm> and Civil Rights Complaints in U.S. District Courts, 2000 (NCJ 193979) at <http://www.ojp.usdoj.gov/bjs/abstract/crcus00.htm>.

### Damage awards

Damage award amounts are presented as estimates limited by data coverage and quality issues. For further information about award variables see the AOUSC codebook at the National Archive of Criminal Justice Data <http://www.icpsr.umich.edu/NACJD/index. html>; the codebook is archived with studies 4026 and 4059.

**Selected federal civil rights statutes**

## Employment

*The Civil Rights Acts of 1866 and 1871* were established to enforce the 13th, 14th, and 15th amendments to the U.S. Constitution following the U.S. Civil War (1861–1865). The 1866 act prohibits racial discrimination in the making and enforcement of contracts among public and private employers. The 1871 act deals with civil rights violations by government entities. The civil rights acts have been increasingly used in employment discrimination cases.

*The Equal Pay Act of 1963* requires employers to pay men and women equal pay for equal working conditions.

*Title VII of the Civil Rights Act of 1964* prohibits employers with 15 employees or more from discriminating on the basis of race, color, religion, sex, or national origin.

*The Age Discrimination in Employment Act of 1967* prohibits discrimination on the basis of age against persons 40 years of age or older. This act applies to employers with 20 employees or more. This Act was amended by the *Older Workers Benefit Protection Act* in 1990 to ensure that older workers have complete and accurate information about their benefits and are not pressured into waiving their rights under the Age Discrimination in Employment Act (ADEA).

*The Rehabilitation Act of 1973* prohibits government contractors with contracts of $2,500 or more from discriminating against individuals with physical or mental handicaps. Government contracts pursuant to Executive Order 11246 must contain an equal opportunity clause and must develop and maintain an affirmative action plan. Vietnam veterans may benefit from affirmative action plans in government contracts under the *Vietnam Veterans Readjustment Assistance Act of 1974*, and the employment of aliens is dealt with in the *Immigration Reform and Control Act*.

*The Pregnancy Discrimination Act of 1978* amended Title VII to prohibit discrimination against employees or job applicants on the basis of pregnancy and required employers to treat pregnant employees in the same way as employees with medical disabilities.

*The Americans with Disabilities Act of 1990* prohibits discrimination against individuals with disabilities in employment, public services, and public accommodations.

*The Civil Rights Act of 1991* amended several of the federal employment discrimination laws including Title VII of the *Civil Rights Act of 1964, the Civil Rights Act of 1866, the ADEA, the Rehabilitation Act,* and *the Americans with Disabilities Act* (ADA).

The act amended Title VII and the ADA to provide the right to a jury trial and punitive damages (not to exceed $300,000); it amended the *Civil Rights Act of 1866* to prohibit racial harassment in the workplace and in post-hire employment conduct rather than just in hiring and promotions.

## Housing and accommodations

*The Civil Rights Act of 1866* ensures that all citizens of the U.S. shall have the same right, in every state and territory, as is enjoyed by white citizens to inherit, purchase, lease, sell, hold, and convey real and personal property.

*The Fair Housing Act* prohibits discrimination in various types of housing transactions such as sales, renting, and financing on the basis of race, religion, sex, or national origin. *The Fair Housing Amendments Act of 1988* expanded the *Fair Housing Act* to prohibit discriminatory housing practices based on handicap and familial status and provided for enhanced government enforcement of the act, including the recovery of monetary penalties in cases where discrimination is found.

*The Equal Credit Opportunity Act* prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age, because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

*Title II of the Civil Rights Act of 1964* prohibits discrimination based on race, color, religion, and national origin in places or public accommodation, such as hotels, restaurants, and certain places of entertainment.

## Voting

*The Voting Rights Act of 1965* protects racial and language minorities from discrimination in the electoral process and from being denied the fair opportunity to elect candidates of their choice.

*The Voting Accessibility for the Elderly and Handicapped Act of 1984* ensures access for handicapped and elderly individuals to polling places for federal elections.

*The Uniformed and Overseas Citizens Absentee Voting Act of 1986* enables members of the Armed Forces and other U.S. citizens who are abroad to register and vote absentee in presidential congressional elections.

*The National Voter Registration Act of 1993* commonly referred to as *the Motor Voter Law,* improves the access to voter registration by requiring states to provide simultaneous voter registration and driver's license applications, provide a mail-in application, and make registration available at various government agencies.

TAB 4

**EXHIBIT B**

PL 0001

**Anthony J. Rotondi**

| | |
|---|---|
| **From:** | Anthony J. Rotondi <AJR@AJROTONDI.COM> |
| **Sent:** | 3-16-16 5:09 PM |
| **To:** | 'Jeremy I. Stein' |
| **Cc:** | 'Holly G. Rogers' |
| **Subject:** | RE: RIOC |

Jeremy:

The lack of veracity in your e-mail is astounding, including the statement that I have somehow "taken [your] e-mail out of context." The documented terms of our mediation agreement are clear and unambiguous to anyone who can read. You plainly agreed to certain mediation terms in writing and are now breaching that agreement and desperately attempting to obfuscate the record by misrepresenting telephone discussions between us, as well as with the proposed mediator. In light of the clear written record, your desperate attempt to go on the offensive by incredulously claiming that I somehow "mean only to obstruct any meaningful chance of resolving this case with a neutral" is absurd.

To the contrary, Melick has played games and obstructed the process while Mr. Lewis remains unemployed and continues to incur damages based on your clients' and your conduct. It appears that Melick's strategy regarding mediation has been to cause delay and waste my time and Mr. Lewis' time with false representations. While this strategy is consistent with Respondents' penchant for fabrication, it does not serve their interest and instead appears to be designed to advance the interests of the Executive Chamber.

Rest assured that your strategy of delay and relying on false representations will serve no purpose other than to increase the damages that a jury ultimately will award Mr. Lewis. Indeed, I look forward to questioning your clients under oath regarding the slew of varying positions and blatant misrepresentations they have disseminated concerning Mr. Lewis' termination, as well as our efforts at mediation. A sophisticated jury in the Southern District of New York will clearly see through the plethora of nonsensical and irreconcilable fabrications.

/AJR

---

**From:** Jeremy I. Stein [mailto:jstein@melicklaw.com]
**Sent:** Tuesday, March 15, 2016 3:52 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Cc:** Holly G. Rogers <hrogers@melicklaw.com>
**Subject:** RE: RIOC

Anthony:

I had made it very clear over the telephone, numerous times, that we were not going to bring all of the board of directors to the mediation, and that we would only be bringing those people who were absolutely necessary to facilitate settlement. This was repeated when we spoke to the proposed mediator. You have taken my e-mail out of context. Since you are unwilling to compromise on the most basic issue related to this mediation, it is clear that you mean only to obstruct any meaningful chance at resolving this case with a neutral. My clients are no longer interested in mediation at this time.

PL 0002

Please feel free to call me to discuss this matter further if your position changes or you wish to present us with a more reasonable demand or proposed resolution.

**Jeremy I. Stein**
**Partner**
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
jstein@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Tuesday, March 15, 2016 11:01 AM
**To:** Holly G. Rogers
**Cc:** Jeremy I. Stein
**Subject:** RE: RIOC

Holly,

I have forwarded Melick & Porter's recently revised proposed mediation terms to Mr. Lewis. Nonetheless, I am certain you are aware of the wholly disingenuous nature of the positions advanced in your correspondence regarding the previously agreed mediation terms. Melick's effort to obfuscate its reneging on an agreement reached five months ago – as outlined below – and the concomitant lack of good faith in advancing those positions seriously jeopardizes the possibility of any pre-suit settlement.

*First,* two partners from Melick (Jeremy Stein and Mark Mazurczak) contacted me in September 2015 to propose mediation. My October 7, 2015 e-mail below clearly stated that Mr. Lewis was agreeable to mediation contingent upon the three simple provisions set forth therein, *including that all Respondents be present.* Because Melick had already proposed mediation, there was no need for Melick to confirm that Melick and its clients were generally agreeable to mediation. Jeremy's October 8 email response unequivocally indicated that Melick and its clients agreed to mediation on Mr. Lewis' proposed terms. To claim in your email below that "[t]here was never an agreement reached that all parties on the notice of claim would be present at the mediation" – and instead now state that RIOC intends to have Susan Rosenthal and a mysterious "representative of the Board to be determined by RIOC" attend a mediation – is unbelievable.

PL 0003

That Melick and its clients had already proposed mediation in September is plainly evident from my October e-mails with Jeremy.  Indeed, there would be no reason for Jeremy in his October 8 response to state "our client is agreeable to mediation," – which had already been established – unless it was to accept the straightforward terms in my October 7 e-mail.  Tellingly, my e-mail unambiguously stated:

> Please let me know whether RIOC agrees to proceed *in this manner*.  I cannot imagine that any of our requests prevent mediation, but *if this is unacceptable, please advise in what regard*.  (Emphasis added.)

Jeremy's response likewise was plain and clear: "We are agreeable to mediation."

*Second*, the claim in your March 7, 2016 e-mail below that Jeremy's October 8, 2015 e-mail somehow meant to convey that "since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7" defies credulity.  In an October 2 e-mail I requested that Jeremy "confirm whether [it] remains the case" that Melick "was not representing RIOC in regards to Mr. Lewis' FOIL requests."  Jeremy's response on this FOIL issue could not have been clearer:

> *I do not have any further information on the FOIL issues.  I am waiting to hear back from my client contact who is currently in China*, so I appreciate your patience.  As soon as I can get an answer I will relay that to you. (Emphasis added.)

To now claim that this "out of the country" reference somehow relates to the already agreed upon mediation, and not FOIL, is absurd.

Melick's current attempts at creating a wholly manufactured, revisionist, and unsupportable history are unfortunate.  In reliance on Melick's agreement to our proposed mediation terms, for five months Mr. Lewis and myself have invested our time (as well as the time of multiple mediators and their assistants) in furtherance of mediation.  Because Melick and its clients are now breaching that agreement it is likely that our efforts were a needless expenditure of resources.

Considering that RIOC President Indelicato has told blatant untruths about, among other things, Mr. Lewis termination and the other Respondents' actions related thereto, it is inappropriate to have a veiled mediation that excludes the Respondent Directors.  This is particularly the case given the apparent conflict of interest between Ms. Indelicato and the individual Director Respondents given Ms. Indelicato's publicly confirmed misrepresentations.

Further, should the case continue through trial, there is a very real risk of personal judgments being entered against the individual Respondents for punitive damages under myriad statutory provisions.  As you know, current law, public policy and contractual terms prohibit coverage or indemnification for punitive damages awards under insurance policies and

indemnity agreements. Under such circumstances, it is improper to shield the Respondent Directors from a mediation process thereby depriving those individuals as well as the insurer(s) of a potential settlement that could resolve Mr. Lewis's claims thereby avoiding any risk of personal exposure to the individual Respondents. It is unclear who is making these decisions that affect the exposure of the individual Respondents (as well as Respondents' insurer(s), which you have oddly refused to identify). This conduct, however, seems consistent with the manner in which the Executive Chamber and the resident Respondent Directors interact.

I additionally note that excluding the individual Respondents makes little sense from Melick's perspective. Respondents covered by insurance and indemnity provisions who are excluded from a mediation (that could resolve the matter and prevent litigation) would surely look to their counsel to justify their exclusion from the process if suit is later filed against those respondents. This conflict would be magnified in the event that a judgment, which imposes personal, uninsurable and unindemnifiable liability is entered against those individual Respondents (as is very likely with respect to Mr. Lewis's claims).

It appears that the only entity that would benefit from holding a mediation on Melick's materially revised terms is the Executive Chamber. In such case, the Executive Chamber – neither an intended beneficiary under the insurance policy(s) nor a potential beneficiary of indemnity provisions – would control benefits that are meant to inure to the individual Director Respondents.

Finally, requesting us to "confirm . . . if [Mr. Lewis] intends on providing a reduced and more reasonable demand in advance of the mediation" in the very same communication in which Melick advances outlandish positions to justify its breach of the previously agreement quite frankly is offensive. Additionally, from your communication and our prior discussions, it appears that Melick and the Executive Chamber do not appreciate adequately the seriousness of the Respondents' misconduct and the overwhelming incontrovertible evidence in Mr. Lewis' favor.

Again I have forwarded your email to Mr. Lewis and will confer with him regarding your recently revised mediation terms and revert. Nonetheless, to avoid jeopardizing the possibility of pre-suit settlement, I again request that Melick and its clients honor the previously agreed terms.

/AJR

---

From: Holly G. Rogers [mailto:hrogers@melicklaw.com]
Sent: Monday, February 29, 2016 5:51 PM
To: 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
Cc: Jeremy I. Stein <jstein@melicklaw.com>
Subject: RE: RIOC

Anthony:

PL 0005

As discussed, the email from Jeremy to you on October 8, 2015 (that you have provided below) states only that our client is agreeable to mediation, and that since our client was out of the country, we would have to get back to you regarding the terms of mediation proposed in your email of October 7, 2015.

There was never an agreement reached that all parties on the notice of claim would be present at the mediation.

In our last discussion, I informed you of who my client intends to have present at the mediation. That has not changed.

Please confirm whether or not your client intends on participating in mediation, and, if so, if he intends on providing a reduced and more reasonable demand in advance of the mediation, as discussed last week.

Best regards,

**Holly G. Rogers**
Attorney
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com
MA ~ RI ~ CT ~ NH ~ NY ~ CA

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Monday, February 29, 2016 5:32 PM
**To:** Holly G. Rogers
**Subject:** FW: RIOC

Holly,

Below is the email I mentioned during our prior conversations in which Jeremy indicated that Melick & Porter represents all parties on the Notice of Claim and agreed on their behalf, among other things, that as a condition of the mediation "all parties listed in the notice of claim be present at the mediation." In that same email, I offered "to hold the mediation after hours or on a weekend should scheduling be an issue" to accommodate the respondents – as I indicated might be necessary during the recent conversation you and I had with Ms. Jansenson.

As you can imagine, I do not see how Jeremy can now "deny" that an agreement was reached regarding the presence of all parties in the mediation (as you indicated he has during our discussion last week). Such a "denial" would be a complete 180 change in position from having all the individual respondents present at the mediation to having none of the individual respondents present. Please circle back with Jeremy and advise regarding whether the prior agreement will be honored and your clients will be present at the mediation.  Thank you.

-      Anthony

PL 0006

**From:** Jeremy I. Stein [mailto:jstein@melicklaw.com]
**Sent:** Thursday, October 08, 2015 5:59 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** RE: RIOC

Anthony:

We are agreeable to mediation. Please be advised that Melick & Porter represents all parties on the Notice of Claim. I do not have any further information on the FOIL issues. I am waiting to hear back from my client contact who is currently in China, so I appreciate your patience. As soon as I can get an answer I will relay that to you.

As discussed, we would suggest using Ruth Raisfeld as a mediator, who is a little more reasonable given your prior concerns with the cost of JAMS. If that is agreeable to you, we will obtain her availability. Please feel to call me with any concerns you might have.


Jeremy I. Stein
Partner
**Melick & Porter, LLP**
76 Center Street
Waterbury, CT 06702
Main: (203) 596-0500
Fax: (203) 721-8532
jstein@melicklaw.com
www.melicklaw.com
MA ~ RI ~ CT ~ NH ~ NY ~ CA

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Wednesday, October 07, 2015 12:34 PM
**To:** Jeremy I. Stein
**Subject:** RE: RIOC

Jeremy,

   Further to our discussion regarding your inquiry of whether Mr. Lewis would consider submitting a demand or participating in a mediation to explore early resolution of his claims, he is willing to participate in a mediation with the very simple provisos set forth below:

   (i)    the parties agree on an acceptable mediator and forum;
   (ii)   all parties listed in the notice of claim be present at the mediation (We are willing to hold the mediation after hours or on a weekend should scheduling be an issue); and
   (iii)  the parties and counsel use their best efforts so that any mediation occurs without undue delay.


   Please let me know whether RIOC agrees to proceed in this manner. I cannot imagine that any of our requests prevent mediation, but if this is unacceptable, please advise in what regard. Feel free to contact me should you care to discuss prior to circulating to your client(s).

PL 0007

Additionally, I have not received a response to my email of October 2 seeking clarification of the parties that Melick & Porter represents and the specific matters. Kindly confirm whether Melick & Porter represents any parties listed in the notice of claim other than RIOC so that I may contact any remaining parties or their counsel, as necessary.

Please advise regarding the mediation and Melick & Porter's representation by noon on Friday, October 9. Otherwise, I will assume that RIOC does not desire to participate in a mediation and that Melick & Porter represents RIOC and no other parties and only with regards to the notice of claim. Thank you.

/AJR

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 02, 2015 5:06 PM
**To:** 'Jeremy I. Stein' <jstein@melicklaw.com>
**Subject:** RIOC

Jeremy,

I will be following up with Mr. Lewis over the weekend regarding our call yesterday after which I will forward to you the email that we discussed concerning a potential mediation. In the interim, I would appreciate it if you could clear up the two issues below for me.

I recently read an email relating to FOIL requests from Mr. Kraut (one of RIOC's directors) to Mr. Lewis in which Mr. Kraut seemed to indicate that RIOC had retained counsel for the FOIL issues. I understood from our first discussion that Melick & Porter was not representing RIOC in regards to Mr. Lewis' FOIL requests. Could you please confirm whether that remains the case. Additionally, if you know of another firm representing RIOC on the FOIL issues, I would appreciated it if you let me know who that is so that I communicate with the appropriate persons/firm.

I understand that Melick & Porter represents the RIOC corporate entity with respect to Mr. Lewis's notice of claim, but I am not certain whether Melick represents the RIOC Executives, RIOC's Board of Directors, or the Individual Directors. Could you please let me know either way, again, so that I communicate with the appropriate persons/firm. Thanks.

-   Anthony

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

*****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

PL 0008

**EXHIBIT U**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEWIS

_____

**ORAL ARGUMENT REQUESTED**

16-CV-03071 (ALC)

Plaintiff,

- against -

THE ROOSEVELT ISLAND OPERATING
CORPORATION, et al.

Defendants.

------------------------------------------------------------------

*(AMENDED)*
**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

ANTHONY ROTONDI
*Attorney for Plaintiff*
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
ajr@ajrotondi.com
www.ajrotondi.com

# Contents

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF FACTS.......................................................................................................2

STANDARD OF REVIEW ......................................................................................................4

A.   *Defendants Misconstrue the Appropriate Standard of Review for Sovereign Immunity Defense*..........4

B.   *Defendants' Reliance On Twombly and Ashcroft While Ignoring Recent Second Circuit Clarification in Littlejohn Is Misplaced.* ........................................................................................................5

ARGUMENT..........................................................................................................................6

I.    THE ELEVENTH AMENDMENT DOES NOT BAR ANY OF PLAINTIFF'S CLAIMS AGAINST ANY DEFENDANT BECAUSE, *INTER ALIA*, RIOC IS NOT A "STATE OR AN AGENCY" ENTITLED TO THE PROTECTIONS OF THE DOCTRINE OF SOVEREIGN IMMUNITY..........................................................................................................................6

A.   *RIOC Is Not Entitled to Sovereign Immunity* .................................................................6

B.   *Six Factor Test For Sovereign Immunity Determinations* ...................................................7

i.    How the Entity is Funded – RIOC is Self-Sufficient.......................................................8

ii.   Whether The Entity's Obligations Are Binding Upon the State.......................................9

II.   PLAINTIFF ADEQUATELY PLED CAUSES OF ACTION ALLEGING DISPARATE TREATMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION ON ACCOUNT OF RACE AND GENDER..........................................................................................................11

a.    Plaintiff's Allegations Regarding Changes In The RIOC Executive Team And His Replacement By Someone Outside The Protected Class Alone Provide Sufficient Facts Supporting "An Inference Of Discrimination."....................................................................................................14

b.    Plaintiff Appropriately Pled Defendants' "Pattern And Practice" Of Discrimination Which Contrary To Defendants' Assertions Is Not Available Only For Claims Brought By The Government Or A Class Of Plaintiffs.........................................................................................................14

A.   *Plaintiff Satisfied the Pleading Requirements for Hostile Work Environment Claims* .......................15

B.   *Plaintiff Satisfied the Pleading Requirements for a Retaliation Claims*.......................................17

III.  THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS FOR PLAINTIFF'S CLAIMS AGAINST THE OFFICER INDIVIDUAL DEFENDANTS AND THE BOARD INDIVIDUAL DEFENDANTS..........................................................................................19

IV.   PLAINTIFF'S CAUSES OF ACTIONS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES MUST STAND BECAUSE, *INTER ALIA* DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ..........................................................................................21

V.    PLAINTIFF PLED VIABLE CLAIMS FOR PUNITIVE DAMAGES WHICH SHOULD BE DETERMINED AT TRIAL..................................................................................................22

VI.   PLAINTIFF'S CLAIMS FOR NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING SHOULD BE DISMISSED AS TO RIOC AND THE BOARD INDIVIDUAL DEFENDANTS..........................................................................................23

VII.  SHOULD THE COURT GRANT ANY PART OF DEFENDANTS' MOTION AND DISMISS ANY CAUSE OF ACTION OR DEFENDANT, OR FIND THAT SUBJECT MATTER

JURISDICTION IS LACKING, PLAINTIFF RESPECTFULLY SUBMITS THAT ANY SUCH
DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO RE-PLEAD..............25

CONCLUSION....................................................................................................................................25

## PRELIMINARY STATEMENT

Plaintiff filed a Complaint detailing claims against Defendants, which adequately pled the elements of those claims. Nonetheless, Defendants filed the instant Rule 12(b)(6) and 12(b)(1) Motion to Dismiss the Complaint (the "Motion" or "MTD").  Indicative of the weakness of Defendants' Motion, Defendants ask this Court to dismiss the Complaint based upon legal authority of cases determining the sufficiency of evidence supporting claims, including summary judgment motions and post-trial motions.  Indeed, in the rare instances where Defendants proffer motion to dismiss cases, that authority is cited for basic propositions.  Defendants then piece together soundbite quotes of the rare motion to dismiss case cited -- with the overwhelming majority of post-discovery motions testing the sufficiency of evidence -- to attempt to hold Plaintiff to a new standard of pleading in which Plaintiff would be required to allege more facts in the Complaint than he would need to prove in order to defeat a motion for summary judgment. This is not how the law works.

Defendants also repeatedly ignore propositions of law in cases cited in their own brief and egregiously ignore a plethora of allegations from the Complaint.  Tellingly, Defendants' memorandum of law does not include a "Statement of Facts," an implicit acknowledgment that the detailed allegations in the Complaint warrant denial of their Motion.

There are many other glaring deficiencies with the Motion, and here are just a few:

- Defendants claim that the Complaint somehow does not plead personal involvement.  The detailed Complaint is replete with allegations of misconduct, including failure to fulfill fiduciary obligations (including taking corrective action), by Defendants Charlene M. Indelicato, Frances A. Walton, Claudia McDade and each of the Directors:  Michael Shinozaki, Margie Smith, David Kraut, Katherine Grimm, Fay Christian, Howard Policy, Mary Beth Labate and Darryl Towns.

- Defendants provide misleading argument on the issue of sovereign immunity. The Motion claims that it is "well-established" that RIOC is entitled to sovereign immunity.  This is simply not true.  Defendants fail inform the Court that of the only two non-binding cases which found RIOC to have sovereign immunity, one was a summary judgment decision with much evidence in the record, and, in the other the Honorable Judge Rakoff said the issue of RIOC's sovereign immunity is "far from

doubt." Critically, two key factors that were not present in Chafetz and Jones are present here, namely that: (i) RIOC is inarguably self-sufficient financially as admitted in their Annual Filings and in a Hearing by then RIOC Chair Defendant Mary Beth Labate and (ii) the Attorney General ("AG") is not involved in this action.

- Defendants attempt to attack Plaintiff's retaliation claim when Defendants and their own counsel have admitted that Plaintiff was terminated for reported wrongdoing at RIOC, i.e. whistleblowing. (See e.g. (Compl at 57)

Defendants' Motion is deficient for a host of reasons, and the unlawful conduct on which Plaintiff's claims are based is the type of malicious, wanton, willful and recklessly indifferent conduct that warrants not only the denial of their Motion, but the imposition of punitive damages.

## STATEMENT OF FACTS[1]

The events giving rise to the claims in this Complaint are particularly egregious. Plaintiff served as General Counsel ("GC") to the Corporation in an exemplary fashion for nearly four years. Notwithstanding Plaintiff's recognized contributions to the Corporation, or that he had received a performance-based raise just a few weeks earlier, he was terminated immediately by an e-mail sent on a Friday afternoon by RIOC President Charlene Indelicato.  The termination was the culmination of Plaintiff being subjected to a hostile work environment, discrimination and retaliation based upon Plaintiff's race, gender and that he had reported concerns about wrongdoing at the Corporation, including with regard to financial and discrimination issues, i.e. "whistleblowing." Plaintiff was the only male and only minority (black) member of the executive team. After he was terminated, Defendants replaced him with a white women leaving RIOC with an executive team of all white woman of similar age. Strikingly, Defendants and their Counsel even have admitted that Plaintiff's termination was an act of retaliation. (Complaint at ¶ 3)

The Complaint also includes facts concerning negligent hiring, supervision, retention and training by the Director Defendants – for failure to properly exercise their duties. The Director

---

[1] Plaintiff provides a summary of the Complaint allegations and respectfully refers the Court to the Complaint for the entirety of facts alleged.

Defendants knew that Indelicato had a propensity for discrimination based on prior lawsuits, but hired her anyway and didn't supervise her properly. The Directors Defendants also egregiously ratified her unlawful conduct in terminating Plaintiff by failing to take corrective action and voting in white female replacement for the black male Plaintiff.  (See Complaint at ¶¶ 47, 52, 53, 113 to 116, 119.)[2]

Defendants discriminatory conduct is illustrated through Plaintiff his being subjected to discriminatory and offensive:  (i) directives to undertake tasks because he was black; (ii) comments about his skin color / complexion (iii) comments about Blacks and Caribbeans; (iv) comments about the behaviors of ethnic people (v) comments about other blacks including a high ranking executive in the Governor's Executive Chamber; (vi) worse treatment than White executives in terms of benefits and severance; and (vii) the poor treatment of RIOC black employees by Indelicato, Walton, McDade and RIOC Board.  (Complaint at ¶¶ 55, 75, 78, 91, 93, 95, 96)

Defendants Walton and McDade also engaged in discriminatory and hostile conduct toward Plaintiff, in an effort to ostracize him and prevent him doing his job.  For example:  (1) they changed the lock on his door after he was wrongfully terminated making it look like Plaintiff had engaged in some sort of illicit conduct; (1) acted in concert with Indelicato to Plaintiff's exclusion on many issues; (2) made disparaging comments about blacks; (3) concealed relevant information; and (5) unilaterally reducing the Legal budget with no input from Plaintiff and (4) changing the lock on Plaintiff's office door after he was wrongfully terminated to give the wrongful appearance that Plaintiff had engaged in illicit conduct.  (Complaint at ¶¶ 60, 63, 79, 97, 100, 101)

Plaintiffs was also treated far less favorably than his white female counterparts McDade and Walton in that he was cursed at, screamed at berated, when they never were and they received raises

---

[2] The Directors have continued to cause Plaintiff harm by condoning the dissemination of false information about his work ethic and pretext after the fact.  (¶¶ 82, 116)

when he did not even though they were far less deserving. (Complaint 71, 72, 73, 77, 83-87).[3]
Defendant McDade's conduct was particularly egregious given her position as Director of Human
Resources.  McDade has made particularly offensive and racist remarks about blacks, including
telling her direct report not to speak with certain RIOC employees "because they are Black"
(Complaint ¶ 81)  In addition, McDade troublingly and without any good reason withheld Plaintiff's
personnel file for months, which suggests foul play.  (Complaint ¶ 82)

Finally, shortly after Plaintiff reported concerns about discrimination and financial
wrongdoing at RIOC involving Indelicato, Walton and McDade, he was terminated.[4]  (Compl. at
55-56).  The Director Defendants who always spoke glowingly about Plaintiff failed to take
corrective action and ratified the unlawful conduct by voting in a white woman to replace the black
male Plaintiff resulting in an all-white and all female executive team.  (See Complaint at ¶¶ 47, 52,
53, 65, 113 to 116, 119.)

## STANDARD OF REVIEW

### A.  *Defendants Misconstrue the Appropriate Standard of Review for Sovereign Immunity Defense*

Defendants assert that in "resolv[ing] disputed jurisdictional facts, including disputes over
issues of Eleventh Amendment sovereign immunity," "a court does not draw inferences in favor
of the plaintiff" and that "plaintiff must prove by a preponderance of the evidence that such
jurisdiction exists." (MTD at p. 2) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir.
2000) and State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 77 n4 (2d Cir.
2007)).  *First*, Defendants ignore that the Rowland decision upon which Defendants rely
recognized Second Circuit authority to the contrary holding that "when reviewing dismissal under

---

[3] Defendants do not cite a single "comparator" motion to dismiss case, and accordingly, the comparison of
Plaintiff to Walton at this stage of the proceedings is appropriate.

[4] As the Second Circuit has noted, "the close temporal proximity" between plaintiff's protected action and
adverse employment action "ay in itself be sufficient to establish the requisite causal connection between a
protected activity and retaliatory action." Kaytor v. Blee. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010)

Fed.R.Civ.P. 12(b)(6) or 12(b)(1), 'the court must accept all factual allegations in the complaint

as true and draw inferences from those allegations in the light most favorable to the plaintiff.'"

Rowland, 494 F.3d 71 (Quoting Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.

1997). Additionally, Defendants omit that the Rowland Court opined that "in adjudicating a

motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed

factual issues by reference to evidence outside the pleadings, including affidavits." Rowland, 494

F.3d 71 (citing Antares Aircraft, L.P. v. F. of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991). Likewise,

Harris cited by Defendants held that "A court may fulfill its duty by reference to evidence outside

the pleadings." Citing See Zappia Middle East Construction Co. v. Emirate of Abu Dhabi, 215

F.3d 247, 253 (2d Cir. 2000).

### B. Defendants' Reliance On Twombly and Ashcroft While Ignoring Recent Second Circuit Clarification in Littlejohn Is Misplaced.

Defendants cherry pick quotes from two cases for the proposition that to survive a 12(b)(6)

motion for "causes of action, alleging race and gender-based disparate treatment, hostile work

environment, and retaliation, in violation of Title VII, § 1981, § 1983, NYSHRL and NYCHRL" a

plaintiff must plead facts adequate "to state a claim for relief that is plausible on its face." (MTD at

5) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) and Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 570 (2007)).  However, recently in Littlejohn v. City of N.Y., 795 F.3d 297 (2d Cir. 2015)

– cited and relied upon by Defendants in the MTD – the Second Circuit relaxed the facts required to

pled under Iqbal to survive a motion to dismiss. Id. at 311. Under the current standard as the

Second Circuit explained in Littlejohn, to survive a motion to dismiss a plaintiff need only allege:

"(1) member[ship] of a protected class…., [(2) qualify[cation] for the position [] sought,] (3) … an

adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an

inference of discriminatory motivation." Littlejohn, 795 F.3d at 311. The Second Circuit

specifically held that a "plaintiff cannot reasonably be required to allege more facts in the complaint

5

than the plaintiff would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a nondiscriminatory justification." Littlejohn, 795 F.3d at 311; Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (holding complaint need not contain specific factual allegations to state a prima facie case of discrimination and Rule 9(b) does not explicitly require greater pleading requirements set forth in Rule 8(a) for discrimination cases).

## ARGUMENT

## POINT I

I.   **THE ELEVENTH AMENDMENT DOES NOT BAR ANY OF PLAINTIFF'S CLAIMS AGAINST ANY DEFENDANT BECAUSE, *INTER ALIA*, RIOC IS NOT A "STATE OR AN AGENCY" ENTITLED TO THE PROTECTIONS OF THE DOCTRINE OF SOVEREIGN IMMUNITY**

### A. *RIOC Is Not Entitled to Sovereign Immunity*

Defendants' assertion -- without any real analysis -- that sovereign immunity bars claims other than Title VII against "RIOC and the Board, as well as the Officer Individual Defendants and the Board Individual Defendants in their official capacities" is unavailing. *First*, Defendants baldly claim that "it is *well-established* that RIOC specifically is entitled to protection from suit in federal court for purposes of sovereign immunity." (MTD at p. 4) (emphasis added) To support the purported "well-established" law, Defendant cites two district court cases involving RIOC that are non-binding and inapplicable to this Action. (*See* MTD at p. 4, citing *Chafetz v. Roosevelt Island Operating Corp.* 2000 WL 1277337 (SDNY, Sept. 8, 2000) and *Jones v. Roosevelt Island Operating Corp. et al.* 2013 WL 6504428 (SDNY, Dec. 7, 2013)). Moreover, the Hon. Jed S. Rakoff, who presided over and issued the more recent of the decisions in *Jones*, disagrees with Defendants' view that the issue is "well-established." To the contrary, during the October 10, 2013 oral argument in *Jones*, Judge Rakoff's ruled that "[he] agree[s] with plaintiff's counsel that the issue is not totally free from doubt." indicate the opposite is true.[5] (TAB 1 annexed hereto,

---

[5] The transcript reveals the following exchange:

THE COURT: Well, thank you very much. Both of you actually distilled the whole issue very, very

Transcript at p. 10) (emphasis added) (annexed hereto).  Chafetz – the other case Defendants rely

upon – related to a summary judgment motion submitted after Plaintiff had an opportunity to seek

evidence to support his alleged jurisdictional basis.

In addition, as discussed in more detail below, there are key factual differences present in

the instant case that were not present in Chafetz or Jones, which completely alter the analysis and

warrant denial of Defendants' motion.

### B. Six Factor Test For Sovereign Immunity Determinations

The factors the Second Circuit considers in determining whether RIOC is an "arm of the

state" entitled to sovereign immunity are:

(1) how the entity is referred to in the documents that created it;

(2) how the governing members of the entity are appointed;

(3) how the entity is funded;

(4) whether the entity's function is traditionally one of local or state government;

(5) whether the state has a veto power over the entity's actions; and

(6) whether the entity's obligations are binding upon the state.

Mancuso v. New York State Thruway Authority, 86 F.3d 289, 293 (2d Cir. 1996)

Having relied on non-binding[6] and factually inapposite cases that acknowledge the

---

nicely.

I am going to grant the motion, although *I agree with plaintiff's counsel that the issue is not totally free from doubt*, but on the whole I think Judge Buchwald's opinion is persuasive. I will write a short opinion so you will have something there for the purpose of any appeal. . .

MR. LAWLOR: If I may, your Honor, with the dismissal of RIOC from this action, I'm not totally sure of the interplay here, but could that be *without prejudice as to a filing in state court*? The issue that I had

THE COURT: Yes, it's with prejudice with respect to the folks we talked about earlier before we got to this issue, but here it's -- the wording "with prejudice" and "without prejudice" is awkward in a jurisdictional thing. This Court lacks jurisdiction over the claims we were just discussing *That in no way prevents you from filing those claims in state court*.

(TAB 1 annexed hereto, Transcript at p. 10) (emphasis added) (annexed hereto).

[6] The non-binding effect of effect of sovereign immunity determinations is exemplified by the only case other than Chafetz and Jones case that Defendants cite as support for their request for sovereign immunity protection.  Defendants' assert that In Martin v. Lanigan, 541 N.Y.S.2d 142 (1989) a "suit against State

7

uncertainty of the issue, Defendants proffer no analysis of the factors courts review in sovereign immunity determinations, other than to misstate that "[t]he same factors that led the courts in Chafetz and Jones to determine that RIOC is an arm of New York State remain applicable in this case." (MTD at 4, n. 2). Nothing could be further from the truth. While the Mancuso six-factors were applied in Chafetz and referenced in Jones, certain highly relevant facts in the instant case were not present and/or explored in those decisions, which critically change the analysis and warrant denial of sovereign immunity; specifically RIOC's financial self-sufficiency and the absence of the AG in this action.

### i. How the Entity is Funded – RIOC is Self-Sufficient

The first critical difference in factors relates to "how the entity is funded." The Chafetz court noted that the (i) "State's funding is a key consideration," and (ii) the analysis is "not on initial funding, but on current funding," but [punted] on this factor holding "the record on this motion is unclear as to whether RIOC has actually received appropriations from the State in recent years or is self-funding." Chafetz at *3-4. In Jones, the Court noted that in Chafetz "the entity's funding structure did not clearly cut either way" and relied on this in reaching its decision. Jones at *7. Here, however, there is no question that RIOC is self-sufficient financially and, accordingly, this "key consideration" militates / dictates against immunity.

Indeed, during an October 2005 hearing of the NYS Assembly Committee on Corporations, Authorities and Commissions, Defendant Mary Beth Labate, then Chair of the RIOC Board, testified unequivocally that RIOC now *"run[s] the island on a fiscally self-sufficient basis without*

---

Thruway Authority board members in their official capacity was a claim against the State and was dismissed on the basis of sovereign immunity." (MTD at 4). First, Martin v. Lanigan was not a Court of Appeals case – as indicated by the citation format – but rather a Third Department decision. More importantly, just seven years later – in a case conveniently not cited by Defendants, -- the Second Circuit held that the same State Thruway Authority is not entitled to sovereign immunity. Mancuso v. N.Y. State Thruway Auth. , 86 F.3d 289, 307 (2d Cir. 1996) (affirming the district court's rejection of Eleventh Amendment immunity for the State Thruway Authority).

*state or city subsidies* that [it] received in the past," and that RIOC has "*cutoff*" such State and City subsidies.[7] (emphasis added) A copy of the hearing transcript is attached hereto as TAB 2 (the "LaBate Tr. at 5") Defendants Kraut and Shinozaki were also on the Board at the time.

In addition, RIOC has filed Public Authority Annual Reports for the past six years (for fiscal years 2011-2016), each containing statements acknowledging that RIOC "*is self-sustaining*" and "*neither borrows nor depends on appropriations.*"[8] Relevant pages of the Public Authority Annual Reports are annexed hereto collectively as TAB 3. (2011 Report at p. 5; 2012 Report at p. 7; 2013 Report at Section III (iii); 2014 Report at p. 12; 2015 at p. 11; 2016 Report at p. 13) (emphasis added.)

In light of Defendants' party admissions and Annual Filings – certain of which were submitted by Defendants Walton and Indelicato (then CFO and CEO/President) – Defendants are estopped from arguing that this "key consideration" not considered by Jones or Chafetz weighs in favor of sovereign immunity. Indeed, quite to the contrary, it weighs heavily against sovereign immunity.

    ii.  Whether The Entity's Obligations Are Binding Upon the State

---

[7] The hearing transcript is attached as (TAB 2) is available at http://www.rioc.com/pdf/MBL%20Final%20Statement.pdf. Labate also stated: (i) "*RIOC has in fact used the subsidy cutoff as an opportunity to get our own house in order, and the result has been a self-sufficient administration* that is better able to plan for the future for the betterment of our residents." (Labate Tr. at 9) (emphasis added) and (ii) "*Rather than being critical of RIOC's fiscal management, it would seem we should be commended for setting an example that other authorities around the state should aspire to in terms of being fiscally self-sufficient.*" (Labate Tr. at 9.) (emphasis added.)

[8] Each report contains one or both of the following statements: (i) "*Roosevelt Island Operating Corporation is self-sustaining*: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Bus Operations; and other revenues to fully meet its operational expenses" and (ii) "*Roosevelt Island Operating Corporation neither borrows nor depends on appropriations* and thus is minimally exposed to market, interest rate, and economic risks." Links to the Filings: https://rioc.ny.gov/PARIS/FY10-11/Annual-Report-FY1011.pdf; https://rioc.ny.gov/PARIS/FY11-12/Annual-Report-FY1112.pdf; https://rioc.ny.gov/PARIS/FY12-13/Annual-Report-FY1213.pdf; https://rioc.ny.gov/PARIS/FY13-14/Annual-Report-FY1314.pdf; https://rioc.ny.gov/PARIS/FY14-15/Annual-Report-FY1415.pdf; https://rioc.ny.gov/PARIS/FY15-16/Annual-Report-FY1516.pdf

The other key difference which Defendants omit is that here they are represented by private / insurance counsel, not the Attorney General. In both <u>Chafetz</u> and <u>Jones</u>, the AG defended the cases and thus the sixth-factor, whether the entities obligations were binding on the state, was clear.[9] Critically, the AG's absence strongly suggests the AG's office has no indemnification obligations. Accordingly, the sixth-factor in the test, like the third-factor, weighs against immunity.[10]

Notably, in an increasing number of jurisdictions, however, courts have held that where a municipality or other political subdivision purchases liability insurance, its immunity from tort liability is removed to the extent of the coverage of the insurance. The support for this rationale is that the primary reason for the immunity doctrine – that is, the protection of public funds – no longer exists when a governmental unit has insurance protection and, in this situation, there is no need for application of the doctrine.[11]

In sum, even assuming the other four factors were properly considered in <u>Chafetz</u> and <u>Jones</u>, which is arguable, these two factors (fiscal self-sufficiency and absence of the AG) dictate that sovereign immunity should not apply.

---

[9] The State is unequivocally not obligated to satisfy RIOC's corporate debts, see N.Y. Unconsol. § 6395(1) (the "RIOC Act"), such as payroll and benefit obligations. The RIOC Act discusses potential State indemnification obligations for liabilities, claims or judgments arising out of the "development, management or operation of Roosevelt Island," id. § 6392(1), but unequivocally states: "Any member, officer or employee of such corporations seeking to be saved harmless or indemnified or to claim any other benefits available pursuant to this section or <u>section seventeen of the public officers law</u> shall comply with the procedural requirements of such <u>section seventeen</u>. As used in this section the terms "member", "officer" and "employee" shall include a former member, officer or employee, his estate or judicially appointed personal representative."

[10] Plaintiff respectfully requests the Court take Judicial Notice of TAB Nos. 1 to 3 per Rule 201(b)(2) & (c)(2) for the Rule 12(b)(1) Motion as proof of the matter asserted, to illustrate the need for discovery on subject matter jurisdiction prior to determining the 12(b)(1) Motion, or as just some of the additional facts Plaintiff may plead so that any potential dismissal should be without prejudice and with leave to amend.

[11] See <u>Sexton v. City of Hannibal</u>, 832 F. Supp. 2d 1060 (E.D. Mo. 2011) (when a public entity purchases liability insurance for tort claims, sovereign immunity is waived to the extent of and for the specific purposes of the insurance purchased); <u>Payne v. DeKalb County</u>, 414 F. Supp. 2d 1158 (N.D. Ga. 2004) (sovereign immunity waived to the extent counties have liability insurance coverage for the alleged wrongs committed by public officials); <u>Arrington v. Martinez</u>, 716 S.E.2d 410 (N.C. Ct. App. 2011) (a town or municipality may waive sovereign immunity through the purchase of liability insurance).

## POINT II

II.   **PLAINTIFF ADEQUATELY PLED CAUSES OF ACTION ALLEGING DISPARATE TREATMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION ON ACCOUNT OF RACE AND GENDER**

Apparently in recognition that they are without a defense to the Action, rather than submitting legal support for their positions, Defendants spend pages upon pages of their motion of their Motion droning on with a misplaced theme that "[t]he Complaint largely consists of facts that are irrelevant, false, and/or misleading, or conclusory statements and/or legal conclusions without specific facts to support the allegations. (MTD 8-9)   A simple read of the Complaint, which is replete with specific detailed factual allegations, clearly illustrates the absurdity of this position repeatedly advanced by Defendants.  Apparently, Defendants believe that if they repeat those assertions enough times, somehow it will become true.

Defendants also attempt to attack the quality of the "evidence" in Plaintiff's Complaint, apparently seeking to have the Court enforce a post-trial evidentiary threshold in order for the Complaint to survive Defendants' 12(b)(6) Motion to Dismiss.  For example, Defendants' claim that Plaintiff baldly asserts that Indelicato made comments about his 'skin color/complexion,' but provides no other facts to substantiate the allegation." (MTD at p. 5 at n. 3) Defendants also claim this is the only racial motivated conduct directed at Plaintiff, which is completely undermined by a plethora of allegations in Complaint.  (See Complaint at ¶¶ 55, 60, 63, 75, 78, 79, 91, 93, 95, 96, 97, 100, 101) Perhaps one of the most baffling of these attempts is Defendants admission that "Plaintiff describes in *great detail the circumstances surrounding his termination"*, but then incredulously asserting that the illegal conduct that occurred in connection with his termination is "totally irrelevant" to Plaintiff's Complaint, which asserts unlawful retaliation and wrongful termination. (MTD at p 6) (emphasis added.)

In another stark example, Defendants copy in paragraph 68 and 65 of the Complaint (below) as a purported example of a "conclusory allegation" that the Court should disregard:

- "...the last full executive RIOC team, prior to Defendant Indelicato's appointment, was comprised of a Hispanic female (President & CEO), a White male (VP & CFO), a Hispanic male (VP of Operations), and a Black male (VP & General Counsel). The racial and gender makeup of the executives was 50% Hispanic, 25% Black (for a total of 75% Minority), 25% White, 75% male and 25% female. Subsequent to the appointment of Indelicato, Defendants RIOC, RIOC Board, Individual Directors, McDade, and Indelicato changed the profile of the executive positions at RIOC to 0% Hispanic, 0% Black, 0% Minority, 100% White, and 100% female. Compl. ¶ 68.

- "By terminating Plaintiff and replacing him with another White female around the same age as Indelicato, Defendants concluded the transition of RIOC's entire Executive positions from a racially and gender diverse group of executives to exclusively all female and all White executives around the same age." Compl. ¶ 65.

Defendants not only refer to these hard facts as "conclusory allegations", but then attack the truth of the statements by claiming that "Plaintiff provides deliberately skewed and misleading facts in an attempt to show that Defendants sought to eviscerate employees at RIOC who were not white and female." (MTD 8-9)

After sifting through Defendants' repetitions regarding conclusory allegations, Defendants' argument can be boiled down to:

- Plaintiff has not pled facts showing an inference of race or gender discrimination (MTD at 7)

- Plaintiff's "pattern-and-practice" method of proof is available only as to claims brought by the government or a class of plaintiffs, so Plaintiff is prohibited from making such a claim. (MTD at p 9) (Citing Chin, 685 F.3d at 150.)

- Plaintiff also attempts to show an inference of racial discrimination by adducing evidence that similarly situated employees were treated more favorably. However, Plaintiff cannot rely on the employment experiences of any of the other individual RIOC employees to whom he refers in the Complaint because he has not sufficiently pled that they are similarly situated to him, or that they were treated differently or more favorably than him. (MTD at 9) (citing Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)

Notwithstanding the abundancy of facts Plaintiff pled supporting his claims, Defendants argue that that Plaintiff has not pled facts to satisfy the "minimal burden of showing facts suggesting an inference of discriminatory motivation" as required under Littlejohn. 795 F.3d at 311. Astonishingly, to support this assertion Defendants cite exclusively to summary judgement motion decisions notwithstanding the Second Circuit's specific admonishment that a "plaintiff

cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment." Littlejohn, 795 F.3d at 311. Defendants mix and match quotes from summary judgment motion decisions and decisions on post-trial motions with quotes from the scant motion to dismiss decisions to string together legal propositions that simply put are false and misleading.  For example, the Motion asserts:

> The Second Circuit recently confirmed that the Plaintiff must provide plausible facts to support a minimum inference of discriminatory motivation to survive a motion to dismiss. See Littlejohn, 795 F.3d at 311. Once he has done so, the burden then shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. McDonnell Douglas Corp., 411 U.S. at 802. The plaintiff must then establish that the defendant's proffered reason is a mere pretext for actual discrimination. See McDonnell Douglas Corp., 411 U.S. at 804. The Court must determine whether Plaintiff can satisfy his "ultimate burden of persuading the trier of fact that the defendant *intentionally discriminated* against the plaintiff." Reeves v. Sanderson Plumbing Products, Inc., 503 U.S. 133, 143 (2000) (citation omitted) (emphasis added); Littlejohn, 795 F.3d at 311. These standards require dismissal of Plaintiff's discrimination claims. (MTD at 6-7)

> Defendants' reliance on Reeves v. Sanderson Plumbing Products, Inc., 503 U.S. 133, 143

(2000) to support their specious legal conclusion that "[t]he Court must determine whether Plaintiff can satisfy his 'ultimate burden of persuading the trier of fact that the defendant *intentionally discriminated* against the plaintiff,'" at the Rule 12(b)(6) motion to dismiss stage is absurd.  (MTD at p. 7) (emphasis added by Defendants) Reeves was a decision relating to an appeal of a post-trial motion challenging the sufficiency of the evidence submitted at trial – not at the Rule 12(b)(6) motion to dismiss pleading stage.[12]

Even under the standard in the summary judgment motion decisions that Defendants rely upon held "in discrimination cases where state of mind is at issue, [the Second Circuit] affirms a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of

---

[12] Additionally, Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) -- the case quoted in Reeves as support for Defendants' quoted soundbite but reflected in the MTD as "citation omitted" -- likewise was a determination of a post-trial motion relating to the sufficiency of evidence.

discrimination.'" Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003) (quoting Graham

v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (Cited in MTD at 9).

**a.  Plaintiff's Allegations Regarding Changes In The RIOC Executive Team And His Replacement By Someone Outside The Protected Class Alone Provide Sufficient Facts Supporting "An Inference Of Discrimination."**

.Plaintiff's Complaint presented hard facts illustrating changes in the racial and gender make-

up of Defendant RIOC's executive team during Defendant Indelicato's presidency. (Compl. 3, 65,

68)  In response, Defendants inappropriately challenge the veracity of the information pled and

repeat their mantra of conclusory allegations.  However, Defendants own cases establish the

[fallacy] of their position.  Littlejohn– one of the rare motion to dismiss cases cited by Defendants

states: "*an inference of discrimination also arises when an employer replaces a terminated or

demoted employee with an individual outside the employee's protected class.*" Littlejohn, 795 F.3d

297 at 312 (emphasis added) (collecting Second Circuit cases); see also Zimmermann v. Assoc.

First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("mere fact that a plaintiff was replaced by

someone outside the protected class will suffice for the required inference of discrimination")

Because Defendants replaced Plaintiff who is a male black with a white woman, this required

"inference of discrimination" applies equally to Plaintiff's race and gender causes of action.

(Compl 3, 37, 54).

**b.  Plaintiff Appropriately Pled Defendants' "Pattern And Practice" Of Discrimination Which Contrary To Defendants' Assertions Is Not Available Only For Claims Brought By The Government Or A Class Of Plaintiffs**

Defendants reliance on Chin v. Port Auth. of N.Y. & N.J. Inc., 685 F.3d 135 (2d Cir. 2012)

for the misstated proposition that "Plaintiff cannot allege pattern and practice claims because such

claims can only be brought by the government or a class of plaintiffs." (MTD at 6) *First*, as with

most cases that Defendants rely upon, Chin was a decision on post-jury trial motion and not

"allegations" made in a Compliant at the pleading stage.  Second, in the very same opinion the

Second Circuit in Chin states (which Defendants ignore): "[t]o be sure, proof that an employer

14

engaged in a pattern or practice of discrimination may be of substantial help in demonstrating an employer's liability in the individual case", and "[e]vidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim."[13]

Defendants reliance on <u>Simmons Grant v. Quinn Emanuel Urquhart & Sullivan, LLP</u>, 915 F. Supp. 2d 498, 505 (S.D.N.Y. 2013) to support their erroneous "pattern and practice" argument is similarly unavailing. *First*, <u>Simmons</u> was a summary judgement case addressing evidentiary standards; and second, <u>Simmons</u> addressed "[p]laintiff's attempt to establish the adverse employment action element of her prima facie case of intentional discrimination through statistical evidence", and there can be no question that Plaintiff's termination here was an adverse employment action.[14]

## A. *Plaintiff Satisfied the Pleading Requirements for Hostile Work Environment Claims*

Defendants outdid themselves in proposing that Plaintiff did not satisfy the pleading requirements for a hostile work environment cause of action. Defendants cite no fewer than 15 cases as purported authority for that proposition, but each case is either a decision on a summary judgment motion or a post-trial appeal. Moreover, Defendants provide no analysis of any of the cases cited, choosing instead to choose a select sentence out of context from each cited case.

This Court has held that "NYCHRL discrimination claims undergo a slightly different, more

---

[13]  Defendants' position is contradicted by other authority in this Circuit: "[R]elevant to the issue. . . is data suggesting that a termination was part of a general pattern of discrimination. . . "<u>Ganzy v. Allen Christian School</u>, 995 F.Supp. 340, 349-50 (E.D.N.Y. 1998) (citing McDonnell Douglas, 411 U.S. at 805, 93 S.Ct. 1817; <u>Lieberman v. Gant</u>, 630 F.2d 60, 68 (2d Cir. 1980) ("[e]vidence of general patterns of discrimination by an employer is relevant even in an individual disparate treatment case"); <u>Louison v. Blue Cross Blue Shield of Greater New York</u>, 1990 WL 108347, *1 (S.D.N.Y. 1990) (plaintiff's document requests seeking information regarding other complaints of discrimination were relevant); <u>Flanagan v. Travelers Ins. Co.</u>, 111 F.R.D. 42, 48 (W.D.N.Y. 1986) (same).

[14] Defendants fare no better by relying on <u>Lopez v. Met. Life. Ins. Co.</u>, 930 F.2d 157 (1991), which was an appeal from a 4-day bench trial and the court's opinion concerning the statistical evidence presented was limited to the particular facts of that case.

permissive analysis than the federal and state statutes . . . [which] require a materially adverse

action for a race discrimination claim to be actionable, the NYCHRL expands the definition of

discrimination beyond 'conduct [that] is tangible (like hiring or firing) ... to encompass all

allegations that a plaintiff is treated differently based on protected status." Kerman-Mastour, 814

F. Supp. 2d 355, 366 (S.D.N.Y. 2011) Additionally, "Courts must analyze NYCHRL claims

separately and independently from any federal and state law claims, construing the

NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a

construction is reasonably possible." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d

102, 109 (2d Cir. 2013)) (internal quotation marks omitted).

    Defendants' reliance on Williams v. NYC Housing Auth., 61 A.D.3d 62, 78 (1st Dep't

2009) to support their hostile work-environment argument is unavailing.  (MTD at p. 11)

Defendants offer a misrepresentation of the holding in Williams, stating "Plaintiff must show that

the acts complained of are more than 'petty slights and trivial inconveniences.' Id. at 80.  This

is not accurate – the burden is not on the Plaintiff.  Instead, Williams states "defendants can still

avoid liability if they prove that the conduct complained of consists of nothing more than what a

reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"

Indeed, Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d Cir. 2010), cited in Defendants'

MTD held that the NYCHRL "does not require the same severity or pervasiveness that federal law

requires" for a hostile work environment claim. (See MTD at 11)

    Plaintiffs reliance another summary judgment motion decision of Heba v. New York State

Division of Parole, 537 F.Supp.2d 457, 468 (E.D.N.Y. 2007) is likewise unavailing.  (See Opp at

12).  Not only was this also a summary judgment case, but the Court based it's reasoning based on a

finding through an evaluation of the evidence that "the context of the [] [parties' relationship and . .

. the context of the arguments, the comments are more reflective of the growing antagonism

between former friends, rather than discriminatory animus." (See MTD at p. 11 citing Heba, 537

F.Supp.2d 457, 468 (E.D.N.Y. 2007) Although the basis for the court's finding is not apparent from the parenthetical Defendants provided in the MTD, which states "supervisor's angry outbursts and use of profanity did not constitute an environment of pervasive hostility and abuse."

### B. *Plaintiff Satisfied the Pleading Requirements for a Retaliation Claims*

Defendants' arguments challenging the pleading of Plaintiff's discrimination claims premised on summary judgment motions and post-trial motions seemed far-reaching – because they are – but Defendants' arguments against the retaliation claims go even further. Defendants repeatedly demand (at the pleading stage) that Plaintiff: (i) establish his claims by a "preponderance of the evidence" (MTD at p. 13); (ii) provide "proof" that he reported potentially improper salary activity (MTD at p. 13); and (iii) provide "proof" of the exact date he made those reports (MTD at p. 14). Defendants go on to then challenge the veracity of the statements, claiming the allegations are baseless and particularly dispute that Plaintiff reported concerns regarding questionable salary activity and racial discrimination, referring to his reporting as, among other things, "unsubstantiated." (MTD at pp. 14, 15) Defendants' challenge to the veracity of the allegations is remarkable not only because such a challenge is wholly inappropriate for a Rule 12(b)(6) motion, but because as set forth in Paragraph 57 of the Complaint, Melick and Porter – the same counsel on Defendants' MTD – "admitted that Plaintiff was terminated for reporting potential wrongdoing."[15] (Compl. ¶ 57; see also Id. ¶ 3)

---

[15] Complaint Paragraph 57 reads:

> Astoundingly, Defendants subsequently admitted that Plaintiff was terminated for reporting potential wrongdoing, commonly referred to as "Whistleblowing." That is, in an almost surreal fashion, through their counsel, Melick and Porter, and otherwise Defendants admitted that Plaintiff's dismissal was a retaliatory act done in response to his reporting concerns about potential misconduct and wrongdoing. Defendants thereby expressly admitted that their conduct violated and was in direct contradiction to, inter alia, the protections afforded to Mr. Lewis under: 42 U.S.C. 1983; 42 U.S.C. 1981; Federal and State Constitutional provisions including the First Amendment; Title VII; the New York City Human Rights Law; and the NYS Human Rights Law. Defendants' conduct also violated RIOC's own claimed policy of affording "whistleblowers" protection against adverse employment action as well as the NYS Public Officers Law Section that mandates the same protections be afforded employees who report potential misconduct. Defendants' apparent comfort with admitting that they violated a slew of Constitutional and statutory civil rights protections exemplifies the

17

Defendants' inappropriate challenge to the pleadings does not even stop there, opting to allege their own facts to claim that Plaintiff should have "reported his concerns through any of the established channels at RIOC, such as with human resources, or by making an internal complaint of discrimination pursuant to established RIOC policies and procedures regarding same." (MTD at 14)

Surprisingly, Defendants finally cite a decision on a Rule 12(b)(6) motion to dismiss, Mandavia v. Columbia Univ., 912 F.Supp.2d 119 (S.D.N.Y. 2012).  (MTD at p. 15) Unsurprisingly, Defendants cite the case merely for the use of yet another irrelevant soundbite. Id. Defendants omit the Mandavia court's holding regarding the pleading requirements and appropriate standard of review for an employment discrimination or retaliation Complaint, which specifically do not include an onus on Plaintiff to establish a prima facie case at the pleading stage. Mandavia., 912 F.Supp.2d at 126.  The Court in Mandavia held:

> In suits "alleging employment discrimination or retaliation," a plaintiff is "not required to plead facts sufficient to establish a prima facie case." Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010) [**17] (Lynch, J.) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)). "Rather, the ordinary rules for assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 8(a)'s notice pleading standard applies . . . [and] requires only a short and plain statement of the claim with sufficient factual heft to sho[w] that the pleader is entitled to relief." Id. at 512.

Mandavia., 912 F.Supp.2d at 126; See also Vega v. Hempstead Union Free School Dist., 801 F.3d 72 (2d Cir. 2015) (reversing dismissal and holding that for a retaliation claim to survive a motion to dismiss, a plaintiff need only "plausibly allege that: (1) defendants discriminated -- or took an adverse employment action -- against him, (2) 'because' he has opposed any unlawful employment practice").

---

manner in which certain Defendants conducted themselves with an air of impunity during Defendant Indelicato's self-described reign as dictator. (Cmplt. at ¶ 57; see also Complt at ¶ 3)

## POINT III

### THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS FOR PLAINTIFF'S CLAIMS AGAINST THE OFFICER INDIVIDUAL DEFENDANTS AND THE BOARD INDIVIDUAL DEFENDANT

Defendants devote significant part of their Motion arguing that claims against the Individual Defendants should be dismissed because of a purported lack of personal involvement and intent. Defendants' efforts are unavailing because, among other reasons, the necessary personal involvement and intent required at the pleading stage is more than adequately satisfied. (MTD at pp. 15 -20) (See Compl. ¶¶ 47, 52, 53, 60, 63, 71, 72, 73 75, 78, 79, 82, 83-87 91, 93, 95, 96, 97, 100, 101, 113 to 116, 119.)

> The Second Circuit held that:
>
> The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.
>
> As set forth in Iqbal v. Hasty, 490 F.3d 143,152 (2d Cir. 2007) cert. granted *sub nom*

Ashcroft v. Iqbal, 128 S. Ct. 2931 (2008). Additionally, although pled in the Complaint, intent is not required to establish individual liability.  Liability on an individual in a supervisory position "may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act.") Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

The Complaint sufficiently pleads personal involvement against each of the Defendants including the Director Defendants who, *inter alia*, failed to take corrective action. (See Compl. at ¶¶ 47, 52, 53, 113 to 116, 119.)  Case decisions relied upon by Defendants in their own memo of law confirm as much.  Specifically, Littlejohn vs. City of New York, 795 F.3d 297, 314 (2d Cir. 2015) (MTD at p. 3, FN 1) states that "personal involvement under §§ 1981 and 1983  can be

established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Accordingly, any single one of these five prongs constitute "personal involvement," and at minimum four of the five have been sufficiently plead in the Complaint. For Defendants to completely ignore these factors while arguing for dismissal defies credulity. Even under the more exacting standard of summary judgment motion decisions that Defendants' Motion primarily relies upon, courts apply these factors and deny defendants' requests for dismissal based upon a claimed lack of personal involvement. For example, in Johnson v. Newburgh Enlarged School Dist., 239 F. 3d 246 (2nd Cir. 2001), the Second Circuit held that a triable issue of fact existed because "a jury could find the Supervisors personally involved in the unconstitutional deprivation on the basis that they were either grossly negligent in supervising [a co-defendant] or that they exhibited deliberate indifference to the [plaintiff's] rights by failing to act on information that unconstitutional acts were occurring."

Defendants attempt to dismiss the aiding and abetting claims is also misplaced. Indeed, the aider and abettor liability can be extended to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of the alleged discriminatory conduct. Dillon v. Ned Mgmt., No. 13-CV-2622, 2015 WL 427921 (E.D.N.Y. Feb. 2, 2015) (same).[16] Here, there can be no question that the Director Defendant inaction is grounds

---

[16] Furthermore, a case cited in Defendants' MTD recognizes aiding and abetting liability may be present where a defendant's "inaction aided and abetted [a] termination. Hargett v. Metropolitan Transit Authority, 552 F.Supp.2d 393, 408 (S.D.N.Y. 2008) (MTD at 22) ("plaintiff alleges only that the defendants failed to take an action with respect to his

for aider and abettor liability, as is the discriminatory conduct of Walton and McDade.  (Compl. at ¶¶ 60, 63, 79, 82, 97, 100, 101) (Walton & McDade)  (Compl. at ¶¶ 47, 52, 53, 113 to 116, 119) (Director Defendants)[17]

## POINT IV

**PLAINTIFF'S CAUSES OF ACTIONS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES MUST STAND BECAUSE, *INTER ALIA* DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Defendants, apparently not content with the attempts in their Motion directed at the pleadings to hold Plaintiff to the standards of review for summary judgment motions and post-trial motions, questioning the veracity of Plaintiff's allegations, requiring Plaintiff to, among other things, provide "proof" of his allegations, and submitting Defendants own supplemental facts, Defendants now ask the Court to apply a new "heightened pleading requirement" to Plaintiff's claim.  (MTD at p. 20) Notwithstanding the wealth of Second Circuit authority regarding qualified immunity, Defendants cite a 1990 Fifth Circuit summary judgment case and claim that a "heightened pleading standard is imposed upon the plaintiff, requiring that the complaint state specific facts sufficient to overcome the qualified immunity defense." (MTD at 20) (citing Nieto v. San Perlita Independent School Dist., 894 F.2d 174 (5th Cir. 1990)). This 1990 Fifth Circuit decision has never been acknowledged in the Second Circuit for that proposition. Neither has the Second Circuit recognized the proposition that a plaintiff's pleading should be held to a higher standard in anticipation of defendants' potential qualified immunity defense.

Defendants then continue their attempts to avoid relevant Second Circuit authority by citing to a 1996 Minnesota State Court of Appeals summary judgment decision in a futile effort to find

---

complaints, without alleging any facts tending to suggest that they were actually required to do so. . .or that their inaction aided and abetted his termination.")

[17] Defendants' assertion that Section 1981 only applies to race discrimination and therefore Plaintiff's gender discrimination claims must be dismissed is unavailing and fails as do their other arguments in Point III of the MTD. (MTD at p. 15)

support their ill-fated argument. (MTD at 21 (citing <u>Goonewardena v. University of Minnesota,</u> 1996 WL 523797 (Minn.App. Sept. 17, 1996)) Finally, to round things off, Defendants conclude their argument by citing to an Eleventh Circuit decision, but omitting any reference to the 11th Circuit in the case citation. (MTD at p. 21, citing "<u>GJR Invs., Inc. v. County of Escambia, Florida,</u> 132 F.3d 1359 (1998)." Defendants' efforts to avoid Second Circuit authority regarding qualified immunity are unavailing. As stated by the Second Circuit in <u>Mandell v. County of Suffolk</u>, 316 F. 3d 368 (2nd Cir 2003), cited in Plaintiffs' Motion, "retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact [and] [u]ntil that issue is resolved by a factfinder, therefore, the retaliation claim against defendant [] cannot be dismissed on qualified immunity grounds.'"[18] Defendants have provided zero dismissal authority to support their argument that qualified immunity protects them.

## POINT V

## PLAINTIFF PLED VIABLE CLAIMS FOR PUNITIVE DAMAGES WHICH SHOULD BE DETERMINED AT TRIAL

Defendants state that punitive damages may only be recovered against individual public employees in their individual capacities "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Munafo v. Metro. Trans. Auth.</u>, 2003 WL 21799913 at 22 (E.D.N.Y., Jan. 22. 2003). (MTD at 22). Tellingly, Defendants fail to offer a single case where punitive damages against individuals were dismissed. Indeed, the "reckless indifference to the federally protected rights of others" in the jury trial case cited by Defendants is precisely the type of

---

[18] <u>See also</u> <u>Caraccilo v. Village of Seneca Falls,</u> 582 F. Supp. 2d 390 (WDNY 2008) (rejecting Defendants sovereign immunity argument based on the contention that the individual Board members could not be held liable for a termination because it was the mayor's sole decision to terminate.) <u>See also</u> <u>Wallace v. Suffolk County Police Dep't,</u> 396 F. Supp. 2d 251(EDNY 2015) (denying qualified immunity where Plaintiff has sufficiently alleged conduct by the Individual Defendants that, if proven true, would constitute a violation of his well-established First Amendment rights.)

reprehensible conduct Defendants engaged in here and warrant punitive damages.  Contrary to

Defendants position, racial discrimination and retaliation are often subject to punitive damages See

Swinton v. Potomac Corp., 270 F.3d 794, 817-818 (9th Cir. 2001), cert. denied, 535 U.S. 1018, 122

S.Ct. 1609, 152 L.Ed.2d 623 (2002) ( failure to address a pattern of racial slurs and harassment was

sufficiently reprehensible to support a $1 million punitive damage award); Zhang v. Am. Gem

Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003) ($2.6 million punitive damages award was not

excessive where plaintiff was excluded from management meetings, terminated and

then denied a severance package given to white employees)  Johnson-Klein v. California State

Univ., Fresno, No. 05CECG02645 (Cal. Super. Ct. Dec. 6, 2007). ($19.1 million in damages where

employer retaliated when plaintiff complained about discrimination.); Quinlan v. Curtiss-Wright

Corp., No. L-8976-03 (N.J. Super. Ct. Feb. 13, 2007) (a jury in New Jersey awarded over $9 million

to a female human resource professional who proved she was denied a promotion because of her

gender and later terminated in retaliation for bringing a discrimination lawsuit); Quinby v. WestLB

AG, No. 04-cv-07406 (S.D.N.Y. Nov. 2007) ($2.54 million award even though jury found employer

not liable on discrimination claim; instead, the jury awarded damages on the plaintiff's retaliation

claim); Hunter v. Allis-Chalmers, 797 F.2d 1417, 1425, 41 EPD Par. 36,417 (7th Cir. 1986)

(punitive damages warranted where the defendant had deliberately fired a worker for making well-

founded complaints about persistent acts of racial harassment).

## POINT VI
### PLAINTIFF'S CLAIMS FOR NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING SHOULD BE DISMISSED AS TO RIOC AND THE BOARD INDIVIDUAL DEFENDANTS

Notwithstanding Defendants' misleading citation of case decisions, Plaintiff has adequately

pled his claims for negligent hiring, screening, retention, supervision and training.  Defendants'

argument attempting to hide behind sovereign immunity is merely a bootstrapping of their

sovereign immunity defense and fails with the sovereign immunity defense. (MTD at p. 22)

23

Second, the cases Defendants cite (MTD at p. 22) for the proposition that Board Individual Defendants are not employers do no support Defendants' position in the least. (MTD p. 22 at first full paragraph.) Those non-binding cases with no value as precedent are summary judgement motion decisions that for the most part stand for the proposition that under certain circumstances, and under certain statutory provisions a "Board" either is not a suable entity because it is not a being, incorporated etc. or does not fall within the statutory definition of employer for that particular statute. These cases have nothing to do with whether an individual board member may be sued for the purposes of the negligence claims Defendants challenge in Point VI of their MTD.

Additionally, White v. Pacifica, 973 F.Supp.2d at 375 cited by Defendants squarely contradicts Defendants position regarding who or what qualifies as an "employer" On the very next page after the page cited by Defendants. The Court in White held:

> Under the NYSHRL, [a]n individual qualifies as an "employer" when that individual has an ownership interest in the relevant organization or the "power to do more than carry out personnel decisions made by others. To determine whether a defendant is an "employer" within the meaning of the NYSHRL, the Court examines whether the alleged employer: (1) had the power to hire employees; (2) made the payment of salary or wages to the employee; (3) had the power of dismissal over the employee; and (4) had the power to control the employee's conduct. (internal quotation references and punctuation removed)

Finally, Defendants' argument that an employee acting within the scope of his employment combined with respondeant superior exclude claims of negligent hiring and retention completely ignores that claims maybe pled in the alternative. Because alternative theories of liability may be alleged in a Complaint, Defendants' theory (MTD p. 23 second paragraph) is a non-starter.[19]

---

[19] In addition, as recognized in the Jones decision cited in Plaintiffs own Motion, in Colon v. Coughlin, the Second Circuit held that: The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights by failing to act on information indicating that unconstitutional acts were occurring. 58 F.3d 865, 873 (2d Cir. 1995). Here the Directors Defendants are alleged to have violated the second, third, fourth and fifth prongs here, each of which standing along, would permit these claims to proceed. (See Cmplt at ¶¶ 47, 52, 53, 113 to 116, 119.)

<u>POINT VII</u>

**SHOULD THE COURT GRANT ANY PART OF DEFENDANTS' MOTION AND DISMISS ANY CAUSE OF ACTION OR DEFENDANT, OR FIND THAT SUBJECT MATTER JURISDICTION IS LACKING, PLAINTIFF RESPECTFULLY SUBMITS THAT ANY SUCH DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO RE-PLEAD**

Prior to filing the instant Motion, Defendants filed a 3-page pre-motion letter, listing basis such as the Complaint fails to plead sufficient facts for all claims and notifying the Court that it may later come up with additional motion basis. Defendants were granted permission to file the MTD without a pre-motion conference. Because Defendants pre-motion letter included broad-sweeping and vague motion basis and notified the Court and Plaintiff that Defendants may raise even additional basis not specified in their pre-motion letter, any potential efficiency benefit that could have been had by amending the Complaint prior to Defendants filing their MTD was lost. Plaintiff is able to amend the Complaint with additional factual allegations, which he respectfully submits will cure any potential pleading omission with regard to his claims and Defendants' defenses, including the sovereign immunity defenses and qualified immunity. Accordingly, should the Court grant any part of Defendants' motion and dismiss any cause of action or Defendant, or find that subject matter jurisdiction is lacking, Plaintiff respectfully submits that any such dismissal should be without prejudice and with leave to re-plead.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants Motion to Dismiss the Complaint in its entirety, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 12, 2016

                                        Respectfully submitted,
                                        *Attorney for Plaintiff*

                            By: ____/s/_____.
                                 Anthony Rotondi
                                 5 Columbus Circle, Suite 800
                                 New York, NY 10019
                                 Tel: 212-709-8340
                                 ajr@ajrotondi.com

Tab 1

1

DAATJONA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ANTHONY JONAS,

4              Plaintiff,

5         v.                          13 CV 2226 (JSR)

6   THE ROOSEVELT ISLAND OPERATING
    CORPORATION, et al.,
7
             Defendants.
8
    ------------------------------x
9                                     New York, N.Y.
                                      October 10, 2013
10                                    5:00 p.m.

11  Before:

12             HON. JED S. RAKOFF,

13                                    District Judge

14                     APPEARANCES

15  LAW OFFICE OF MICHAEL LAMONSOFF
         Attorneys for Plaintiff
16  BY:  RYAN LAWLOR

17  NEW YORK STATE ATTORNEY GENERAL'S OFFICE
         Attorneys for Defendants Roosevelt Island, Yee and
18  Laszczych
    BY:  JAMES COONEY
19
    DAVIS & FERBER
20       Attorneys for Defendants Torrens, Flaherty, Ankomah and
    Hernandez
21  BY:  IAN SACK

22

23

24

25

Case 1:16-cv-03071-ALC-SN   Document 72-1   Filed 09/13/16   Page 3 of 33
Case 1:16-cv-03071-ALC   Document 59-1   Filed 08/04/16   Page 3 of 32

2

DAATJONA

1          (In open court, case called)

2          MR. LAWLOR:  For plaintiff, Ryan Lawlor with Michael

3    Lamonsoff's office.

4          MR. COONEY:  For defendants Roosevelt Island Operating

5    Corporation and Roosevelt Island Public Safety Department, as

6    well as Lieutenant Yee and Detective Laszczych, James Cooney,

7    Assistant Attorney General, New York State Attorney General's

8    Office.

9          MR. SACK:  For defendants Torrens, Hernandez, Flaherty

10   and Ankamah, Ian Sack from Davis & Ferber.  Good afternoon.

11         THE COURT:  Good afternoon.

12         We're here on a motion to dismiss by the individuals

13   and entities represented by the state, and I believe plaintiff

14   agrees that the claims against the Roosevelt Island Public

15   Safety Department should be dismissed.  Yes?

16         MR. LAWLOR:  That's correct, your Honor.

17         THE COURT:  Very good.  Now with regard to the claims

18   against defendants -- well, I'm not is quite sure how this is

19   pronounced, L-A-S-Z-C-Z-Y-C-H.

20         MR. COONEY:  Laszczych.

21         THE COURT:  Laszczych, of course, and Yee, Y-E-E, in

22   their personal capacities, I think, if I haven't missed

23   something, the only allegation made against them is as part of

24   a catch-all in paragraph 38, "At no time did any of the other

25   defendants take steps to intervene in, prevent or otherwise

3

DAATJONA

1   limit misconduct engaged in by defendants Ralph Torrens and

2   Raul Hernandez against plaintiff."

3       So is there anything else that you, if given the

4   opportunity to amend, would allege against those two

5   defendants?

6       MR. LAWLOR:  Your Honor, the names were provided to us

7   by counsel.  I put that in the declaration, I think it's my

8   Exhibit C.  As they are higher officers than just the regular

9   peace officers, the mother of the victim here, Ms. Vega,

10  indicated there were officers at the hospital when Mr. Jones

11  was still chained to the hospital bed.  I didn't want to, under

12  Rule 11, make that allegation if it was going to be unfounded,

13  but if the discovery could proceed, I would think that that

14  might be --

15      THE COURT:  This is, of course, the classic chicken

16  and egg problem.  Under federal law you need to make out at the

17  pleading stage a plausible claim.  And of course every

18  plaintiff's counsel says, with a certain common sense, well, I

19  need discovery, particularly as to the more remote kind of

20  defendants, and defense counsel says, with equal substance, you

21  shouldn't be able to sue someone if you don't already have a

22  plausible claim against them.  And 50 years ago the law -- the

23  federal law resolved that dilemma in the plaintiff's favor and

24  now resolves it in defendant's favor.  So there we are.

25      So I'm inclined to dismiss those claims unless you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

DAATJONA

1   tell me you have something more.

2        MR. LAWLOR:  Just the fact that those names were

3   provided by the defendant as people involved in this incident.

4        MR. COONEY:  If I may, your Honor, to clarify, I did

5   provide on May 7, 2013 this letter that we're talking about.

6   What's interesting is actually the names I provided were

7   Detective Laszczych, Lieutenant Yee, and then Sergeant

8   Hernandez, Officer Torrens, who is already in the first

9   complaint, Officer Flaherty, Officer Ankomah, and then Officer

10  Michael.

11        In the amended complaint, plaintiff was able to or did

12  actually make, I think, plausible claims matching up actual

13  alleged violative conduct with Hernandez, Flaherty, and Ankomah

14  which were, again, newly named as provided by me in this

15  letter.

16        THE COURT:  So the point is he wasn't able to do it as

17  to the others.  So I am going to dismiss with prejudice the

18  claims against those two in their personal capacities.

19        So now we get to the real heart of the argument, which

20  is the claims against the Roosevelt Island Operating

21  Corporation as well as the two other -- the two state

22  representatives being sued in their official capacities.  I'm

23  not stating this as well as I should, but essentially the

24  question is the sovereign immunity question.  So let me hear

25  first from defense counsel, then from plaintiff's counsel, and

5

DAATJONA

1    then on rebuttal from defense counsel.

2         MR. COONEY: Thank you, your Honor.

3         It's very well settled that the State of New York, its

4    entities and its employees in their official capacities, could

5    not be sued in federal court for monetary damages.

6         Now with RIOC and the case I cite, which is *Chafetz v.*

7    *Roosevelt Island* --

8         THE COURT: So if I accept that case, you win. But

9    I'm not required to accept that case. It's a case by Judge

10   Buchwald, who I greatly respect, but she's a judge at the same

11   level I am. So I guess the question is why should I go down

12   that road?

13        MR. COONEY: This case, the *Chafetz* case, is actually

14   an employment discrimination case brought by a former high

15   ranking RIOC employee/official. It's on all fours to this case

16   for the following reasons --

17        THE COURT: To the issue that we're concerned with on

18   this part of the argument.

19        MR. COONEY: Exactly. When they looked at the factors

20   as given by the Second Circuit, I believe that all but two of

21   the factors point to RIOC being an arm of the state, and

22   therefore protected by sovereign immunity protections.

23        The key here is that -- and they mention this on page

24   5 of the printouts, but it's actually between 13 and 14: The

25   parties agree -- I'm quoting here -- that the state is not

6

DAATJONA

1    obligated to satisfy RIOC's corporate debts -- then they quote

2    the RIOC enabling statute -- such as payroll and benefit

3    obligations, but is obligated to indemnify RIOC and its

4    employees against liabilities, claims or judgments arising out

5    of development, management, and operation of Roosevelt Island,

6    unquote.

7         That's precisely what is going on here.  These are

8    employees, the public safety officers, who are entitled to

9    representation by my office through New York State Public

10   Officers Law, Section 17, and if they are able to meet -- if

11   they take a hit or judgment, they are indemnified.  That comes

12   out of the state coffers.

13        In fact, this opinion goes, quote, the fact the State

14   Attorney General's Office is representing the defendant in this

15   action only lends further support to our conclusion, unquote,

16   that this is considered the state or an arm of the state.  So

17   although there is no circuit level precedent that RIOC is an

18   arm of the state, I believe these factors were fully decided

19   correctly in the *Chafetz* decision and should be followed here.

20        Thank you, your Honor.

21        THE COURT:  Thank you.

22        Let me hear from plaintiff's counsel.

23        MR. LAWLOR:  Thank you, your Honor.

24        As I point out in the brief, *Archer*, a case also at

25   the same level as the district court level, allowed the case to

7

DAATJONA

1  proceed against RIOC.

2  THE COURT:  And actually I am impressed that both of

3  you found, since neither of these were reported in the Fed

4  Supp., that you picked them up.  But in *Archer* the issue was

5  never really addressed, right?

6  MR. LAWLOR:  That's why --

7  THE COURT:  You're saying it's there by implication

8  because it's a jurisdictional or quasi jurisdictional argument,

9  but still there's no indication it was even brought to the

10  judge's attention.  Now he has an obligation ultimately

11  himself, but that doesn't mean he picked it up.  It's a bit

12  speculative is my point.

13  MR. LAWLOR:  I agree.  The FRCP 12(h)(3) would have

14  been where, I believe, he would have dismissed it for lack of

15  jurisdiction.

16  Also the *Hess* case, which counsel I don't believe

17  mentioned, but it's the same thing about where is the money

18  coming from.  *Chafetz* was 13 years ago.  If that is the same

19  circumstance now, I don't think I can disagree that that would

20  be -- it would implicate the state's coffers, that's an arm of

21  the state, and the 11th Amendment bars it from being brought

22  here.  At the time this motion was made there was no indication

23  that that is the case, it didn't have an applicable insurance

24  contract or something of the sort that would prevent the state

25  purse from being implicated.

8

DAATJONA

1    THE COURT: Well, thank you very much. Both of you
2    actually distilled the whole issue very, very nicely.
3    I am going to grant the motion, although I agree with
4    plaintiff's counsel that the issue is not totally free from
5    doubt, but on the whole I think Judge Buchwald's opinion is
6    persuasive. I will write a short opinion so you will have
7    something there for the purpose of any appeal, and in the
8    meantime the case goes on and we already have the schedule set.
9    So is there anything else we need to take up today?
10    MR. LAWLOR: If I may, your Honor, with the dismissal
11    of RIOC from this action, I'm not totally sure of the interplay
12    here, but could that be without prejudice as to a filing in
13    state court? The issue that I had --
14    THE COURT: Yes, it's with prejudice with respect to
15    the folks we talked about earlier before we got to this issue,
16    but here it's -- the wording "with prejudice" and "without
17    prejudice" is awkward in a jurisdictional thing. This Court
18    lacks jurisdiction over the claims we were just discussing.
19    That in no way prevents you from filing those claims in state
20    court.
21    MR. LAWLOR: Thank you, your Honor.
22    THE COURT: And I will make that clear in the written
23    opinion as well. Very good. Anything else?
24    Good, thank you so much.
25    MR. COONEY: Thank you, your Honor.

Tab 2



**ROOSEVELT ISLAND OPERATING CORPORATION**
of the State of New York
591 Main Street
Roosevelt Island, NY 10044
**(212) 832-4540**
**www.rioc.com**

George E. Pataki
*Governor of the State of New York*

Herbert E. Berman
*President / Chief Operating Officer*

Kenneth Leitner
*Vice President / General Counsel*

Mary Beth Labate, *Chair*
David Kraut
Nancy Reuss
Mark Ponton
John B. Mannix
H. Patrick Stewart
Deborah Beck
Alberteen Anderson
Michael Sinozaki
*Board of Directors*

## STATEMENT OF MARY BETH LABATE

## CHAIR, ROOSEVELT ISLAND BOARD OF DIRECTORS

### Public Hearing, New York State Assembly

### Committee on Corporations, Authorities and Commissions

### October 17, 2005

The Roosevelt Island Operating Corporation appreciates this opportunity to meet with the members of the Committee on Corporations, Authorities, and Commissions today to discuss what we believe to be a continuing success story.

Our 147 acre island in the East River is home to more than 9,000 New Yorkers living in more than 3,650 apartments spanning the economic range from low income to market rate housing. The island has six historic landmarks, several spacious parks, and sports facilities, an aerial tramway, numerous playgrounds, a waterfront promenade, and unparallel views of Manhattan.

i

Our progress may have hit a few bumps over the past 36 years, but it has been constant, and we remain committed to continuing that progress as we develop additional housing in Southtown and Octagon, a new park at Southpoint and continuing to maintain and upgrade our infrastructure.

We are meeting here today in response to a report issued by your committee about operations at Roosevelt Island, and specifically, the management of the island by the Roosevelt Island Operating Corporation, the public-benefit corporation created by the State Legislature in 1984.

We welcome the comments in the report commending the current administration's oversight of the island. Under President Herb Berman, we have achieved financial independence and self-sufficiency for the first time in our history. In 1995, RIOC had a $3.9 million fund balance. By the end of the 2004-2005 fiscal year, that fund balance had grown to $10 million, with no major outstanding liabilities.

It is because of that fiscal stability that we are able to embark on an ambitious, $21 million five year capital improvement program that calls for renovation of the exterior of the historic Blackwell House, replacement of two elevators – along with related electrical and

2

waterproofing work – at the Motorgate Parking facility, a complete overhaul of the tramway, the purchase of four new hybrid electric buses and a host of other activities.

We are concerned, however, at many of the comments in the report that we view as the result of misinformation given to the Committee by some members of the Roosevelt Island Residents Association. The vast majority of those comments are either inaccurate or refer to events that occurred long before the current administration took over, in some cases more than a decade ago. While we who currently administer island activities, or oversee them from our positions on the board of directors, had no role in those events, we feel compelled to explain to you point by point why they are inaccurate, unfair and flat out wrong.

In fact, some of the items that RIRA pointed to as criticisms are rather examples of excellent management that enhances our ability to better serve our residents, which of course is the reason we exist in the first place.

Let us take a few of those points one by one.

    1. RIRA alleges that $3.4 million in money from the Department of Environmental Protection was diverted from its intended use to build an ecological park near the Octagon tower site and instead used to cover the cost of infrastructure work at Southtown. This is incorrect. In fact, that money was a reimbursement for direct outlays

by RIOC resulting from damage to the seawall in 1994 during the on-going construction of the city's Third Water Tunnel. RIOC continues to work on Octagon Park, and expects to complete landscaping and other improvements using a combination of funds provided by the developer of the Octagon Apartments and ecological park, and RIOC's available fund balance, once the City's work on the Water Tunnel is completed.

2. The committee report asks whether RIOC has ignored the General Development Plan (GDP) as it applies to parks and other amenities. The first point to be made is that the GDP, a 5 page document first promulgated in 1969 and amended several times since, is not a rigid blueprint for specific developments going in specific locations but a series of broad criteria and a statement of philosophy. We remain committed to the principles underlying the GDP. But the various island residents' groups who have brought past legal actions have been repeatedly rebuffed in their attempt to read into the GDP a set of ironclad design restrictions that simply do not exist. The overall land map on the island reveals compliance with the vision of a complex intertwined series of residences, retail establishments, parks, public facilities and the like.

3. RIRA has raised questions about whether provisions requiring an 80/20 affordable housing requirement, in which 20 percent of units are set aside as affordable units, are being observed in the Southtown development. We are not aware of any tax abatement agreements between the developers and either the city or state that would require the

developer to set aside 20% of the units for affordable. We would note, however, that development of the Southtown buildings is guided by the commitment to affordability contained in the General Development Plan. In fact, the first two buildings being developed in Southtown are being fully occupied respectively by the staffs of Memorial Sloan Kettering and Cornell University Hospital, both tax exempt medical and/or entities which to the best of our knowledge are subsidizing the carrying costs for their staffs who will live there in order to make them affordable. The third building will be partly owned by Cornell.

4. RIRA has alleged that RIOC has grabbed the mortgage recording taxes from the State paid by the developer of the Southtown project. This is another misunderstanding, whether intentional or otherwise, of the fiscal arrangements under which development proceeds on the island. In fact what happened is that because RIOC is exempt from paying the mortgage recording tax, an arrangement was made with the developer for an equivalent fee to be paid into RIOC's accounts. This amounted to about $3.6 million combined for the first three buildings to be developed in Southtown. The alternative would have been for no mortgage recording tax to have been paid at all, which would have provided the developer with a windfall. Instead, the money was deposited into RIOC's accounts for use in managing and developing the island. It is one more example of how RIOC has used its financial expertise to maximize its ability to run the island on a fiscally self-sufficient basis without state or city subsidies that we received in the past. Rather than being criticized for this action, it is one more instance in which the current

administration should be commended for its creative – and I might add transparent –
financial management.

5. RIRA similarly complained, though without specifics, that something is amiss in the
alternative parking location planned in connection with the Octagon Project. While we
are not sure just what the complaint is, the situation is that the existing Motorgate Parking
facility capacity was expected to be inadequate once the Southtown project was
completed. Quite simply, the Motorgate could not accommodate both Southtown and the
Octagon. We needed future additional parking on the Island and we ensured that the
developers, not RIOC, paid for it. While the developer initially planned a number of
parking spots that would have complied with HUD mortgage insurance financing
requirements tied to the market value of apartments, the developer's eventual decision to
forego HUD financing allowed the development to go forward with fewer, though still
adequate, parking capacity.

6. The committee has asked about public participation in the decisions to revise
redevelopment plans at Octagon Park. The project was the subject of at least nine public
hearings and meetings at which developer Bruce Becker presented his plans and listened
to island residents' expressing their views. If you include additional meetings, there were
about 40 sessions at which the plans were discussed with residents and others. In
addition, Becker spoke informally with many residents at various RIOC board meetings,

and worked closely with the Roosevelt Island Tennis Association in upgrading those courts. Becker also offered several times to meet with the then-president of RIRA and the RIRA planning committee, but those invitations were never followed up on. It was a pleasure to attend the Octagon Topping Off Ceremony on September 21st and see so many Island residents there to celebrate this important project.

7. The committee asked whether raises given to former RIOC President Rob Ryan and his employee, Rob Antonek, were approved by the RIOC board. As you know, this was the focus of the so-called Hitsman Report, which was prepared for the RIOC board as these questions swirled around the former administration which was summarily removed by the board more than three years ago. In our discussions with committee staff, we explained that elements of the Hitsman report might fall under Federal and State confidentiality laws and that we had to take extreme caution to ensure that we did not expose the Corporation to liability by running afoul of those laws as they apply to current and former employees. At the request of the committee, we have had those sections redacted from the report and we made it available to you. As far as the board's view of Mr. Ryan's activities, suffice it say that our action removing him from office speaks for itself.

8. The committee questions whether all interested parties were given adequate and simultaneous notification of modifications to the Request for Qualifications for

development at Southtown. This question goes back several administrations to 1996. A check of our records reveals that on August 19, 1996, there was a pre-submission conference held that was mandatory to interested parties, and the agenda included an item entitled "Clarifications to the RFQ." Among the clarifications handed out to attendees was one which increased flexibility in the manner in which the batch concrete was to be brought to the site and processed, in essence replacing a requirement that a barge-based delivery system be used to a preference for such a system. Everyone got the same information at the same time, as best we can recreate from our records.

There are a number of errors in the committee report I feel compelled to point out, in order to ensure we are dealing with the same fact base. The report, for example, points to pages 47 and 48 of the General Development Plan which is only a five page document. For another, the report undervalues four of the Southtown buildings by a combined $7.5 million.

We are not in violation of the Open Meetings Law, as is alleged by RIRA, since we only go into executive session to discuss personnel matters and the details of on-going real estate transactions where we believe our position is best served by keeping our internal discussions confidential.

The report also raises RIRA's allegation that RIOC has used one-shot fiscal infusions to cover its operating expense, which is not correct. A one-shot is generally viewed as a non-recurring source of income spent within the current year, or the use of one-time income from capital sales for operating expenses. Neither of those are the case here.

7

In one specific case mentioned, the board collected 66 years of rental revenue from Southtown in a lump sum. Had we used that revenue for operating expenses, we might be subject to that kind of criticism. In fact we have dedicated 60 percent of that revenue to the long term reserve fund, 39 percent directly to the capital budget and just 1 percent to the operating budget. The result again has been RIOC's ability to launch its $21 million capital program, commit $4 million to preserve and enhance open space on Southpoint and create a reserve fund conservatively projected to be $7.8 million.

Assemblymen Brodsky and Grannis have been critical in the past of actions by the state government in ending operating subsidies that had been used during previous administrations to balance our books. But any unbiased review of RIOC's finances over the past decade would reveal that RIOC has in fact used the subsidy cutoff as an opportunity to get our own house in order, and the result has been a self-sufficient administration that is better able to plan for the future for the betterment of our residents.

Rather than being critical of RIOC's fiscal management, it would seem we should be commended for setting an example that other authorities around the state should aspire to in terms of being fiscally self-sufficient.

8

We are here to answer any questions you might have about the points I have touched upon, or any other points you might want to bring up. We are proud of our stewardship of this jewel in the East River that is home to thousands of middle class residents who are the heart and soul of our city and state.

We are always ready to listen to constructive criticism and eager to carry out recommendations that will enhance the quality of life for our residents and the transparency and effectiveness of our management.

Thank you very much.

Tab 3

**Andrew M. Cuomo**
*Governor*

**Charlene M. Indelicato**
*President/Chief Executive Officer*

**Donald D. Lewis**
*Vice President/General Counsel*

**Frances A. Walton**
*Vice President/Chief Financial Officer*

**ROOSEVELT ISLAND**
**OPERATING CORPORATION**
of the State of New York



591 Main Street, Roosevelt Island, NY 10044
T: (212) 832-4540 • F: (212) 832-4582
rioc.ny.gov

**Board of Directors**
Darryl C. Towns, *Chairperson*
Fay Fryer Christian
Dr. Katherine Teets Grimm
David Kraut
Robert L. Megna
Howard Polivy
Michael Shinozaki
Margaret Smith

# THE ROOSEVELT ISLAND OPERATING CORPORATION
## Public Authority Annual Report

Fiscal Year Ended March 31, 2014

### Background

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan (GDP), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an aerial tramway, comprehensive garbage compacting system and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

### I. Mission Statement

Created by the State of New York as a public benefit corporation, it is the mission of the Roosevelt Island Operating Corporation to plan, design, develop, operate, maintain and manage Roosevelt Island.

### Public Benefit

The Corporation is a political subdivision of the State of New York and additional stakeholders include the City of New York, residents, students, developers and commercial operators, workers and visitors to Roosevelt Island (the "Island"). The Corporation's stakeholders benefit from the

**III. (ii) Grant and Subsidy Programs**

Included in "Other Expenses" are expenditures for public purpose grants totaling $275,000 per year for the years ended 2014 and 2013. The Roosevelt Island Youth Center was granted $175,000 each year to help fund operating expenses. The remaining grants of $100,000 are awarded to various Island-based not-for-profits that must apply each year and require Board approval.

**III. (iii) Operating and Financial Risks**

Roosevelt Island Operating Corporation is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Parking Operations; and other revenues to fully meet its operational expenses.   Roosevelt Island Operating Corporation neither borrows nor depends on State or City appropriations and thus is minimally exposed to market, interest rate, and economic risks.

The development agreement for Southtown buildings ("Buildings") seven (7) through nine (9) between Hudson Related Joint Venture ("Developer") and RIOC included a contingent de-designation (cancellation of project or portion of) fee of $2,438,400.   The agreement is collateralized by a Guaranty Letter of Credit issued by Deutsche Bank Trust Company, NA in the amount of $2,438,400 maturing on August 15, 2014, to be renewed annually.   The Building 7 Lease was closed on October 10, 2013 and construction is in progress. The Building 8 Lease Closing shall occur no later than 30 months after the Building 7 Lease Closing; and the Building 9 Lease Closing shall occur no later than 30 months after the Building 8 Lease Closing.   In the event that the Developer fails to close a Building lease in accordance with the foregoing schedule, except if due to RIOC, RIOC may draw the entire balance of the Guaranty Letter of Credit and apply same at its sole discretion, and in addition thereto, at its sole option, de-designate Developer for each such Building and for the remainder of the Building. RIOC believes that the development will occur based in part on the increased interest in the Island as a result of the multi-billion dollar Cornell Technion project on the Island

**III. (iv) Bond Ratings**

Roosevelt Island Operating Corporation does not issue bonds.

**III. (v) Long-term Liabilities**

Roosevelt Island Operating Corporation has no long-term liability except post employment benefits other than pension, which is described below under section III. (v)(c)

**III. (v)(a) Leases**

Roosevelt Island Operating Corporation has agreements with four housing companies operating on the Island to sublease commercial space occupied by the housing companies. Rent expense for the years ended March 31, 2014 and 2013 approximated $86,000 per year



**RIOC**

Roosevelt Island
Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, NY 10044
(212) 832-4540
rioc.ny.gov

Andrew M. Cuomo
*Governor*

Leslie Torres
*President*
*Chief Executive Officer*

Fernando Martinez
*Vice President*
*Operations*

Steven Chironis
*Vice President*
*Chief Financial Officer*

Board of Directors
*Darryl C. Towns*
*Chairperson*
*Fay Fryer Christian*
*Katherine Teets Grimm*
*Jonathan Kalkin*
*David Kraut*
*Robert L. Megna*
*Howard Polivy*
*Michael Shinozaki*
*Margaret Smith*

# THE ROOSEVELT ISLAND OPERATING CORPORATION
## Public Authority Annual Report
### Fiscal Year Ended March 31, 2012

## Background

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan (GDP), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an aerial tramway, comprehensive garbage compacting system and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

## I. Mission Statement

Created by the State of New York as a public benefit corporation, it is the mission of the Roosevelt Island Operating Corporation to plan, design, develop, operate, maintain and manage Roosevelt Island.

## Public Benefit

The Corporation is a political subdivision of the State of New York and additional stakeholders include the City of New York, residents, students, developers and commercial operators, workers and visitors to Roosevelt Island (the "Island"). The Corporation's stakeholders benefit from the development and preservation of properties and open spaces, as well as sharing in the economic growth of the Roosevelt Island community.

equivalents totaling $42,210,163 and other assets of $4,228,896. Liabilities are comprised of accounts payable of $457,249, deferred revenue of $30,437,919, other post-employment benefits of $2,046,344, and other liabilities totaling $517,404. Deferred revenue represents the net present value of ground rent revenue received for the Southtown and Octagon development projects that will be recognized over their respective lease terms. Of total net assets, $11,113,352 is available to be used to meet ongoing capital obligations. Additionally, $1,866,791 is available for ongoing operational expenses.

## STATEMENTS OF NET ASSETS

|  | | 2012 | | 2011 | % Change |
|---|---|---|---|---|---|
| Current and other assets | $ | 46,439,059 | $ | 48,103,655 | -3% |
| Capital assets, net | | 67,090,562 | | 66,395,699 | 1% |
| Total Assets | $ | 113,529,621 | $ | 114,499,354 | -1% |
| | | | | | |
| Liabilities | $ | 33,458,916 | $ | 33,737,618 | -1% |
| | | | | | |
| Net assets: | | | | | |
| Investment in capital assets | $ | 67,090,562 | $ | 66,395,699 | 1% |
| Restricted for capital projects | | 11,113,352 | | 13,743,612 | -19% |
| Unrestricted | | 1,866,791 | | 622,425 | 200% |
| Total net assets | $ | 80,070,705 | $ | 80,761,736 | -1% |

## III. (ii) Grant and Subsidy Programs

Roosevelt Island Operating Corporation provided public purpose grants totaling $275,000 per year for the years ended 2012 and 2011. The Roosevelt Island Youth Center was awarded $175,000 each year to help fund operating expenses. This is a contractual obligation between Roosevelt Island Operating Corporation and Roosevelt Landings which was agreed to as one of the terms of Roosevelt Landings Lease agreement (the Youth Center's Landlord) in exchange for free rent and utilities. The remaining grants of $100,000 are awarded to various Roosevelt Island based not-for-profits that must apply each year and require Board approval.

## III. (iii) Operating and Financial Risks

Roosevelt Island Operating Corporation is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Bus Operations; and other revenues to fully meet its operational expenses. Roosevelt Island Operating Corporation neither borrows nor depends on appropriations and thus is minimally exposed to market, interest rate, and economic risks.

For the long term, the development agreement for Southtown buildings five through nine between Hudson Related Joint Venture and RIOC included a contingent de-designation (cancellation of project or portion of) fee of $2,252,198. As of the date of this report, Southtown building five and six were completed within the agreed upon timeframe, and resulted in the pro-rata reduction of the de-designation fee to $1,420,800. The remaining Southtown buildings

**ROOSEVELT ISLAND**
**OPERATING CORPORATION**
of The State of New York



Andrew M. Cuomo

Charlene M. Indelicato
············································

Donald D. Lewis
·····················································

Frances A. Walton
···················································

**BOARD OF DIRECTORS**

# THE ROOSEVELT ISLAND OPERATING CORPORATION
## Public Authority Annual Report

### Fiscal Year Ended March 31, 2015

## Background

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan ("GDP"), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an Aerial Tramway, a comprehensive garbage compacting system, and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

## I. Mission Statement

Created by the State of New York as a public benefit corporation, it is the mission of the RIOC to plan, design, develop, operate, maintain and manage Roosevelt Island.

## Public Benefit

The Corporation is a political subdivision of the State of New York and additional stakeholders include the City of New York, residents, students, developers and commercial operators, workers and visitors to Roosevelt Island (the "Island"). The Corporation's stakeholders benefit from the

**III. (ii) Grant and Subsidy Programs**

Included in "Other Expenses" are expenditures for public purpose grants of $275,500 and $258,925. These funds were approved on April 10, 2014, and April 4, 2013, respectively for the fiscal years ended 2015 and 2014. The Roosevelt Island Youth Center was granted $175,000 each year to help fund operating expenses. The remaining grants were awarded to various Island-based not-for-profits upon evaluation of their applications and Board approval.

**III. (iii) Operating and Financial Risks**

RIOC is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Parking Operations; and other revenues to fully meet its operational expenses. RIOC neither borrows nor depends on State or City appropriations and thus is minimally exposed to market, interest rate, and economic risks.

The development agreement for Southtown buildings ("Buildings") seven (7) through nine (9) between Hudson Related Joint Venture ("Developer") and RIOC included a contingent de-designation (cancellation of project or portion of) fee of $2,438,400. The agreement is collateralized by a Guaranty Letter of Credit issued by Deutsche Bank Trust Company, NA in the amount of $2,438,400 maturing on August 15, 2015, to be renewed annually. The Building 7 Lease was closed on October 10, 2013 and construction is in progress. The Building 8 Lease Closing shall occur no later than 30 months after the Building 7 Lease Closing; and the Building 9 Lease Closing shall occur no later than 30 months after the Building 8 Lease Closing. In the event that the Developer fails to close a Building lease in accordance with the foregoing schedule, except if due to RIOC, RIOC may draw the entire balance of the Guaranty Letter of Credit and apply same at its sole discretion, and in addition thereto, at its sole option, de-designate Developer for each such Building and for the remainder of the Buildings. RIOC believes that the development will occur based in part on the increased interest in the Island as a result of the multi-billion dollar Cornell Technion project on the Island.

As set forth in Note 9(c) of the Notes to Financial Statements for March 31, 2015 and 2014, RIOC entered into a Revenue Allocation Agreement ("RAA") with Empire State Development ("ESD") for the repayment for the repayment of certain Accrued Operating Deficits and Public Facilities Debt amounting to $170,356,976 with a stated interest rate of 5.74%. In addition, there are other State Operating Subsidies and State Capital Investments that were received and may have to be repaid under the terms of the RAA. The RAA calls for revenues to be allocated in the following manner: (1) RIOC Operating Expenditures; (2) Satisfaction of UDC's Accrued Operating Deficit; (3) Satisfaction of UDC's Public Facilities Debt; (4) Satisfaction of other State Operating Subsidies, and (5) Satisfaction of other State Capital Investments.

**III. (iv) Bond Ratings**

RIOC does not issue bonds.

**III. (v) Long-term Liabilities**

RIOC has no long-term liability except post employment benefits other than pension, which is described in section III. (v)(c)

11



**NEW YORK** | **Roosevelt Island**
STATE OF | **Operating Corporation**
OPPORTUNITY.

**ANDREW M. CUOMO**
Governor

# Public Authority Annual Report

### Fiscal Year Ended March 31, 2016

## Background

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan ("GDP"), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an Aerial Tramway, a comprehensive garbage compacting system, and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

## I. Mission Statement

Created by the State of New York as a public benefit corporation, it is the mission of the RIOC to plan, design, develop, operate, maintain and manage Roosevelt Island.

## Public Benefit

The Corporation is a political subdivision of the State of New York and additional stakeholders include the City of New York, residents, students, developers and commercial operators, workers and visitors to Roosevelt Island (the "Island"). The Corporation's stakeholders benefit from the development, and preservation of properties and open spaces, as well as sharing in the economic growth of the Roosevelt Island community.



**NEW YORK** STATE OF OPPORTUNITY | **Roosevelt Island Operating Corporation**

ANDREW M. CUOMO
Governor

### III. (ii) Grant and Subsidy Programs

Included in "Other Expenses" are expenditures for public purpose grants of $218,000 and $275,500 for the years ended March 31, 2016 and 2015 respectively. The Roosevelt Island Youth Center was granted $175,000 each year to help fund operating expenses. The remaining grants were awarded to various Island-based not-for-profits upon evaluation of their applications and Board approval

### III. (iii) Operating and Financial Risks

RIOC is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Parking Operations; and other revenues to fully meet its operational expenses. RIOC neither borrows nor depends on State or City appropriations and thus is minimally exposed to market, interest rate, and economic risks.

The development agreement for Southtown buildings ("Buildings") seven (7) through nine (9) between Hudson Related Joint Venture ("Developer") and RIOC included a contingent de-designation (cancellation of project or portion of) fee of $2,438,400. The agreement is collateralized by a Guaranty Letter of Credit issued by Deutsche Bank Trust Company, NA in the amount of $2,438,400 maturing on August 15, 2016, to be renewed annually. The Building 7 Lease was closed on October 10, 2013 and construction was completed on September 21, 2015. The Building 8 Lease Closing shall occur no later than 30 months after the Building 7 Lease Closing; and the Building 9 Lease Closing shall occur no later than 30 months after the Building 8 Lease Closing. The Building 8 Lease was not closed by April, 10, 2016. In the event that the Developer fails to close a Building lease in accordance with the foregoing schedule, except if due to RIOC, RIOC may draw the entire balance of the Guaranty Letter of Credit and apply same at its sole discretion, and in addition thereto, at its sole option, de-designate Developer for each such Building and for the remainder of the Buildings. RIOC believes that the development will continue and has begun negotiations for Buildings 8 and 9.


As set forth in Note 9(c) of the Notes to Financial Statements for March 31, 2016 and 2015, RIOC entered into an agreement with ESD for the repayment of certain Public Facilities Debt and Accrued Operating Deficit amounting to $170,356,976 with a stated interest rate of 5.74%. ESD has acknowledged that there are significant projected future capital investments to be made by RIOC.

### III. (iv) Bond Ratings

RIOC does not issue bonds.



Roosevelt Island
Operating Corporation
of the State of New York
591 Main Street
Roosevelt Island, NY 10044
(212) 832-4540
rioc.ny.gov

Andrew M. Cuomo
Governor

Leslie Torres
President
Chief Executive Officer

Fernando Martinez
Vice President
Operations

Steven Chironis
Vice President
Chief Financial Officer

Board of Directors
Darryl C. Towns
Chairperson
Fay Fryer Christian
Katherine Teets Grimm
Jonathan Kalkin
David Kraut
Robert L. Magna
Howard Polivy
Michael Shinozaki
Margaret Smith

# THE ROOSEVELT ISLAND OPERATING CORPORATION
## Public Authority Annual Report
### Fiscal Year Ended March 31, 2011

## I. MISSION STATEMENT

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan (GDP), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an aerial tramway, comprehensive garbage compacting system and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

RIOC accomplishes its mission by:

Promoting the development of a mixed-use, residential community; now home to more than 13,000 residents

Servicing the growing community and developing and maintaining public facilities, public promenades, and commercial opportunities.

Ensuring the corporation is in compliance with its enabling legislation, corporate By-laws and guidelines, Public Authority laws, and applicable Federal, State, and City laws and rules, by evaluating and implementing efficient and effective policy and procedures.

accounts payable of $534,283, deferred revenue of $30,814,428, other post-employment benefits of $1,708,479, and other liabilities totaling $680,428. Deferred revenue represents the net present value of ground rent revenue received for the Southtown and Octagon development projects that will be recognized over their respective lease terms. Of total net assets, $13,743,612 is available to be used to meet ongoing capital obligations. Additionally, $622,425 is available for ongoing operational expenses

## STATEMENTS OF NET ASSETS

|                                 |    | 2011        |    | 2010        | % Change |
|---------------------------------|----|-------------|----|-------------|----------|
| Current and other assets        | $  | 48,103,655  | $  | 62,827,301  | -23%     |
| Capital assets, net             |    | 66,395,699  |    | 52,340,229  | 27%      |
| Total assets                    | $  | 114,499,354 | $  | 115,167,530 | -1%      |
|                                 |    |             |    |             |          |
| Total liabilities               | $  | 33,737,618  | $  | 33,703,534  | 0%       |
| Net assets:                     |    |             |    |             |          |
| Investment in capital assets    | $  | 66,395,699  | $  | 52,340,229  | 27%      |
| Restricted for capital projects |    | 13,743,612  |    | 28,884,694  | -52%     |
| Unrestricted                    |    | 622,425     |    | 239,073     | 160%     |
| Total net assets                | $  | 80,761,736  | $  | 81,463,996  | -1%      |

### III. (ii) Grant and Subsidy Programs

Roosevelt Island Operating Corporation provided public purpose grants totaling $275,000 per year for the years ended 2011 and 2010. The Roosevelt Island Youth Center was awarded $175,000 each year to help fund operating expenses. This is a contractual obligation between Roosevelt Island Operating Corporation and Roosevelt Landings which was agreed to as one of the terms of Roosevelt Landings Lease agreement (the Youth Center's Landlord) in exchange for free rent and utilities. The remaining grants of $100,000 are awarded to various Island based not-for-profits that must apply each year and require Board approval.

### III. (iii) Operating and Financial Risks

Roosevelt Island Operating Corporation is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Bus Operations; and other revenues to fully meet its operational expenses. Roosevelt Island Operating Corporation neither borrows nor depends on appropriations and thus is minimally exposed to market, interest rate, and economic risks.

For the long term, the development agreement for Southtown buildings five through nine between Hudson Related Joint Venture and RIOC included a contingent de-designation (cancellation of project or portion of) fee of $2,252,198. As of the date of this report, Southtown building five and six were completed within the agreed upon timeframe, and resulted in the pro-rata reduction of the de-designation fee to $1,420,800. The remaining Southtown buildings seven, eight and nine may not be developed before the determination date of December 31, 2012,

5

Andrew M. Cuomo
*Governor*

Charlene M. Indelicato
*President/Chief Executive Officer*

Donald D. Lewis
*Vice President/General Counsel*

Steven Chironis
*Vice President/Chief Financial Officer*



**Roosevelt Island Operating Corporation**
of the State of New York
591 Main Street, Roosevelt Island, NY 10044
T: (212) 832-4540 • F: (212) 832-4582
http://rioc.ny.gov

**Board of Directors**
Darryl C. Towns, *Chairperson*
Fay Fryer Christian
Dr. Katherine Teets Grimm
David Kraut
Robert L. Mogna
Howard Polivy
Michael Shinozaki
Margaret Smith

# THE ROOSEVELT ISLAND OPERATING CORPORATION
## Public Authority Annual Report

### Fiscal Year Ended March 31, 2013

## Background

The Roosevelt Island Operating Corporation of the State of New York ("RIOC") is a public benefit corporation and a political subdivision of the State of New York. RIOC was created by the New York State legislature, in 1984, to take responsibility, pursuant to a General Development Plan (GDP), for the development and operation of the 147 acres comprising the former Welfare Island, located in New York City's East River. RIOC assumed the role of the New York State Urban Development Corporation as lessee under a 99-year Master Lease (running until 2068) from the City of New York.

The GDP, which has been amended from time to time, provides for the development of housing, shops and community facilities for a mixed income, handicap accessible, residential neighborhood. As an island community, Roosevelt Island requires specialized operations and capital infrastructure maintenance such as an aerial tramway, comprehensive garbage compacting system and seawall improvements. RIOC supplements the very basic services provided by the City of New York, and provides specialized operations and capital improvements.

Pursuant to its enabling legislation, the RIOC Board of Directors is composed of nine members including the Commissioner of the New York State Division of Housing and Community Renewal, who serves as the chair; the New York State Director of the Budget; and seven public members nominated by the Governor of the State of New York with the advice and consent of the New York State Senate. Of the seven public members, two members are recommended by the Mayor of New York City, and five members must be residents.

## I. Mission Statement

Created by the State of New York as a public benefit corporation, it is the mission of the Roosevelt Island Operating Corporation to plan, design, develop, operate, maintain and manage Roosevelt Island.

## Public Benefit

The Corporation is a political subdivision of the State of New York and additional stakeholders include the City of New York, residents, students, developers and commercial operators, workers and visitors to Roosevelt Island (the "Island"). The Corporation's stakeholders benefit from the

On RIOC's statement of position at March 31, 2013, total assets of $114,038,559 exceeded total liabilities of $33,762,970 by $80,275,589 (total net position). Total assets are comprised of capital assets (e.g., buildings, machinery and equipment) totaling $68,724,541, cash and cash equivalents totaling $40,740,110 and other assets of $4,573,908. Liabilities comprised of accounts payable of $809,459, unearned revenues of $29,910,944, other post-employment benefits of $2,382,670, and other liabilities totaling $659,897. Unearned revenues represent the prepaid ground rent revenue received for the Southtown and Octagon development projects that will be recognized over their respective lease terms. Of total net position, $10,450,427 is available to be used to meet ongoing capital obligations. Additionally, $1,100,621 is available for ongoing operational expenses.

## STATEMENTS OF NET POSITION

|  | | 2013 | | 2012 | % Change |
|---|---|---|---|---|---|
| Current and other assets | $ | 45,314,018 | $ | 46,439,059 | -2% |
| Capital assets, net | | 68,724,541 | | 67,090,562 | 2% |
| **Total Assets** | $ | 114,038,559 | $ | 113,529,621 | 0% |
| Liabilities | $ | 33,762,970 | $ | 33,458,916 | 1% |
| Net position | | | | | |
| Investment in capital assets | $ | 68,724,541 | $ | 67,090,562 | 2% |
| Restricted for capital projects | | 10,450,427 | | 11,113,352 | -6% |
| Unrestricted | | 1,100,621 | | 1,866,791 | -41% |
| Total net position | $ | 80,275,589 | $ | 80,070,705 | 0% |

### III. (ii) Grant and Subsidy Programs

Included in "Other Expenses" are expenditures for public purpose grants totaling $275,000 per year for the years ended 2013 and 2012. The Roosevelt Island Youth Center was granted $175,000 each year to help fund operating expenses. The remaining grants of $100,000 are awarded to various Island-based not-for-profits that must apply each year and require Board approval.

### III. (iii) Operating and Financial Risks

Roosevelt Island Operating Corporation is self-sustaining: it generates sufficient revenues from long term ground and commercial leases – residential fees, ground rent, commercial rent, and public safety fees; service fees from its Tramway and Bus Operations; and other revenues to fully meet its operational expenses. Roosevelt Island Operating Corporation neither borrows nor depends on appropriations and thus is minimally exposed to market, interest rate, and economic risks.

# EXHIBIT V

**TAB 1**

**From:** Anthony J. Rotondi <AJR@AJROTONDI.COM>
**Sent:** Friday, October 7, 2016 11:50 AM
**To:** 'Holly G. Rogers'
**Subject:** RE: Initial Disclosures


You have got to be kidding.  The disclosures were due 2 weeks after the CMC.  Are you able to exchange on Tuesday?


----Original Message-----
From: Holly G. Rogers [mailto:hrogers@melicklaw.com]
Sent: Thursday, October 6, 2016 10:34 PM
To: 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
Cc: Jeremy I. Stein <jstein@melicklaw.com>
Subject: RE: Initial Disclosures

Anthony:

We will  provide our initial disclosures by the end of next week.

Best regards,

Holly G. Rogers
Attorney
Melick & Porter, LLP
900 Main Street South
Southbury, CT 06488
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com
MA ~ RI ~ CT ~  NH ~ NY ~ CA

-----Original Message-----
From: Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
Sent: Thursday, October 06, 2016 5:38 PM
To: Holly G. Rogers
Subject: Initial Disclosures

Holly,

 We need to exchange our initial disclosures.  I suggest we do a simultaneous exchange by email. I am out of the office at the moment, but can do so either a few hours or tomorrow.  Please let me know your preference.

/AJR


Anthony J. Rotondi
5 Columbus Circle, Suite 800

New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
****************************************************
****************************************************
This email (and any attachments thereto) is intended only for use by the
addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited.
If you receive this email in error please immediately notify me at (212)
709-8340 and permanently delete the original email (and any copy of any
email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
****************************************************

**TAB 2**

| | |
|---|---|
| **From:** | anthony rotondi <ajr@ajrotondi.com> |
| **Sent:** | Tuesday, October 18, 2016 11:35 AM |
| **To:** | 'Holly G. Rogers' |
| **Subject:** | Re: Initial Disclosures & Notices of Deposition |

Still have not heard back from you. It does not bode well for the rest of discovery if I am forced to file a motion to compel just to get defendants to serve their initial disclosures.  We are now one month out from the CMC. It is just initial disclosures, not a trial notebook. Please advise of status ASAP.

On October 14, 2016, at 18:47, "Holly G. Rogers" <hrogers@melicklaw.com> wrote:

No, I'll touch base with you on Monday.

Holly G. Rogers
Attorney
Melick & Porter, LLP
900 Main Street South
Southbury, CT 06488
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com
MA ~ RI ~ CT ~  NH ~ NY ~ CA

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 14, 2016 5:58 PM
**To:** Holly G. Rogers
**Subject:** RE: Initial Disclosures & Notices of Deposition

Holly,

I have not heard back from you.  Are you prepared to either exchange or file the initial disclosures?

/AJR

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 14, 2016 1:57 PM
**To:** 'Holly G. Rogers' <hrogers@melicklaw.com>
**Subject:** RE: Initial Disclosures & Notices of Deposition

I checked with the ECF help desk and was told that you may file them if you would like to but there is no requirement to file. I'll do it either way.  Whatever you prefer is fine.

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Friday, October 14, 2016 1:37 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** RE: Initial Disclosures & Notices of Deposition

I believe they also get filed via ECF.

Holly G. Rogers
Attorney
**Melick & Porter, LLP**
900 Main Street South
Southbury, CT 06488
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 14, 2016 1:05 PM
**To:** Holly G. Rogers
**Subject:** RE: Initial Disclosures & Notices of Deposition

Seems like a sensible way to proceed.

---

**From:** Holly G. Rogers [mailto:hrogers@melicklaw.com]
**Sent:** Friday, October 14, 2016 1:00 PM
**To:** 'Anthony J. Rotondi' <AJR@AJROTONDI.COM>
**Subject:** RE: Initial Disclosures & Notices of Deposition

Anthony:

Regarding Initial Disclosures, are you still proposing that we do a mutual email exchange?

Holly G. Rogers
Attorney
**Melick & Porter, LLP**
900 Main Street South
Southbury, CT 06488
Main: (203) 596-0500
Fax: (203) 721-8532
hrogers@melicklaw.com
www.melicklaw.com

MA ~ RI ~ CT ~ NH ~ NY ~ CA

---

**From:** Anthony J. Rotondi [mailto:AJR@AJROTONDI.COM]
**Sent:** Friday, October 14, 2016 12:23 PM

**To:** Holly G. Rogers
**Subject:** Initial Disclosures & Notices of Deposition

Holly,

1. Attached is a courtesy copy of Plaintiff's Notice of Depositions faxed to your office earlier today.
2. Please confirm that you will be serving Defendants' Initial Disclosures today.

Thanks.

/AJR

**Anthony J. Rotondi**
5 Columbus Circle, Suite 800
New York, NY 10019
Tel: 212-709-8340
www.ajrotondi.com

****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
****************************************************
****************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 709-8340 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm and professional qualifications will be provided upon request.
****************************************************

**EXHIBIT W**

**ANTHONY J. ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
www.ajrotondi.com
(212) 709-8340

October 19, 2016

<u>VIA ECF & ELECTRONIC MAIL</u>
The Hon. Sarah Netburn.
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 430
New York, NY 10007

Re: *Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)(SN)*
<u>*Plaintiff's Motion to Preclude Defendants' Introduction of Documents or Witness*</u>
<u>*Testimony.*</u>

Dear Judge Netburn:

I represent Plaintiff, Mr. Donald Lewis, in the above-referenced action (the "Action") and fort he reasons set forth below submit this Letter Motion to Preclude Defendants' Introduction of Documents or Witness Testimony Based Upon Defendants' Refusal to Serve Initial Disclosures Under Federal Rule of Civil Procedure 26(a)(1).

Defendants have a long and well-documented history of engaging in frivolous conduct to delay Plaintiff's resolution of his claims – both before and after Plaintiff filed this Action. Plaintiff will spare the Court recitation of the entirety of Defendants' bad-faith conduct and instead Plaintiff (i) attaches as Tab 1 and Tab 2 hereto, a letters dated June 16, 2016 and August 4, 2016[1] (without attachments) respectively from Plaintiff's counsel to the Hon. Andrew L. Carter that detail just some of Defendants' questionable conduct; and (ii) attaches as Tab 3 hereto, Exhibit B to the Complaint[2] as further example of Defendants' misconduct, including Defendants' willingness to blatantly misrepresent facts to further their goal of delay.

One month ago, on September 20, 2016, Your Honor held a case management conference in this Action and issued a Case Management and Scheduling Order (attached as Tab 4 hereto). The parties Initial Disclosures were to be served within 14 days of the CMC. Since the Initial Disclosure due date, Plaintiff repeatedly attempted to have Defendants comply with their obligations to serve Initial Disclosures.[3] In response, Defendants repeatedly agreed to serve their

---

[1] Plaintiff submitted the August 4 letter in Opposition to Defendants' request to stay discovery but Defendants' conduct regarding delay was necessarily at issue. (Tab 2 *passim*.)

[2] The correspondence contained in Exhibit B (Tab 3 hereto) speaks volumes regarding the disingenuous nature of the positions Defendants have taken, but that correspondence does not reflect that weeks thereafter during a telephone conversation with the undersigned, Defense counsel, Ms. Holly Rogers, falsely asserted that Plaintiff had called off the mediation. Defense counsel made this statement in direct contradiction of the position in defense counsel's last email on the topic of mediation, in which Defendants called off the mediation expressly stating "My clients are no longer interested in mediation at this time." (Tab 3, Exhibit B to Complaint at page 1.)

[3] Plaintiff proposed a simultaneous email exchange or simultaneous ECF filing to avoid any potential advantage or prejudice regarding the timing of serving or viewing the adverse parties' disclosures. Having not received Defendants' Disclosures, Plaintiff filed his Disclosures today (giving Defendants a potential advantage) to avoid any potential argument by Defendants – no matter how nonsensical and specious that argument would be considering the clear record to the contrary – that Plaintiff has refused to serve his Disclosures.

1

disclosures, but then – without any explanation – failed to serve the disclosures as agreed. Ultimately, Defendants' counsel simply stopped responding to Plaintiff's communications by which Plaintiff requested the status of the Defendants' Disclosures. Attached as Tab 5 and Tab 6 are two email strings (over the course of weeks) between Plaintiff's counsel and Defendants' counsel reflecting those communications.

Although a party may amend its Initial Disclosures, in limited circumstances and within certain time limitations, that is not the case in this matter where Defendants blatantly disregarded their obligations to serve *any* Initial Disclosures. Therefore, Defendants herein have no Disclosures document to amend and have waived the opportunity to introduce documentary or witness evidence in in any summary judgment motion or trial of this matter. Accordingly, Plaintiff respectfully requests that the Court find that Defendants have failed to disclose any potential witnesses or documents upon which to base any potential defenses and therefore are precluded from submitting any such evidence in any summary judgment motion or trial of this Action.

To the extent that an in person or telephonic conference is required under the Court's Individual Practice Rule III A, Plaintiff respectfully submits that such conferral obligation has been satisfied and / or any further conferral among counsel would be futile. In that regard, Plaintiff submits for the Court's consideration, the following:

(i)     The attached email correspondence (Tabs 5 and 6) satisfies the conferral obligation;

(ii)    Any further conferral among counsel would be an exercise in futility because, *inter alia*, Defendants' counsel already breached agreements to serve Defendants' Disclosures by without explanation failing to serve the disclosures and ultimately failing to respond to email communications;

(iii)   Defendants' complete failure to serve *any* initial disclosure document is a failure in the most basic discovery obligation and not a complex issue such as an issue regarding the appropriate scope of complicated discovery requests that might necessitate negotiations among counsel;

(iv)    Defense counsel has a long and well-documented history of completely misrepresenting facts documented in writing, making any telephone discussion fodder for additional misrepresentations.[4]

Additionally, Plaintiff respectfully submits that Defendants' conduct warrants an award to Plaintiff of his attorney fees and costs incurred in both his efforts to have Defendants comply with their obligations and serve Initial Disclosures and the filing of this motion, either in the form of sanctions or under the Court's general powers. An award of attorney's fees is appropriate considering, *inter alia*, (i) Defendants' long and well-documented history of engaging in spurious delay tactics to avoid Plaintiff's resolution of his claims, which largely are directed at wasting the time of Plaintiff's counsel; and (ii) Defendants' blatant refusal to even attempt compliance with the most basic of discovery obligations.

For all the reasons set forth above, Plaintiff respectfully requests that the Court issue an order:

(i)     Precluding Defendants from introducing documentary evidence or witness testimony in any summary judgment motion or trial of this Action based on either (a)

---

[4] Misrepresentations include among others: (i) agreement regarding the terms of a proposed mediation and then breaching those terms claiming the agreed terms did not exist; (ii) falsely blaming Plaintiff for Defendant's purported need for an extension to respond to the Complaint based on a on a fictitious refusal to provide "affidavits of service"; (iii) altering agreed upon correspondence to the Court prior to filing in order to falsely blame Plaintiff for Defendants' purported need for an extension; and most egregiously (iv) falsely blaming the Honorable Andrew L. Carter for Defendants' purported need for additional extensions to respond to the Complaint.

Defendants' failure to disclose those documents and witnesses during discovery, (b) as a sanction for failing to serve Initial Disclosures within the prescribed time, or (c) as within the Court's general power to control its docket;

(ii)     Awarding Plaintiff his attorney fees and costs incurred both his efforts to have Defendants comply with their obligations to serve Initial Disclosures and incurred in the filing of this motion; and

(iii)    Such further relief as the Court deems appropriate.

Respectfully submitted,

/s/

Anthony J. Rotondi

Cc: Melick & Porter (via ECF)

3

**EXHIBIT X**

| NYSD_ECF_Pool@nysd.uscourts.gov | Activity in Case 1:16-cv-03071-ALC-SN Lewis v. Roosevelt Island Operating Corporation et al Rule 26 Disclosure | Wed 10/19/2016 4:44 PM |
|---|---|---|
| This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended. ***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record an... | | |
| NYSD_ECF_Pool@nysd.uscourts.gov | Activity in Case 1:16-cv-03071-ALC-SN Lewis v. Roosevelt Island Operating Corporation et al Letter | Wed 10/19/2016 3:10 PM |
| This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended. ***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record an... | | |

**EXHIBIT Y**

**ANTHONY J. ROTONDI**
5 Columbus Circle
New York, NY 10019
ajr@ajrotondi.com
www.ajrotondi.com
(212) 709-8340

December 28, 2016

VIA ECF
The Hon. Sarah Netburn.
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 430
New York, NY 10007

Re: *Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)(SN) Discovery*

Dear Judge Netburn:

I represent Plaintiff, Mr. Donald Lewis, in the above-referenced action and regret to inform the Court that notwithstanding Plaintiff's efforts to resolve discovery issues in good faith, Defendants continue to refuse to comply with even the most basic of discovery obligations making it abundantly clear that the Court's involvement is necessary for discovery to proceed in any organized manner. Initially, Plaintiff apologies for the tardy submission of this letter, and respectfully requests that the Court accept the submission nunc pro tunc to December 27.

In sum, for more than one year Defendants' entire strategy has been designed to delay and waste time at all costs including misconduct and essentially to "hide the ball" and obstruct Plaintiff. Certain relevant background and facts are detailed below:

**I.      Civil Case Management Plan.**

Plaintiff invested significant time negotiating a Joint Proposed Case Management Order ("CMO") and attempting to convince defense counsel, Holly Rogers of Melick & Porter, that in Plaintiff's counsel's opinion, an initial proposed discovery period in excess of 4 months would not be well-received.  Nonetheless, Plaintiff's efforts were wasted when after numerous discussions and exchanges of several drafts, the parties could not submit a joint proposed CMO because Defendants insisted on requesting between 5 ½ and 6 ½ months for fact discovery, while simultaneously unnecessarily restricting certain rights afforded to Plaintiff.

**II.      Initial Disclosures.**

On September 20, 2016, Your Honor held a Case Management Conference ("CMC") in the instant action.  Pursuant to FRCP the parties were to exchange initial after the CMC.  Nonetheless, Defendants repeatedly refused to provide their initial disclosures, and only did so after Plaintiff filed his Initial Disclosures and a Motion to Preclude, which was filed based on, among other reasons, Plaintiff's experience with defense counsel's delay tactics and with the near certainty that absent such motion, Defendants likely still would not have served their initial disclosures.[1]

---

[1] The Court issued its decision denying Plaintiff's Motion to Preclude while Plaintiff was finalizing a Reply that, among other things, would have established that Defendants Opposition to the Motion contained blatantly false statements designed to mislead the Court into finding in Defendants' favor.  Because the Order was issued before the Reply was finalized, Plaintiff opted to not trouble the Court with further submissions on the Motion.

### III.   Plaintiff's Discovery to Defendants All of Which Remain Outstanding and to Which Defendants Have Not Served a Single Response or Produced a Single Piece of Paper.

Since the Court's CMC, Plaintiff served, *inter alia*, the following:

- ➤ On October 10, 2016, Plaintiff served Requests for the Production of Documents to Defendant Roosevelt Island Operating Corporation ("RIOC") and all individually named Defendants.
- ➤ On October 14, 2016, Plaintiff served a Notice to Depose each individual Defendant in November and December 2016 and to depose the following current RIOC employees in December 2016: Mark Rothman; Gretchen Robinson; Karlene Jean; Erica Spencer-El; Lada Stasko; Arthur Eliav; and John McManus.[2]
- ➤ On October 19, Plaintiff served Defendant RIOC with Interrogatories.
- ➤ On October 20, Plaintiff served Defendant Smith with Requests for Admission. ("RFAs")
- ➤ On October 21, Plaintiff served Defendant Smith with Interrogatories.
- ➤ On October 23, Plaintiff served Defendant Grimm with Interrogatories and RFAs.
- ➤ On October 24, Plaintiff served Defendant Shinozaki with Interrogatories and RFAs.
- ➤ On October 29, Plaintiff served Defendant Polivy with Interrogatories and RFAs.
- ➤ On October 29, Plaintiff served Defendant Kruat with Interrogatories and RFAs.
- ➤ On October 30, Plaintiff served Defendant Labate with Interrogatories and RFAs.
- ➤ On November 1, Plaintiff served Defendant Towns with Interrogatories and RFAs.
- ➤ On December 27 after defense counsel continued staling scheduling the depositions of the non-party witnesses identified in Defendants Initial Disclosures, Plaintiff scheduled and issued Subpoenas Duces Tecum for Messrs. Alphonso David, Michael Volforte, Andrew Kennedy and Mike Kendall.[3]

### IV.   Defendants' Discovery to Plaintiff On the Eve of the Joint Discovery Status Update.

- ➤ Two months after the CMC and on the eve of the November 17 deadline for the First Discovery Status Report, defense counsel emailed Defendants' First Request for the Production of Documents and Interrogatories and on November 14 sought to depose Plaintiff on Monday, December 19. (The deadline for the First Discovery Status Report was then extended to November 21.)
- ➤ On Friday, December 16 at approximately 6 p.m., in response to Plaintiff's inquiry regarding whether Defendants intended to proceed with Plaintiff's Deposition noticed for Monday, defense counsel indicated for the first time that they never intended to proceed with Plaintiff's deposition because they had emailed the deposition notice contemporaneous with the document discovery and made each returnable simultaneously so that they would not receive Plaintiff's discovery responses in advance of the requested deposition date.[4]

### V.   Defendants' Lack of Response to Plaintiff's Discovery Requests.

- ➤ Rather than responding to any of Plaintiff's written discovery demands to Defendants, by letter dated October 27, (the "October 27 Extension Request") defense counsel claimed: "each Defendant

---

[2] Plaintiff already has been prejudiced by Defendants' delay tactics in the unfortunate passing of RIOC employee Mark Rothman, who Plaintiff understands may have been directed by certain Defendants to destroy documents.

[3] Currently awaiting Mr. Kendall's confirmation.

[4] Plaintiff was prepared to serve his discovery responses and objections on December 16, but after discussions with defense counsel and considering Defendants' utter failure to respond to any long-overdue discovery requests, Plaintiff did not serve his responses. However, on December 26, Plaintiff served his Responses and Objections to Defendants' Document Requests and today will serve his Objections and Responses to Defendants Interrogatories to Plaintiff.

will require additional time to complete beyond the November 9, 2016 deadline to respond to the first of the discovery requests that the Plaintiff issued on October 10, 2016 . . . we are writing to request a reasonable extension of the deadline(s) for the respective Defendants to respond to written discovery items issued by the Plaintiff to *December 9, 2016, or 30 days from the date that any item of written discovery is/was issued*, whichever is later. (emphasis added)

➢ By letter dated December 8, defense counsel again claimed that they "will require an additional three weeks . . . to respond to the Plaintiff's requests for production" (relayed at various times by Ms. Rogers as December 30 and December 31). (emphasis added)

Plaintiff did not agree to any requested extensions but engaged in discussions to attempt reaching a mutually agreeable overall discovery schedule, which proved to be futile owing to defense counsel's bad faith conduct as described *infra* at Section VI, *infra*.

## VI.   Plaintiff's Attempts to Negotiate a Good Faith Resolution of Discovery Issues Was a Futile Waste of Time Because Of Defendants Bad Faith Conduct.

In more than 21 years in the profession (during which Plaintiff's counsel likely handled, managed and/or supervised upwards of one thousand cases across the U.S. and internationally) the sheer and utter nonsense, ridiculous conduct, and flagrant disregard for the rules that defense counsel has exhibited rivals that of any adversary, save one who the court ultimately precluded from taking any discovery from my client.  Just some of the nonsensical and dilatory positions taken by defense counsel include:

➢ Ms. Rogers repeatedly claiming that "you [Plaintiff] have all the documents because Defendants produced them to you in response to the FOIL requests," while claiming in the same conversation that Defendants required additional time to respond to the document requests because of the burden on counsel to produce the documents Ms. Rogers just asserted were all previously produced.

➢ Offering deposition dates for each of the individual Defendants to create the misimpression of cooperating with discovery and then:

   (i)    On the eve of the First Joint Status Letter deadline informing Plaintiff that Defendants had no intention of producing any of Defendant RIOC's corporate documents prior to the depositions thereby forcing Plaintiff to depose each Defendant at least twice;

   (ii)   On the eve of the Second Joint Status Letter deadline informing Plaintiff that notwithstanding that the offered deposition dates were months after the discovery due dates, Defendants had no intention of responding to all of the discovery requests prior to the depositions, forcing Plaintiff to depose each Defendant at least twice;

   (iii)  On the eve of the Second Joint Status Letter deadline, taking the cavalier position that *Defendants would not commit to any date at all* by which any Defendants other than RIOC would respond to outstanding discovery requests and would only agree to "*see what I can do* if you give me a list of the response you want prioritized but *I'm not making any promises or committing to any dates*," notwithstanding that the responses were all already long overdue.

   (iv)   Claiming for the first time just minutes prior to the filing of the Second Status Letter that Defendants required Plaintiff to be one of the first witnesses to be deposed, notwithstanding Defendants' months of delay in even seeking Plaintiff's deposition.

➢ Months of delaying noticed RIOC employee depositions by not only failing to provide deposition dates, but refusing to even confirm basic inquiries such as whether Melick represents the RIOC employees, by repeatedly claiming "*I don't know if we represent the non-party employees.*"

➢ Months of refusing to confirm whether Melick would arrange scheduling of the non-party witnesses listed in Defendants' Initial Disclosures, claiming "I don't know whether we will arrange those depositions."

➢ For no valid reasons, offering deposition dates in essentially the exact opposite chronological order noticed on Plaintiffs' Notice of Depositions to Defendants and then incredulously claiming Defendants were unaware that there was any order to the noticed depositions notwithstanding that the Notice of Depositions contained a chart chronologically listing the dates and the names of the deponents.

Plaintiff's counsel has expended significant efforts in attempting to reach resolution without troubling the Court, only for defense counsel to thwart those efforts through illusory scheduling representations and last minute notices that Defendants will once again flout deadlines and obligations. We are weeks away from the scheduled close of discovery and Defendants have not responded to a single outstanding discovery requests, have refused to provide deposition dates for any RIOC employee witnesses and have even refused to inform Plaintiff whether Melick is representing the non-party RIOC employees, with Ms. Rogers claiming she does not know who she represents. What is even more egregious is defense counsel's cavalier attitude towards flouting Defendants obligations under the FRCP and to respond to discovery coupled with their continued willingness to submit blatantly false statements to the Court.

Indeed, Ms. Rogers reaction after learning that her attempts to stymie Plaintiff from scheduling certain non-party depositions was the familiar practice of submitting court filings containing misrepresentations, half-truths, outright falsehoods, and attempts to shift blame and create a false record with self-serving inaccurate correspondence. Plaintiff respectfully submits that Ms. Rogers entire December 28 submission should be disregarded as such. Plaintiff will not address each of the points but will address just a few misrepresentations as examples.

First, Ms. Rogers sought Plaintiff's consent (which was not given) to extend the required status letter for another week seemingly indicating a desire to continue negotiations ostensibly through the close of discovery and *ad infinitim* while she offers illusory solutions, refuses to provide deposition dates, refuses to commit to responding to written discovery by any date at all, and changes positions minutes before the filing of required discovery updates. Ms. Rogers disingenuously pretends to be shocked that Plaintiff was not willing to play along with her gamesmanship, even though counsel acknowledged during telephone discussions last week that an impasse had been reached on several issues requiring the Court's involvement because of Defendants refusal to cooperate in the most basic of issues.

The first paragraph of Ms. Rogers' letter states:

The undersigned unfortunately did not hear from Plaintiff's counsel until 4:00 p.m. today after it was necessary for the undersigned counsel to inquire of Plaintiff's counsel as to whether he would be available today to confer regarding the joint status letter. Plaintiff responded by once again conveying his unwillingness to confer in good faith.

However, in reality on December 27, Ms. Rogers first left a voice message with my office at 3 p.m. and then at 3:05 p.m. emailed a request for Plaintiff to consent to an extension of the discovery status letter. Plaintiff's counsel responded via email by 3:18 pm and by 3:54 emailed to Ms. Rogers the letter dated December 27, 2016 annexed hereto as Exhibit A along with an offer to discuss anything -- all in under one hour. In response, Ms. Rogers sent a flurry of accusatory self-serving emails designed to alter the record and then went dark. Plaintiff could establish the spurious nature of nearly each assertion in Ms. Rogers December 28 correspondence. However, the problem is the comfort that Ms. Rogers displays in constantly attempting to mislead two federal court judges through the submission of misleading and blatantly false misrepresentations over the past approximate one year, which comfort seems to increase with each occasion that goes unchecked.

4

Plaintiff's counsel has never needed to trouble a court with such a ministerial task as scheduling depositions and does so in this case having exhausted other alternatives. Indeed, it is now a mere three weeks prior to the scheduled end of discovery and Defendants steadfastly have refused to comply with even the most basic of their obligations. In contrast to Defendants' dilatory conduct, Plaintiff diligently prosecuted this action notwithstanding that his counsel is a solo practitioner and during much of this time was otherwise occupied receiving medical treatment through outpatient hospitalization. Defense counsel on the other hand is a large law firm with six regional offices. Additionally, Defendant RIOC has at least 6 attorneys on staff available to work on this matter. Specifically, (1) recently appointed President Susan Rosenthal, who formerly served as General Counsel and appeared before Your Honor in that role on this matter; (2) General Counsel Jacqueline Flug; (3) Associate General Counsel Arthur Eliav; (4) Associate Counsel Lada Stasko; (5) New Excelsior Legal Fellow Chris Dor, who Ms. Rosenthal represented is specifically tasked with handling issues related to this matter; and (6) Gretchen Robinson, who technically serves as an Internal Controls and Compliance Officer, but who is an admitted attorney and is frequently relied on to preform legal work at RIOC.

Nonetheless, Defendants are incapable or unwilling to respond to single simple discovery requests for months on end. And only even sent any discovery requests to Plaintiff on the eve of the First Status Letter due date. Ms. Rogers repeated excuse is that she cannot handle responding to Plaintiff's discovery requests in a timely manner – or even commit to any date certain whatsoever of doing so – because her firm represents all the Defendants and it is time-consuming for her to respond on behalf of each Defendant. If Melick lacks the capacity to represent all Defendants, Melick should not have undertaken that representation.[5] Indeed, it is foreboding that such effort had to be expended just to attempt to have Defendants comply in any manner with their discovery FRCP obligations and any substantive issues regarding the adequacy of Defendants' responses remain a complete unknown because Defendants have sought to engage in misconduct and blatantly frivolous and transparent gamesmanship instead of working on their discovery obligations.

Accordingly, Plaintiff respectfully requests that the Court (i) "so order" the deposition schedule set forth in the correspondence attached as Exhibit A; (ii) hold a conference so that Defendants will be made to comply with their discovery obligations or be penalized for their failure to do so; and (iii) such further relief as the Court deems just and appropriate.

Respectfully submitted,

Anthony J. Rotondi

---

[5] Indeed, it is unclear how Melick represents Ms. Indelicato – who might be described as orchestrating Plaintiff's unlawful termination -- and the Resident Director Defendants, who as the Court may recall: (i) expressed shock upon learning of Plaintiff's unlawful termination; (ii) subsequent to Plaintiff's unlawful termination were overheard yelling at Defendant Indelicato that "you [Indelicato] lied to us [the Resident Directors]"; (iii) provided Plaintiff with a glowing written recommendation; (iv) urged Plaintiff "to not take what had been done to him lying down;" and (v) expressed a desire to compensate Plaintiff for his unlawful termination.

EXHIBIT A

**ANTHONY ROTONDI**
5 Columbus Circle, Suite 800
New York, NY 10019
ajr@ajrotondi.com
(212) 709-8340

December 27, 2016

VIA ELECTRONIC MAIL
Holly G. Rogers
Melick & Porter, LLP
900 Main Street South
Southbury, CT 06488

Re: *Lewis v. Roosevelt Island Operating Corp. et al., No. 16- CV-03071 (ALC)*

Dear Ms. Rogers:

Consistent with the dates defense counsel has offered, Plaintiff confirms the following

dates for the deposition of the Individual Defendants:

| | |
|---|---|
| David Kraut: | January 19 |
| Margaret Smith: | January 27 |
| Michael Shinozaki: | January 24[1] |
| Katherine Grimm: | January 31 |
| Fay Freyer Christian: | February 9 |
| Howard Polivy: | February 17 |
| Claudia McDade: | February 7 |
| Mary Beth Labate: | February 28 |
| Frances Walton: | February 15 |
| Charlene Indelicato: | February 24 |
| Darryl Towns: | March 2 |

Additionally, I have issued subpoenas duces tecum (a copy of which will be forwarded to

you under separate cover) and confirmed availability of the following individual non-party

witnesses:

| | |
|---|---|
| Alphonso David: | February 3 |
| Michael Volforte: | February 13 |

---

[1] Defendants offered January 16 or Jan 20 for Defendant Shinozaki's Deposition, while indicating counsel was "awaiting confirmation of availability." However, January 16 is a holiday and Defendants have not confirmed availability for January 20, on which Plaintiff's counsel is unavailable. Accordingly, Plaintiff requests that Mr. Michael Shinozaki be available on January 24 for his deposition.

Andrew Kennedy:     March 7

Mike Kendall:     February 22[2]

Donald Lewis will be available for deposition on one of the following dates of Defendants' choice: March 9 or March 10. As you can see, the schedule contemplates at least two depositions per week, and travel to Albany for certain depositions. The necessity to schedule Mr. Lewis' deposition in March was created by Defendants' refusal to respond to Plaintiff's discovery requests. Additionally, yesterday Plaintiff served his Responses and Objections to Defendants' First Request for the Production of Documents and today will be serving his Responses and Objections to Defendants' Interrogatories.

Finally, as we discussed on many occasions, Defendants have yet to provide any dates for the depositions of the RIOC employee witnesses, which were noticed months ago. Plaintiff again reiterates his requests for available dates to conduct the noticed depositions of the RIOC employee witnesses.

Sincerely,

---

[2] Awaiting confirmation of availability.

**EXHIBIT Z**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

DONALD LEWIS,

                    Plaintiff,

        -against-                Civil Action No.:
                                16-CV-03071
                                (ALC)(SN)

THE ROOSEVELT ISLAND OPERATING
CORPORATION, THE ROOSEVELT ISLAND
OPERATING CORPORATION BOARD OF DIRECTORS,
CHARLENE M. INDELICATO, CLAUDIA MCDADE,
FRANCES A. WALTON, MARGARET SMITH,
HOWARD POLIVY, KATHERINE GRIMM,
MICHAEL SHINOZAKI, FAY FREYER CHRISTIAN,
DARRYL TOWNS, DAVID KRAUT and
MARY BETH LEBATE in their official and
individual capacities,

                    Defendants.
----------------------------------------X

                        30 Wall Street, 8th Floor
                        New York, New York


                        March 17, 2017
                        10:05 a.m.


            EXAMINATION BEFORE TRIAL of MARGARET

SMITH, a Defendant herein, taken by the Plaintiff,

pursuant to Notice, held at the above-mentioned

time and place, before Rebecca Quigley, a Notary

Public of the State of New York.

                LH REPORTING SERVICES, INC.
                Computer-Aided Transcription
                        (718) 526-7100

```
1                    MARGARET SMITH
2    terms, it would not have come up?
3         A    It would not have come up.
4         Q    I'm just going to switch gears for a
5    second and go to Plaintiff's 2, please.
6         A    Okay.
7         Q    And this is Defendant Margie Smith's
8    privilege log that was provided in, I think, the
9    first production that you made in this case.
10              Privilege Control Item Number 1, it
11   states, "Chart Regarding New Hire."
12        A    Uh-huh.
13        Q    And then it says "AL" next to that.
14        A    Uh-huh.
15        Q    And if -- according to the legend, AL, I
16   believe, means anticipation of litigation; is that
17   correct?
18        A    Is that what it means?
19              MS. ROGERS:  If you go to the bottom of
20         the third page --
21              THE WITNESS:  Third page, yes.
22        Q    Which litigation was that in anticipation
23   of?
24        A    I'm not really sure I have an answer to
25   that.
```

MARGARET SMITH

1

2      Q    It's just the first one, Ms. Smith, where

3  it says --

4      A    No.  I know what you're saying, but I

5  don't understand -- I didn't put the ALs in there,

6  so I'm not sure.

7      Q    So as far as you know, that chart

8  regarding -- Item Number 1 is not related to any

9  specific litigation?

10          MR. REINHARZ:  Objection to form.

11     Q    You can answer.

12     A    I'm not really sure I understand the

13  question.  I would guess -- we're always

14  anticipating litigation whenever we deal with

15  personnel things.

16     Q    Why would that be?

17     A    Because I have a personnel background, and

18  I always anticipate litigation when I look at

19  personnel issues.

20     Q    And is that something -- when you say we,

21  you meant Roosevelt Island or the board?

22     A    Well, we, I meant myself.  I shouldn't

23  have said we.  I should have said I.

24     Q    All right.  So is it fair to say that that

25  privilege anticipation of litigation indicated next

MARGARET SMITH

1

2      to Item Number 1 does not relate to any specific

3      litigation --

4          A     No.

5          Q     -- that you anticipated?  Yes, it does

6      not?

7          A     No, it does not.

8          Q     No, it does not?

9          A     No, it does not.

10         Q     Just a general sense of, there may be

11     litigation in the future?

12         A     Yes.  When I say I worked in Western

13     Electric in various departments, one was personnel.

14     That was, like, my first shot out of the box.  And

15     everything we did there was always in anticipation

16     of litigation.

17         Q     Were they sued often?

18         A     Not often, but I didn't get terribly

19     involved in any cases or anything like that.  But it

20     was just a general rule that personnel things are

21     privileged, and you never know what you're going to

22     need in the future, and so you always keep things

23     privileged and confidential.  And so that's what we

24     did.

25         Q     And Item Number 2, new hire report --

MARGARET SMITH

1
2   well, actually, I'll withdraw that.

3        Just go back -- going back to Number 1

4   again, it says, "Number of Documents Withheld, 5."

5        Are those five different charts that it's

6   referring to?

7        A    I -- I would have to look at them again.

8   I don't remember.  I took a whole bunch of stuff

9   out.

10       Q    And where are those documents now?

11       A    I believe you have them (indicating).

12       Q    Ms. Rogers, your attorney?

13       A    Yes.  I'm sorry.

14       Q    Okay.  That's fine.

15       A    Okay.

16       Q    Number 2, new hire report, also states AL

17  for privilege, anticipation of litigation?

18       A    Uh-huh.

19       Q    Would your response to that be the same,

20  that it was just a general sense of sort of gloom

21  and doom, that there might be litigation but no

22  specific litigation?

23       A    Yeah.

24       Q    Item Number 3, employee job with EEO

25  description, and it says AL as well; that's just a

```
1                    MARGARET SMITH
2   general sense of potential litigation, but no
3   specific litigation anticipated?
4        A    Right.
5        Q    Number 4, chart regarding promotions and
6   adjustments.
7        A    Yep.
8        Q    Anticipation of litigation is indicated.
9             Is that, again, just a general sense --
10       A    That's the same thing, just a general
11  sense.
12       Q    Maybe I can save some time, I think.
13            From 5 -- so from 1 through -- through 13
14  all state anticipation of litigation --
15       A    Right.
16       Q    -- by indicating AL.
17       A    Uh-huh.
18       Q    Your response would be the same to all of
19  those?
20       A    It would be the same.
21       Q    That there was no specific litigation?
22       A    No specific litigation.
23            MR. ROTONDI:  I would call for the
24       production of those documents, Ms. Rogers.  If
25       we can just mark that in the record, please.
```